# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
### DOCKET NO. 1:23-CV-114

-------------------------------------------------------------X

**JOHN DOE**

                **Plaintiff,**

          -against-

**WAKE FOREST UNIVERSITY,**


               **Defendant.**

-------------------------------------------------------------X

                **VERIFIED COMPLAINT**

                **JURY TRIAL DEMANDED**

Plaintiff John Doe (hereinafter referred to as "Plaintiff" or "John")[1], by and through his counsel, Nesenoff & Miltenberg, LLP, and Ekstrand and Ekstrand, LLP, as and for his complaint against defendant Wake Forest University ("Wake Forest" or the "University"), alleges upon knowledge with respect to himself, and upon knowledge, information and belief as to all other matters, as follows:

## THE NATURE OF THIS ACTION

1.     Plaintiff John Doe ("Plaintiff" or "John Doe" or "John"), a second semester senior at Wake Forest University, with an expected graduation in May of 2023, brings this action against Wake Forest University, due to the University's actions in investigating and adjudicating allegations of sexual misconduct brought against John by fellow student, Jane Roe ("Jane").

---

[1] Plaintiff herewith files a motion to proceed pseudonymously.

1

2.     The encounter at issue occurred in the fall of 2021, when John and Jane engaged in sexual activity after attending a sorority date function together.

3.     Importantly, this was not the first time John and Jane had been intimate, as they had participated in an ongoing consensual sexual relationship, which involved approximately eight to nine other occasions where they engaged in sexual activity, since the spring of 2021.

4.     The alleged incident of October 15-16, 2021 proceeded in the same manner as their previous interactions had, with both parties demonstrating their clear consent through their actions, and John and Jane then spending the night together in one of their dorm rooms.

5.     Six months later, in April of 2022, Jane filed a complaint of non-consensual sexual activity against John related to their interaction on October 15-16, 2021.

6.     Four months thereafter, and ten months after the alleged incident, the Title IX office supplemented Jane's complaint to also include an allegation of non-consensual sexual intercourse.

7.     However, at no time did John and Jane ever engage in sexual intercourse, on the night of October 15-16, 2021, or at any other time.

8.     Assistant Director of the Title IX Office Jessica Telligman ("Telligman" or the "Investigator") proceeded to conduct an investigation that was riddled with bias and a presumption of guilt against John: Telligman failed to properly notify John of the allegations against him; repeatedly offered Jane suggested responses to her investigatory questions; explained away in her investigation report the inconsistencies between Jane's

medical records and the account she provided to Telligman; and wholly disregarded exculpatory testimony.

9.      The matter eventually proceeded to a hearing before the Hearing Officer, attorney Dixie Wells ("Wells" or the "Hearing Officer"). Hearing Officer Wells evidenced a bias against John when she adopted the flawed findings of the Investigator, accepted Jane's allegations as fact despite her inconsistent and contradictory accounts, limited the time for John's advisor to cross-examine Jane because the hearing was going late into the evening, prohibited John's advisor from asking Jane relevant questions, and reached a hearing outcome that was contrary to the weight of the evidence.

10.      Ultimately, John was found responsible for sexual harassment by sexual assault and sexual harassment by sexual assault with an object and sanctioned with a one-year suspension, both of which were upheld when John's appeal was denied.

11.      As a result of the procedurally defective, prejudicial, and arbitrarily inequitable process that was replete with gender bias, Plaintiff was suspended from Wake Forest University for a period of one year, delaying his graduation date, putting his job offer which is contingent on his graduation in May 2023 in jeopardy, derailing his educational goals and career aspirations, and permanently tarnishing his name and reputation.

12.      Based on the foregoing, Plaintiff brings this action for violations of Title IX of the Education Amendments of 1972 and breach of contract.

## THE PARTIES

13.      At all times relevant to this Complaint, Plaintiff was and is a natural person

3

and citizen of the United States who currently resides in Florida.

14. At all times relevant to this Complaint, Defendant Wake Forest University was and is a private research university located in Winston-Salem, North Carolina.

15. Upon information and belief, at all times relevant to this Complaint, Wake Forest receives and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) (hereinafter "Title IX").

## JURISDICTION AND VENUE

16. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

17. This Court has personal jurisdiction over Wake Forest University on the ground that Wake Forest University is conducting business within the State of North Carolina, including in this judicial district.

18. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the Defendant Wake Forest University is conducting business within the State of North Carolina, including in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I. Plaintiff's Matriculation at Wake Forest

19. Plaintiff matriculated as a first-year student at Wake Forest University in the fall of 2019, with an anticipated graduation date in May of 2023.

20. John chose to attend Wake Forest because he was impressed with its academic credentials and the sense of community it offered.

4

21.    During his time at Wake Forest, he has maintained a 3.27 GPA while majoring in finance.

22.    At the end of summer 2022, he received a job offer that is contingent upon his May 2023 graduation from Wake Forest University.

### *II. Relevant Policies and Procedures*

A. *Wake Forest University Sex and Gender Discrimination, Harassment, and Misconduct Policy and Definitions*

23.    Wake Forest University's Sex and Gender Discrimination, Harassment, and Misconduct Policy (the "Policy") applies to allegations of sexual harassment and sexual misconduct made by or against a student or employee of the University or a third party, regardless of sex, sexual orientation, sexual identity, gender expression, or gender identity.

24.    The Title IX sexual harassment and Grievance Procedures apply to allegations of sexual harassment in the University's Education Program or Activity, and to alleged sexual misconduct arising from the same facts and circumstances as the allegations of sexual harassment.

25.    "Education Program of Activity" is defined as all of the University's operations and includes (1) locations, events, or circumstances over which the University exercised substantial control over both the Respondent and the context in which the alleged sexual harassment occurred and (2) any building owned or controlled by a student organization that is officially recognized by the University.

26.    The Policy prohibits discrimination, harassment, and misconduct on the basis of sex and gender.

5

27.     The Policy defines sexual harassment as conduct that meets one of the following criteria:

    a.  An employee of the University conditioning the provision of an aid, benefit, or service on an individual's participation in unwelcome sexual conduct;
    b.  Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's Education Program or Activity; or
    c.  Sexual assault, which is any sexual act directed against another person, without the consent of the person, including instances where the person is incapable of giving consent. Sexual assault can occur between individuals of the same or different sexes and/or genders.

28.     Sexual assault includes rape, which is defined as "the carnal knowledge of a person, without the consent of the victim, including instances where the person is incapable of giving consent because of his/her age or because of his/her temporary or permanent mental or physical incapacity."

29.     The Policy defines sexual misconduct as "conduct that would otherwise meet the definition of sexual harassment but does not meet the geographical or personal jurisdiction requirements under Title IX and its implementing regulations."

30.     Non-Title IX sexual/gender-based harassment is defined as follows: "a form of discrimination that includes verbal, written, or physical behavior, directed at someone, or against a particular group, because of that person's or group's sex, gender identity, actual or perceived sexual orientation, or based on gender stereotypes, when that conduct is unwelcome and meets at least one of the following criteria: (i) submission to or rejection of the conduct is made either explicitly or implicitly a term or condition of an individual's education, employment, University living environment, or participation in a University

6

activity or program; or (ii) submission to or rejection of the conduct is used as the basis for, or as a factor in, decisions affecting an individual's education, employment, University living environment, or participation in a University activity or program; or (iii) the conduct has the purpose of effect of creating an intimidating, hostile, or offensive educational, employment, University living, or University activity or program environment(s) for an individual; or (iv) the conduct unreasonably interferes with the educational, employment, or University living, or University activity or program environment(s) of an individual; and the conduct is sufficiently severe or pervasive that it alters the terms, condition, or privileges of an individual's education, employment, University living environment, or participation in a University activity or program.

31.     The definition of Non-Title IX sexual misconduct applies to students from the time a student moves into an on-campus residence or matriculates at the University, whichever is sooner, and continues until the student is no longer enrolled at the University.

32.     The Policy defines consent as permission for something to happen or agreement to do something. Consent is unambiguous mutually understandable words and/or actions that indicate willingness to participate in the activity. Further, the Policy states that consent can be revoked at any time through words and/or actions before or during that sexual act, and it is automatically withdrawn if someone becomes unconscious or falls asleep.

33.     The Policy states that whether someone has given consent is based on the totality of the circumstances and is determined by reference to a reasonable person in the same or similar circumstances.

7

34.     Further, the Policy notes that consent can never be given by someone who is incapacitated: "A person does not have capacity to consent to a sexual act if, at the time of the act, they cannot understand the sexual nature of the proposed act, cannot understand that they have the right to refuse to participate in the act, or are otherwise unaware that the sexual activity is occurring."

35.     The Policy prohibits retaliation, which is defined as (1) any adverse action (including direct and indirect intimidation, threats, coercion, discrimination, or harassment) that is (2) threatened or taken against a person (a) for the purpose of interfering with any right or privilege secured by Title IX or provided under the Policy; or (b) because the person has made a report or formal complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing related to Title IX or sexual misconduct.

36.     The Policy presumes that individuals who file formal complaints do so in good faith. The University may take disciplinary action against any individual who knowingly files a false formal complaint or interferes with a grievance process.

37.     The Policy encourages members of the University community to report discrimination, harassment, or misconduct concerns to the Title IX Coordinator, but also designates some academic staff, administrative staff, and athletic staff as mandatory reporters.

38.     The University will address allegations of sex and gender discrimination, harassment, and misconduct in accordance with the Policy regardless of the length of time that has passed since the alleged conduct.

8

B. *Title IX Sexual Harassment and Non-Title IX Sexual Misconduct Grievance Procedures*

**i. Applicability, Complaint Intake, and Overarching Provisions**

39.    The Title IX Sexual Harassment and Non-Title IX Sexual Misconduct Grievance Procedures (the "Procedures") applies to allegations of sexual harassment in the University's Education Program or Activity and allegations of sexual misconduct.

40.    The Procedures states that the University treats Claimants and Respondents equitably by providing remedies to a Claimant when a determination of responsibility against a Respondent is found and by following these procedures before imposing any sanctions against a Respondent for sexual harassment or sexual misconduct.

41.    The Procedures will be followed by the University when the University has actual knowledge of sexual misconduct or allegations thereof.

42.    Upon receiving an allegation of sexual harassment or sexual misconduct, the Title IX Coordinator will contact the Claimant to discuss available supportive measures, with or without a formal complaint being filed, and explain the formal complaint process to the Claimant.

43.    Upon receipt of a formal complaint, the Title IX Coordinator will provide Claimant and Respondent a written notice which will include the following:

    a. The allegations, including sufficient details known at the time (including date and time of the alleged conduct), with at least five days to prepare a response before an initial interview;
    b. A copy of these Procedures;
    c. A statement that the Respondent is presumed not responsible for the alleged conduct, that the formal complaint is presumed to have been filed in good faith, and that a determination regarding responsibility is made at the conclusion of the grievance process;

9

    d. A statement that each party may elect an advisor of their choice, who may
       or may not be an attorney and who will be permitted to review and inspect
       evidence collected during the investigation;
    e. A statement that informs each party that they may have a support person
       of their choosing to support them throughout the process; and
    f. A statement informing the parties of the University's prohibition on
       knowingly making false statements or knowingly submitting false
       information during the grievance process.

44.    Allegations included in a formal complaint will be investigated, but the University will dismiss a formal complaint or a portion of the allegations therein if any of the following are met:

    a. The conduct alleged in the formal complaint, even if substantiated, would
       not constitute sexual harassment or misconduct;
    b. At the time of filing the formal complaint the Claimant was not
       participating in or attempting to participate in the University's Education
       Program or Activity;
    c. The alleged conduct did not occur in the University's Education Program
       or Activity;
    d. The alleged conduct did not occur against an individual in the United
       States;
    e. The Claimant notifies the Title IX Coordinator in writing that the
       Claimant would like to withdraw the formal complaint or any included
       allegations;
    f. The Respondent is no longer enrolled or employed at the University; or
    g. Despite efforts to do so, the University is unable to gather evidence
       sufficient to reach a determination.

45.    The University will provide written notice of the date, time, location, participants, and purpose of all hearings, investigative interviews, or other meetings with sufficient time for the party to prepare to participate.

46.    At the discretion of the University, a Respondent who withdraws from the University during the pendency of a grievance process under this Procedure may be barred from University property and activities and may be ineligible for re-enrollment.

47.     If a Respondent completes all graduation requirements during the grievance process, the University may hold the Respondent's diploma until resolution of the formal complaint.

48.     The University will ensure that the designated Title IX Coordinator, investigator, decision-maker, sanctions officer, appellate officer, or adaptive resolution facilitator under these Procedures does not have a conflict of interest or bias for or against Claimants or Respondents either generally or the individuals.

49.     The University will ensure that the Title IX Coordinator, investigators, decision-makers, sanctions officers, appellate officers, and adaptive resolution facilitators receive training on the definition of sexual harassment and misconduct, the scope of the University's Education Program or Activity, how to conduct an investigation and grievance process, and how to serve impartially.

50.     Decision-makers are further trained on issues of relevance of questions and evidence and any technology used at live hearings.

51.     The University bears the burden of proof of gathering evidence sufficient to reach a determination regarding responsibility at all times.

52.     The Pre-Hearing Procedure states that respondents are presumed to be not responsible for alleged sexual harassment until the University makes a determination, and investigators and decision-makers will objectively evaluate all evidence and will not make any credibility determinations based on a party's status as Claimant or Respondent.

a.  **The Investigation**

53.     The Title IX Coordinator will promptly appoint one or more investigators,

11

unless the parties choose to participate in an Adaptive Resolution Process.

54.     Investigators may be University employees, the Title IX Coordinator, non-employees, or a combination.

55.     The Title IX Coordinator will contemporaneously share the name(s) and contact information of the investigator(s) with the Claimant and Respondent and will forward a copy of the formal complaint to the investigator(s).

56.     The parties have two days from the appointment to identify, in writing, to the Title IX Coordinator any alleged conflicts of interest or bias on the part of the assigned investigator(s).

57.     If the Title IX Coordinator determines that a material conflict of interest or material bias exists, the Title IX Coordinator will assign a different investigator(s).

58.     If the Title IX Coordinator is the investigator, parties may identify, in writing, any alleged conflicts of interest or bias to the Vice President of Campus Life or the Associate Provost for Academic Initiatives who will then consider such a statement and assign a different investigator if they find material conflict or bias exists.

59.     The investigator(s) will promptly begin the investigation once the formal complaint is received by taking the following steps: (i) interviewing the Claimant, Respondent, and witnesses; (ii) summarizing such interviews in writings or providing access to audio recordings or transcripts of such interviews; (iii) collecting and reviewing relevant documents; (iv) visiting, inspecting, and taking or reviewing photographs of relevant websites; and (v) collecting and reviewing other relevant evidence.

60.     The investigator(s) will then prepare a written investigative report that fairly

12

summarizes relevant evidence and includes items such as the formal complaint, written statements of position, summaries or transcripts of all interviews, photographs, descriptions of relevant evidence, and summaries or copies of all relevant electronic records.

61.     Before completing the investigative report, the investigator(s) will send or make available to each party and their advisor any electronic or hard copy of any evidence obtained during the investigation that is directly related to the allegations in the formal complaint including (1) any evidence that the University does not intend to rely in reaching a determination and (2) both inculpatory and exculpatory evidence.

62.     The parties have ten (10) days from the time that the evidence is provided to submit to the investigator(s) a written response to the evidence, in which the parties may address the relevance of any evidence, any further investigation activities of questions that they believe are necessary, and may submit additional evidence with an explanation of how it is relevant and why it was not previously provided.

63.     The investigator(s) will review and consider the parties' written responses and may conduct additional investigative activities as appropriate prior to finalizing the investigative report.

64.     If the additional investigative activities yield new evidence, the investigator(s) will make available the new evidence to each party and their advisor, and parties will have ten days to respond.

65.     The investigative report will be sent to the parties and their advisors by electronic copy or hard copy at least ten days prior to the hearing.

13

66.     Nothing in the Pre-Hearing Procedure restricts either party from discussing the allegations under investigation, gathering, preserving, and/or presenting relevant evidence.

67.     All evidence and witnesses should be identified to the investigator(s) as early as possible as to avoid such evidence or witnesses being excluded from the hearing or investigation.

### b. Title IX Sexual Harassment Hearing Procedures

68.     The Title IX Sexual Harassment Hearing Procedures (the "Hearing Procedure") will be utilized if parties do not wish or are unable to agree to a resolution through the Adaptive Resolution process. The Title IX Coordinator will appoint a hearing officer, who will administer the hearing, serve as the decision-maker regarding responsibility, and where applicable, recommend sanctions.

69.     The hearing officer may be a University employee or non-employee.

70.     The Title IX Coordinator will contemporaneously share the hearing officer's name and contact information with the Claimant and Respondent and provide the hearing officer with the formal complaint, all evidence directly related to the allegations, the parties' written responses to the evidence, and the investigative report.

71.     Within two (2) days of the appointment, the parties may identify to the Title IX Coordinator, in writing, any alleged conflicts of interest or bias on the part of the hearing officer, which the Title IX Coordinator will carefully consider and promptly assign a different hearing officer if the Title IX Coordinator determines that a material conflict of interest or material bias exists.

14

72.    Promptly after the appointment of the hearing officer and no less than seven (7) days prior to the hearing, the hearing officer will provide written notice to the Claimant and Respondent providing the date, time, and location of the hearing.

73.    Any changes to the hearing date, time, or location will be provided in writing to both parties prior to the date of the hearing.

74.    Each party may submit a written statement to the hearing officer that includes any response to the investigative report, at least five (5) days prior to the hearing.

75.    The hearing officer will share the statement with the other party, who has two (2) days to respond.

76.    During the hearing, the appointed hearing officer may question the Claimant, Respondent, and any witnesses the hearing officer deems relevant.

77.    If a party or witness fails to appear at the hearing after receiving proper notice of the hearing and absent extenuating circumstances, the hearing officer will proceed with the hearing and issuance of their responsibility determination, and as applicable, sanction recommendation.

78.    The hearing officers and parties may question the investigator(s) about the investigative report during the hearing.

79.    The Title IX hearing does not take place within a court of law and is not bound by formal rules of evidence that apply to court proceedings.

80.    Evidence of and questions about the Claimant's sexual predisposition or prior sexual behavior are not relevant and will not be permitted at the hearing, except if the questions meet the following criteria: (i) the questions and evidence about the Claimant's

prior sexual behavior are offered to prove that someone other than the Respondent committed the alleged conduct; or (ii) the questions and evidence concern specific incidents of the Claimant's prior sexual behavior with respect to the Respondent and are offered in an effort to prove consent.

81.    Evidence regarding the Respondent's sexual activity, regardless of whether Respondent was formally investigated or found responsible for such conduct, may be permitted to show that the Respondent has engaged in a pattern of behavior similar to the alleged conduct at issue, provided that Respondent has not been found "not responsible" by the University in a proceeding regarding such conduct.

82.    The hearing officer may exclude evidence if the hearing officer determines that the probative value of the evidence is outweighed by needlessly presenting cumulative evidence or that a question is posed solely to harass a witness or other party.

83.    The University will make the evidence provided by the investigators to the parties available during the hearing to give each party equal opportunity to refer to such evidence during the hearing, including for purposes of cross-examination.

84.    During the hearing, parties will be in separate rooms and will use technology to ensure that each party can see and hear any party or witness answering questions.

85.    The hearing may be conducted partially or entirely remotely at the discretion of the hearing officer.

86.    Both the Claimant and Respondent will have an equal opportunity to address the hearing officer with an opening statement.

87.    Both the hearing officer and each party's advisor will have the opportunity

16

to question the other party and any witnesses, including investigators.

88.     After any opening statement, the hearing officer will ask any questions of each party and each witness through direct examination, then the advisor for the Claimant may cross-examine the Respondent, afterward, the advisor for the Respondent may cross-examine the Claimant.

89.     The hearing officer will determine the order of witnesses and questioning by advisors, and before a party answers a cross-examination question, the hearing officer will determine whether the question is relevant and permitted under this Procedure.

90.     After the hearing, the hearing officer will determine whether the evidence establishes that it is more likely than not that the Respondent committed sexual harassment and will render a finding of "responsible" or "not responsible" and include a rationale for the decision.

91.     When practical, the hearing officer will orally communicate the finding of "responsible" or "not responsible" to the parties on the day of or the day after the hearing, with the rationale and additional information provided in the final outcome letter.

92.     If the Respondent is found responsible, the Title IX Coordinator will provide the finding of fact in support of the determination to the Sanctions Officer, who will then determine the sanction(s) to be imposed.

93.     The Dean of the student's college or school or designee will act as the Sanctions Officer for student Respondents.

94.     The Sanctions Officer will consider the following when determining sanctions:

17

a. The nature and severity of the misconduct;
b. Whether a sanction will bring an end to, prevent a recurrence of, or remedy the effects of the sexual harassment;
c. The impact of separating a student from their education; and
d. Any prior disciplinary history of a Respondent.

95.     According to the Hearing Procedure, the appropriate sanctions for sexual assault will generally include a period of separation from the University, at minimum.

96.     Sanctions for Respondents who are students may include, but are not limited to, expulsion or suspension from the University, disciplinary probation, social restrictions, parental notification, education sanctions (such as community service, reflection paper(s), and/or fines) expulsion or suspension from University housing, suspension or revocation of admission, and/or withholding or revocation of a degree(s).

97.     The Sanctions Officer will send their sanctions determination to the Title IX Coordinator, who will share it with the hearing officer for inclusion in the final outcome letter.

98.     Sanctions are effective immediately upon issuance of the final outcome letter, unless otherwise determined by the Sanctions Officer and/or Title IX Coordinator.

99.     The final outcome letter will be issued within twenty-one (21) days of the hearing, and Respondent and Claimant will receive the letter simultaneously.

100.    The final outcome letter will name the Respondent, identify the allegations potentially constituting sexual harassment, describe procedural steps taken from the filing of the formal complaint through the determination, provide findings of fact in support of the hearing officer's determination, and provide a statement of rationale for the result as to each allegation, including the responsibility determination and any sanctions.

18

101.    Both the Claimant or the Respondent may appeal the hearing officer's decision regarding responsibility and/or the sanction(s) imposed on the Respondent.

102.    The permissible grounds to appeal the responsibility determination are: (i) procedural irregularity that affected the outcome; (ii) new evidence that was not reasonably available at the time of the determination and that could affect the outcome; and (iii) the Title IX Coordinator, an investigator, or the hearing or sanctions officers had a conflict of interest or bias that affected the outcome.

103.    Sanctions may only be appealed on the ground that the severity is incommensurate to the gravity of the sexual harassment for which the Respondent was found responsible.

104.    Appeals must be submitted in writing to the Title IX Coordinator within five (5) days from the date of the final outcome letter.

105.    The Title IX Coordinator will promptly inform the other party of the filing of the appeal, and the party will have three days from such notification to submit a written response to the appeal.

106.    The Title IX Coordinator will appoint an appeal officer, within two (2) days of the appointment, the Claimant or Respondent may identify in writing alleged conflicts of interest or bias posed by assigning that appeal officer. The Title IX Coordinator will carefully consider such statement and will promptly assign a different appeal officer, if the Title IX Coordinator determines that a material conflict of interest or material bias exists.

107.    Within fifteen (15) days of the receipt of the appeal, the appeal officer will determine either that the decision of the hearing officer should stand or that the decision

should be overturned and will issue a written explanation of that result and the rationale behind it.

108. If the appeal officer determines that the hearing officer's decision should be overturned, the appeal officer will consult with the Title IX Coordinator and other University administrators as necessary, the appropriate steps to come to a final resolution of the formal complaint, which may include another hearing before the same or a different hearing officer.

### C. *Adaptive Resolution*

109. Parties may elect to resolve the formal complaint through the adaptive resolution process so long as the parties both voluntarily consent to such resolution, both parties are students or employees or the University, and the Title IX Coordinator determines that adaptive resolution is appropriate.

110. To utilize adaptive resolution, it must be appropriate for all allegations at issue, and may not be selected for only select allegations.

111. Either party and the Title IX Coordinator reserve the right to terminate the adaptive resolution process at any time and proceed with a full investigation and hearing.

112. When a formal complaint is to be resolved with adaptive resolution, the Title IX Coordinator will designate a trained individual to serve as the adaptive resolution facilitator and will share the name of the facilitator with the Claimant and Respondent.

113. Within two (2) days of the designation, the Claimant or Respondent may identify to the Title IX Coordinator, in writing, alleged conflicts of interest or bias posed by assigning that facilitator. The Title IX Coordinator will carefully consider such

statement and promptly assign a different facilitator if the Title IX Coordinator determines that a material conflict of interest or material bias exists.

114. The adaptive resolution facilitator will meet separately with each party to review the process and allegations and identify the outcome each party seeks from the resolution process.

115. If the adaptive resolution facilitator determines a resolution meeting is proper, the facilitator will provide written notice providing the date, time, and location of that meeting. At the discretion of the facilitator, the meeting may occur with the parties in different locations or meeting with parties may take place on different dates.

116. If either party fails to participate in the adaptive resolution process, the Title IX Coordinator may direct the complaint to be resolved using a full investigation and hearing.

117. During adaptive resolution, the parties may:

   a. Engage one another in the presence of, and/or facilitated by, the facilitator;
   b. Communicate their feelings and perceptions regarding the incident and the impact of the incident (either by communicating directly with one another or by communicating indirectly through the facilitator);
   c. Relay their wishes and expectations regarding the future; and/or
   d. Come to an agreed-upon resolution of the allegations.

118. Any resolution reached during the adaptive resolution process must be memorialized in writing and signed by the parties, facilitator, and the Title IX Coordinator or designee.

119. Respondent must complete all measures agreed to in the written resolution agreement, with the Title IX Office monitoring compliance, once all measures are

21

completed no further process is available with regard to the allegations in the formal complaint.

120. If the Respondent fails to complete all measures, the Claimant or Title IX Coordinator may refile the formal complaint and resume the formal resolution process.

121. Measures that parties agree to in the adaptive resolution process may include but are not limited to:

    a. Alcohol education classes for the Respondent;
    b. Completion of online sexual harassment training;
    c. Regular meetings with an appropriate individual, unit, or resource;
    d. Permanent or temporary no contact order;
    e. Restrictions for participations in certain activities, organizations, programs, or classes;
    f. Change in residential assignment or restrictions on access to certain residence halls or apartments;
    g. Restriction of participation in certain events;
    h. Reflection paper or written apology; or
    i. Completion of an educational or behavioral plan for Respondent

122. A resolution reached during the adaptive resolution process is final and not subject to appeal.

### III. The Relationship Between Plaintiff and Jane Roe

123. Plaintiff and Jane met in the spring of 2021, during their sophomore years, when they were put in contact by Plaintiff's fraternity brother, W.L. who was dating one of Jane's friends.

124. That same evening, John and Jane met up for the first time, had a conversation and then returned to John's dorm room where they engaged in kissing and touching. Jane stayed over that night in John's room.

125. Thereafter, John and Jane engaged in sexual activity on approximately six to

eight other occasions that semester. On each of these occasions, they engaged in kissing, cuddling, and touching, on at least four of these occasions John digitally penetrated Jane, and on at least one prior occasion Jane performed oral sex on John, but at no time did they engage in intercourse.

126. John and Jane conveyed their consent to the sexual activity through their physical contact, which they each understood; at no time did either of them express consent verbally during their prior sexual encounters.

127. Jane would typically spend the night in John's room after these interactions.

128. Subsequent to the spring semester, the relationship dissipated from John's perspective as he was not interested in pursuing a romantic relationship with Jane.

129. When the fall semester began in August of 2021, after having not communicated all summer, Jane unexpectedly reached out to John and invited him over to her dorm room.

130. John agreed and met her at Polo, where she lived.

131. As they had in the past, they engaged in kissing and touching but did not have sexual intercourse.

132. Thereafter, Jane was persistent in continuing to reach out to John and asking him if he wanted to get together.

133. In September 2021, Jane reached out to John by Snapchat, and he once again spent the night in her dorm room, where they engaged in making out.

134. On or about October 7 or 8 of 2021, Jane reached out to John by Snapchat to ask if he would be interested in accompanying her to her sorority date function.

135.    Though John was already interested in P.C., a girl whom he began dating a few weeks later, because the message was sent via Snapchat, he knew that Jane would be able to see that he viewed her message. Unsure how to respond, and not wanting to leave her message unanswered, he agreed to go with Jane to the event.

### IV. The Evening of October 15, 2021

136.    Approximately two hours prior to the date function, on October 15, 2021, John went to Jane's suite where a group of approximately ten to fifteen students attending the event met beforehand to "pregame".

137.    He recognized one of the male students who was a member of his fraternity but was not familiar with the other students in Jane's suite.

138.    John brought some beers with him to the pregame and engaged in a game of beer pong with Jane during the pregame.

139.    He consumed approximately four to five beers during the pregame.

140.    After the pregame, the group of students including John and Jane walked to Q Lot to catch the van ride to the Last Resort, the venue where the date function was held.

141.    During the ride, Jane became affectionate towards John as they sat next to each other. They began kissing, which was initiated by Jane.

142.    Once at the Last Resort, John consumed two beers, which were provided to him by members of his fraternity who were present at the function and were of legal drinking age, given John was not yet 21.

143.    John spent time talking with his friends and dancing with Jane.

144.    After approximately two hours, the date function came to an end.

145.   Though John did not initially recall a stop at the AEPi house – given the passage of time between the night at issue and his first interview eleven months later, as well as his frequent presence at AEPi—John and Jane did stop at the AEPi house before returning to Jane's dorm.

146.   Though both parties had been consuming alcohol, neither was impaired to a degree that they were unable to appreciate their surroundings or understand what was happening.

147.   Jane did not stumble, did not fall, did not slur her words, and did not fall asleep during the ride back to campus; to the contrary, she was at all times fully coherent and alert.[2]

148.   When they arrived back to Polo, John and Jane went up to Jane's room, where they began making out.

149.   Consistent with all of their prior interactions, Jane demonstrated her consent to engage in sexual activity through her non-verbal actions.

150.   As the interaction continued, Jane and John undressed each other and demonstrated their mutual consent and agreement to progress their intimacy towards intercourse.

151.   John got up and obtained a condom from his wallet and then returned to the bed where Jane was laying on her back.

152.   Jane did not tell him to stop and instead, continued to caress him.

---

[2] John did not learn until he reviewed Jane's interview transcripts in the fall of 2022 that she alleged to have vomited that evening.

153.    John knelt on the bed while facing Jane and attempted to put the condom on.

154.    However, because John was unable to maintain an erection, they never initiated the act of intercourse.

155.    Instead, they each put clothing items back on and continued to kiss and cuddle, as they had on many prior occasions.

156.    At no time was John's body ever pressed on top of Jane's, he never forced her down in any manner, never held her down in a way that prevented her from moving, and never vaginally penetrated her.

157.    Further, Jane never asked John to stop, never asked him to leave, and never got up to leave the room herself.

158.    Instead, she was a fully engaged, active participant at all times.

159.    John slept in Jane's bed that evening.

160.    When they woke up in the morning, they began cuddling, as Jane snuggled on his chest. Jane began to rub John's shoulders and reached up to his hair, which had historically indicated the initiation of sexual contact.

161.    Based upon Jane's actions, and consistent with their prior sexual encounters, they began kissing and John digitally penetrated Jane briefly, an action that Jane had enjoyed on several occasions previously.

162.    They thereafter cuddled for a while longer before John got out of bed, got dressed, said goodbye and gave Jane a kiss, before returning to his dorm room.

163.    John's departure that morning was no different than the many times they had spent together previously.

164.    A few weeks later, John began dating another student at Wake Forest. Accordingly, he did not contact Jane thereafter.

165.    John had no indication that Jane had any concern regarding what transpired between them on October 15, 2021 until he received the Notice of Allegations from Wake Forest six months later, in April of 2022.

### V. Jane's Formal Complaint and the Notice of Allegations

166.    On April 13, 2022, Title IX Director Aishah Casseus ("Casseus") sent John a Notice of Allegations (the "Notice") indicating that Wake Forest had received a formal complaint alleging that he engaged in sexual harassment in violation of the University's Sex and Gender Discrimination and Harassment Policy and Title IX Sexual Harassment and Non-Title IX Sexual Misconduct Grievance Procedures.

167.    Casseus indicated that Jane contended John engaged in "sexual harassment by sexual assault" on October 16, 2021, in the Polo Residence Hall.

168.    Casseus described Jane's allegations as follows: "*[t]he respondent attended my sorority date function as my date on October 15th. After the event in my dorm room I was unable to give consent to activity that occurred due to incapacitation and the next morning non-consensual digital penetration occurred.*"

169.    Notably, this information differed from the information submitted by Jane in her formal complaint the day prior, in which she stated: "*The respondent attended my sorority date function as my date on October 15th. After the event in my dorm room I was unable to give consent to activity that occurred and the next morning non-consensual activity occurred.*"

27

170.    Jane's formal written complaint did not allege that she was not able to give consent "*due to incapacitation*" nor did she mention the act of "*digital penetration,*" yet both of these details appeared in the Notice sent to John the following day.

171.    The Notice further indicated that formal complaints are presumed to have been filed in good faith, that John was presumed not responsible for the alleged conduct, and that retaliation would be a violation of the Policy, as would knowingly providing false or misleading information to Wake Forest officials involved in the investigation or resolution of a formal complaint.

172.    Casseus requested that John offer his availability to meet with her to discuss the process and supportive measures.

### VI. The Adaptive Resolution Process

173.    On April 14, 2022, Casseus advised John via text message that Jane was interested in pursuing an adaptive resolution.

174.    On April 21, 2022, John appeared for an informational meeting with Telligman, along with his advisor, attorney John Fitzgerald.

175.    Importantly, though Telligman initially acted in her capacity as Assistant Director of the Title IX office during this meeting, several months later she was appointed to serve as the Investigator of Jane's complaint.

176.    Telligman recognized this potential conflict of interest early on, as she informed John and his advisor during their April 21 meeting that if she were appointed investigator, she would need to recuse herself from the case. However, she never did so.

177.    On April 25, 2022, Casseus notified John that Toni McMurphy

("McMurphy") was appointed to serve as the Adaptive Resolution Facilitator.

178.    On April 28, 2022, Casseus put John in touch with McMurphy to begin the adaptive resolution process.

179.    Despite Jane's agreement to participate in the process, she failed to participate in good faith, and never made any proposed offers for resolution, choosing instead to place the burden on John to determine what was fair.

180.    After several meetings and email communications between the parties and McMurphy, from May through August of 2022, Jane ultimately declined to accept John's proposed terms for resolution and withdrew from the adaptive resolution process.

181.    On August 19, 2022, Casseus notified John that Jane had terminated the adaptive resolution process and as such, the formal resolution process would resume. Casseus indicated she would identify the assigned investigator shortly.

### VII.    *The Updated Notice of Allegations and Resumption of the Formal Investigation Process*

182.    Telligman was appointed to serve as investigator on August 22, 2022.

183.    On August 29, 2022, Casseus issued a Mutual No Contact Order between John and Jane, prohibiting both direct and indirect contact.

184.    Telligman thereafter interviewed Jane for the first time on August 30, 2022.

185.    On September 1, 2022, Casseus provided John with an Updated Notice of Allegations (the "Updated Notice"), on September 1, 2022, based on additional information provided by Jane during her first investigation interview.

186.    Casseus informed John that Jane was now alleging—ten months after the

29

alleged incident—that in addition to her initial claims, she was also alleging that John sexually assaulted her when he engaged in sexual intercourse with her on October 16, 2021. Specifically, while alleging in her initial claims that she was unable to consent due to incapacitation, Jane now stated that while she initially consented to sexual intercourse with John in her residence hall room, she subsequently withdrew her consent by stating "this doesn't feel good."

187.    Casseus informed John that Jane was "alleging this instance of withdrawn consent in addition to the separate instance of alleged non-consensual digital penetration which allegedly happened a few hours later and was referenced in the original Notice of Allegations."

188.    Incredibly, despite having submitted her formal complaint back in April of 2022 and participating in an adaptive resolution process during the summer of 2022, this was the first time that Jane alleged that she and John had engaged in non-consensual sexual intercourse on the night of October 15-16, 2021.

189.    Moreover, it was apparent that Jane supplemented her initial allegation of non-consensual sexual activity due to incapacitation, with a claim of non-consensual sexual activity due to the withdrawal of consent.

190.    Jane was further interviewed by Telligman on September 7, 2022, October 5, 2022, and October 12, 2022.

191.    Jane concurred that she and John had engaged in consensual kissing and fondling, and spent the night together on several occasions in the spring of 2021 and once or twice in the fall of 2021 prior to the night at issue.

192.    Jane also confirmed that she and John had not previously discussed consent for any of their sexual interactions, but instead both used "physical responses" such as touching John's hair, or kissing him back, to indicate consent.

193.    She explained that she and John "responded in different ways and provided consent in different forms," when engaging in sexual activity including digital penetration.

194.    John appeared for investigation interviews with Telligman on September 8, 2022, September 15, 2022, September 26, 2022, and October 6, 2022.

195.    He also voluntarily appeared for a polygraph examination on October 20, 2022.

196.    As part of the polygraph examination, John provided a statement describing the nature of his sexual interactions with Jane, between the spring of 2021 and fall of 2021, as well as their sexual encounter on October 15, 2021.

197.    Among the statements made, John indicated: (i) "[s]ince I could not get erect, we did not have sex"; (ii) Jane was an active participant and was never passed out or asleep during each time [Jane] and I engaged in any sexual contact"; (iii) "Jane never insinuated in any way that she did not want to have sexual contact with me"; and (iv) "Jane and I never engaged in sexual intercourse."

198.    The polygrapher determined that there was no deception detected.

199.    Though John offered to pay for the polygraph examination of Jane, she declined to undergo one.

200.    Telligman also interviewed witnesses P.K. (Jane's close friend), I.L. (Jane's close friend), B.M. (John's fraternity brother and Secretary of the fraternity), P.Y. (Jane's

sorority sister and suitemate), S.W. (Jane's former sorority sister and suitemate), and A.G. (polygraph examiner).

201. On November 4, 2022, Telligman issued the Title IX Investigation Report.

202. The Report again revised the allegations made against John, to include alternative theories of non-consent related to the sexual activity on the evening of October 15, 2021, as well as a claim that Jane was incapacitated due to sleep during the sexual activity on the morning of October 16, 2021.

203. Specifically, Telligman summarized the allegations under investigation as follows:

> a. She was incapacitated (due to alcohol) when Respondent engaged in sexual intercourse with her in her residence hall room on campus following a social event in which Respondent was Claimant's invited date. Alternatively, Claimant alleges that if she gave consent for sexual intercourse, she withdrew that consent after intercourse started when she stated, "this doesn't feel good," yet Respondent continued; and
> b. She was incapacitated (due to sleep) when Respondent digitally penetrated her vagina without consent during the morning hours of October 16th when she woke up in her bed in her residence hall room. Respondent then allegedly continued to penetrate her after Claimant woke up.

204. The Report also included select portions of Jane's medical records, indicating that she visited the University Student Health Service on October 18, 2021.

205. The chief complaint listed on Jane's medical record from October 18, 2021 was "requesting drug testing."

206. Importantly, the October 18, 2021 medical record indicates that Jane "denie[d] sexual assault."

207. The medical records also noted that Jane took a "Plan B" after her encounter

32

with John, notwithstanding that she reported to Investigator Telligman that John put a condom on and that she was on birth control, and indicated that she scheduled a follow up visit for October 24, 2021 to test for chlamydia and gonorrhea, despite having never tested for such sexually transmitted diseases after any of their prior sexual encounters.

208.    The medical record further revealed various inconsistencies in Jane's account, as to what she told the hospital staff within days of the alleged incident, as compared to what she told Investigator Telligman approximately one year later.

209.    These inconsistencies include, but are not limited to, the following:

   a.   The October 18 medical record states "patient denies sexual assault," while she reported to the university that she was sexually assaulted by John.
   b.   The October 18 medical record states Jane began drinking alcohol at 7:30 p.m. on October 15, 2021, made herself a mixed drink with three to four shots, went to a friend's house off campus around 9:30 where she made another mixed drink of no more than 2 shots, then had water about 30 minutes later, before going to a fraternity party around 10:30, and making herself vomit around 11:00 p.m. In contrast, she reported to Investigator Telligman that she attended a pregame party in her suite starting at approximately 7:15 p.m., drank approximately 3.5 shots in a mixed drink, at around 9:15 p.m. took a ride over to the sorority date function which was held at a bar, while at the bar she shared two drinks with John, began to feel unwell towards the end of her time at the bar and so went to sit outside and drink water, then went to a fraternity house where she vomited three times, before returning to her dorm at around 12:30 a.m.
   c.   The October 18 medical record also states that Jane blacked out around 12:00 a.m., notes that the last thing she recalls is arriving home, a friend drove her, and she remembers returning to campus and unlocking her door. Jane reported that when she woke up in the morning, a male (John) was in her bed, and stated that she did not recall consenting to, *or having* sexual intercourse, with him. In sharp contrast, she reported to Investigator Telligman that she and John received a ride from a pledge driver back to Polo, that upon arriving to her room they began making out, their clothing started to come off, John put on a condom, and then they started to have sex. She told Telligman that she said okay at first, but then told John that it didn't feel good, which he ignored.

33

210.    When questioned by Telligman about the discrepancies in her statements, Jane stated she was trying to keep things private, and what she stated to the Student Health Services was not the full story but rather "a broad, you know, broad, broad, vague timeline," because she was "scared to get in more trouble…"

211.    Jane further alleged that she was afraid of getting in trouble, did not know who was a mandatory reporter, and did not want her sorority to get in trouble. Investigator responds "That makes sense. So essentially you're trying to add a little anonymity into it."

212.    Investigator Telligman offered Jane a suggested response, to further justify the evident inconsistencies in her accounts, stating "So it may be, and correct me, I'm going to make an assumption based on what you just told me, it may be that your goal there was just to get the drug testing, not to report anything necessarily. Is that kind of what you're telling me," which Jane not surprisingly agreed to and adopted.

213.    Ultimately, Investigator Telligman and the hearing panel accepted these irrational explanations.

### VIII. Jane's Retaliatory Actions

214.    Subsequent to her filing of the complaint with the University, Jane approached the Secretary of John's fraternity (witness B.M.), as well as the head of the judicial board (J.D.), to discuss her allegations against John and demand that he be immediately kicked out of the fraternity.

215.    Casseus had confirmed to Jane that she could take such action in reporting John to the fraternity, as the Title IX process was separate from any process the fraternity

34

may employ.

216.    When the Secretary of the fraternity advised Jane that she should continue to utilize the University's Title IX process and assured Jane that the fraternity would respect whatever decision resulted from the process, Jane became very angry, berated them, called them names, and threatened to tell people that their fraternity supports sexual assaulters.

217.    After this conversation, Jane's friend and witness A.B. likewise began reaching out to the fraternity and accusing the fraternity of not taking the allegations seriously, stating "I cannot believe you could stand to be in a fraternity with a sexual assaulter," and referring to John as a "rapist" in a text message to B.M. on April 29, 2022.

218.    During the spring and fall of 2022, as the investigation was ongoing, Jane's friends engaged in retaliatory actions against John, seeking to further harm his name and reputation, and arising to the level of physical contact.

219.    These actions included telling John to leave a bar, aggressively elbowing John in his side, pouring beer on John's back, and forcing a shoulder into John's back.

220.    Despite John repeatedly addressing his concerns about retaliation and expressing his desire to pursue a complaint, through meetings and email correspondence dating back to his first interview on September 8, 2022, the University has to date, failed to take any action on John's complaint.

### IX. The Hearing Process

221.    On November 1, 2022, prior to issuance of the final investigation report, Casseus notified John that the hearing was scheduled to take place on November 29, 2022 beginning at 9:00 a.m.

35

222. The University appointed attorney Dixie Wells to serve as the hearing officer.

223. The selection of Wells was improper given her background in defending universities against claims brought by students.

224. In fact, her website biography includes as part of her notable representations, several matters where she secured favorable outcomes for universities when defending against student claims, for breach of contract, unfair and deceptive trade practices, and the mishandling of student sexual misconduct complaints.

225. The University's appointment of Wells to serve as the hearing officer in this matter thus created a conflict of interest, given her allegiance to universities and the defense of their conduct processes, regardless of how procedurally defective or unfair they may be.

226. Casseus advised John that he had the opportunity to submit a pre-hearing written statement at least five (5) days prior to the hearing—by November 24, 2022, which was Thanksgiving Day—and that such a statement would be shared with the other party, who could then submit a response within two (2) days.

227. Jane submitted a pre-hearing statement on November 25, which John responded to in writing, on November 27, 2022.

228. John appeared for the hearing in person on November 29, while Jane and witnesses B.M., S.M., I.L. and A.G. appearing remotely via Zoom.

229. Wells deprived John of a fair and meaningful opportunity to be heard when: (i) John's advisor was not able to cross-examine Jane until the very end of the hearing, before Wells concluded the proceeding at 10:28 p.m.; (ii) despite there being no time limits

imposed on the questioning of any other witnesses, Wells did limit the time for John's advisor to cross-examine Jane, because it was getting into the late evening hours and all participants were undoubtedly exhausted, hungry, and less able to focus; (iii) Wells permitted Jane's advisor to interrupt John's attorney during his cross-examination of Jane, to inquire how much longer he would take; (iv) Wells permitted Jane's advisor to ask every question proposed, while repeatedly barring John's advisor from asking the parties and witnesses questions that Wells arbitrarily deemed not relevant; (v) at 10:16 p.m., Wells threatened John's attorney that she planned to conclude the hearing in "15 minutes", which she did twelve minutes later; (vi) Wells permitted Jane and the Investigator to respond to questions with such statements as "that information is in one of my recorded statements" or "that information is in my report"; (vii) Wells repeatedly interrupted John's advisor during his cross-examination of Jane; (viii) rebuffed John's advisor's attempt to ask Jane certain relevant and material questions; and (ix) permitted Jane's attorney to interrupt his cross-examination by raising objections, even though objections are not permitted in a Title IX hearing.

230. On December 20, 2022, Casseus sent John a copy of the hearing outcome letter (the "Outcome Letter").

231. Wells concluded that Wake Forest had proven by a preponderance of the evidence that:

     a. John and Jane had engaged in sexual activity on at least eight occasions during the Spring of 2021 and the Fall of 2021, before October 15, 2021;
     b. On each previous occasion, consent to sexual activity was inferred through a progression of kissing and caressing;
     c. Jane and John never had sexual intercourse before October 15, 2021;

d.  Jane was intoxicated and impaired to some extent on the evening of October 15, 2021, but not incapacitated as defined by Wake Forest's policies on the evening of October 15, 2021 or the early hours of October 16, 2021;

e.  Jane and John engaged in sexual intercourse during the early hours of October 16, 2021;

f.  Jane consented to sexual intercourse initially;

g.  After sexual intercourse began, Jane said it "doesn't feel good";

h.  John admitted that if Jane had said that (which he denied) he would have construed that statement as Jane withdrawing consent and would have stopped immediately;

i.  By saying "it doesn't feel good" Jane was withdrawing consent;

j.  The sexual intercourse continued after Jane stated it "doesn't feel good";

k.  John and Jane spent the night in Jane's bed;

l.  John digitally penetrated Jane on the morning of October 16, 2021;

m.  Jane was incapacitated when the digital penetration began.

232.  In concluding that sexual intercourse had occurred, Wells found the fact that Jane had taken a Plan B to be corroborative evidence, while disregarding Jane's statement to the healthcare provider that she denied a sexual assault and did not recall either consenting to, or having, sexual intercourse with John.

233.  Notably, Jane refused to sign a release authorizing Telligman to discuss Jane's medical record with the Director of Student Health.

234.  Wells also cited to the fact that Jane did not contact John again after October 16, 2021, as evidence that "something bad" happened on that date, while overlooking that John began dating another Wake Forest student, P.C., shortly thereafter, which Jane likely would have known about given their overlapping friend groups.

235.  Further, Wells disregarded the fact that Jane remained in bed with John that evening, after supposedly being sexually assaulted by John, as evidence cutting against Jane's claims.

38

236. Wells justified Jane's decision to remain in the bed with John until the morning, rationalizing that it was possible she was frightened, was in her own room, and did not know where to go. This nonsensical reasoning ignores that Jane could have left her bedroom and gone into a different area of her suite, but failed to do so.

237. Finally, while determining that Jane was not incapacitated, Wells nonetheless determined that due to John's "overall lack of attention to and recognition of Claimant's condition during the evening on October 15, 2021, and in the early hours of October 16, 2021" it was reasonable to infer that he likewise was unaware that she was sleeping when he digitally penetrated her on the morning of October 16, 2021.

238. This is quite the leap to make—equating John's supposed lack of awareness to Jane's level of intoxication to an inability to recognize whether someone is sleeping or awake—and a clear effort to find John responsible.

239. With respect to the polygraph examination, Wells stated that she had reservations about the process and methods utilized by A.G., because A.G. testified that different examiners could interpret polygraph results differently and because A.G. did not provide copies of the control questions used during John's examination.

240. Ultimately, Wells concluded that Wake Forest met its burden by demonstrating that John engaged in Sexual Harassment by Sexual Assault (Rape) and Sexual Harassment by Sexual Assault with an Object in violation of the Policy.

241. The findings were thereafter sent to an appointed sanctions officer, in this case, Associate Vice President and Dean of Students Dr. Adam Goldstein, who recommended a one-year suspension as the sanction.

39

242. Wells relayed in the outcome letter the recommended sanction of suspension for a period of one year, with eligibility to return to Wake Forest during the Spring 2024 semester.

## X. John's Appeal of the Hearing Outcome

243. The Outcome Letter indicated that any appeal was due within five (5) days, making John's appeal due on Christmas Day, December 25.

244. Casseus granted John an extension, until January 4, 2023, to submit his appeal.

245. John timely submitted his appeal of the hearing outcome on January 3, 2023.

246. His appeal was based on the following grounds: (i) procedural irregularities that affected the outcome; (ii) the Title IX Coordinator, investigator, or hearing or sanctions officers had a conflict of interest or bias that affected the outcome; and (iii) the sanction was incommensurate to the gravity of the sexual harassment that he was found responsible for.

247. On January 8, 2023, Casseus notified John that Howard Kellam of Rebecca Leitman Veidlinger PLLC had been appointed to serve as the appeal officer.

248. On January 23, 2023, Kellam denied John's appeal, finding that John failed to demonstrate procedural irregularities that affected the outcome of the hearing, characterizing his procedural arguments as substantive disagreements with the outcome, concluding there was no demonstrated bias in favor of the Claimant and/or against the

Respondent, and determining that the sanction was commensurate with the findings.[3]

249.    Consequently, Kellam upheld the findings reached by Hearing Officer Wells and affirmed the one-year suspension.

250.    As a result of the appeal decision, Plaintiff is now suspended from Wake Forest and will not be permitted to reapply for admission to the University until January 2, 2024.

251.    Plaintiff has therefore exhausted his administrative remedies and this lawsuit represents and the last and only option for him to right the wrongs occasions by Defendants' misconduct and to clear his name.

### XI. Damages to John

252.    As a result of the Defendant's unlawful, unfair, gender-biased, and improper conduct, Plaintiff was subjected to a disciplinary process that failed to comport with Wake Forest's promises to Plaintiff as an enrolled student, the tenants of Title IX, and principles of good faith and fundamental fairness.

253.    As a result of Defendant's unlawful, unfair, gender-biased, and improper conduct, Plaintiff was improperly suspended from Wake Forest during his senior year, with a post-graduation job offer pending, depriving him of the benefits of years of hard work and tuition.

254.    As a result of Defendant's unlawful, unfair, gender-biased, and improper

---

[3] While declining to find any bias on the part of Hearing Officer, Kellam did acknowledge that "a pattern of findings in the Claimant's favor without apparent, evidence-based reasons and where the evidence substantially favors the Respondent can be proof of bias."

conduct, Plaintiff has been falsely labeled as a perpetrator of sexual assault and his records from Wake Forest will permanently bear a notation stating that he was suspended as a result of violating its policies.

255.    As a result of Defendant's unlawful, unfair, gender-biased, and improper conduct, Plaintiff's academic/disciplinary file and transcript are now marred by a false and baseless finding of sexual assault and a suspension.

256.    As a result of Defendant's unlawful, unfair, gender-biased, and improper conduct, Plaintiff will likely lose the opportunity to accept his post-graduation employment offer and enter the workforce in the summer of 2023, as such position was contingent upon his graduation in May 2023.

257.    As a result of Defendant's unlawful, unfair, gender-biased, and improper conduct, Plaintiff will have to disclose to any future educational institution or job that he applies to that he was found responsible for committing a sexual assault, effectively destroying any chance for Plaintiff to achieve success academically or professionally in the future.

258.    As a result of Defendant's unlawful, unfair, gender-biased, and improper conduct, Plaintiff's education and career paths have been derailed, resulting in considerable economic and consequential harm.

259.    As a result of Defendant's unlawful, unfair, gender-biased, and improper conduct, Plaintiff has suffered and will continue to suffer reputational harm, ridicule, persecution, pecuniary harm, deprivation of his education, and damage to his education and career prospects.

## COUNT I
## Violation of 20 U.S.C. § 1681 *et seq.*-Title IX-Erroneous Outcome

260.   Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

**a.  *The Effect of the "April 2011 Dear Colleague Letter" on University Sexual Misconduct Policies.***

261.   On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL"). U.S. Department of Education, *Dear Colleague* (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (hereinafter "Dear Colleague Letter" or "DCL").

262.   The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects."  DCL at 4.

263.   The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance.  *See* Joseph Shapiro, *Campus Rape Victims:  A Struggle for Justice*, NATIONAL PUBLIC RADIO (Feb. 24, 2010), http://www.npr.org/templates/story/story.php?storyId=124001493.  The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college

43

disciplinary proceedings, and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (e.g., that women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sexual aggressor role.

264. The OCR further relied on faulty statistics in sounding its "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL at 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline . . . when discussing our country's problem with rape and sexual assault on campus." *See* Christopher Krebs and Christine Lindquist*, Setting the Record Straight on "1 in 5"*, TIME MAGAZINE (Dec. 14, 2015), http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/.

265. Relying on the faulty one-in-five statistic, the OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof— "more likely than not"—in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof. (DCL at 10-11)

266. The DCL (at 12) also strongly discouraged allowing cross-examination because it "may be traumatic or intimidating" to the alleged victim.

267.	Despite its supposed purpose as a mere guidance letter, the Department of Education ("DOE") treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

268.	Before the DCL, colleges and universities generally did not use their disciplinary procedures to adjudicate sexual misconduct cases and certainly not in the manner and frequency that they have since the issuance of the DCL.

269.	After the DCL was published, schools changed their sexual assault and sexual harassment policies and procedures.

270.	On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("OCR's April 2014 Q&A") which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." OCR's April 2014 Q&A at 9, 12; http://www2.ed/gov./about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

271.	The OCR's April 2014 Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *Id.* at 31.

272.	In the same month that the OCR issued its April 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White

House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), *available at* https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf. The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

273.    In June 2014, then-Assistant Secretary of Education Catherine Lhamon testified before the United States Senate, warning that if the OCR could not secure voluntary compliance with the DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice. *See* Testimony of Catherine E. Lhamon, Assistant Secretary Office for Civil Rights, U.S. Department of Education (June 26, 2014), https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-violence.pdf.

274.    To support its enforcement of the DCL, the OCR hired hundreds of additional investigators. To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, CHRONICLE OF HIGHER EDUCATION, https://projects.chronicle.com/titleix/ (last visited August 11, 2022).

275.    The threat of revocation of federal funds—the ultimate penalty—was a powerful tool in motivating colleges to aggressively pursue and punish male students accused of sexual misconduct.

46

276.     Colleges and universities including Wake Forest, were fearful of and concerned about being investigated or sanctioned by the Department of Education and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ").  In response to pressure from OCR, DOJ, and the Obama White House, educational institutions, like Wake Forest, limited procedural protections afforded to males, like Plaintiff, in sexual misconduct cases.

277.     On September 7, 2017, Department of Education Secretary Betsy DeVos vowed to replace the "failed system" of campus sexual assault enforcement to ensure fairness for both accusers and the accused, proclaiming that "one person denied due process is one too many."  Press Release, *Secretary DeVos Prepared Remarks on Title IX Enforcement* (Sept. 7, 2017), *available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

278.     On September 22, 2017, the OCR formally rescinded the DCL and the April 2014 Q&A and put in place interim guidance (the "2017 Q&A"), while the current administration reviewed and revised its practices regarding the adjudication of complaints of sexual misconduct on college campuses.  *See* Dep't of Educ., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf; *see also* Dep't of Educ., *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

279.     In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked

47

against the accused, and *are in no way required by Title IX law or regulation.*" Dep't of

Educ.,        Dear        Colleague        Letter        (Sept.        22,        2017),

https ://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf

(citations omitted) (emphasis added).

280.    On November 16, 2018, the Department of Education released proposed

Title IX regulations, subject to "notice-and-comment rulemaking." *Secretary DeVos:*

*Proposed Title IX Rule Provides Clarity for Schools, Support for Survivors, and Due*

*Process        Rights        for        All*        (Nov.        16,        2018,        9:41        a.m.)

https://content.govdelivery.com/accounts/USED/bulletins/21bcf5b.

281.    Despite a different direction announced by the Trump Administration,

colleges universities, and educational programs including Wake Forest mostly continued

with victim-centered practices and policies in place during the Obama Administration,

holding on, as a matter of ideological commitment, to what is a gender biased enforcement

of Title IX.

282.    In January 2020, NASPA, the national organization of Student Affairs

Administrators in Higher Education, which has 15,000 members representing more than

1,500 institutions, issued a study, *"Expanding the Frame:  Institutional Responses to*

*Students        Accused        of        Sexual        Misconduct."*        (available        at

https://www.naspa.org/report/expanding-the-frame-institutional-responses-to-students-

accused-of-sexual-misconduct).  The study, intended to refute "the common narrative that

institutions are not concerned with responding parties' rights in sexual misconduct

cases," essentially evidenced to the contrary that widespread institutional bias against the

accused starts at the very inception of a complaint, prior to any investigation or adjudication.

283.    In a process governed by the enforcement of Title IX gender equality, and in which overwhelming the majority of accused students are male, the survey reported that only 5% of schools have even one full-time employee to assist accused students; 85% have no budget dedicated specifically to providing services for accused students; and for accused students "no established best practices currently exist, and most institutions are only just developing these programs, identifying what specific services are needed, and exploring what is equitable or equal."  While alleged victims have entire departments of advocates funded by the institution dedicated to their needs, only 13% of colleges and universities have a staff member reach out "directly to responding parties about support services available."  The study suggests that accused students are left to defend themselves by administrators "due to perceived pushback from members of the campus community who disagree with providing respondent services."

284.    On May 6, 2020, the United States Department of Education released new Title IX regulations, which carried the force and effect of law as of August 14, 2020.  ("US Department of Education Releases Final Title IX Rule," available at https://www2.ed.gov/about/offices/list/ocr/newsroom.html)

285.    The new Title IX regulations provided respondents certain procedural rights, including without limitation:   (i) a presumption of innocence until a finding of responsibility is made at the conclusion of the process; (ii) the right to review evidence directly related to the allegations with at least ten (10) days to review and respond; (iii) the

49

right to review an investigative report that fairly summarizes relevant evidence and a minimum of ten (10) days in which to respond to the investigative report; (iv) an assurance that Title IX personnel are free from conflicts of interest or bias; and (v) the right to a live hearing in which each party's advisor may ask the other party and any witnesses all relevant questions, including those challenging credibility, with such cross-examination to be conducted directly, orally, and in real time. (*See* "Summary of Major Provisions of the Department of Education's Title IX Final Rule," available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf)

286. The May 2020 regulations took effect on August 14, 2020, and governed the proceedings in this matter.

287. On June 23, 2022, the Biden Administration issued a Notice of Proposed Rulemaking regarding proposed changes to the regulations once again, proclaiming that the amendments will "restore crucial protections for students who are victims of sexual harassment, assault, and sex-based discrimination- a critical safety net for survivors that was weakened under previous regulations."

288. As these most recent proposed regulations remain in the notice and comment period, they are not applicable to Plaintiff's case.

b. *The Title IX Pleading Standard.*

289. Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

50

290.   Title IX may be violated by a school's failure to remedy sexual harassment, and by a school's imposition of discipline where gender is a motivating factor in the decision.  In either case, the statute is enforceable through an implied private right of action. *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979); *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

291.   Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Wake Forest.

292.   Upon information and belief, Wake Forest, at all times relevant to this Complaint, received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Acts of 1972, 20 U.S.C. § 1681(a).

293.   The Second Circuit in *Yusuf v. Vassar College* articulated two theories under which a plaintiff could plead a Title IX violation – erroneous outcome and selective enforcement.

294.   Under an "erroneous outcome" case, the claim is that the plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings.  "Plaintiffs who claim that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf v. Vassar Coll.*, 35 F.3d at 715.

295.    Under the "selective enforcement" theory, the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

296.    While some circuits continue to analyze Title IX claims under the erroneous outcome and selective enforcement theories, the Fourth Circuit has adopted the Seventh Circuit's view that there is "no need to superimpose doctrinal tests on the [Title IX statute.] *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019). More simply, "the standard for Title IX claims in this context" asks: "do 'the alleged facts, if true, raise a plausible inference that the university discriminated [against John Doe] 'on the basis of sex'?" *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854–55 (7th Cir. 2019) (quoting *Purdue Univ.*, 928 F.3d at 667–68); *Schwake v. Arizona Bd. Of Regents*, 967 F.3d at 947.

297.    In so doing, the Fourth Circuit has noted however that it "find[s] no inherent problems with the erroneous outcome and selective enforcement theories identified in *Yusuf*.  In fact, either theory, with sufficient facts, may suffice to state a plausible claim. We merely emphasize that the text of Title IX prohibits all discrimination on the basis of sex.  *See* 20 U.S.C. § 1681(a)." *Sheppard v. Visitors of Virginia State Univ.,* 993 F.3d 230, 236 (4th Cir. 2021).

### c.   *Gender Bias Exhibited Throughout the Investigations and Adjudications.*

298.    Wake Forest violated Title IX in the instant case because the University reached an erroneous finding that Plaintiff was responsible for sexual misconduct, and gender bias was a motivating factor in the wrongful finding.

299.     Further, there was a particularized causal connection between the erroneous outcome in Plaintiff's disciplinary proceeding and his sex, as described in detail throughout this complaint.

300.     Upon information and belief, Wake Forest's mishandling of Plaintiff's Title IX cases was informed by institutional, systemic gender bias, as well as external pressure from the student body and the United States Department of Education, under a threat of rescission of federal funds.

301.     Wake Forest applied its policies and procedures in a manner that discriminated against Plaintiff on the basis of his sex and led to erroneous outcomes.

302.     Wake Forest also imposed an unwarranted and unjustly severe sanction on Plaintiff, in suspending him mere months prior to his anticipated graduation date, and gender bias was a motivating factor.

303.     Several of the University administrators involved in the disciplinary matter against Plaintiff acted in a discriminatory manner against him, as further described below.

### 1. The Investigator and Title IX Coordinator

304.     From the initiation of the charges against Plaintiff, the Title IX Coordinator and Investigator, Director and Assistant Director of the Title IX office respectively, conspired to perform the investigation against Plaintiff in a manner calculated to find Plaintiff responsible for a policy violation.

305.     First, when transmitting the Notice of Allegations to John on April 13, 2022, Wake Forest failed to specify the alleged "non-consensual sexual activity due to incapacitation" that occurred on October 15, 2021. Instead, Casseus provided John with

53

this vague notice, failing to either confirm with Jane the specific acts that she believed to be fully consensual, and in turn, failing to notify John what those acts were.

306.    The Title IX Office thereafter suggested to the parties that they consider exploring the Adaptive Resolution process, knowing that John was not fully informed of the allegations made against him.

307.    Based upon the information included in the Notice of Allegations, and unaware of Jane's allegations related to non-consensual sexual intercourse, John agreed to participate in Adaptive Resolution on April 25, 2022.

308.    When Adaptive Resolution was not successful and the formal investigation began, the Title IX office supplemented Jane's allegations, to include an allegation of non-consensual sexual intercourse, four months after the initial Notice of Allegations was delivered to John, ten months after the incident in question, and based solely upon statements made by Jane during her first investigation interview.

309.    Permitting the addition of these new claims to the allegations against John, after he had already participated in the Adaptive Resolution process demonstrated a bias against him as the male accused.

310.    Second, Telligman further evidenced a bias against John and in favor of Jane when she repeatedly offered Jane suggested responses to her investigatory questions.

311.    For instance, to assist Jane in explaining the evident inconsistencies in her accounts, Telligman offered: "So it may be, and correct me, I'm going to make an assumption based on what you just told me, it may be that your goal there was just to get

54

the drug testing, not to report anything necessarily. Is that kind of what you're telling me," which Jane not surprisingly agreed to and adopted.

312. Similarly, Telligman suggested to Jane that the text message she sent to I.L. on October 16, 2021 at 12:59 a.m., in which she told I.L. "it burns" could be employed to further support her claim of non-consensual sexual intercourse.

313. During the hearing on November 29, 2022, I.L. testified that when she read Jane's text message stating "it burns" she did not understand what was meant by that.

314. In fact, Telligman was the first person to introduce the idea that Jane's statement "it burns" could be used to support Jane's claim that she experienced pain as a result of being sexually assaulted.

315. During Telligman's September 7, 2022 interview with Jane, the following exchange took place:

"Jessica Telligman 22:53 Okay. So then you say "I'm boy okay, it burns" and that's when it looks like the reference to "I'm boy okay" was your attempt to write "I'm not okay"?

Natalia Drobnjak 23:02 Yes. If you look on a keyboard, you know, N, O, T are right next to B,O, Y. Um, and that's, I, I've never said the phrase "I'm boy okay" so

Jessica Telligman 23:15 ***Do you think the "burns" is a reference to the intercourse?*** (emphasis added)

Natalia Drobnjak 23:19 Most likely, I mean, I don't remember putting my hand on like a frying pan or something.

Natalia Drobnjak 23:23 ***But I would assume so."*** (emphasis added)

316. From that point forward, the supposed meaning of this text message (i.e. a sexual assault had caused Jane's vaginal pain) was attributed to Jane, and deemed

supportive of her allegations, even though it was Telligman who first introduced the meaning as embraced by Jane.

317. The Hearing Officer also adopted this interpretation of Jane's text message, noting in the hearing outcome that "It burns" would be consistent with vaginal pain resulting from engaging in sexual intercourse while not sufficiently lubricated."

318. Thus, Telligman's efforts to assist the female complainant eventually contributed to the erroneous finding reached by the hearing officer.

### 2. The Hearing Officer

319. Hearing Officer Dixie Wells demonstrated a clear bias against Plaintiff through the manner in which she conducted the hearing, applied the hearing procedures, and issued an erroneous decision that was not supported by the evidence.

320. The Procedures provide that "[m]aterials used to train Title IX Coordinators, investigators, decision-makers, sanctions officers, appellate officers, and adaptive resolution facilitators will not rely on sex or gender stereotypes and will promote impartial investigations and adjudications of Formal Complaints of Sexual Harassment and/or Sexual Misconduct.

321. With respect to hearings specifically, section 3A.02 of the Procedures provide that "[F]ollowing the investigation the appointed hearing officer will conduct a hearing in which they may question the Claimant, the Respondent, and any witnesses whose testimony the hearing officer deems relevant. During the hearing, the hearing officer and the parties may also question the investigator(s) about the investigative report."

56

322. Notably, the Procedures do not impose any time limit on the direct or cross-examination of the parties or witnesses.

323. In the matter involving John, the hearing officer conducted the hearing in a manner that deprived him of a fair and meaningful process, and adversely affected the outcome.

324. First, the hearing was scheduled to begin at 9:00 a.m. on November 29, 2022 and conclude on the same day. Despite the number of witnesses, nature of the claims presented, and the potential ramifications to John, hearing officer Wells did not want the matter to proceed into a second day.

325. Accordingly, the hearing was arranged such that both John and Jane were able to give their opening statements before the witnesses were scheduled to appear, based on their convenience.

326. In addition to John, Jane, and Telligman, the witnesses who appeared for and testified at the hearing included A.G., I.L., B.M., S.W., and P. K.

327. As a result, John's advisor was not able to cross-examine Jane until the very end of the hearing, before Wells concluded the proceeding at 10:28 p.m.

328. Despite there being no time limits imposed on the questioning of any other witnesses, Wells did limit the time for John's advisor to cross-examine Jane, because it was getting into the late evening hours and all participants were undoubtedly exhausted, hungry, and less able to focus.

329.    Rather than pushing the matter to a conclusion within one day, Wells should have permitted John's advisor the opportunity to thoroughly question Jane on all relevant evidence.

330.    Instead, Wells permitted Jane's advisor to interrupt John's attorney during his cross-examination of Jane, to inquire how much longer he would take. Shortly thereafter, at 10:16 p.m., Wells threatened John's attorney that she planned to conclude the hearing in "15 minutes." She did ultimately conclude the hearing at 10:28 p.m.

331.    Recognizing the significance of her error in curtailing John's right to cross-examine his accuser, Wells went to great lengths in her hearing outcome letter to discuss the amount of time that various witnesses were questioned for during the hearing.

332.    However, given there were not time limits imposed for the questioning of witnesses, the amount of time actually spent on any particular witness does not negate the unfairness of Wells pushing John's advisor to wrap up his questioning of the Complainant.

333.    John, as the accused, was entitled to a meaningful opportunity to be heard, which included the right to cross-examine his accuser to the extent necessary and without any arbitrary timeframe imposed.

334.    Second, Wells permitted Jane's advisor to ask every question proposed to the parties and witnesses, yet repeatedly barred John's advisor from asking critical and material questions that Wells arbitrarily deemed not relevant.

335.    These actions on the part of Wells not only demonstrated gender bias against John, but also deprived John of his right to cross-examination and his right to a fair and impartial hearing.

336.     Third, Wells failed to direct the witnesses to answer questions posed to them, permitting them to respond with such statements as "that information is in one of my recorded statements" or "that information is in my report."

337.     There is no question that the purpose in holding a live hearing is to hear directly from the witnesses, gain information that may not be included in the written record, and assess credibility by, for instance, highlighting inconsistencies in the testimony.

338.     Wells further deprived John of a meaningful hearing when she permitted the witnesses to respond in a manner that prevented him from exposing Jane's lack of credibility.

339.     Fourth, Wells demonstrated a clear bias against John when she interrupted his attorney numerous times during his questioning of Jane. In comparison, Wells never interrupted Jane's advisor during her cross-examination of John.

340.     Furthermore, Wells accused John's attorney of harassing Jane when he asked her certain questions and permitted Jane's attorney to interrupt his cross-examination by raising objections, even though objections are not permitted in a Title IX hearing.

341.     Among the lines of questioning that John's advisor was prohibited from pursuing included whether Jane's text message to a friend in which she stated "it burns" could possibly have referred to her throat hurting after having thrown up several times, rather than any pain in her genital area due to having had non-consensual intercourse with John.

342.     This was clearly a highly relevant issue, yet Wells rebuffed the attempt of John's advisor to explore it.

343.	Similarly, Wells refused to allow John's advisor to question Jane about her years of physical conditioning that she had undergone as a collegiate level volleyball player. Again, this line of questioning was relevant to the issue of whether she was able to move John's hand or leg away from her on the morning of October 16, 2021, if she did not want to engage in the sexual activity.

344.	Even further, Wells also did not allow John's advisor to question Jane about the timing of her alcohol consumption on the relevant evening, when she last consumed alcohol, when she allegedly vomited, or how she felt after she vomited.

345.	All of these instances of Wells limiting the ability of John's advisor to thoroughly question Jane on critical and relevant topics demonstrated that she was biased in favor of the female complainant and took actions accordingly, to ensure a finding of responsibility against John.

346.	Fifth, Wells demonstrated her bias against John as the male accused when she issued a decision that was utterly unsupported by the evidence. *See Doe v. Columbia,* 831 F.3d 46, 57 (2d Cir. 2016) ("[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side…it is plausible to infer…that the evaluator has been influenced by bias."

347.	Wells ultimately concluded that Jane's version of the events was more credible than John's based upon the following evidence: (i) Jane's October 18, 2021 medical report from Wake Forest Student Health Services; (ii) Jane's text messages with a friend who attended a different university; (iii) Jane's conversations and text messages

60

exchanged with her best friend, witness I.L.; and (iv) text messages exchanged between Jane's friends and witnesses, I.L. and P.K.

348. Initially, a thorough review of Jane's October 18, 2021 medical record would actually lend support to John's account of the events, and raise doubt as to Jane's credibility.

349. Specifically, the medical records reveal the following:

a. Jane *denied* a sexual assault;
b. The chief complaint presented for was drug testing;
c. Jane stated she did not recall consenting to *or having* sexual intercourse with the male, in comparison to her later reporting to Telligman that John had sexual intercourse with her, without her consent;
d. Jane stated she was not concerned for her safety, yet later told Telligman that she was "triggered" every time she saw John;
e. Jane declined to go to the ER for a SANE exam;
f. Jane reported that she made herself vomit once, thinking that she had been drugged, in comparison to her report nearly a year later to Telligman that she threw up three times;
g. While telling her friend from out of state that she did not need a Plan B pill because she was on birth control, she accepted one from Student Health;
h. She reported to Student Health that she blacked out around 12:00 a.m. on October 16, 2021, which was disputed by her later testimony demonstrating she had a clear recollection of events occurring after this time, as well text messages exchanged with friends;
i. Jane alleged to have vaginal pain that was "gradually improving" yet never underwent an examination to determination the basis for such pain, and was never prescribed any medication for such pain.

350. Throughout her four investigation interviews, Jane presented an account of October 15-16, 2021 that differed substantially from the version reported to the health care providers mere days after the alleged incident, on October 18, 2021. *See* ¶¶ 208, 343 *supra*.

351.   Wells rationalized these discrepancies in the outcome letter, accepting Jane's explanation that she provided a different account to Student Health because she did not want to discuss a sexual assault with a male nurse.

352.   Wells overlooked however, that while the intake nurse was a male, Jane was seen by a female provider, a female nurse, and was accompanied by a female from the Safe Office.

353.   Wells also overlooked the fact that Jane declined to authorize the testimony of Dr. Price, the Director of Student Health, at the hearing. Dr. Price could have provided more information about the diagnosis reached.

354.   Incredibly, while declining to draw any adverse inference from Jane's refusal to permit the testimony of Dr. Price at the hearing, in the outcome letter Wells essentially accused John of withholding evidence when he explained that he did not have any relevant text messages from that evening or early morning.

355.   Given he did not view the interaction with Jane as different in any way from their prior sexual encounters, he had no reason to text anyone about what had transpired.

356.   It was not clear why the fact that John did not text anyone about Jane that morning, when he had no indication that anything was amiss, would cause Hearing Officer Wells to draw a negative inference.

357.   Yet, Wells disregarded his explanation and drew an adverse inference, further demonstrating her bias against him.

358.    Despite the numerous inconsistencies in Jane's reporting and the various issues noted above, Wells nonetheless relied upon the medical records when concluding that Jane was more credible than John.

359.    Specifically, she noted the fact that Jane was given Plan B (even though she was already on birth control), and the diagnosis of "adult sexual abuse" (despite the absence of any exam to determine the cause of the vaginal pain and the fact that this conclusion was based on Jane's fabricated narrative) to conclude that John and Jane did have sexual intercourse that evening.

360.    Wells also improperly relied on a text message Jane sent to her best friend I.L., on October 16, 2021 at 12:59 a.m., in which Jane stated: "it burns." As described above, Telligman offered Jane an explanation for this statement which would support her claim of sexual assault.

361.    Rather than accepting the obvious meaning of this statement – that her throat hurt because she had vomited several times—Telligman, and subsequently Wells, accepted that this phrase – "it burns"—referred to Jane's vagina hurting from being sexually assaulted.

362.    Similarly, Wells construed Jane's alleged statement "this doesn't feel good" as evidence that she withdrew her consent after the sexual intercourse commenced.

363.    However, once again, this statement was not related to engaging in non-consensual sexual intercourse but was rather, related to Jane not feeling well due to having vomited earlier in the evening.

364. Jane herself was clear during her August 30, 2022 interview that "I was very [inaudible] after throwing up three times *which is why I told him* that this doesn't feel good." (emphasis supplied)

365. Yet, Wells still accepted this testimony as evidence that Jane withdrew consent to sexual intercourse with John.

366. Wells also discounted Jane's potential motivation for filing her complaint against John, which further contributed to her biased decision-making.

367. John submitted that Jane filed the complaint because she wanted to get back at him for choosing to date another student at Wake Forest, crushing her hope that their relationship would turn into something beyond causal hook ups, and because the male student Jane began dating at the end of February 2022, one of John's fraternity brothers, was disciplined by the fraternity for unacceptable behavior toward a female student.

368. This argument was not mere speculation on John's part. Witness P.Y. recalled Jane being frustrated with Plaintiff prior to the relevant evening because Jane was not sure whether Plaintiff was interested in her. P.Y. further descried that Jane expressed her frustration when she and John only kissed but did not engage in further sexual activity and at one point, Jane had told P.Y. that she was never speaking to Plaintiff again because he gave her mixed signals.

369. None of this was considered by Wells when making credibility assessments.

370. Additionally, Wells construed certain evidence in favor of Jane's account, despite the myriad of equally plausible alternative explanations.

371.    For instance, Wells relied heavily upon a text message Jane sent to her non-Wake Forest friend on October 17, 2021 at 3:43 p.m. stating "something really bad happened this weekend."

372.    Wells concluded that this text message was contemporaneous evidence supporting John's allegations of non-consensual sexual contact.

373.    However, she failed to consider that something "bad" could have referred to Jane consuming too much alcohol, being embarrassed about getting drunk, being embarrassed about vomiting at the fraternity house, being frustrated that John was unable to maintain an erection with her, or being upset that John did not appear to be interested in pursuing a relationship with her.

374.    Yet, none of these alternatives were considered.

375.    Wells took it a step further in the hearing outcome letter, finding that Jane not contacting John after the relevant incident was consistent with something "bad" having happened.

376.    Despite acknowledging later on in the hearing outcome letter that John and Jane had overlapping friend groups and as such, Jane likely would have learned that John had begun dating another student at Wake Forest—a reasonable explanation to refrain from contacting him—Wells still relies on the fact that John and Jane did not have further contact as evidence supporting her claims.

377.    Finally, Wells entirely overlooked Jane's testimony given during her August 30, 2022 investigation interview, when she stated "When we started to have sex, it started off as okay. . . But I remember it coming out."

65

378. This statement supports John's description of what occurred; namely, that they attempted to engage in intercourse but he was unable to maintain an erection and therefore, they never did so.

379. This incredibly important acknowledgement by Jane was wholly disregarded by investigator Telligman, as well as hearing officer Wells.

380. Recognizing the significance of this admission by Jane, and in an effort to discount any exculpatory evidence, Telligman included in her investigation report a footnote stating "Investigator Telligman asked Claimant to clarify this sentence, and Claimant stated that she was referring to the condom coming out of the package."

381. While this explanation does not make any logical sense in the context of Jane's testimony, this clarification question referenced by Telligman Johns not appear in the transcripts from any of the four investigation interviews with Jane, further raising doubt regarding the reliability of the investigation.

382. Unsurprisingly, Wells once again accepted the evidence as presented by Telligman, without question.

383. Notably, while Wells accepted as fact Jane's contention that she suffered vaginal pain, despite never having undergone a gynecological examination to confirm that, Wells rejected John's testimony that he had been unable to maintain an erection on prior occasions, because he did not provide any medical records to prove it.

384. However, at no time did Telligman ever request that John obtain medical records to support this fact. Yet, Wells mischaracterized Telligman's general invitation to all parties to provide any additional information that they wanted her to consider, as a

66

specific request to John to obtain medical records, which he purportedly failed to do. This is flat wrong.

### c. *External Pressure on Wake Forest to Aggressively Respond to Allegations of Sexual Harassment*

385.　It is well established that a university that is motivated to take adverse action against an accused male in order to respond to or protect itself from negative publicity about sexual harassment is motivated by gender bias and engages in unlawful sex discrimination under Title IX. *Doe v. Columbia Univ.*, 831 F.3d at 58 (stating that "fear of negative publicity or of Title IX liability[] are not necessarily . . . lawful motivations distinct from sex bias," and that an institution "that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute . . . in order to avoid . . . bad publicity[] has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex").

386.　On April 26, 2021, approximately one year prior to the date on which Jane filed her complaint, the OCR opened an investigation against Wake Forest regarding its handling of a sexual harassment complaint. The investigation remains active. *See* https://www2.ed.gov/about/offices/list/ocr/docs/investigations/open-investigations/tix.html?_queries%5_Bstate%5D=NC&page=4&offset=60 (last visited: January 24, 2023).

387.　On August 28, 2021, students at Wake Forest participated in a protest, to respond to an allegation of sexual assault committed by a student against another Wake

67

Forest student. This protest brought the issue of sexual misconduct to the forefront and led to increased conversations around sexual violence on campus.

388. In October of 2021, Wake Forest created the Sexual Assault Prevention Support and Accountability Committee, charged with implementing a university-wide sexual assault campus climate survey and advising the student body president on issues relating to sexual misconduct.

389. Approximately one year ago, a Change.org petition addressed to the Administrators of Title IX, Residence Life and Housing, Dean of Students, and the Office of the Vice President at Wake Forest University, "demanding action on WFU's decision to jeopardize the safety of their students." https://www.change.org/p/wfu-students-resolution-demanding-action-on-wfu-s-decision-to-jeopardize-the-safety-of-their-students-10f501ac-1c5b-442d-9de1-1210884313cd

390. The petition opens with the proclamation that Wake Forest "has recently allowed many abusers and sexual offenders to return to campus, taking the safety that the survivors once had away."

391. It goes on to state "[t]he administration is enabling the behavior of known assaulters"; "students safety has been endangered"; "Wake Forest University is putting survivors in a position of neglect, disrespect, and retraumatization"; and "[e]ach day known assaulters are permitted on campus provides another opportunity for future sexual violence to occur."

392. The petition demanded that "Wake Forest takes appropriate action that prioritizes and respects the safety of survivors, and not permit known abusers to be readmitted to the University."

393. To date, the petition has garnered 6,131 signatures.

394. In the spring of 2022, Wake Forest students participated in a Campus Climate Survey, intended to provide insight into the prevalence of sexual misconduct at Wake Forest.

395. The survey, completed by 38% of the Wake Forest student population, revealed that 55% of participants indicated they had experienced sexual assault in the form of sexual harassment, stalking, non-consensual or unwanted sexual contact or intimate partner violence.

396. In late October 2022, a suspect was charged with trespassing on Wake Forest property.

397. Many viewed the University's response to the concern as inadequate and lacking in transparency, prompting students to voice their concerns about general student safety on campus, with one female student stating that she felt she needed "to protect herself."

398. Additionally, upon information and belief, Wake Forest has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed upon male students, while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against female/non-male students.

69

399. Based on the foregoing, Plaintiff was subjected to a biased, prejudiced, and unfair process in violation of Title IX designed to find him, the male, responsible.

400. This unlawful discrimination in violation of Title IX has proximately caused Plaintiff to sustain substantial and ongoing injury, damage, and loss, including, but not limited to: emotional distress; psychological damages; loss of education; loss of future educational and career opportunities; reputational damages; economic injuries; and other direct and consequential damages.

401. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial but in excess of $75,000, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Wake Forest to: (i) permit Plaintiff to participate as a student in good standing for the spring 2023 semester at Wake Forest; (ii) reverse the outcome, findings, and sanctions regarding the Jane matter; (iii) expunge Plaintiff's disciplinary record with respect to all of the complaints made against him; (iv) remove any record of the findings and/or Plaintiff's suspension from his educational file/disciplinary records/transcript; and (vi) any and all further actions required to return Plaintiff to the status quo ante.

## COUNT II
## Breach of Contract

402. Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

403. At all times relevant hereto, a contractual relationship existed between Wake Forest and Plaintiff by virtue of Plaintiff's enrollment at Wake Forest and as defined by

70

and through Wake Forest's policies and procedures governing the student disciplinary system, including but not limited to the Sex and Gender Discrimination, Harassment, and Misconduct Policy and the Title IX Sexual Harassment and Non-Title IX Sexual Misconduct Grievance Procedures.

404. Through these policies, Wake Forest provided specific, enforceable provisions outlining certain procedures that were to be followed by the institution before Plaintiff could be suspended or expelled for violation of a university policy.

405. Any failure to follow promised procedures in the disciplinary process would therefore constitute a violation of the University's contract with its student.

406. Accordingly, through the documents it publishes and provides to students, Wake Forest makes express and implied contractual commitments to students involved in the disciplinary process and/or the investigation of potential violations of the policies.

407. Under North Carolina law, the elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract.

408. Based on the aforementioned facts and circumstances, Wake Forest created express and implied contracts when it offered, and Plaintiff accepted, admission to Wake Forest, and when Plaintiff paid the required tuition and fees.

409. Wake Forest committed several breaches of its agreements with Plaintiff during the investigation and adjudication processes, as described below.

*i. Failure to Provide Proper Notice of Allegations*

410. Section 2A.04 of the Procedures expressly states that Wake Forest will provide the Respondent with:

71

"[w]ritten notice of these Grievance Procedures and of the allegations of conduct potentially constituting Sexual Harassment and/or Sexual Misconduct, including sufficient details known at the time… Sufficient details including the identities of the parties involved in the incident, if known, the conduct allegedly constituting Sexual Harassment and/or Sexual Misconduct…"

411. On April 12, 2022, six months after the alleged incident, Jane filed a formal complaint, alleging as follows: "The respondent attended my sorority date function as my date on October 15th. After the event in my dorm room I was unable to give consent to activity that occurred and the next morning non-consensual activity occurred."

412. The following day, on April 13, 2022, the Title IX office notified John that Jane was alleging non-consensual sexual activity due to incapacitation on the evening of October 15, 2021, and non-consensual digital penetration on the morning of October 16, 2021.

413. Certainly, if Jane truly believed that she and John had engaged in non-consensual sexual intercourse in the early morning of October 16, 2021, she would have included that information in her initial complaint, on April 12, 2022. However, she did not do so.

414. In transmitting the Notice of Allegations to John on April 13, 2022, Wake Forest failed to specify the alleged "non-consensual sexual activity due to incapacitation" that occurred on October 15, 2021. Instead, Casseus provided John with this vague notice, failing to either confirm with Jane the specific acts that she believed to be fully consensual, and in turn, failing to notify John what those acts were.

415. Shortly after John received the Notice of Allegations, Casseus suggested to the parties that they consider exploring the Adaptive Resolution process, knowing that John was not fully informed of the allegations made against him.

416. Based upon the information included in the Notice of Allegations, and unaware of Jane's allegations related to non-consensual sexual intercourse, John agreed to participate in Adaptive Resolution on April 25, 2022.

417. However, if John had known that the allegations against him would be supplemented four months later, and ten months after the alleged incident, to include an allegation of non-consensual sexual intercourse, he would not have agreed to participate in the Adaptive Resolution process.

418. Instead, Wake Forest permitted the Adaptive Resolution process to move forward and permitted Jane to revise her allegations when it became apparent that this form of resolution would not be successful.

419. Consequently, the formal investigation began in August of 2022, rather than in April 2022, the delay of which contributed to a deterioration in the memories of both John and the witnesses who would thereafter be interviewed, as well as a delay in the ultimate resolution of the matter.

### ii. Failure to Presume Respondent Not Responsible

420. Section 2A.15 of the Procedures provide that "Respondents are presumed not responsible for alleged Sexual Harassment until Wake Forest makes a determination regarding responsibility pursuant to these Grievance Procedures."

73

421. Section 2A.16 of the Procedures provides that "[t]he investigators and decision-makers under these Grievance Procedures will objectively evaluate all Relevant Evidence, including both inculpatory and exculpatory evidence, and will not make any credibility determinations based on a person's status as a Claimant, Respondent, or witness."

422. Wake Forest violated these Procedures when the Title IX office supplemented Jane's allegations, to include non-consensual sexual intercourse, four months after the initial Notice of Allegations was delivered to John, after a several months' long but unsuccessful Adaptive Resolution process took place, and based solely upon statements made by Jane during her first investigation interview.

423. Notably, John had not yet met with Investigator Telligman to present his account of the events at issue.

424. Instead, Wake Forest presumed John to be responsible for the alleged violations, accepted Jane's statements as true, and did not question why she chose to bring up this allegation for the first time nearly ten months after the incident in question.

425. Investigator Telligman, tasked with investigating an allegation of non-consensual sexual touching, obtained information to impose an additional charge on John, which she then brought to Casseus upon conclusion of Jane's first interview. Casseus then sent the updated notice to John just two days later, demonstrating a presumption that John was guilty and Jane was more credible, before John even appeared for a first interview.

### iii. Failure to Conduct a Fair Hearing

426.    The Procedures provide that "[m]aterials used to train Title IX Coordinators, investigators, decision-makers, sanctions officers, appellate officers, and adaptive resolution facilitators will not rely on sex or gender stereotypes and will promote impartial investigations and adjudications of Formal Complaints of Sexual Harassment and/or Sexual Misconduct.

427.    With respect to hearings specifically, section 3A.02 of the Procedures provide that "[F]ollowing the investigation the appointed hearing officer will conduct a hearing in which they may question the Claimant, the Respondent, and any witnesses whose testimony the hearing officer deems relevant. During the hearing, the hearing officer and the parties may also question the investigator(s) about the investigative report."

428.    Notably, the Procedures do not impose any time limit on the direct or cross-examination of the parties or witnesses.

429.    In the matter involving John, the hearing officer conducted the hearing in a manner that deprived him of a fair and meaningful process, and adversely affected the outcome.

430.    First, the hearing was scheduled to begin at 9:00 a.m. on November 29, 2022 and conclude on the same day. Despite the number of witnesses, nature of the claims presented, and the potential ramifications to John, hearing officer Wells did not want the matter to proceed into a second day.

75

431. Accordingly, the hearing was arranged such that both John and Jane were able to give their opening statements before the witnesses were scheduled to appear, based on their convenience.

432. In addition to John, Jane, and Telligman, the witnesses who appeared for and testified at the hearing included A.G., I.L., B.M., S.W., and P. K.

433. As a result, John's advisor was not able to cross-examine Jane until the very end of the hearing, before Wells concluded the proceeding at 10:28 p.m.

434. Despite there being no time limits imposed on the questioning of any other witnesses, Wells did limit the time for John's advisor to cross-examine Jane, because it was getting into the late evening hours and all participants were undoubtedly exhausted, hungry, and less able to focus.

435. Importantly, while Wells permitted Jane's advisor to ask every question proposed, she repeatedly barred John's advisor from asking the parties and witnesses questions that Wells arbitrarily deemed not relevant.

436. These actions on the part of Wells further deprived John of his right to cross-examination and his right to a fair and impartial hearing.

437. Rather than pushing the matter to a conclusion within one day, Wells should have permitted John's advisor the opportunity to thoroughly question Jane on all relevant evidence.

438. Instead, Wells permitted Jane's advisor to interrupt John's attorney during his cross-examination of Jane, to inquire how much longer he would take. Shortly

thereafter, at 10:16 p.m., Wells threatened John's attorney that she planned to conclude the hearing in "15 minutes." She did ultimately conclude the hearing at 10:28 p.m.

439.    Recognizing the significance of her error in curtailing John's right to cross-examine his accuser, Wells went to great lengths in her hearing outcome letter to discuss the amount of time that various witnesses were questioned for during the hearing.

440.    However, given there were not time limits imposed for the questioning of witnesses, the amount of time actually spent on any particular witness does not negate the unfairness of Wells pushing John's advisor to wrap up his questioning of the Complainant.

441.    John, as the accused, was entitled to a meaningful opportunity to be heard, which included the right to cross-examine his accuser to the extent necessary and without any arbitrary timeframe imposed.

442.    Second, Wells failed to direct the witnesses to answer questions posed to them, permitting them to respond with such statements as "that information is in one of my recorded statements" or "that information is in my report."

443.    There is no question that the purpose in holding a live hearing is to hear directly from the witnesses, gain information that may not be included in the written record, and assess credibility by, for instance, highlighting inconsistencies in the testimony.

444.    Wells further deprived John of a meaningful hearing when she permitted the witnesses to respond in a manner that prevented him from exposing Jane's lack of credibility.

77

445. Third, Wells demonstrated a clear bias against John when she interrupted his attorney numerous times during his questioning of Jane. In comparison, Wells never interrupted Jane's advisor during her cross-examination of John.

446. Furthermore, Wells accused John's attorney of harassing Jane when he asked her certain questions and permitted Jane's attorney to interrupt his cross-examination by raising objections, even though objections are not permitted in a Title IX hearing.

447. Among the lines of questioning that John's advisor was prohibited from pursuing included whether Jane's text message to a friend in which she stated "it burns" could possibly have referred to her throat hurting after having thrown up several times, rather than any pain in her genital area due to having had non-consensual intercourse with John.

448. This was clearly a highly relevant issue, yet Wells rebuffed the attempt of John's advisor to explore it.

449. Similarly, Wells refused to allow John's advisor to question Jane about her years of physical conditioning that she had undergone as a collegiate level volleyball player. Again, this line of questioning was relevant to the issue of whether she was able to move John's hand or leg away from her on the morning of October 16, 2021, if she did not want to engage in the sexual activity.

450. Even further, Wells also did not allow John's advisor to question Jane about the timing of her alcohol consumption on the relevant evening, when she last consumed alcohol, when she allegedly vomited, or how she felt after she vomited.

451.   All of these instances of Wells limiting the ability of John's advisor to thoroughly question Jane on critical and relevant topics demonstrated that she was biased in favor of the female complainant and took actions accordingly, to ensure a finding of responsibility against John.

### iv. Failure to Address Retaliation Against Respondent

452.   Section 1.01 of the Procedures provides:

> "Discrimination and harassment are antithetical to the values of the Wake Forest community; and are incompatible with the safe, healthy environment that the Wake Forest community expects and deserves, and will not be tolerated. Wake Forest is committed to providing programs, activities, and an education and work environment free from discrimination and harassment. Wake Forest is also committed to fostering a community that promotes prompt reporting and fair and timely resolution of those behaviors."

453.   Section 1.02 of the Procedures states: "This policy also prohibits Retaliation as defined by Title IX and in this Policy. Complaints alleging Retaliation may be filed with the Title IX Coordinator and, at the discretion of the Title IX Coordinator, may be addressed under Wake Forest's Pre-Hearing Grievance Procedures set forth below or other grievance procedures adopted by Wake Forest."

454.   During John's first interview with Telligman on September 8, 2022, John advised Telligman that on at least four occasions he had experienced episodes of retaliation by Jane's friends, including being elbowed in the back, being told to "go home" when he arrived at the Last Resort with a group of friends, having beer dumped on him multiple times, and being called a "rapist" in text messages sent from Jane's friends to John's fraternity brothers.

79

455. In addition to discussing these instances of retaliation during his interview, he also sent an email to Telligman on October 19, 2022, alleging additional acts of retaliation committed by Jane's friends I.L. and H.D. Specifically, while on a fraternity and sorority trip over the fall break, two women "body-checked" him when they walked by him.

456. Thereafter, on October 21, 2022, John met with Telligman to further discuss his complaints for retaliation, emailed with Casseus about his complaint on November 1, 2022, November 9, 2022, November 15, 2022, and November 18, 2022.

457. Casseus required John to provide express written confirmation that he wished to pursue complaints of retaliation against Jane's friends, before he was informed that the matter had been transferred to the Dean of Students, Jim Settle. The Title IX office took no action other than speaking with Jane's friends.

458. Thereafter, John exchanged emails with Dean Settle about his retaliation complaints on December 1, 2022 and December 15, 2022. Again, no action was taken, supposedly due to the Christmas holidays. Dean Settle informed John that he would be on break until January 3, 2023.

459. As of January 23, 2023, Wake Forest had yet to take any action on John's retaliation complaint.

460. In sharp contrast, when Jane simply claimed during her August 30, 2022 interview that she told John "this doesn't feel good" during their sexual encounter, Telligman and Casseus took swift action to supplement the Notice of Allegations and added

an additional charge of non-consensual sexual intercourse against John, in less than two days' time.

461. Evidently, Wake Forest responded to the female complainant Jane's allegations with urgency, while failing to address John's complaint whatsoever, more than four months after he first raised the issue (and counting).

462. Each of the foregoing breaches contributed to a process that deprived Plaintiff of his fundamental and contractually guaranteed rights, ultimately leading to two adverse and erroneous findings against Plaintiff.

463. As a proximate and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damage, economic injuries and other direct and consequential damages.

464. As a result of the foregoing, Plaintiff is entitled to damages in excess of $75,000 in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendant Wake Forest University as follows:

(i)     On the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Wake Forest to: (i) reverse the outcome, findings, and sanction regarding the Jane

complaint; (ii) expunge Plaintiff's disciplinary record in its entirety; (iii) remove any record of the Jane finding or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) any and all further actions required to return Plaintiff to the status quo ante;

(ii) On the second cause of action for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

## **JURY DEMAND**

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated:  **New York, New York**
         **February 3, 2023**

Respectfully submitted,

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff*

**By:  */s/ Andrew Miltenberg*
Andrew T. Miltenberg, Esq.
Tara J. Davis, Esq.
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
tdavis@nmllplaw.com
*Pro Hac Vice applications forthcoming*

-and-

82

**EKSTRAND AND EKSTRAND, LLP**

**By:** /s/ _Robert Ekstrand_

Robert C. Ekstrand, Esq.
110 Swift Avenue, 2nd Floor
Durham, North Carolina 27705
(919) 416-4590
rce@ninthstreetlaw.com
Bar No. 26673

## <u>VERIFICATION</u>

**STATE OF** <u>North Carolina</u> **)**

**)** **ss:**

**COUNTY OF** <u>Forsyth</u> **)**

     **JOHN DOE,** being duly sworn, deposes and say:

     I am the Plaintiff named in this matter. I have read the annexed complaint, know the contents thereof, and the same are true to my knowledge, except as to matters alleged upon information and belief and as to those matters, I believe them to be true.

     Signed under the pains and penalties of perjury, on this $\underline{2nd}$ day of February, 2023.



DocuSigned by:

*John Doe*

D7057F04D77B48B…

"John Doe"

1