## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
## DOCKET NO. 1:23-cv-114

-----------------------------------------------------------------X

**JOHN DOE**

       **Plaintiff,**

  **-against-**

**WAKE FOREST UNIVERSITY,**

       **Defendant.**

-----------------------------------------------------------------X


## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## MOTION FOR A TEMPORARY RESTRAINING ORDER
## <u>AND PRELIMINARY INJUNCTION</u>

1

# INTRODUCTION

Plaintiff John Doe (a pseudonym) ("Plaintiff" or "John" or "Doe"), a senior at Wake Forest University ("Defendant" or "Wake Forest" or the "University"), hereby moves, pursuant to Fed. R. Civ. P. 65 for a temporary restraining order and preliminary injunction enjoining Defendant from enforcing its decision to suspend Plaintiff from the University for one year and placing a notation on his transcript, and directing Defendant to immediately restore Plaintiff's access to all courses and academic resources necessary for the completion of his undergraduate studies and, upon successful completion of his degree requirements, to timely confer Plaintiff's degree.

Plaintiff, a student in good academic standing prior to the issuance of the suspension decision, was slated to complete his coursework and graduate from the University in May 2023. Prior to the suspension decision, Plaintiff had been offered and accepted a position for full time employment, to begin in the summer of 2023. This position is now in jeopardy as it is contingent on Plaintiff's completion of his undergraduate degree. Accordingly, Plaintiff respectfully makes an application for a temporary restraining order and preliminary injunction that will allow him to resume his studies forthwith and to timely complete the requirements for his undergraduate degree, receive his degree, and begin his employment, while this case is pending.

In his Complaint, which is being filed with this Court along with the instant motion, Plaintiff details how Wake Forest engaged in prohibited sex discrimination and violated Plaintiff's contract with the University when it erroneously found him responsible for sexual misconduct and imposed a one-year suspension. While he is entitled to relief on all

2

counts, he moves for immediate relief based on his Title IX claim. As demonstrated herein, Plaintiff meets the requirements for a temporary restraining order and preliminary injunction: he is likely to succeed on the merits of his Title IX claim, he is likely to suffer irreparable harm absent the requested relief, the balance of hardships tips in his favor, and the requested injunction is in the public interest. As such and for the reasons described below, issuance of a temporary restraining order and preliminary injunction is warranted.

## **STATEMENT OF FACTS**

The complete facts underlying this litigation are set forth fully in Plaintiff's Complaint, filed simultaneously with the instant motion and incorporated herein by reference. For the Court's convenience, a summary of the relevant facts follows.

Plaintiff, a male undergraduate student at Wake Forest University, was accused by Jane Roe, a fellow student, of violating the University's Gender Discrimination, Harassment, and Misconduct Policy (the "Policy"). Cmplt. ¶¶ 1, 166.

John and Jane met in the spring of 2021. Cmplt. ¶ 123. Thereafter, John and Jane engaged in sexual activity on approximately six to eight occasions that semester. Cmplt. ¶ 125. On each of these occasions, they engaged in kissing, cuddling, and touching, but did not engage in intercourse. *Id.* John and Jane conveyed their consent to sexual activity through physical contact, which they each understood; at no time did either of them express consent verbally during their sexual encounters. Cmplt. ¶ 126.

On or about October 7 or 8, 2021, Jane reached out to John to ask if he would be interested in accompanying her to her sorority date function. Cmplt. ¶ 134. John agreed to go with Jane to the event. Cmplt. ¶ 135. On October 15, 2021, John and Jane began the

3

night in Jane's suite, where a group of approximately ten to fifteen students met up before the date function to "pregame". Cmplt. ¶ 136. After, the group of students took a van ride to the venue where the date function was held. Cmplt. ¶ 140. During the ride, Jane became affectionate towards John as they sat next to each other. Cmplt. ¶ 141. They began kissing, which was initiated by Jane. Cmplt. ¶ 141. Once at the venue, John spent time talking with his friends and dancing with Jane. Cmplt. ¶ 143.

After approximately two hours, the date function came to an end. Cmplt. ¶ 144. John and Jane stopped at the AEPi house before returning to Jane's dorm. Cmplt. ¶ 145. Though both parties had consumed alcohol, neither was impaired to a degree that they were unable to appreciate their surroundings or understand what was happening. Cmplt. ¶ 146. Jane did not stumble, fall, slur her words, or fall asleep during the ride back to campus; to the contrary, she was at all times fully coherent and alert. Cmplt. ¶ 147.

When they arrived back to Jane's dorm, John and Jane went up to Jane's room, where they began making out. Cmplt. ¶ 148. Consistent with their prior interactions, Jane demonstrated her consent to engage in sexual activity through her non-verbal actions. Cmplt. ¶ 149. As the interaction continued, Jane and John demonstrated their mutual consent and agreement to progress their intimacy towards intercourse. Cmplt. ¶ 150. John obtained a condom from his wallet and then returned to the bed. Cmplt. ¶ 151. Jane did not tell him to stop and instead, continued to caress him. Cmplt. ¶ 152.

John attempted to put the condom on however, because John was unable to maintain an erection, intercourse did not occur. Cmplt. ¶¶ 153-154. Instead, they continued to kiss and cuddle. Cmplt. ¶ 155. At no time was John's body ever pressed on top of Jane's, he

4

never forced her down, never prevented her from moving, and never vaginally penetrated her. Cmplt. ¶ 156. Further, Jane never asked John to stop, never asked him to leave, and never got up to leave the room herself. Cmplt. ¶ 157. Instead, she was a fully engaged and active participant. Cmplt. ¶ 158.

John slept in Jane's bed that evening. Cmplt. ¶ 159. When they woke up in the morning, they began cuddling. Cmplt. ¶ 160. Jane began to rub John's shoulders and reached up to his hair, which had historically indicated the initiation of sexual contact. *Id.* Based upon Jane's actions, and consistent with their prior sexual encounters, they began kissing and John digitally penetrated Jane briefly. Cmplt. ¶ 161. They thereafter cuddled for a while longer before John got out of bed, got dressed, said goodbye and gave Jane a kiss, before returning to his dorm room. Cmplt. ¶ 162. John's departure that morning was no different than the many times they had spent together previously. Cmplt. ¶ 163. A few weeks later, John began dating another student. Cmplt. ¶ 164. Accordingly, he did not contact Jane thereafter. *Id.* John had no indication that Jane had any concern regarding what transpired between them on October 15, 2021 until he received the Notice of Allegations from Wake Forest six months later, in April of 2022. Cmplt. ¶ 165.

On April 13, 2022, Title IX Director Aishah Casseus ("Casseus") sent John a Notice of Allegations (the "Notice") indicating that Wake Forest had received a formal complaint alleging that he engaged in sexual harassment in violation of the University's Policy. Cmplt. ¶ 166. Casseus indicated that Jane contended John engaged in "sexual harassment by sexual assault" on October 16, 2021, in her dorm. Cmplt. ¶ 167.

On April 14, 2022, Casseus advised John that Jane was interested in pursuing an

adaptive resolution. Cmplt. ¶ 173. After several meetings and email communications from May through August of 2022, Jane declined to accept John's proposed terms for resolution and withdrew from the adaptive resolution process. Cmplt. ¶ 180.

On August 19, 2022, Casseus notified John that the formal resolution process would resume. Cmplt. ¶ 181. Assistant Director of Title IX Jessica Telligman ("Telligman") was appointed to serve as investigator. Cmplt. ¶ 182. On August 29, 2022, Casseus issued a Mutual No Contact Order between John and Jane. Cmplt. ¶ 183. Telligman interviewed Jane for the first time on August 30, 2022. Cmplt. ¶ 184. On September 1, 2022, Casseus provided John with an Updated Notice of Allegations (the "Updated Notice"). Cmplt. ¶ 185. Casseus informed John that Jane was now alleging—ten months after the alleged incident—that John engaged in non-consensual sexual intercourse with her on October 15, 2021. Cmplt. ¶ 186. Specifically, Jane claimed that while she initially consented to sexual intercourse with John, she subsequently withdrew her consent. *Id.*

Jane was again interviewed by Telligman, on September 7, 2022, October 5, 2022 and October 12, 2022. Cmplt. ¶ 190. Jane concurred that she and John had engaged in consensual kissing and fondling and spent the night together on several occasions in the spring of 2021 and once or twice in the fall of 2021. Cmplt. ¶ 191. Jane also confirmed that she and John had not previously discussed consent for any of their sexual interactions, but instead both used "physical responses" to indicate consent. Cmplt. ¶ 192. John appeared for investigation interviews with Telligman on September 8, 2022, September 15, 2022, September 26, 2022, and October 6, 2022. Cmplt. ¶ 194. Telligman also interviewed six witnesses. Cmplt. ¶ 200.

On November 4, 2022, Telligman issued the Final Investigation Report. Cmplt. ¶ 201. The Report again revised the allegations made against John, to include alternative theories of non-consent related to the sexual activity on the evening of October 15, 2021, as well as a claim that Jane was incapacitated due to sleep during the sexual activity on the morning of October 16, 2021. Cmplt. ¶ 202. The Report included select portions of Jane's medical records, indicating that she visited the University Student Health Service on October 18, 2021. Cmplt. ¶ 204. Importantly, the medical record indicated that Jane "denie[d] sexual assault." Cmplt. ¶ 206. The medical record also revealed inconsistencies in Jane's account, as to what she told the hospital staff within days of the alleged incident, as compared to what she told Telligman approximately one year later. Cmplt. ¶¶ 208-209.

The University appointed attorney Dixie Wells to serve as the hearing officer, despite the evident conflict created by her background of defending universities against claims brought by students. Cmplt. ¶¶ 222-224. John appeared for the hearing in person on November 29, 2022 while Jane and the witnesses appeared remotely. Cmplt. ¶ 228. Wells deprived John of a fair and meaningful opportunity to be heard when: (i) John's advisor was not able to cross-examine Jane until the very end of the hearing.; (ii) despite there being no time limits imposed on the questioning of any other witnesses, Wells did limit the time for John's advisor to cross-examine Jane, because it was getting late; (iii) Wells permitted Jane's advisor to interrupt John's attorney during his cross-examination of Jane, to inquire how much longer he would take; (iv) Wells permitted Jane's advisor to ask every question proposed, while barring John's advisor from asking the parties and witnesses questions that Wells arbitrarily deemed not relevant; (v) at 10:16 p.m., Wells threatened

7

John's attorney that she planned to conclude the hearing in "15 minutes"; (vi) Wells permitted Jane and the Telligman to respond to questions with such statements as "that information is in one of my recorded statements" or "that information is in my report"; (vii) Wells repeatedly interrupted John's advisor during his cross-examination of Jane; (viii) rebuffed John's advisor's attempt to ask Jane certain relevant questions; and (ix) permitted Jane's attorney to interrupt his cross-examination by raising objections, even though objections are not permitted in a Title IX hearing. Cmplt. ¶ 229.

On December 20, 2022, Casseus sent John a copy of the hearing outcome letter. Cmplt. ¶ 230. Wells concluded that Wake Forest met its burden by demonstrating that John engaged in Sexual Harassment by Sexual Assault (Rape) and Sexual Harassment by Sexual Assault with an Object in violation of the Policy. Cmplt. ¶ 231. The findings were thereafter sent to an appointed sanctions officer, who recommended a one-year suspension as the sanction, with eligibility to return in Spring 2024. Cmplt. ¶¶ 241-242.

John submitted his appeal of the hearing outcome on January 3, 2023. Cmplt. ¶ 245. His appeal was based on: (i) procedural irregularities that affected the outcome; (ii) a conflict of interest or bias that affected the outcome; and (iii) the sanction was incommensurate to the gravity of the sexual harassment that he was found responsible for. Cmplt. ¶ 246. On January 23, 2023, appeal officer Howard Kellam denied John's appeal. Cmplt. ¶ 248. While declining to find any bias on the part of Hearing Officer Wells, Kellam did acknowledge that "a pattern of findings in the Claimant's favor without apparent, evidence-based reasons and where the evidence substantially favors the Respondent can be proof of bias." Cmplt. ¶ 248, n. 3.

Through this action, Plaintiff seeks, *inter alia*, an order directing Wake Forest to set aside the decision finding him responsible for sexual assault and to have all annotations referencing the finding removed from his transcript. Without appropriate redress, the unjustified decision and sanction will cause irreversible damage to Plaintiff's reputation, education, and future career. Moreover, without immediate injunctive relief to preserve the status quo, Plaintiff will be unable to complete his current semester's courses, unable to obtain his degree, and unable to begin employment for which he has already accepted a full-time offer. Doe Decl., ¶¶ 12-13.

## QUESTION PRESENTED

*Question*:    Should this Court issue a temporary restraining order and preliminary injunction to (1) prevent Defendant from suspending Plaintiff and marking his transcript; (2) requiring Defendant to restore Plaintiff's access to all courses and academic activities for the Spring 2023 semester; and (3) directing Defendant, upon Plaintiff's successful completion of the relevant requirements, to timely confer Plaintiff's degree, pending the resolution of this litigation?

*Answer*:    Yes. It is likely that that the finding of responsibility and sanction against Plaintiff, which derive from a biased, flawed, and unjust process conducted by Defendant, will be reversed. Should Plaintiff not be permitted to resume his education, complete the final semester of his senior year, and earn his undergraduate degree, he will suffer irreparable harm that will not be able to be remedied if this Court ultimately finds that Wake Forest violated Plaintiff's rights and reverses the finding and sanction. Conversely, permitting Plaintiff to resume his education while the matter proceeds through this

9

litigation will pose no harm to Defendant.

## ARGUMENT

**I.     The Requested Temporary Restraining Order and Preliminary Injunction is Proper Under the Law.**

A preliminary injunction, while considered an extraordinary remedy, should be issued when necessary to preserve the status quo pending the final outcome of a case. *Amazon.com, Inc. v. WDC Holdings LLC*, No. 20-1743, 2021 WL 3878403, at *4 (4th Cir. Aug. 31, 2021). The status quo "is not the circumstances existing at the moment the lawsuit or injunction request was actually filed, but the 'last uncontested status between the parties which preceded the controversy.'" *Aggarao v. MOL Ship Management Co., Ltd*., 675 F.3d 355, 378 (4th Cir. 2012), *citing Stemple v. Bd. Of Ed. of Prince George's Cnty*., 623 F.2d 893, 898 (4th Cir. 1980). The temporary restraining order and preliminary injunction that Plaintiff seeks here merely *preserves* the status quo of the last peaceable, uncontested status between the parties, i.e.— John's status as an active student enrolled at Wake Forest.

In a number of recent cases, federal courts have granted the kind of injunctive relief sought here, prohibiting schools from implementing discipline against students whose litigation challenges the school's disciplinary proceedings, while such litigation is pending. *See, e.g., Doe v. University of Connecticut*, No. 3:20-cv-00092 (D. Conn. Jan. 23, 2020); *Nokes v. Miami Univ.*, No. 17-CV-482, 2017 WL 3674910 (S.D. Ohio Aug. 25, 2017); *Doe v. Pennsylvania State Univ*., 276 F. Supp. 3d 300, 302 (M.D. Pa. 2017); *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 313 (D.R.I. 2016); *Ritter v. Oklahoma*, No. 16-CIV-0438-HE, 2016 WL 2659620, 2016 U.S. Dist. LEXIS 60193 (W.D. Okla. May 6, 2016); *King v.*

10

*DePauw Univ.*, No. 2:14-cv-70, 2014 WL 4197507, 2014 U.S. Dist. LEXIS 117075 (S.D. Ind. Aug. 22, 2014); *Doe v. Texas Christian Univ.*, No. 4:22-CV-00297-O, 2022 WL 1573074 (N.D. Tex. April 29, 2022).

## II.    **The Legal Standard.**

Plaintiff's motion for a temporary restraining order and preliminary injunction, which seeks to maintain the status quo and prevent irreparable harm during the pendency of this lawsuit, should be granted because the facts, as discussed herein, satisfy the requirements for such relief under the standard set forth in *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 20 (2008), and as recognized by the Fourth Circuit in *Pashby v. Delia,* 709 F.3d 307, 320 (4th Cir. 2013).

Parties seeking a temporary restraining order and preliminary injunction must make a "clear showing" of four prerequisites: "(1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest." *Pashby v. Delia,* 709 F.3d at 320 (*citing Winter,* 555 U.S. at 20).[1]  The court must "separately consider each *Winter* factor to determine whether each factor has been "satisfied as articulated."  *Id.* at 320-321, (*citing The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2010), *reversed on other grounds*).  *See also Cantley v. W. Va. Reg'l Jail & Corr. Facility Auth.,* 771 F.3d 201,

---

[1] "A request for a preliminary injunction is evaluated in accordance with a 'sliding scale' approach: the more the balance of irreparable harm inclines in the plaintiff's favor, the smaller the likelihood of prevailing on the merits he need show in order to get the injunction." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 813 (4th Cir. 1991), citing *Kowalski v. Chicago Tribune Co.,* 854 F.2d 168, 170 (7th Cir.1988).

207 (4th Cir. 2014); *AT by HT v. Univ. of N. Carolina,* No. 1:16-CV-489, 2016 WL 10586289, at *3 n.5 (M.D.N.C. July 7, 2016).

## III.    Plaintiff is Likely to Succeed on the Merits of his Claims.

To demonstrate a likelihood of success on the merits, "[a] plaintiff need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (internal quotations omitted). Motions for preliminary injunction are "governed by less strict rules of evidence." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725 (4th Cir. 2016). Because "the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held" and "given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* (*quoting Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

### A. Violation of Title IX- Erroneous Outcome

Title IX states: "No person in the United States shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Title IX bars the imposition of university discipline where gender is a motivating factor." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). The statute is enforceable through an implied private right of action. *Id.* at 714. Title IX claims relating to university disciplinary proceedings generally fall into in two categories: (1) "erroneous outcome" cases, in which "the claim is that plaintiff was innocent and wrongly found to have committed an offense"; and (2) "selective

12

enforcement" cases, where "the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender." *Id.* at 715.

Here, it is alleged that Wake Forest's decision finding Plaintiff responsible for sexual assault was erroneous and was motivated by gender bias. While some circuits continue to analyze Title IX claims under the erroneous outcome and selective enforcement theories, the Fourth Circuit has adopted the Seventh Circuit's view that there is "no need to superimpose doctrinal tests on the [Title IX statute.] *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019). More simply, "the standard for Title IX claims in this context" asks: "do 'the alleged facts, if true, raise a plausible inference that the university discriminated [against John Doe] 'on the basis of sex'?" *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854–55 (7th Cir. 2019) (quoting *Purdue Univ.*, 928 F.3d at 667–68); *Schwake v. Arizona Bd. Of Regents*, 967 F.3d at 947.

Pleading sufficient facts which cast some articulable doubt on the accuracy of the outcome of a Title IX disciplinary proceeding is "not a significant barrier to cross" and can be established in a number of ways including: pointing to procedural flaws in the investigatory and adjudicative processes; noting inconsistencies or errors in the adjudicator's oral or written findings; or challenging the overall sufficiency and reliability of the evidence. *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 584 (E.D. Va. 2018); *Norris v. Univ. of Colo.*, 362 F. Supp. 3d 1001, 1011 (D. Colo. 2019); *Yusuf*, 35 F. 3d at 715. Allegations that a plaintiff was not provided a right of cross-examination when credibility was at stake is also sufficient to cast some articulable doubt on the accuracy of a

13

disciplinary proceeding's outcome. *Baum*, 903 F.3d 575, 585-586 (6th Cir. 2018) (where the outcome of a university disciplinary proceeding depends on credibility, an accused has a constitutional due process right to "some form of cross-examination" of the accuser at an in-person hearing). As are "particular evidentiary weaknesses behind the finding of an offense such as motive to lie on the part of a complainant or witnesses." *Norris*, 362 F. Supp. 3d at 1011. Moreover, gender bias can be inferred from the manner in which university officials treat a male Title IX respondent as compared to the female complainant(s), including allegations that exculpatory evidence was overlooked in favor of finding the male responsible for Title IX violations. *See Marymount U.*, 297 F. Supp. 3d at 586-587; *Norris*, 362 F. Supp. 3d at 1012-1013; *Doe v. Columbia*, 831 F.3d 46, 57 (2d Cir. 2016) ("[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side…it is plausible to infer…that the evaluator has been influenced by bias.")

Plaintiff submits that the facts of this case show a clear influence of gender bias on the outcome of the proceedings and a prima facie case of sex discrimination.

In this case, the facts provided in the Complaint and the Declaration of John Doe in support of this motion, sufficiently raise a plausible inference that Wake Forest discriminated against Plaintiff when it found him responsible for violating the Policy, resulting in a sanction of a one-year suspension. By way of example, and not limitation: (i) Casseus supplemented Jane's Notice of Allegations in September 2021, adding a charge of non-consensual sexual intercourse four months after the initial notice was sent to John and ten months after the encounter at issue; (ii) Telligman offered to Jane suggested responses

14

to explain away the inconsistencies between her testimony provided during the investigation and her statements made in the medical records; (iii) Telligman offered to Jane proposed meanings for statements made in text messages, to strengthen Jane's claims against John; (iv) Hearing Officer Wells limited the time for John's advisor to cross-examine Jane during the hearing because it was getting late into the evening; (v) Wells permitted Jane's advisor to interrupt John's advisor during his cross-examination of Jane; (vi) Wells permitted Jane's advisor to ask every question presented to the parties and witnesses while barring John's advisor from asking critical and relevant questions; (vii) Wells issued a decision that was against the weight of the evidence; (viii) Wells disregarded the numerous inconsistencies and contradictions in Jane's statements; (ix) accepted Jane's decision not to authorize the testimony of Director of Student Health Dr. Price while drawing an adverse inference as to Doe's inability to provide relevant text messages despite his affirmation that he did not have any; (x) Wells overlooked Jane's motivations for filing the complaint against John; and (xi) entirely ignored Jane's statement that supported John's account of them having attempted to engage in intercourse but not being able to do so given he could not maintain an erection.

The foregoing, when considered along with additional external pressures placed upon the University to find in favor of the female complainant and against the male respondent, provides further evidence of gender bias. *See, e.g., Columbia*, 831 F.3d at 57 ("[I]t is entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from

sexual assault."); *Collick v. William Paterson Univ.,* 16-471 (KM) (JBC), 2016 WL 6824374 at *16 (D.N.J. Nov. 17, 2016) ("[I]t is no more than a commonsense inference that the public's and the policymakers' attention to the issue of campus sexual assault may have caused a university to believe it was in the spotlight" and thus discriminate against the male respondent)*, adhered to on denial of reconsideration,* 2017 WL 1508177 (D.N.J. Apr. 25, 2017)*, aff'd in part, remanded in part,* 699 Fed. Appx. 129 (3d Cir. 2017); *Doe v. Rollins Coll.*, 352 F. Supp. 3d 1205, 1210–11 (M.D. Fla. 2019) (investigation "amidst a clamor of public and campus scrutiny over its treatment of sexual assault complaints by female students" created "circumstantial evidence of bias"); *Doe v. Amherst Coll.*, 238 F.Supp.3d 195, 223 (D. Mass. 2017) (allegations that university was trying to "appease" a student-led movement resulted in gender bias); *Doe v. Lynn Univ., Inc.*, 235 F.Supp.3d 1336, 1340–42 (S.D. Fla. 2017) (allegations that university was reacting to "pressure from the public and the parents of female students" to punish males); *Wells v. Xavier Univ.*, 7 F.Supp.3d 746, 751 (S.D. Ohio 2014) (allegations suggested that university was "reacting against him[ ] as a male" in response to a Department of Education investigation).

The circumstances relevant to this matter include, but are not limited to, the following: (i) on April 26, 2021, approximately one year prior to the date on which Jane filed her complaint, the OCR opened an investigation against Wake Forest regarding its handling of a sexual harassment complaint, which currently remains active; (ii) on August 28, 2021, students at Wake Forest participated in a protest, to respond to an allegation of sexual assault committed by a student against another Wake Forest student; (iii) in October of 2021, Wake Forest created the Sexual Assault Prevention Support and Accountability

16

Committee, charged with implementing a university-wide sexual assault campus climate survey and advising the student body president on issues relating to sexual misconduct; (iv) approximately one year ago, a Change.org petition addressed to administrators at Wake Forest University, demanded action by Wake Forest, stating the University "has recently allowed many abusers and sexual offenders to return to campus, taking the safety that the survivors once had away", and accusing Wake Forest of "putting survivors in a position of neglect, disrespect, and retraumatization"; (v) in the spring of 2022, Wake Forest students participated in a Campus Climate Survey, intended to provide insight into the prevalence of sexual misconduct at Wake Forest. The survey, completed by 38% of the Wake Forest student population, revealed that 55% of participants indicated they had experienced sexual assault; and (vi) in October 2022, a suspect was charged with trespassing on Wake Forest property. Many viewed the University's response to the concern as inadequate, prompting students to voice their concerns about general student safety on campus.

In light of the foregoing, Plaintiff sufficiently sets forth a likelihood of success on the merits of his Title IX claim, satisfying the first element of the preliminary injunction analysis.

**IV. Plaintiff Will Suffer Irreparable Harm if the University is Permitted to Enforce its Suspension Decision Pending the Outcome of this Litigation.**

It is well established that a showing of irreparable harm requires a Plaintiff to demonstrate that he is subject to a continuing harm that cannot be adequately addressed by final relief on the merits and for which "monetary damages are difficult to ascertain or are inadequate." *Lab'y Corp. of Am. Holdings v. Kearns*, 84 F. Supp. 3d 447, 463 (M.D.N.C.

2015) (citing *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F. 3d 546, 551–52 (4th Cir. 1994)); *Hughes Network Systems, Inc. v. InterDigital Communication Corp.*, 17 F.3d 691 (4th Cir. 1994). Plaintiff easily makes such a showing here. At the time of his suspension, Plaintiff was in the final few months of his final year of college, and, upon successful completion of these last courses, Plaintiff was on track to graduate and earn his degree in May 2023. Further, Plaintiff is scheduled to begin employment based on a previously accepted job offer, in the summer of 2023 which is contingent upon completion of his undergraduate degree. Doe Decl., ¶ 12.

Absent injunctive relief, Plaintiff will suffer losses for which money damages alone cannot compensate; specifically, if no injunction is issued, even if Plaintiff ultimately succeeds on the merits of his claim, he still would be a full year of credits short of graduating, would not earn his degree on time, and would forever have to explain to any future employer or graduate program the reason for his failure to complete his degree on time. Moreover, while money damages might help to compensate for the lost salary that he had expected to begin earning in the summer of 2023, it would not compensate for the loss of the opportunity in terms of future career success. Accordingly, without injunctive relief, Plaintiff will be precluded from completing his final coursework, be ineligible to graduate or receive his degree, and be ineligible to begin his career. Doe Decl. at ¶¶ 12-13.

For these losses, money damages cannot make Plaintiff whole. *See, e.g., Doe v. Middlebury*, *supra,* 2015 WL 5488109 at \*3 ("While Plaintiff may recover money damages to compensate for lost wages, money damages cannot compensate for . . . the delay in the completion of his degree, or the opportunity to begin his career in July . . . with this

18

particular employment. Further, Plaintiff would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap."); *Doe v. Univ. Conn.*, *supra*, No. 20-CV-00092, ECF No. 18, at *4 ("For a college student poised to graduate in a few months, it is highly likely that a . . . suspension and a sanction for sexual assault would indeed 'forever change[]' the trajectory of his education and career. . . . "); *Doe v. Univ. of Notre Dame*, *supra*, 2017 WL 1836939, at *12 ("Even if John prevails in this case and the disciplinary dismissal is set aside by the final relief awarded. . . I am persuaded that this gap constitutes irreparable harm to John's reputation and resumé for purposes of career prospects and possible further academic advancement. The questions the gap raises, and the explanation it requires, are potentially damaging to John in a manner not compensable by money damages and not repaired by permanent injunctive relief that might be granted after a decision on the merits in John's favor."); *King v. DePauw University*, *supra*, 2:14-cv-70 (S.D. Ind. Aug. 22, 2014) ("If King is not permitted to complete this upcoming semester at DePauw—he will forever have either a gap or a senior-year transfer on his record. The Court finds it inevitable that he would be asked to explain either situation by future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct by DePauw. Successfully seeing this lawsuit to its conclusion could not erase the gap or the transfer; the question will still be raised, and any explanation is unlikely to fully erase the stigma associated with such a finding. Money damages would not provide an adequate remedy at that point; DePauw's disciplinary finding—even if determined to have been arbitrary or made in bad faith—would continue to affect him in a very concrete

19

way, likely for years to come."); *Phillip v. Nat'l Collegiate Athletic Ass'n*, 960 F. Supp. 552, 558 (D. Conn. 1997) (granting preliminary injunction where, "if the motion is denied, [plaintiff]'s education will be interrupted and delayed, perhaps for years"); *Coleman v. Newburgh Enlarged City School Dist.*, 319 F. Supp. 2d 446, 453 (S.D.N.Y. 2004) (continued suspension of student, and accompanying preclusion from extracurricular activities, "would result in imminent and irreparable harm"); *Maczaczyj v. State of N.Y.*, 956 F. Supp. 403, 408 (W.D. N.Y. 1997) (plaintiff showed irreparable harm where, in absence of injunction, he would not be able to participate in his master's program, or any other master's program at the college, which exclusion would most likely affect his ability to engage in future employment of his choice and would have an unquantifiable effect on his mental health).

Accordingly, Plaintiff meets the second element necessary for injunctive relief.

## V.    <u>The Balance of Hardships Tips Decidedly in Plaintiff's Favor</u>.

In assessing the third factor, a court must consider the burdens that would be imposed on the moving party and the non-moving party if the injunction were granted. *See Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020). Where granting an injunction would have little impact on the non-moving party, but denying the relief sought would cause great harm to the moving party, this factor weighs in favor of granting the injunction. *See NovaQuest*, 498 F. Supp. 3d at 838; *Frankenmuth Mut. Ins. Co. v. Cadet Constr. Co.*, No. 1:19-CV-1125, 2020 WL 2322726, at *5 (M.D.N.C. May 11, 2020).

The balance of hardships in this case weighs decidedly in Plaintiff's favor. Permitting Plaintiff to resume his classes for the spring 2023 semester would not place

any hardship on the University. Throughout the duration of the disciplinary proceedings, which spanned approximately nine months, from April of 2022 until January of 2023, Plaintiff continued his studies without issue. Accordingly, permitting Plaintiff to continue his courses poses no threat whatsoever to the safety of any Wake Forest student. Additionally, the University can continue the mutual no contact order in place, to ensure there is no interaction between John and Jane. Indeed, granting Plaintiff's motion would simply restore the status quo pro prior to his suspension. If Wake Forest ultimately prevails in this litigation, it can simply place the notation back on Plaintiff's transcript and revoke/rescind his degree. *See Doe v. Middlebury Coll.*, 2015 WL 5488109, at *4; *Doe v. University of Connecticut*, No. 3:20-cv-00092, ECF No. 18, at *11.

Conversely, as discussed in section IV above, the burden to Plaintiff if the preliminary injunction is denied is significant and will negatively harm him throughout his life, even if the findings and sanction are ultimately reversed. Thus, this factor supports the issuance of a preliminary injunction.

## VI. __It is in the Public Interest to Grant the Injunction.__

There is a strong public interest in avoiding violations of civil rights. *See Floyd v. City of New York*, 959 F. Supp. 2d 668, 673 (S.D.N.Y. 2013). Likewise, "[t]he public has an interest in fundamentally fair and sound educational discipline that is not imposed arbitrarily or capriciously." *Doe v. Univ. of Notre Dame*, *supra*, 2017 WL 1836939, at *13. *See also Ritter v. State of Oklahoma, supra*, 2016 WL 2659620, at *3 ("[I]t is always in the public's interest that a student be treated fairly before being disciplined."). And while there is a public interest in the enforcement of university disciplinary policies, "allowing

21

the Plaintiff to enroll in school while the Court adjudicates his motion for a preliminary injunction does not unreasonably interfere with that interest." *Doe v. Univ. Conn.*, *supra*, No. 3:20-cv-00092, ECF No. 18, at \*12. *See also Middlebury Coll.*, *supra*, 2015 WL 5488109, at \*4 (finding public interest did not weigh against Plaintiff where he posed no danger to campus and there was no potential for him to interact with Roe if readmitted). Thus, the public interest weighs in favor of granting Plaintiff injunctive relief, satisfying the fourth and final element for such relief.

## VII.    A Bond is Not Required.

Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, "the district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d at 332. Plaintiff submits that no bond is required here as Defendant will not suffer any material damage, nor be exposed to the likelihood of any harm, if the requested preliminary injunction is granted. Therefore, Plaintiff submits that he should not be required to post any bond/security as part of this motion.

## CONCLUSION

For the foregoing reasons, the Court should grant a temporary restraining order and preliminary injunction restraining Defendant from suspending Plaintiff from Wake Forest pending the adjudication of the merits of the Complaint.

Respectfully submitted this 7th day of February 2023.

NESENOFF & MILTENBERG, LLP

By: _/s/ Andrew Miltenberg_
Andrew T. Miltenberg, Esq.
Tara J. Davis, Esq.
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
tdavis@nmllplaw.com
_Notice of Special Appearances forthcoming_

-and-

EKSTRAND AND EKSTRAND, LLP

By: /s/ _Robert Ekstrand_
Robert C. Ekstrand, Esq.
NC Bar No. 26673
110 Swift Avenue, 2nd Floor
Durham, North Carolina 27705
Direct/Cell: (919) 452-4647
rce@ninthstreetlaw.com

_Attorneys for Paintiff_

## CERTIFICATE OF COMPLIANCE WITH LR7.3(d)

The undersigned counsel hereby certifies that this brief contains 6,207 words as calculated by the word processing software used to produce it and therefore complies with LR7.3(d)'s limitation of 6,250 words, excluding captions, signature blocks and certificates.

/s/ Robert Ekstrand
Robert C. Ekstrand, Esq.
NC Bar No. 26673

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2023, I filed the foregoing using the Clerk's CM/ECF system, which will provide notice to all counsel of record. I further certify that the foregoing will be served manually on all parties along with the summons and complaint.

/s/ Robert Ekstrand
Robert C. Ekstrand, Esq.
NC Bar No. 26673