CONFIDENTIAL

# TITLE IX OFFICE INVESTIGATION REPORT
## 11/04/2022

Jessica Telligman, Assistant Director of the Wake Forest University Title IX Office, conducted an investigation and prepared this investigation report pursuant to the *Sex and Gender Discrimination and Harassment Policy and Title IX Sexual Harassment and Non-Title IX Sexual Misconduct Grievance Procedures* (the "Policy" attached as Exhibit A).

The investigation and this investigation report are based upon a presumption that the Claimant made the Formal Complaint in good faith, as well as a presumption the Respondent is not responsible for the alleged violations unless and until a determination regarding responsibility is made by the Hearing Officer after the conclusion of the hearing. The investigator is an objective gatherer of evidence related to the Formal Complaint. This report summarizes the investigator's activities and evidence collected regarding the Formal Complaint.

1. **Background Information**

   a. ▇▇▇▇▇▇▇▇ ("Claimant") and ▇▇▇▇▇▇▇▇ ("Respondent") are both senior undergraduate students at the University.

   b. Claimant submitted a Title IX Formal Complaint form (attached as Exhibit B) to the Wake Forest Title IX Office on April 12, 2022. Claimant alleges that during the night of October 15, 2021, and during the early morning hours of October 16, 2021:

      a. She was incapacitated (due to alcohol) when Respondent engaged in sexual intercourse with her in her residence hall room on campus following a social event in which Respondent was Claimant's invited date. Alternatively, Claimant alleges that if she gave consent for sexual intercourse, she withdrew that consent[1] after intercourse started when she stated "this doesn't feel good," yet Respondent continued.

      b. She was incapacitated (due to sleep) when Respondent digitally penetrated her vagina without consent during the morning hours of October 16th when she woke up in her bed in her residence hall room. Respondent then allegedly continued to penetrate her after Claimant woke up.

   c. Claimant has not reported the alleged sexual assault to law enforcement. Consequently, there are no pending criminal law violations.

---

[1] The allegation of withdrawn consent was provided to Respondent in a second Notice of Allegations that was issued on September 1, 2022. Prior to that time, the Title IX Office did not have notice of that allegation until Investigator Telligman's first interview of Claimant on August 30, 2022, which is why it was not included in the first Notice of Allegations sent to Respondent on April 13, 2022.

1

**CONFIDENTIAL**

   d.  Throughout the investigation, Claimant referenced a belief that she may have been drugged on the night in question. Claimant has not alleged that Respondent drugged her, and therefore this is not an allegation presented for this hearing.

   e.  At the time of the alleged incident, Claimant had a single room but lived in a suite (▮▮▮▮▮) with her sorority sisters ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

   f.  Neither Claimant nor Respondent produced any text messages between them. Their conversations were primarily via Snapchat, records of which are automatically deleted.

## 2. Policy Definitions

   a.  The Policy defines sexual assault as "any sexual act directed against another person, without the consent of the person" including "<u>rape</u>" which is "the carnal knowledge of a person, without the consent of the victim," including instances where the person is incapable of giving consent because of incapacitation.

   b.  "<u>Sexual assault with an object</u>" is defined as "to use an object or instrument to unlawfully penetrate, however slightly, the genital or anal opening of the body of a person, without the consent of the person, including instances where the victim is incapable of giving consent because of his/her age or because of his/her temporary or permanent mental or physical incapacity."

   c.  The University defines <u>consent</u>, in part, as "permission for something to happen or agreement to do something." Furthermore, consent is "unambiguous, informed, active (not passive), voluntary (freely given), mutually understandable words and/or actions that indicate a willingness to participate in the sexual activity. Whether someone has given consent is based on the totality of the circumstances and is determined by reference to a reasonable person in the same or similar circumstances."

   d.  Consent may never be given by someone who is incapacitated. The University defines <u>incapacitated</u> as someone who does not have capacity to consent. "A person does not have capacity to consent to a sexual act if, at the time of the act, they cannot understand the sexual nature of the proposed act, cannot understand that they have the right to refuse to participate in the act, or are otherwise unaware that the sexual activity is occurring." The Respondent must also know or should know, based on a reasonable person standard, that the other person does not have capacity to consent.

## 3. List of Witnesses

- ▮▮▮▮▮▮▮: WFU student and Claimant's close friend.
- ▮▮▮▮▮▮▮: WFU student and Claimant's close friend.
- ▮▮▮▮▮▮▮: WFU student and Respondent's fraternity brother.
- ▮▮▮▮▮▮▮: WFU student and Claimant's former sorority sister and suitemate.

**CONFIDENTIAL**

- ███████: WFU alumni and Claimant's former sorority sister and suitemate.
- Andrew Goldstein, Polygraph Examiner

### 4. Claimant's Formal Complaint

The following information is the narrative provided by Claimant in her Formal Complaint: *"The respondent attended my sorority date function as my date on October 15th. After the event in my dorm room I was unable to give consent to activity that occurred and the next morning non-consensual activity occurred."*

### 5. Recorded Interviews of Claimant

Investigator Jessica Telligman interviewed Claimant on August 30, September 7, October 5, and October 12, 2022. Transcripts of the interviews have been provided to both parties and will be provided to the Hearing Officer. Claimant stated that she invited Respondent to her sorority date function on Friday, October 15, 2021. Claimant stated that Respondent was not a stranger to her because they had spent time together before. Claimant described their prior engagement as she had hung out with Respondent approximately four times in Spring 2021 and once or twice in Fall 2021. During this time, they did not have sexual intercourse but had spent the night in each other's rooms and engaged in consensual kissing, fondling, and Claimant stated that she performed oral sex on Respondent once. Claimant stated that during these prior interactions, she was "coherent," which Claimant stated was not the case on the night in question.

<u>Prior consent</u>

Investigator Telligman asked Claimant if she and Respondent had ever discussed consent for any of their sexual interactions, and she said no and explained that they used "physical responses" such as her touching Respondent's hair or kissing him back to indicate consent. Claimant said that she and Respondent "respond[ed] in different ways and provid[ed] consent in different forms." Investigator Telligman asked about instances of prior digital penetration and how Claimant and Respondent previously exchanged consent for that activity. Claimant again referenced kissing and hair touching, and also said that in prior interactions, she was a "functioning, moving, awake person" which Claimant stated was a difference from the incident in question.

<u>Pre-party in suite</u>

Claimant stated that on October 15, 2021, she and Respondent attended a pre-game party in her suite in ███████ starting at approximately 7:15pm. Claimant stated that during the pre-game party, which lasted approximately 2.5 hours, she drank approximately 3.5 shots of Tito's vodka mixed into a drink that she guesses was pink lemonade. Claimant stated that she was accustomed to drinking this amount of alcohol and did not feel bad after the pre-game. She described herself as "loose" and "relaxed." Claimant stated that she kissed Respondent on the charter bus ride to a bar called the Last Resort, which is near the University campus.

**CONFIDENTIAL**

Last Resort (bar)

Claimant stated that after she and Respondent arrived at the Last Resort at approximately 9:15pm, Respondent went to the bar and got two mixed drinks. Claimant does not know what was in the drinks. Claimant stated that she and Respondent shared the drinks. Claimant did not go to the bar because she was not 21 years old. Claimant stated that she and Respondent had fun and danced on the dance floor. She also recalls that she and Respondent talked and got to know each other better.

Claimant stated that during the end of her time at Last Resort, she began to feel unwell and she went outside and sat down. Claimant stated that she felt unwell standing so it was easier for her to sit. She said her head started pounding and she felt nauseous. Respondent gave her a cup of water and she drank it but did not feel better. Claimant's friend ▮▮▮▮ was also at the Last Resort and began to engage with Claimant to assist her. Claimant asked ▮▮▮▮ if she could bring Respondent to ▮▮▮▮ off-campus fraternity house ▮▮▮▮) and ▮▮▮▮ agreed. Claimant sent a text message to her friend ▮▮▮▮ at 10:46pm saying, "IM GOING TL ▮▮▮▮" which she believes was her attempt to say, "I'm going to ▮▮▮▮." All text messages in this matter are attached as Exhibit C. ▮▮▮▮ responded, "OKAY" and "girl take care of yourself can I do anything." Claimant responded at 10:50pm and said, "▮▮▮▮" and "WORK GETNANRIDE TOMHPUSE" which she believes she was trying to say, "working on getting a ride to the house." Claimant stated that she does not recall this text exchange, and said, "I don't remember a lot of that night."

Off-Campus ▮▮▮▮ House

Claimant stated that she believes a University student (▮▮▮▮ pledge driver) gave ▮▮▮▮, Claimant, and Respondent a ride from the Last Resort to the ▮▮▮▮ house. Claimant does not recall being in the car. Claimant texted ▮▮▮▮ at 12:12am, saying "As ▮▮▮▮ is going me" and "he's sitting by me" and "I need a ride." Claimant does not recall sending these text messages, but she stated that she believes she sent them after she had been at the ▮▮▮▮ house for about one hour (since 11:00pm).

▮▮▮▮ sent Claimant a text message at 12:12am asking if Claimant was still at the Last Resort, and Claimant replied and said, "NO" and "▮▮▮▮." ▮▮▮▮ then asked, "are you okay?" and Claimant said, "Yes" and "InTAKKED ALREADY" which Claimant guessed was her attempt to say, "I vomited already." ▮▮▮▮ replied, "good." Claimant believes that she vomited three times at the ▮▮▮▮ house – twice in the upstairs bathroom and once outside.

At 12:17am, Claimant texted ▮▮▮▮ and said, "I'm Coming back to ▮▮▮▮" and ▮▮▮▮ replied, "okay be safe!" Claimant replied at 12:21am and said "WE ARE FOONF BACL TO POLI" which she believes was an attempt to say, "I'm going back to ▮▮▮▮." ▮▮▮▮ then texted Claimant to say she was at a different party, and Claimant replied, "Z DOOMG WHAT" which she believes is an attempt to ask what ▮▮▮▮ was doing. At 12:59am, Claimant texted ▮▮▮▮, "I'm Boy okay" and "it burns." ▮▮▮▮ replied, "goodnight." Claimant stated that she believes, "I'm Boy okay" was an attempt to text "I'm not okay" because NOT is beside BOY on a keyboard.

4

**CONFIDENTIAL**

Claimant assumes "burns" is a reference to intercourse with the Respondent, but she cannot recall typing these text messages.[2]

Claimant stated that she recalls having an open drink at the ▇ house because she was wearing a white shirt and the red drink was spilled on it. She described herself as "stumbling so much." Claimant went upstairs from the basement party to the bathroom because she was sick, and Claimant stated that Respondent stayed in the basement during that time.

Claimant then recalls that she and Respondent received a ride from another pledge driver to her residence (▇). Claimant does not recall any conversation with Respondent about him coming with her, but she said that he lived in Dogwood Residence Hall which is the same drop off point as ▇ so it would have made sense for them to ride together. Claimant stated that she recalls having difficulty walking up the stairs in her suite in ▇. She said, "I just remember feeling just almost like a little out of breath." Respondent was walking behind Claimant.

Claimant then said, "I remember us starting to make out" and she said she was sitting on her bed. She said that "clothes started to come off and then at some point I really don't remember but he pulled out a condom." Claimant said that she does not recall any words being exchanged. Claimant said,

> "When we started to have sex, it started off as okay. I was basically coaching myself to do it. But I remember it coming out.[3] I remember saying okay at first, but I wasn't doing well. I was very [inaudible] after throwing up three times which is why I told him that this doesn't feel good, and he ignored me."

Claimant said that when she told Respondent, "this doesn't feel good," he ignored her. Claimant stated that she recalls thinking "why did he just ignore me?" Claimant said "no words were spoken" and "that is where my memory cuts out."

Next morning

Claimant then woke up in the morning time and was laying on Respondent's chest. Claimant stated that she woke up naked, which is unusual for her. She stated that she does not sleep naked. Claimant stated that her bedside lamp was knocked over and she does not know why.

Claimant said that "the moment I woke up, he had already started fingering me." By that, Claimant means that Respondent was inserting his fingers into her vagina. Claimant stated, "When I woke up, I did not move. He did not ask for consent. He never spoke to me." Claimant said she then "moved [her] legs and that took a lot of courage and [she] tried to move his hand but he didn't stop." Claimant said, "not once did he check in with me."

---

[2] ▇ stated during her interview that at the time she received the text messages from Claimant saying "I'm Boy okay" and "it burns," she did not know what Claimant meant.
[3] Investigator Telligman asked Claimant to clarify this sentence, and Claimant stated that she was referring to the condom coming out of the package.

5

**CONFIDENTIAL**

Claimant stated that she was "petrified" and "in a state of shock" and after Respondent stopped touching her, he got out of her bed, went to the bathroom and then thanked her for inviting him to the date function and kissed her before he left her room.

After Respondent left her room, Claimant stated that she saw a used condom and a ripped condom wrapper on the ground. Claimant sent a text message to ▓▓▓ at 8:40am stating, "Hi yes. Why were you worried" and then texted ▓▓▓ at 8:41am.

▓▓▓ room

During her first interview with Investigator Telligman, Claimant stated that she believed that she went to ▓▓▓ room "pretty early in the morning." During her second interview, Claimant stated that she was able to review the text messages between her and ▓▓▓ and she said the text messages helped Claimant understand that when she sent a first text message to ▓▓▓ at 8:41am saying, "exactly," Respondent had already left her room. Claimant initially believed she went to ▓▓▓ room about that time, but during the second interview, Claimant stated that she probably stayed alone in her room for approximately three hours until her second text to ▓▓▓ at 11:12am saying, "Please answer the phone."

## 6. Claimant's Medical Records

During the investigation, Claimant produced a list (Exhibit D) of what she described as dates of her visits to the University Student Health Service. That list has been provided to both parties and will be provided to the Hearing Officer. Claimant stated that the first visit listed is 10/18/21 and she saw PA Charley Cummings.[4] Claimant provided a medical record from this visit (Exhibit F). Claimant stated that she requested and received a test for possible drugging during this visit. Claimant stated that the test did not show any drugs in her system, but that it would not have because of the amount of time that had passed since the incident (3 days). Claimant stated that she was provided Plan B and received a referral to the Safe Office during this visit.

October 18, 2021 medical record

Claimant's medical record from October 18, 2021 (Exhibit F) includes a nurse's note by James Perrott indicating that "Pt denies sexual assault." During her interview on October 12, 2022, Investigator Telligman asked Claimant about this statement, and Claimant stated that she did not intend to report a sexual assault during her October 18th student health visit. The chief complaint listed on the record is "requesting drug testing" and Claimant stated that was all she wanted that day. Claimant stated that when a male nurse walked in the room, she was uncomfortable and described the entire visit as her being in "complete shock" and having "extreme anxiety." Claimant further stated that she was not sure who was a mandatory reporter and did not understand "what really even happened to [her]."

Claimant's October 18, 2021 medical record also notes that Claimant "reports she began drinking alcohol around 7:30pm on Friday – she made herself a mixed drink in her drom [sic]

---

[4] Charley Cummings no longer works for the University.

**CONFIDENTIAL**

with 3-4 shots of liquor." The medical record continues, "she went to a friend's house off campus around 9:30pm and made another mixed drink with an unknown quantity o [sic] liquor, but thinks no more than 2 shots."

During her interview on October 12, 2022, Investigator Telligman asked Claimant about the differences between this information in the student health record and the information she previously provided during the Title IX investigation. Claimant stated that given she was under 21 years old and unsure about disciplinary violations, she was very scared that she, the sorority, or ▉▉▉ would get in trouble. Consequently, for example, instead of saying that she went to Last Resort, she mentioned a friend's house off campus. Claimant stated that the reference in the medical record to approximately 3-4 shots of liquor in her dorm was probably a reference to the pre-party and the reference to "another mixed drink with an unknown quantity of liquor" was likely a reference to what the Respondent gave her at the Last Resort.

The October 18th record also states that Claimant recalls "blacking out" around 12:00am and "the last thing she remembers is arriving home." During her interview on October 12, 2022, Investigator Telligman asked Claimant about the differences between this information in the student health record and the information she previously provided during the Title IX investigation. Claimant stated that, again, she did not intend to reveal a sexual assault during this visit. She was "terrified" and embarrassed and even though the record says she did not recall sexual intercourse, she did recall that but did not want to say it. Claimant stated that she was not ready to report because she was "barely surviving" and did not think anyone would believe her.

The diagnosis included in this October 18th medical record says, "adult sexual abuse, confirmed, initial encounter." Investigator Telligman asked Claimant if she would sign a release such that Dr. Price, the director of Student Health and the medical director of the provider involved, could explain the diagnosis to Investigator Telligman, but Claimant declined.

<u>Later SHS visits</u>

Claimant chose not to produce her later medical records, but indicated Student Health visits on 10/25/21, 11/12/21, and 11/22/21 were all related to the alleged assault. Claimant stated the 10/25/21 visit to Charley Cummings marked as "follow up" was related to "internal" pain Claimant attributed to intercourse with Respondent. Claimant stated that pain from intercourse did not dissipate for two weeks. Claimant stated that she was also scheduled for a chlamydia and gonorrhea test at this visit.

Claimant stated that a lasting scar on her face was from a "stress rash" that she also attributes to the alleged assault. Claimant stated that she saw Brooks Irvin, PA-C on 11/12/21 for the rash. A photo (Exhibit E) of the rash was provided by Claimant. Claimant also stated that her eyelids were peeling from stress.

Claimant stated that by the third visit with Charley Cummings on 11/22/21, also marked "follow up," she was feeling physically better but not mentally.

**7. Respondent's Responses**

7

**CONFIDENTIAL**

Investigator Telligman interviewed Respondent on September 8, September 15, and October 6, 2022. Transcripts of the interviews have been provided to both parties and will be provided to the Hearing Officer. Respondent stated that he met Claimant during the Spring 2021 semester when they were both Sophomores. ▓▓▓▓, Respondent's friend and fraternity brother, set him up with Claimant and they began talking, primarily via Snapchat. Respondent provided his text message with ▓▓▓▓ from April 17, 2021, which Respondent stated was the first time he met Claimant. The text message from ▓▓▓▓ states, "gotchu a hookup show" (Exhibit C).

Respondent estimated that he had probably 8 prior interactions with Claimant that he described as "hookups" and he said of those, half were occasions when he digitally penetrated her vagina. Respondent said he and Claimant never had a conversation about this, but that he "had just done it at times, and there was no push back" so he "felt that she was comfortable with it." He said "there was nothing telling me that this was making her uncomfortable in any way." Investigator Telligman asked Respondent if Claimant initiated any conversations with him about sexual activity before she did something such as perform oral sex on him, and Respondent stated that she never asked him either. He said they exchanged consent nonverbally "just based off how our night was going" and it was not necessary to stop and have a conversation.

Respondent stated that after the Spring 2021 semester, his contact with Claimant "kind of fizzled out." Respondent stated that he was not "looking to date" Claimant and they did not speak at all during Summer 2021. Respondent stated that once he and Claimant returned to campus for the Fall 2021 semester, Claimant reached out to him after a party one night. She asked him to come over to her residence hall room, which he did. Respondent stated that he made out with Claimant but cannot recall if there was fondling that night. Respondent stated that after that "hookup," Claimant was persistent in texting him to get together again, but he declined because he was sick for some time. Respondent stated that after he got better, they had a second hookup that semester after Claimant Snapchatted him. Respondent believes this may have been early-mid September 2021. Respondent spent the night in Claimant's residence hall room again, but there was no sexual intercourse. Respondent stated that he would not consider himself dating Claimant, but rather described Claimant as someone he "was hooking up with."

October 15, 2021 Date Function

Respondent stated he had never been on a date with Claimant when she sent him a Snapchat message inviting him to her sorority date function. Respondent stated that when he opened the message, he was "drunk" and "panicked." Respondent said that at the time, he was already romantically interested in another student named ▓▓▓▓,[5] but felt he had to respond to Claimant because Snapchat does not allow you to leave the conversation "without leaving her unread." Consequently, Respondent said he agreed to go to the date function, but he felt "neutral" about attending. He said he "didn't mind" going with Claimant, but he was not excited about going either.

---

[5] Respondent stated that he believes Claimant was upset about Respondent's romantic interest in ▓▓▓▓. Respondent stated that his friend ▓▓▓▓ told him that Claimant expressed to him ▓▓▓▓ that she was angry that Respondent took ▓▓▓▓ to a date function instead of her.

8

**CONFIDENTIAL**

Pre-party

Respondent stated that he attended a pre-party with Claimant in her suite prior to the event, but he does not know what time it started. He estimated, "maybe two hours before the date function started." Respondent believes he brought his own beer to the pre-party. Respondent described a beer pong table at the pre-party. Respondent stated that he thinks he played beer pong with Claimant, but he is unclear what she was drinking at the time. Respondent stated that he believes she provided her own alcohol.

Respondent stated that after the pre-party, he rode with Claimant in a van provided by the sorority to the Last Resort. Respondent stated that he and Claimant began "making out" in the van when she initiated kissing. Respondent said, "I had again had a couple of beers so I was in a good mood." Respondent stated that he did not feel uncomfortable. Respondent clarified that he had approximately 4 -5 beers total at the pre-game function, but he described himself as an "experienced drinker" and said he was not intoxicated. Respondent stated that at the time Claimant entered the van on campus, "she seemed intoxicated to a certain level, however, not anything where she was slurring her words, you know, falling over, stumbling." Respondent described her as "very coherent" and probably "in the buzz state."

Last Resort

Respondent stated that once he arrived at the date function, he believes he "had about two more drinks" but he could not have purchased those because he was not 21 years old. Respondent stated that a fraternity brother likely gave him the drinks. Respondent does not recall what those drinks were and stated it "likely would have been just another beer." Respondent stated that he does not recall Claimant drinking at the Last Resort. Respondent said, "that's not to say she wasn't," he just does not recall. Respondent does not recall sharing any drinks with her.

Respondent was asked what he recalls inside the Last Resort and he said, "nothing aside from dancing and possibly kissing on the dance floor." Respondent is unsure how long they were at Last Resort, but he said possibly 1.5 – 2 hours. Respondent stated that sorority date functions typically end with enough time for the attendees to move on to a different party to go downtown. Respondent stated that he does not recall specific details due to the passage of time. He stated that he was "fully coherent" this night and "was not black[ed] out."

Respondent stated that he does not recall any specific conversation with Claimant about leaving the Last Resort with her. He stated that it was "implied" that they would leave together. Respondent stated that he believes he went from the Last Resort with Claimant back to ▆ Residence Hall.[6] Respondent does not recall the method of transportation. Respondent described

---

[6] After Respondent began reviewing information from others during this investigation, he realized that he must have gone with Claimant to the ▆ off-campus house that night. Respondent stated during his September 26, 2022 interview that he does not recall being at the ▆ house, but also stated that his lack of memory is not due to his alcohol consumption that night, but rather the time delay between the night and when he was notified about the allegations.

9

**CONFIDENTIAL**

Claimant as "definitely intoxicated" but he said she was energetic and coherent and described her as a "happy drunk." He said, for example, there was no sign she could not walk straight. She was not slurring her words. She was not falling asleep in the car. He said Claimant was intoxicated "but not to the point where anything seemed off." Respondent stated that he "didn't notice anything that would tell [him] she was close to the point of say blacking out." Respondent stated that Claimant did not tell him she felt bad. He said there "was nothing to tell [him] she was uncomfortable."

Respondent stated that after he arrived with Claimant to her residence hall room, they "started making out and then it got to the point where [they] were gonna have sex." Respondent stated that there "was no verbal consent" but there was nothing to tell him anything was going wrong. Respondent stated "it looked like she felt comfortable." Respondent stated that "there was no pushing off [him] or telling [him] to leave." He said that based on their previous interactions, he felt comfortable with Claimant and he assumed she felt comfortable with him. Respondent stated that he planned to use a condom for sex and had one, but he was unable to use it because he could not get an erection. Consequently, there was no sexual intercourse and he and Claimant put their clothes back on. He said they made out and went to sleep in her single bed. Respondent does not recall any specific words being said during this entire interaction.

<u>Morning</u>

Respondent stated that on the morning in question, he and Claimant woke up in her bed and began cuddling. He said he does not recall the "specific motions" of how they were cuddling. Respondent stated that he wants to make it clear that he recalls that "we were both in the mind space that we were together. This is going on. We're cuddling. And that's when [he] started to finger her." He stated that it lasted "only a few minutes" and he did not intend for it to lead to any other sexual activity. Respondent could not recall any words exchanged during this time. When asked how he knew Claimant was in the "mind space" to be digitally penetrated, Respondent said:

> "Just based off how we were cuddling that morning, you know, we were very close. You know she was rubbing my shoulders, scratching my shoulder, something along those lines, and I brush her hair, you know, just cuddling. I felt that we were in the same head space. Same mood. That's how I could describe it. That's how I felt it was okay to finger her."

Investigator Telligman asked Respondent if he can specifically recall seeing Claimant's eyes open and knew she was moving before the digital penetration, and he said yes. Respondent specifically stated during his October 6, 2022 interview that he is sure that Claimant's eyes were open and she was present and aware of what was happening. Respondent stated that the primary purpose of digital penetration was for the Claimant's enjoyment, not his.

Respondent stated that when he left Claimant's room, he did not think anything was wrong. Respondent stated that before he left, the Claimant sat up on the bed, said "some form of goodbye" and he gave her a kiss. He described it as a normal night with Claimant. The Respondent stated that he does not recall seeing a lamp knocked over, nor does he remember

10

**CONFIDENTIAL**

engaging in any activity that would have led to a lamp being knocked over. He did not think it was different from his other interactions with the Claimant. Respondent stated that the first notice he had that Claimant may have an issue with the night in question was April 2022 when he received the Notice of Allegations from the Title IX Office. Prior to that time, he stated that no one had told him that Claimant was upset with him. Respondent stated that he never heard from Claimant again. He said that was not odd because their interaction was primarily for "hookups" and they did not engage in casual conversation. Instead, they would Snapchat each other after they were out and wanted to hookup. Respondent was also interested in dating someone else at the time so he did not reach out to Claimant.

▆

Respondent described a situation involving his fraternity brother ▆▆▆▆ that he stated may have been motivation for Claimant's allegations against him. Respondent described an incident in which ▆▆ allegedly made someone uncomfortable at a fraternity social gathering and as a result, was suspended by the fraternity for a date function. Respondent was involved as the Vice President of the fraternity at the time. Respondent stated that Claimant was "talking to" ▆▆ at that time and ▆▆ told her about it. Respondent stated that Claimant became very upset when she brought her allegations about Respondent to his fraternity and the fraternity did not discipline Respondent. Respondent thinks that could be the reason she escalated it to the Title IX Office. Respondent also described a situation this past summer wherein he was going to live in Charlotte with some of his fraternity brothers, including ▆▆. This was housing provided by Johnson & Wales. Respondent stated that he asked Johnson & Wales for a separate space from ▆▆ and they removed ▆▆ before Respondent had the chance to address it. Respondent stated that ▆▆ was "very mad" about this and Claimant found out as well.

### 8. Claimant's Response

On October 5, 2022, Investigator Telligman reviewed with Claimant the Respondent's statement that he did not have sexual intercourse with Claimant on the night in question. Claimant stated again, as she had previously, that she did have sexual intercourse with the Respondent on the night in question. She stated that sexual intercourse was happening for a few minutes when she told Respondent that it did not feel good, and Claimant stated that her memory cuts out a few seconds after saying that to him.

### 9. Witness ▆▆▆▆

Investigator Telligman interviewed witness ▆▆▆▆ on September 6, 2022. A transcript of this interview has been provided to both parties and will be provided to the Hearing Officer.

▆▆ told Investigator Telligman that she sent a text message to her friend ▆▆ at 10:51pm on the night in question after she received a phone call from Claimant. ▆▆ stated that Claimant called her just before she sent that message and she sounded very intoxicated. ▆▆ said Claimant was hard to understand but was saying things like, "▆▆, I wish you were here." ▆▆ said it was rare for Claimant to be out without her that semester because they spent so much time together. ▆▆ had previously been Claimant's date to events as friends. ▆▆

**CONFIDENTIAL**

said it was unusual for Claimant to be so impaired because she typically stayed in control of herself. ▮ said on the phone call, Claimant was "slurring her speech" and not forming coherent sentences. ▮ was concerned so she texted their friend ▮ who was at the Last Resort and said, "can u help ▮" and he replied at 10:51pm, "Bro ▮ been all over ▮." "It's hard to break them up but np." ▮ replied, "I'm sorry to be a narc but she called me and can barely talk." ▮ replied two minutes later and said, "I found her she's fine, just drunk." One minute later ▮ wrote, "She's about to yak we have her."

At 11:08pm, ▮ texted ▮, "I'm with her and got her water and taking her to the house so we can keep an eye on her, the pledges all know she's under our watch." By 11:13pm, ▮ texted, "She throwing up rn [right now]." ▮ replied and asked, "where is ▮" and ▮ wrote, "here at ▮"

An hour later at 12:12am, ▮ texted Claimant and asked if she was still at the Last Resort. Claimant replied and said she was at ▮. ▮ asked if she was okay, and Claimant wrote, "Yes InTAKKED AREADY." ▮ assumed Claimant meant "I yakked already" so ▮ wrote "good" probably because she thought Claimant would feel better. The last messages between Claimant and ▮ that night ended with ▮ saying, "goodnight" at 1:02am.

<u>Morning</u>

▮ told Investigator Telligman that she woke up on the morning of October 16, 2021 to Claimant calling her on the phone. ▮ did not answer the first time because she was tired, but Claimant called again and ▮ thought she needed to answer so she did. Claimant asked to come over and ▮ asked if she wanted to meet up later because she was still sleepy, but Claimant wanted to come then. Claimant arrived at ▮'s room and ▮ greeted her by asking something along the lines of, "hey, how was last night?" ▮ said that Claimant started crying and told ▮ that she "woke up to him touching me." ▮ said she told Claimant "whoa, whoa, wait, like what's going on?" and told Claimant that was not okay. ▮ said they then talked about what happened and Claimant told her that after she returned to her room with Respondent the night prior, her memory was foggy but she remembered "bits and pieces." Claimant told her that "they did have sex but she doesn't remember it." ▮ said, "she [Claimant] knew it didn't feel good." Investigator Telligman asked ▮ if Claimant mentioned consent. ▮ said, "I don't think she said that she didn't want to in the first place, or that she said 'no' in the first place." ▮ said Claimant told her when they started having sex, "it hurt," Claimant told Respondent "this doesn't feel good" and she "does not remember anything after that." ▮ also said this alleged sexual intercourse hurt Claimant "for like two weeks after," which is not normal.

▮ said that Claimant said she woke up in the morning to "him touching her or whatever he did to her," a used condom on the floor, and her lamp turned over. ▮ said she asked Claimant if she was "fully asleep" and Claimant said, "yes, I completely had not been awake and I woke up to his, to him touching me." ▮ said she was pretty sure Claimant was naked and she does not sleep naked. ▮ said that Claimant told her that she tried to move or flinch her body to give the hint to Respondent to stop touching her, but he did not stop. ▮ said, "I

12

**CONFIDENTIAL**

think she ended up fully stopping him by either moving her leg to where he could not touch her anymore."

▮▮▮ said that Claimant was very anxious about not knowing what happened with Respondent.

Investigator Telligman asked ▮▮▮ about her text messages with ▮▮▮ wherein she [▮▮▮] said to ▮▮▮ on October 18, 2021:

> "i don't want to tell all the boys bc I don't want them to ask questions and stuff but between me & u, please as a friend, don't talk about the dfunc [date function] a lot with ▮▮▮ [Claimant] because she's kinda nervy that she was drugged or something and it wasn't a great night in all and people keep bringing it up and i don't want it to make her anxious."

With regards to this text, ▮▮▮ referenced ▮▮▮ text message to her from the night of the date function wherein ▮▮▮ said "▮▮▮ been all over ▮▮▮ it's hard to break them up." ▮▮▮ said that "their guy friends [who] were there [at the date function], kept teasing her about it." Later in that text conversation between ▮▮▮ and ▮▮▮, ▮▮▮ writes,

> "I don't blame her, I've never seen ▮ that bad so fast, like normally she can hang but she was trashed so quickly."

**10. Witness** ▮▮▮

Investigator Telligman interviewed witness ▮▮▮ on September 7, 2022. A transcript of this interview has been provided to both parties and will be provided to the Hearing Officer.

▮▮▮ told Investigator Telligman that he was friends with Claimant and attended the date function with one of Claimant's sorority sisters. ▮▮▮ states that he recalls that Claimant was "incredibly drunk" that night and he recalls her sitting "on the big chair" outside the Last Resort looking for a bag or trash can to vomit. ▮▮▮ said, "I can't tell you what she had to drink, other than she was incredibly intoxicated." ▮▮▮ described Claimant as realizing in the moment that she was intoxicated because she was saying, "oh my goodness, I am incredibly drunk." Claimant also was stumbling and slurring her words.

▮▮▮ stated that he was the social chair of his fraternity at the time, and they planned to have a low-key party that night. Patrick said that Claimant did not want to go home, so he invited Claimant and Respondent to his party at the ▮▮▮ off-campus fraternity house. Patrick said that they went back to this house and he "told everybody that was working the party that night that this girl is incredibly drunk and we need to keep an eye on her and make sure nothing bad happens to her." ▮▮▮ said he talked with ▮ and said, "Hey, ▮▮▮ is incredibly drunk, please keep an eye on her."

At the off-campus house, ▮▮▮ said that Claimant "was very clearly at the state that she could and probably should go home" but she did not want to. ▮▮▮ described it as "still a little early" and he said he "wanted to keep her at our place so we could make sure we had a team of people

13

**CONFIDENTIAL**

watching, making sure she could get water, and keeping an eye on her." ▮▮▮ said that Claimant is a little sister in his fraternity and was very comfortable in this environment. ▮▮▮ said that at some point, Claimant and Respondent left the house but he did not see them leave. ▮▮▮ did not see Respondent do anything this night that was concerning to him.

▮▮▮ texted Claimant at 2:50am and said, "Hi are you ok, I am worried." ▮▮▮ said he sent this text because he had gotten Claimant water twice and said she was "not good at LR [Last Resort] and she was not better in our basement, but she was maintaining kinda where she was." ▮▮▮ said, "it was more drunk than I'd really ever seen her." Claimant did not reply until the next morning when she said, "Hi yes, why were you worried." ▮▮▮ said, "because you were very drunk and I was just making sure."

**11. Witness** ▮▮▮

Investigator Telligman interviewed witness ▮▮▮ on September 26, 2022. A transcript of this interview has been provided to both parties and will be provided to the Hearing Officer. ▮▮▮ was Claimant's sorority sister and suitemate at the time of the alleged incident. ▮▮▮ attended the pre-party with Claimant and Respondent and went to the Last Resort as well. ▮▮▮ stated that the following students were signed up to be sober monitors at the Last Resort event: ▮▮▮[7] ▮▮▮[8] ▮▮▮ and ▮▮▮. All of these sober monitors except ▮▮▮ and ▮▮▮ have graduated.[9]

▮▮▮ stated that Claimant introduced her to her date (▮▮▮) and that they all attended the pre-party in their suite. ▮▮▮ said that she recalls music in the pre-party and they probably played "cup pong" but ▮▮▮ said the cups probably had water in them because they did not like to waste their alcohol. ▮▮▮ said that Claimant was probably "tipsy" after the pre-party but she was "fine." ▮▮▮ describes herself as typically "hyper aware" of her friends' intoxication levels and said she would have noticed any stumbling or "being messy." ▮▮▮ did not notice those issues with Claimant at the pre-party or on the way to the shuttle.

▮▮▮ stated that she recalls it being "very awkward" on the shuttle ride to the Last Resort because ▮▮▮ and ▮▮▮ were sitting in front of Claimant and Respondent who began making out behind them. ▮▮▮ did not know ▮▮▮ very well at the time but they all went to the Last Resort together. ▮▮▮ does not specifically recall seeing Claimant or Respondent for the

---

[7] Investigator Telligman spoke with ▮▮▮ via telephone on October 5, 2022, and ▮▮▮ stated that she recalls being a sober monitor at the Last Resort event, but does not recall seeing Claimant.

[8] Investigator Telligman spoke with ▮▮▮ via telephone on October 3, 2022, and ▮▮▮ stated that she has no relevant information because she was not at the Last Resort during the time period in question. Instead, she was on campus helping another sorority member.

[9] Claimant stated during her October 5, 2022 interview that sober monitors in her sorority were allowed to drink at events and "oftentimes are also pretty drunk." She also stated that given she transferred into the University as a Sophomore during COVID, she did not know many individuals in her sorority and would not have expected sober monitors to recognize her.

**CONFIDENTIAL**

remainder of the night, but thinks they may have been at the ▮▮▮ house together after the Last Resort. ▮▮▮ was a member of ▮▮▮.

▮▮▮ stated that on the night in question, Claimant texted their suitemate ▮▮▮ and asked ▮▮▮ to leave her room. ▮▮▮ room was closest to Claimant's room, and ▮▮▮ said that Claimant "didn't want whatever was going to happen with ▮▮▮ in her room for them to overhear." ▮▮▮ said that ▮▮▮ did not appreciate being asked to leave her own room. ▮▮▮ also said that this was the second time that Claimant had asked ▮▮▮ to leave her room for Claimant and Respondent, and ▮▮▮ was not going to do it. ▮▮▮ stated that ▮▮▮ told Claimant after she asked her to leave her room the first time that she was not going to do it, and then Claimant asked again and this led to a "blow up."

Next morning

▮▮▮ stated the next morning, she saw Claimant in their suite and asked about the night before as she usually would after an event. ▮▮▮ stated that Claimant brushed her off, but ▮▮▮ was later told by ▮▮▮ that Claimant did not remember the night and thought she may have been drugged. ▮▮▮ stated that Claimant was given a drug test which ▮▮▮ said came back negative. ▮▮▮ stated that her recollection of Claimant on the night in question is that she was "acting normal."

▮▮▮ stated that, "after that like I don't know if it was that night that changed something but she like became very rude to all of us." ▮▮▮ stated that she would check in with ▮▮▮ about Claimant, but ▮▮▮ told ▮▮▮ that Claimant was "fine" and said "she's just going through some stuff." ▮▮▮ said that Claimant was getting over "her other breakup" and ▮▮▮ was not sure exactly what caused Claimant to withdraw. ▮▮▮ said she directly asked ▮▮▮ about Respondent, saying, "did he rape her" and ▮▮▮ said she was told "no" and "reassured that that did not happen." ▮▮▮ said that Claimant "continued to be super, super rude" to the suitemates so they quit talking at this point.

▮▮▮ stated that she recalls Claimant being frustrated with Respondent prior to the night in question because Claimant felt like she and Respondent were on again, off again and Claimant could not tell if Respondent was into her. ▮▮▮ thought maybe the reason Claimant brushed her off the morning after this event was because again, nothing happened. ▮▮▮ said after the prior night they had spent together, Claimant was frustrated because "like they kissed, but nothing further" and ▮▮▮ wondered if "maybe just like again, nothing happened or he just fell asleep or like maybe she's just like, frustrated with him." ▮▮▮ said that previously, Claimant had told her that she was never talking to Respondent again because of these mixed signals, and ▮▮▮ asked Claimant if she wanted them (her roommates) to hold her to that, but Claimant again brushed her off and said it was fine.

**12. Witness ▮▮▮**

Investigator Telligman interviewed witness ▮▮▮ via telephone on October 5, 2022. Given that this was a telephone call instead of an in-person meeting, a transcript of this interview was not created. ▮▮▮ was Claimant's sorority sister and suitemate at the time of the alleged

CONFIDENTIAL

incident. ▌ has since graduated and moved away from Winston-Salem. ▌ stated that on the night in question, she recalls having friends in her room after the date function. ▌ stated that she believes Claimant asked her to leave her room, but she said Claimant did not explain why. ▌ assumed that was for the purpose of a "hook up" but ▌ also stated she was confused because there was no explanation provided. ▌ cannot recall if this request was communicated to her via Snapchat, text message, or something else. ▌ stated that she and her friends left the room upon Claimant's request, but she confronted Claimant about it the following day and said she did not appreciate it. ▌ stated that she did not see Claimant return to the suite with the Respondent on the night in question. ▌ said that the next day, Claimant said something "not great" happened, but did not disclose details, and she (▌) did not have any conversations with Respondent about it either.[10]

### 13. Witness ▌

Investigator Telligman interviewed witness ▌ via telephone on October 12, 2022. Given that this was a telephone call instead of an in-person meeting, a transcript of this interview was not created. ▌ is Respondent's fraternity brother. ▌ stated that Claimant went to the fraternity judicial chair, ▌, in April 2022 to report that Respondent sexually assaulted her. ▌ said that ▌ contacted ▌ as the Secretary of the fraternity. ▌ said that he and ▌ met with Claimant at her request on a Friday in April. ▌ said that Claimant told them that she was going through an adaptive resolution process through Title IX with regards to the sexual assault. Claimant told them that she had "evidence"[11] she was sexually assaulted, and she wanted the fraternity, through the judicial board, to review the evidence, have a "trial," and remove the Respondent from the fraternity. ▌ said that he and ▌ listened to Claimant and told Claimant that she should continue to utilize the University Title IX process, and assured Claimant that their fraternity would respect whatever decision resulted from that process. ▌ said that Claimant became very angry and screamed at them, calling them terrible names. ▌ did not review the "evidence" that Claimant referenced, and instead told Claimant to present the evidence to the Title IX Office. ▌ said that Claimant told them that she would tell people that their fraternity supports sexual assaulters.

▌ said that after this conversation with Claimant, ▌ began reaching out to him and accused the fraternity of not taking the allegations seriously. ▌ said, "I cannot believe you

---

[10] Investigator Telligman asked Claimant about this during her October 5, 2022 interview, and Claimant stated that about one month prior to this incident, she had asked ▌ to leave ▌'s room because Claimant was having the Respondent in her room. Claimant said she did so because the walls were very thin between her room and ▌'s room and Claimant could hear ▌ talking to her friends when ▌ had people in her room. Claimant stated that she did not recall asking ▌ to leave on the night in question, but she also stated that she recalls ▌ confronting her the next morning on October 16, 2021 and "chewing her out" for asking her (▌) to leave her own room. Claimant stated that she was "in shock of what had just happened" so she probably just apologized to ▌.

[11] Investigator Telligman asked Claimant during her October 12, 2022 interview to identify the referenced "evidence," and Claimant stated she meant her timeline, the photo of her face, and the other information she has provided to Investigator Telligman.

16

CONFIDENTIAL

could stand to be in a fraternity with a sexual assaulter" and similar statements. ▮ stated that Claimant then also began texting him to ask again why the fraternity would not suspend the Respondent. ▮ reiterated multiple times that the Title IX Office was the best way to handle the issue.

**14. Witness Andrew Goldstein, LCPE**

During this investigation, Respondent identified Andrew Goldstein as a witness and provided the documents attached as Exhibit G, identifying Mr. Goldstein as a "Forensic Polygraph Examiner." Exhibit G states that Mr. Goldstein met with the Respondent and conducted a polygraph examination. Exhibit G includes a long paragraph that Mr. Goldstein states that he determined was truthful information provided by Respondent.

**Conclusion**

The above report represents Investigator Telligman's summary of the relevant information presented during the investigation. In addition to this report, information presented to Investigator Telligman has already been shared with the parties via the secured drive (Box), and the Hearing Officer will review all information in Box, including the transcripts, prior to the hearing.

**Appendix A: List of Exhibits**

- Exhibit A: *Sex and Gender Discrimination and Harassment Policy and Title IX Sexual Harassment and Non-Title IX Sexual Misconduct Grievance Procedures* (the "Policy")
- Exhibit B: Title IX Formal Complaint form
- Exhibit C: All text messages in this matter
- Exhibit D: Student Health Service list
- Exhibit E: Claimant's photo of her face
- Exhibit F: Student Health Service record from 10/18/21
- Exhibit G: Report from Andrew Goldstein, LCPE

**Appendix B: Interviews Conducted**

- **August 30, 2022** – Claimant interviewed by Jessica Telligman; also present was Stephanie DeAngelis (Claimant's support person) and Skye David, JD (Claimant's advisor, present via Zoom)
- **September 6, 2022** – Witness ▮▮▮▮▮▮ interviewed by Jessica Telligman
- **September 7, 2022** – Claimant interviewed by Jessica Telligman; also present was Stephanie DeAngelis (Claimant's support person) and Skye David, JD (Claimant's advisor, present via Zoom); purpose of interview was to review documents provided by Claimant after her first interview on 8/30/22.

17

**CONFIDENTIAL**

- **September 7, 2022 –** ▮▮▮▮▮▮ interviewed by Jessica Telligman
- **September 8, 2022 -** Respondent interviewed by Jessica Telligman; also present was John Fitzgerald (Respondent's advisor)
- **September 15, 2022 -** Respondent interviewed by Jessica Telligman; also present was John Fitzgerald (Respondent's advisor); purpose of interview was to discuss text messages that Respondent produced on 9/15/22 between himself and ▮▮▮▮▮▮
- **September 26, 2022 -** Respondent interviewed by Jessica Telligman; also present was John Fitzgerald (Respondent's advisor); interview was requested by Respondent to provide additional information.
- **September 26, 2022 –** ▮▮▮▮▮▮ interviewed by Jessica Telligman
- **September 28, 2022 –** ▮▮▮▮▮▮ interviewed by Jessica Telligman, transcript provided
- **October 4, 2022 –** ▮▮▮▮▮▮ interviewed by Jessica Telligman via phone call (no transcript)
- **October 4, 2022 –** ▮▮▮▮▮▮ interviewed by Jessica Telligman via phone call (no transcript)
- **October 5, 2022 -** Claimant interviewed by Jessica Telligman; also present was Stephanie DeAngelis (Claimant's support person) and Skye David, JD (Claimant's advisor)
- **October 6, 2022 -** Respondent interviewed by Jessica Telligman; also present was John Fitzgerald (Respondent's advisor)
- **October 12, 2022 –** ▮▮▮▮▮▮ interviewed by Jessica Telligman via phone call (no transcript)
- **October 12, 2022 –** Claimant interviewed by Jessica Telligman via Zoom (Fall Break); also present was Stephanie DeAngelis (Claimant's support person) and Skye David, JD (Claimant's advisor) and Olivia Bray (Case Coordinator); purpose of interview was to review medical record provided by Claimant on 10/5/22

**Appendix C: Materials provided in Confidential Shared Drive**

| Date provided in drive | Who was it provided to? | What was provided? |
|---|---|---|
| 9/13/22 | Claimant, Respondent, Skye David, Stephanie DeAngelis, John Fitzgerald | Formal Complaint, iPhone note provided by Claimant, Notice of Allegations, updated Notice of Allegations, photo of Claimant's face provided by Claimant, policy, text messages between ▮▮▮▮▮▮ and ▮▮▮▮▮▮, text messages between Claimant and ▮▮▮▮▮▮, text |

18

**CONFIDENTIAL**

| | | |
|---|---|---|
| | | messages between Claimant and ▮▮▮, text messages between Claimant and ▮▮▮ |
| 9/15/22 | Claimant, Respondent, Skye David, Stephanie DeAngelis, John Fitzgerald | Claimant's list of Student Health Service visits |
| 9/16/22 | Claimant, Respondent, Skye David, Stephanie DeAngelis, John Fitzgerald | Text messages between Respondent and ▮▮▮ Claimant interview transcripts (08/30/22, 09/07/22) & Respondent interview transcripts (09/08/22, 09/15/22) |
| 9/19/22 | Claimant, Respondent, Skye David, Stephanie DeAngelis, John Fitzgerald | Witness ▮▮▮ and Witness ▮▮▮ interview transcripts |
| 9/21/22 | Claimant, Respondent, Skye David, Stephanie DeAngelis, John Fitzgerald | Text messages between Claimant and ▮▮▮ updated to include timestamps on pg. 1 |
| 9/23/22 | Claimant, Respondent, Skye David, Stephanie DeAngelis, John Fitzgerald | Typo (time) corrected in Claimant's interview transcript from 8/30/22 |
| 9/28/22 | Claimant, Respondent, Skye David, Stephanie DeAngelis, John Fitzgerald | Respondent interview transcript from 9/26/22; text messages with timestamps between Claimant and ▮▮▮ updated to include timestamps on pg. 1 |
| 9/29/22 | Claimant, Respondent, Skye David, Stephanie DeAngelis, John Fitzgerald | Witness ▮▮▮ and Witness ▮▮▮ interview transcripts |
| 10/14/22 | Claimant, Respondent, Skye David, Stephanie DeAngelis, John Fitzgerald | Claimant interview transcript from 10/5/22; Respondent interview transcript from 10/6/22; Claimant interview transcript from 10/12/22; Updated interview transcripts were re-uploaded – Claimant interview transcript from 8/30/22 & Claimant interview transcript from 9/7/22 for corrections. |
| 10/19/22 | Claimant, Respondent, Skye David, Stephanie DeAngelis, John Fitzgerald | 10/18/21 Claimant SHS medical records; text messages between Claimant/▮▮▮; text messages between Claimant/▮▮▮; & text messages between ▮▮▮ |

**CONFIDENTIAL**

| | | |
|---|---|---|
| 10/21/22 | Claimant, Respondent, Skye David, Stephanie DeAngelis, John Fitzgerald | Respondent's polygraph report and polygraph operator biography |
| 11/04/22 | Claimant, Respondent, Skye David, Stephanie DeAngelis, John Fitzgerald | ███████' redacted interview transcript (9/6/22) |
| 11/04/22 | Claimant, Respondent, Skye David, Stephanie DeAngelis, John Fitzgerald | *Sex and Gender Discrimination and Harassment Policy and Title IX Sexual Harassment and Non-Title IX Sexual Misconduct Grievance Procedures* (the "Policy") |
| 11/04/22 | Claimant, Respondent, Skye David, Stephanie DeAngelis, John Fitzgerald | Final Investigation Report |