**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

|  |  |  |
|---|---|---|
| JOHN DOE, | : | |
| | : | |
| Plaintiff, | : | Case No. 1:23-cv-00114 |
| | : | |
| v. | : | |
| | : | |
| WAKE FOREST UNIVERSITY, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Defendant Wake Forest University (the "University") opposes Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunctions ("Motion") as follows:

**SUMMARY OF THE NATURE OF THE CASE**

This lawsuit arises from the University's response to a student's allegations that John Doe sexually assaulted her. The thrust of Plaintiff's case is that when the University's external, independent hearing officer resolved disputed facts in Jane Roe's favor, the hearing officer did so based on unlawful gender bias instead of an impartial and reasonable review of the facts.

The University recognizes that a sexual misconduct investigation is deeply personal and emotional for the parties involved. But with respect to the University's process and when viewed through the lens of legal obligations, this particular investigation was unremarkable. There were no significant issues or disputes during the investigation, the objections Doe raised at the hearing were few and minor in nature, and both the Hearing Officer's and Appeal Officer's decisions were straightforward and well-reasoned.

John Doe plainly disagrees with the outcome reached by the University's Hearing Officer, but his Motion is predicated on the unsupported idea that but for his sex, the hearing would have come out differently. Support for that contention is nowhere to be found in the record. The bar on a motion for preliminary injunctive relief is difficult to clear under any circumstances, and particularly so here because Doe has asked the Court to order a change the status quo and permit his return to the University prior to the conclusion of his suspension.

Preliminary injunctive relief is inappropriate in this case for several reasons. *First*, the principle harm that Doe has identified – a delay in his graduation resulting from his one-year suspension – cannot be avoided through preliminary relief. As set forth in several declarations submitted with this brief, it is already too late in the semester for Doe to earn the credits required for him to graduate; there is no evidence in the record to the contrary. In fact, the evidence shows that even when Plaintiff was permitted to attend classes before his suspension was final, he did so only sporadically. Because an injunction would not remedy any alleged irreparable harm, preliminary equitable relief is improper.

*Second*, Doe has failed to articulate any irreparable harm. He contends that the passage of time will cause him to lose promised employment, but concedes that lost employment can be compensated through legal remedies. *See* Pl.'s Br. at 18-19. Doe speculates that the delay in graduation will have broader consequences, but an injunction requires imminent, actual harm, and the facts before the Court suggest most clearly that Doe has already been able to obtain employment before getting a degree; there is no reason to believe he will not be able to do the same thing next year when his graduation is imminent.

*Third*, Plaintiff has failed to carry his burden to show by clear and convincing evidence that he is likely to succeed on the merits of showing that but for his gender, a different result would

41154994.8

have occurred. The circumstantial evidence of purported bias Plaintiff presents is thin to the point of breaking, and more often than not dramatically overstates what actually occurred. Where Plaintiff contends that the Hearing Officer permitted Jane Roe's advisor to interrupt cross-examination, for instance, the record shows she did so *twice* in two hours, once to ask if a question was relevant, the other to inquire about time. This is not a Rule 12 motion, and when Plaintiff's allegations are peeled back and tested, sweeping language shrinks to a small set of benign, isolated, and inconsequential exchanges that do not approach Plaintiff's burden of showing that sex-bias dictated the outcome of his case.

*Fourth*, the final two prongs of the analysis – the balance of the equities and public interest – both cut against Plaintiff here. Having failed to make his showing as to a likelihood of success, there is no public interest in undermining the University's legally-imposed obligations to investigate and adjudicate allegations of campus misconduct and likewise no strong justification to permit the impact on Jane Roe that ordering Plaintiff back on campus would result in.

The Court should deny Plaintiff's Motion.

## RELEVANT FACTUAL BACKGROUND

### I. The Wake Forest Policy

The University is required to investigate and respond to complaints of sexual harassment and assault by, and/or against, University students or employees. *See* 20 U.S.C. §1681 *et seq.*; 34 C.F.R. Part 106 *et seq*. In response to its obligations, the University implemented the Wake Forest University Sex and Gender Discrimination and Harassment Policy and Title IX Sexual Harassment and Non-Title IX Sexual Misconduct Grievance Procedures (the "Policy"), attached as **Exhibit A**.

In brief, the Policy requires that a complainant file a formal complaint to trigger the University's response process. *Id.* at § 2A.03. *After* a formal complaint is filed, the University

41154994.8

sends a notice containing the allegations to both parties. *Id.* at § 2A.04. The complaint can follow a formal resolution process, with an investigation, a hearing, and an appeal, or an "Adaptive Resolution" process, whereby a variety of techniques are employed by a facilitator to determine whether the matter can be resolved by agreement. *Id.* at § 3A.01. An Adaptive Resolution process requires the consent of all parties and the University, and cannot start until after a formal complaint has been filed. If Adaptive Resolution fails, the complaint reverts to a formal resolution. *Id*.

Under a formal resolution process, an investigator meets with parties and witnesses to gather facts. *Id.* at § 2B.02. Each party is provided notice of allegations prior to any substantive meeting with the investigator. *Id.* at § 2A.04. The investigator's role is not to make any findings, factual or otherwise, and not to draw any conclusions regarding credibility. Instead, the investigator facilitates the gathering and summary of relevant evidence provided by the parties and which is otherwise available. *Id.* at § 2B.04

Following the investigation, the investigator creates a report summarizing the gathered evidence. *Id.* The report is provided to the parties and to a hearing officer, who presides over a hearing to resolve factual disputes and make findings with respect to whether any policy violations occurred. *Id.* The hearing takes place live and contemporaneously, though parties and witnesses are permitted to participate remotely via Zoom or other similar platform. *Id.* at § 3A.08. At the hearing, the hearing officer may examine, and each party's advisor (who may or may not be a lawyer) may cross-examine, all parties and witnesses. *Id.* The hearing officer is required to consider each question and rule as to whether it is relevant, with only relevant questions allowed to be answered. *Id.* Once the hearing has concluded, the hearing officer drafts a final outcome letter containing factual findings, outcome determinations with respect to any potential policy violations,

and rationales. *Id.* at §§3A.11, 3A.14. A different University administrator is responsible for imposing an appropriate sanction where warranted. *Id.* at § 3A.12.

Both parties have the right to appeal the outcome on the grounds of: (1) a procedural irregularity that affected the outcome; (2) new evidence that was not reasonably available at the time of the determination and could affect the outcome; and (3) the Title IX Coordinator, an investigator, or the hearing or sanctions officers had a conflict of interest or bias that affected the outcome. *Id.* at § 3A.15. The appeal is heard by an appeal officer who has not participated in any earlier stage of the process, and the outcome of the appeal is final. *Id.* at § 3A.17.

## II.     The Allegations against Plaintiff

On October 15, 2021, Plaintiff attended a sorority "date night" event with Jane Roe. *See* ECF No. 1, Compl. at ¶¶ 135-44; ECF No. 6-7, the Final Outcome Letter ("Final Outcome Letter") which is attached as **Exhibit B**. After a night of parties and drinking, Plaintiff spent the night in Jane Roe's bed in her dorm room where the parties engaged in sexual activity. It is undisputed that on the morning of October 16, 2021, Plaintiff digitally penetrated Jane Roe, though consent to that act was disputed. *See* Compl. at ¶ 161. Jane Roe also claimed that Plaintiff had nonconsensual intercourse with her the prior night either while she was incapacitated, or after she withdrew consent. *See* Final Outcome Letter at 1-2. Plaintiff said he was unable to get an erection, so they never had intercourse. *Id.* at 11.

## III.     The Investigation and Hearing

On April 12, 2022, Jane Roe filed a formal complaint ("Formal Complaint") with the University's Title IX Office. A copy is attached as **Exhibit C**. Jane Roe alleged that she was sexually assaulted by Plaintiff: "[Plaintiff] attended my sorority date function as my date on October 15th. After the event in my dorm room I was unable to give consent to activity that

41154994.8

occurred and the next morning non-consensual activity occurred." *Id*. On April 13, 2022, the University's Title IX Coordinator, Aishah Casseus, sent a formal Notice of Allegations ("Notice") to Plaintiff, which is attached as **Exhibit D.** The Notice was consistent with § 2A.04 of the Policy.

The parties agreed to participate in Adaptive Resolution, to attempt to reach a resolution without a formal investigation. *See* Policy at § 3A.01; Declaration of Aishah Casseus attached as **Exhibit E** ("Casseus Decl.") at ¶¶ 18-23. On August 18, 2022, after Adaptive Resolution was unsuccessful, Jane Roe requested to proceed to a formal investigation. *See* Casseus Decl. ¶ 24.

The investigation proceeded consistent with University Policy. Title IX Investigator Jessica Telligman interviewed Plaintiff and Jane Roe four times each. *See* Declaration of Jessica Telligman ("Telligman Decl.") attached as **Exhibit F**. Following Jane Roe's first interview, Telligman alerted Casseus that Jane Roe had clarified her allegations to make clear that she was alleging two instances of assault: one the night of the "Date Night," and one the next morning, both in her dorm room. *Id.* at ¶¶ 20, 22. Based on this information, Casseus provided Doe with a supplemental Notice before his first interview with Telligman, which is attached as **Exhibit G**. Telligman also interviewed six other witnesses and collected documents and exhibits submitted by the parties. On November 5, 2022, Investigator Telligman issued her report ("Investigation Report") to Plaintiff and Jane Roe, which is attached as **Exhibit H**.

A hearing was held on November 29, 2022. *See* Compl. ¶ 228. On December 20, 2022, Hearing Officer Dixie Wells issued the Final Outcome Letter, finding that the evidence established that it was more likely than not that John Doe committed sexual misconduct in violation of the Policy. *See* Final Outcome Letter at 22. On January 3, 2023, John Doe filed an Appeal ("Appeal") of Final Outcome Letter, which is attached as **Exhibit I**. On January 23, 2023, Appeal Officer Howard Kallem issued his Appellate Decision ("Appellate Decision") attached as **Exhibit J**,

41154994.8

which affirmed the Final Outcome Letter. Plaintiff was suspended for one year. *See* letter from Dr. Jim Settler to John Doe, dated January 24, 2023, attached as **Exhibit K**. On February 7, 2022, Plaintiff filed the Complaint and the Motion.

## **LEGAL STANDARD**

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (stating a preliminary injunction is an "extraordinary remed[y] involving the exercise of a very far-reaching power to be granted only sparingly and in limited circumstances").

To obtain a preliminary injunction, a movant must establish the following through clear and convincing evidence: (1) a likelihood of success on the merits; (2) a likelihood the movant will suffer irreparable harm in the absence of relief; (3) the balance of equities tips in the movant's favor; and (4) the injunction is in the public interest. *A Hand of Hope Pregnancy Res. Ctr. v. City of Raleigh*, 332 F. Supp. 3d 983, 1005 (E.D.N.C. 2018) (*citing Winter*, 555 U.S. at 20). This showing is substantially more burdensome than that necessary to survive a motion to dismiss. *Allstate Ins. Co. v. Warns*, No. CIV. CCB-11-1846, 2012 WL 681792, at *15 (D. Md. Feb. 29, 2012); *Action NC v. Strach*, 216 F. Supp. 3d 597, 628 (M.D.N.C. 2016) (the standard for a preliminary injunction is a higher burden than to survive a Rule 12 motion.).

A preliminary injunction may be either prohibitory or mandatory. *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). Mandatory injunctions alter the status quo, while "prohibitory injunctions 'aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending.'" *Id.* When an injunction is mandatory, courts' application of the exacting standard of review appropriate for all preliminary injunctions "is even

41154994.8

more searching." *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). A plaintiff's request to nullify an administrative process to return to a previous status quo constitutes a request for a mandatory injunction. *EZ-Ink, Inc. v. Brother Indus., Ltd.*, No. 2:21CV564, 2021 WL 7909312, at *5 (E.D. Va. Dec. 9, 2021) (holding that a request to nullify a neutral patent evaluation process to allow certain products to be relisted for sale was a request for mandatory relief). And as here, a request to reverse the punishment from a Title IX investigation is a request for mandatory relief. *Montague v. Yale Univ.*, No. 3:16-CV-00885(AVC), 2017 WL 4942772, at *3 (D. Conn. Mar. 8, 2017) (request to reinstate student was mandatory); *Heineke v. Santa Clara Univ.*, No. 17-CV-05285-LHK, 2018 WL 3368455, at *10 (N.D. Cal. July 10, 2018), *aff'd*, 965 F.3d 1009 (9th Cir. 2020) (request to reinstate tenured professor terminated for sexual harassment was mandatory).

## ARGUMENT

### I. Plaintiff has not shown that absent injunctive relief he will suffer irreparable harm.

#### a. Plaintiff cannot avoid the harm he contends is irreparable.

"[A]n important part of the analysis courts must conduct in considering whether to grant a preliminary injunction, [is] whether the party 'is likely to suffer irreparable harm *in the absence of preliminary relief*.'" *Lecky v. Virginia State Bd. of Elections*, 285 F. Supp. 3d 908, 921 (E.D. Va. 2018) (emphasis in original) (quoting *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017)). Put another way, when the harm a Plaintiff is seeking to enjoin has already occurred, and accordingly cannot be remedied by the requested injunctive relief, a court must deny the request for injunctive relief. *Di Biase*, 872 F.3d at 231; *Ry. Lab. Executives Ass'n v. Chesapeake W. Ry.*, 915 F.2d 116, 118 (4th Cir. 1990) (explaining when a request for injunctive relief is moot). The plaintiff in *Winston v. Federal Bureau of Prisons* filed a motion for injunctive relief asking not be transferred to another prison. No. 5:10-HC-2192-FL, 2011 WL 3664416, at *2 (E.D.N.C. Aug. 18,

2011). But because the inmate had already been transferred, the motion was denied "because petitioner seeks to enjoin an act that already has occurred." *Id*.; *see also Wheelihan v. Bingham*, 345 F. Supp. 2d 550, 554 (M.D.N.C. 2004) (same).

Here, the harm Plaintiff characterizes as irreparable is failing to complete his degree by May 2023. *See* Pl.'s Br. at 18. No relief granted by the Court will enable him to do so. The Spring 2023 semester commenced on January 9, 2023, and Plaintiff was permitted to attend classes until January 25. It is notable, if perhaps not dispositive, that during that time period Plaintiff failed to attend, or do work for, at least one of the classes that are required for him to graduate. *See* Declaration of Dr. Gokce Palak ("Palak Decl.") attached as **Exhibit L**. Between the beginning of the semester and January 25, Plaintiff did not access the online materials for his Business & Enterprise Management 241 class. *Id*. at ¶ 5. In fact, Plaintiff's professor took the initiative to contact the Dean's office on or around January 19 because she was concerned that John Doe was not keeping up with the coursework and he had not accessed the materials. This professor has made clear in connection with this Motion that even if Plaintiff resumed the class immediately, he has missed too much coursework and could not pass the class. *Id*. at ¶ 7-8.

In a second class, Doe was assigned to a group at the beginning of the semester, which was responsible for the first group assignment (a "deliverable"). The group divided the work, assigning some to Doe. At the time of his withdrawal, Doe had not completed his share of the group assignment. *See* Declaration of Phil Anderson ("Anderson Decl.") attached as **Exhibit M** at ¶¶ 5. The mid-term examination for the course was February 16, 2023. Immediately after the midterm, students will be assigned to begin working on a larger group project. The first two group projects prepared students for this larger project, building on skills already developed in the first two projects. The professor for this second class likewise does not believe Doe can be successful in his

course at this juncture, and moreover noted that adding Doe back on to a team at this late date would be a significant and unfair burden on that team, since Doe would be entering without any of the fundamental skills developed in the group work for the first half of the course. *Id.* at ¶ 8.

In sum, even if Plaintiff returned to class immediately, he will not be able to complete the required coursework and would be ineligible to graduate in May 2023. *See* Declaration of Dr. Kenny Herbst ("Herbst Decl.") attached as **Exhibit N** at ¶ 4. Because Doe cannot establish that *the absence of injunctive relief* is what is preventing him from suffering his feared harm, his Motion should be denied. *Accord Southtech Orthopedics, Inc. v. Dingus*, 428 F. Supp. 2d 410, 420–21 (E.D.N.C. 2006) (injunctive relief inappropriate where movant's own actions are inconsistent with request for relief).

### b. Plaintiff's feared injuries are economic, not irreparable.

It is axiomatic that economic injuries are not irreparable in nature. *Di Biase*, 872 F.3d at 230. "A plaintiff must overcome the presumption that a preliminary injunction will not issue when the harm suffered can be remedied by money damages at the time of judgment." *Id*. (citing *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994)).

Numerous courts have held that a student who is dismissed or suspended from a University does not suffer irreparable harm because a delay in education is compensable through monetary compensation. *Madej v. Yale Univ.*, No. 3:20-CV-133 (JCH), 2020 WL 1614230, at *6 (D. Conn. Mar. 31, 2020) (delay in obtaining degree is not irreparable harm and can be compensated by monetary damages); *Doe v. George Washington Univ.*, 305 F. Supp. 3d 126, 135 (D.D.C. 2018) (delay in education due to disciplinary matter does not constitute irreparable harm); *Doe v. Vassar Coll.*, No. 19-CV-9601 (NSR), 2019 WL 6222918, at *6 (S.D.N.Y. Nov. 21, 2019) (irreparable harm where plaintiff would lose "his ability to graduate with his class"); *Montague v. Yale*, No.

3:16-CV-00885(AVC), 2017 WL 4942772, at *4 (D. Conn. Mar. 8, 2017) (delay in education can be remedied through monetary compensation.").

This conclusion is underscored by common sense. Plaintiff has shown that he is attractive to employers; he has already demonstrated that he can get a job. Plaintiff contends only that the job he currently has been promised requires him to graduate. He has not alleged that the employer would not permit him to defer pending graduation, and, more important, he has not shown other than through his own speculation that he would be unable to get a comparable job when he does get a degree, presumably a year later, following his suspension. Plaintiff does not allege that he is required to disclose the investigation (or outcome) to his current (or any future) employer. Plaintiff concedes that the loss of employment set to begin in the Summer of 2023 is monetarily compensable for lost salary. *See* Pl.'s Br. at 18 ("while money damages might help to compensate for the lost salary that he had expected to begin earning in the summer of 2023. . ."). The only *imminent* harm Plaintiff has identified is a delay in obtaining a salary, which is compensable harm.

Plaintiff further contends: (1) that delay in starting his career would harm his future career success; and (2) that he would forever have to explain to employers why he did not graduate on time. [ECF No. 6 at 18]. But Plaintiff must allege irreparable harm that is "actual and imminent" not "remote nor speculative." *Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523, 542 (E.D.N.C. 2020) (citing *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002)); *Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir.1997) (A fear of speculative or remote future injury cannot constitute irreparable harm; there must be a likelihood that immediate irreparable harm will occur). Moreover, allegations of diminished future educational or employment prospects are definitionally speculative in nature and cannot establish irreparable harm. *Caila v. Saddlemire*, No. 3:12-CV-00624 VLB, 2013 WL 1310002, at *2, 2013 U.S. Dist. LEXIS 43208, at *4 (D. Conn. Mar. 27,

41154994.8

2013) (speculation that expulsion would interfere with academic and professional career too tenuous to demonstrate irreparable harm); *Knoch v. Univ. of Pittsburgh*, No. 2:16-CV-00970-CRE, 2016 WL 4570755, at *8 (W.D. Pa. Aug. 31, 2016) (same).

Plaintiff also argues, in evident boilerplate, that he "would forever have to explain to any future employer or graduate program the reason for his failure to complete his degree on time." *See* Pl.'s Br. at 18. Apart from the fact that at this juncture, that result is unavoidable, the disciplinary process administered at the University was confidential and cannot be made public without Plaintiff's consent, so Plaintiff's allegations in that regard are unfounded in addition to speculative. In any case, concerns over stigma associated with an adverse outcome in a misconduct proceeding likewise does not constitute irreparable harm. *Doe v. Princeton Univ.*, No. 3:20-CV-4352-BRM-TJB, 2020 WL 2097991, at *7 (D.N.J. May 1, 2020) ("the argument that Plaintiff's reputation, ability to enroll at other institutions, and ability to pursue a career would be damaged is too speculative to satisfy the irreparable harm requirement."); *Brodie v. U.S. Dep't of Health & Human Servs.*, 715 F. Supp. 2d 74, 84 (D.D.C. 2010) (speculation that third-party may learn of decision did not support irreparable reputational harm). Because Plaintiff has failed to establish predicate irreparable harm that is actual and imminent, he is not entitled to a injunctive relief.

## II.    Plaintiff has not demonstrated that his Title IX claim is likely to succeed on the merits because he has not tied any decision made by the University to his sex.

Plaintiff must make a "clear showing" by clear and convincing evidence that he is likely to succeed on the merits to prevail on his motion. *Bartell v. Grifols Shared Servs. NA, Inc.*, No. 1:21CV953, 2022 WL 3359304, at *4 (M.D.N.C. Aug. 1, 2022) (citing *Di Biase*, 872 F.3d at 230); *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 340 (4th Cir. 2001). Fourth Circuit courts consistently "have declined to issue a preliminary injunction when there are significant factual

disputes." *Chattery Int'l, Inc. v. JoLida, Inc.*, Civil No. WDQ-10-2236, 2011 WL 1230822, at *9 (D. Md. Mar. 28, 2011).

Importantly, Plaintiff argues only that his allegations "sufficiently raise a ***plausible inference*** that the University discriminated against Plaintiff when it found him responsible for violating the Policy, resulting in a sanction of a one-year suspension." *See* Pl.'s Br. at 14 (emphasis added). But this is not a Rule 12 motion; the legal standard is not whether Plaintiff's claim can survive a motion to dismiss, but whether he has shown by clear and convincing evidence that a University decision-maker *intentionally* discriminated against him *in this case* because of his gender, and that "but for" his gender, the outcome would have been different. *Sheppard v. Visitors of Virginia State Univ.*, 993 F.3d 230, 236–37 (4th Cir. 2021) (adopting "but for" causation standard for Title IX claims alleging discrimination on the basis of sex or gender in school disciplinary proceedings.); *Bartell v. Grifols Shared Servs. NA, Inc.,* No. 1:21CV953, 2022 WL 3359304, at *4 (M.D.N.C. Aug. 1, 2022) (providing sufficient factual allegations to meet the Rule 12(b)(6) does not establish a likelihood of success on the merits).

Discrimination based on sex or gender under Title IX can be proven by direct or circumstantial evidence. *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n.3 (1983), but we can dispense with the former because Plaintiff does not provide any direct evidence of discrimination – no University official involved in the hearing is alleged to have made any gender-discriminatory remarks; there are no provisions in the University Policy that put any party at a disadvantage based on gender; and there are no gender stereotypes in the Investigation Report.

Plaintiff accordingly relies entirely on circumstantial evidence to support his allegations of purported bias. The inferences Plaintiff presents, however, are unpersuasive, and, in this procedural posture, demonstrably false. They are limited to the following: (1) Plaintiff speculates

41154994.8

that the Wake Forest Title IX Office deliberately withheld a second allegation on nonconsensual

intercourse – it did not, as shown in contemporaneous evidence of record and witness declarations;

(2) Plaintiff argues that the lead investigator suggested answers to Jane Roe in interviews – she

did not, as shown by the recorded context of her interviews and declaration; (3) Plaintiff alleges in

conclusory fashion that the Hearing Officer conducted the hearing with improper and inequitable

procedure – she did not, and the University has provided the entire hearing record to demonstrate

how unremarkable the proceedings were from the perspective of Plaintiff's objections and the

Hearing Officer's conduct, in addition to directly addressing the few concrete examples Plaintiff

actually provides; and (4) Plaintiff disagrees with the outcome of the process, and so argues that

in his view, the conclusions in Final Outcome Letter were not supported by the evidence. To the

contrary, the Final Outcome letter is straightforward, shows all its work, and its reasoning is

supported by the investigation and hearing record. *See* Pl.'s Br. at 15.

None of these allegations has any merit, but even if they did – even if Plaintiff adduced an

issue of disputed fact on one or more of these allegations – it would still be insufficient to show

that (a) Plaintiff had met the high bar for injunctive relief through a substantial likelihood of

success (because the facts are contested, *see Chattery*, 2011 WL 1230822, at *9) or (b) sex was

the "but for" cause of any decision by the University that harmed Plaintiff, as opposed to any

number of other plausible (and lawful) reasons.[1]

---

[1]     Plaintiff also suggests that external factors such as an investigation by the Office for Civil
Rights, a student protest, student surveys, and an unrelated criminal trespassing charge placed
external pressure on the University to find in favor of a female complainant and against a male
respondent.  Those external factors had no impact on the outcome (and are belied by the statistics
regarding recent outcomes in sexual misconduct cases at the University generally). *See* Casseus
Decl. ¶ 42. The Hearing Officer and Appeal Officer were both independent, third-party decision-
makers brought in from outside the University specifically to keep the proceedings free from such

-14-

41154994.8

### a. There is no evidence that University employees conspired to hide an allegation of nonconsensual intercourse from Plaintiff.

Plaintiff first argues that the addition of a nonconsensual sexual intercourse allegation four months after the initial Notice regarding Jane Roe's complaint demonstrated bias against him by the University. *See* Pl.'s Br. at 14. In making this allegation, Plaintiff makes several factual assumptions that are not correct.

*First*, Plaintiff assumes that the University was aware of the nonconsensual sexual intercourse allegation from the start, which it wasn't. Jane Roe's initial complaint on April 12, 2022 did not contain an allegation of nonconsensual intercourse. *See* Formal Complaint. After the Formal Complaint was submitted but before an investigator was assigned to the case or either party was interviewed, the parties agreed to attempt to resolve the matter through Adaptive Resolution, effectively staying the matter for four months. *See* Compl. ¶¶ 175-81; Casseus Decl. ¶¶ 18-24. Plaintiff was not interviewed by the University at any point about the allegations during this time period. *See* Telligman Aff. ¶ 28. On August 18, 2022, Jane Roe requested to proceed to a formal investigation. [Casseus Decl. ¶ 23]. Investigator Telligman was assigned to the case on August 22, 2022 and interviewed Jane Roe about her allegations for the first time on August 30, 2022, which is when Telligman learned of the second allegation. *See* Telligman Decl. ¶ 17, 19-20.

*Second*, Plaintiff assumes (and implies) that the University knew of the second allegation for a significant period of time before alerting him. Not so. After Telligman learned about the second allegation on August 30, 2022, she immediately informed Title IX Coordinator Casseus, who sent Plaintiff an Updated Notice on September 1, 2022. *See* Casseus Decl. ¶¶ 27-30.

influence.  Critically here, ***neither was even aware of the events alleged by Plaintiff***.  *See* Wells Decl. ¶ 27; Kallem Decl. ¶ 11.

41154994.8

*Third*, Plaintiff suggests that the delay in notice was designed to prejudice him, but that too makes little sense, since the entire purpose of a pre-interview notice is to provide a party with information about what will be discussed in the interview. Plaintiff was never interviewed substantively about the allegations until *after* the second notice. *See* Telligman Decl. ¶ 28. So, even if the delay had been anything less than outside the University's control, it still would not have made a practical difference in Plaintiff's ability to prepare for his interview.

It is worth underscoring here that the University cannot control when and how students submit allegations under the Policy. It is not uncommon for new information to come to light during the first interview with a complainant because prior to the first interview a complainant has not been questioned in detail with respect to the allegations. This is particularly true in sexual misconduct investigations. *See* Telligman Decl. ¶ 21. The University's prompt notice of the new allegation cannot stand in for "a clear showing" of bias against Plaintiff because of his gender.

### b. Plaintiff has failed to show that Investigator Telligman exhibited sex-based bias in her investigation.

Plaintiff next alleges that Investigator Telligman suggested answers to Jane Roe to explain away inconsistencies in her testimony and medical records. Pl.'s Br. at 15. Plaintiff presents a single example of Telligman's presumed bias in his Complaint, which, when taken out of context, he suggests demonstrates improper coaching. However, when viewed in context, it is clear that Plaintiff's characterization lacks substance or merit. It is worth underscoring here that even if Plaintiff's claim that Investigator Telligman suggested answers to Jane Roe were true, it would be immaterial to the outcome. Jane Roe was examined by Hearing Officer Wells and cross-examined by Plaintiff's advisor extensively at the hearing on these statements. The University did not take any action against Plaintiff based on the *investigation*; it did so based on a hearing where all

decisions as to the facts were made in the first instance with a full opportunity for both parties to be heard.

Accordingly, Plaintiff's argument that when Investigator Telligman said "So it may be, and correct me, I'm going to make an assumption based on what you just told me, it may be that your goal there was just to get the drug testing, not to report anything necessarily. Is that kind of what you're telling me. . ." (Compl. at ¶ 212), she improperly suggested testimony is not just wrong on the facts, it is immaterial to the outcome. In any case, a review of the entire exchange shows something quite different from Doe's characterization:

> [Jane Roe]: Um, it's really hard to answer those questions, and quite frankly, I came in trying to not answer any one of them. So I think just with those things in mind. I think that adds clarity as to why, you know, the report is written the way as it is, because I didn't answer everything, and I didn't know how to answer everything without getting people in trouble. And there were so many things in those questions. So as for the difference, I think, keeping those things in mind. That is why there is a difference, but also similarities in some senses.

> Jessica: And it looks like to me under subjective, it says chief complaint, requesting drug testing. So it may be, and correct me, I'm going to make an assumption based on what you just told me, it may be that your goal there was just to get the drug testing, not to report anything necessarily. Is that kind of what you're telling me?

> [Jane Roe]: My goal was absolutely not to report. I was terrified. I didn't think anybody would believe me.

See Excerpt of Interview with Jane Roe (10/12/22) attached as **Exhibit O**. Taken in its full context, Investigator Telligman does not suggest an answer. Rather, she asks a clarifying question to confirm her understanding of a circuitous answer. See Telligman Decl. ¶¶ 33-35. To establish bias, it is not enough for Plaintiff to allege Investigator Telligman took this approach with Jane Roe, he must establish she did not take the same approach with Plaintiff. She did. For example:

> Jessica Telligman: You think but we're not sure that was about midnight? Possibly?

[Plaintiff]: Yeah, I don't. I don't want to say I'm positive. But if I had to guess, I would assume the sorority date function kind of wrapped up by then.

Jessica Telligman: you don't remember, and I'm assuming that's not because you were too impaired to remember. It's because of the passage of time?

[Plaintiff]: Correct. I, again, I want to make clear that I was fully coherent during this event. I was not blackout. My memory was not spotty due to alcohol. It's just a matter of being so long ago that certain events don't stick in my mind that long.

*See* Excerpt from Transcript of Interview with Plaintiff (9/8/22) attached as **Exhibit P**. Under Doe's analysis, Telligman improperly suggested that Doe was not impaired that night but simply could not remember because of passage of time, which Plaintiff adopted. But, an objective reading is that Telligman was simply asking a question to clarify an answer as she did with Jane Roe.

Plaintiff also complains about Investigator Telligman's characterization of Jane Roe's text that "it burns" meant vaginal pain. *See* Compl. at ¶ 314-17. As Telligman's declaration makes clear, however, her questions were directed at understanding the text messages, just as above. Jane Roe was cross-examined extensively on the meaning of "it burns" during the hearing, where her credibility could be and was considered by the hearing officer. *See* Hr'g Tr.[2] at 278-80. **Critically,** rather than adopting Telligman's question, Jane Roe testified that she did not remember sending the text and she was presuming what she meant. *See* Hr'g Tr. at 279. Wells understood the value of her testimony, stating "she testified she does not remember any of this." *See* Hr'g Tr. at 280. Thus, even if Plaintiff were correct, against the weight of the evidence, that Telligman attempted to suggest an answer to Jane Roe, it didn't have any effect on the outcome of the hearing because Jane Roe testified at the hearing she did not remember sending the text or what she meant by it.

---

[2]    For convenience of the Court, the University prepared a transcript of the Title IX hearing from the videos, which is attached as **Exhibit S**.  "Hr'g Tr." references citations to the transcript.

41154994.8

As pointed out by the Appeal Officer, Jane Roe's texts were just one piece of evidence relied upon. *See* Appellate Decision at 11. The Hearing Officer relied on other contemporaneous evidence to make her reasoned finding that it was more likely than not that nonconsensual sexual intercourse occurred; there is no "but for" causation to be found here. *See* Declaration of Dixie Wells ("Wells Decl.") attached as **Exhibit Q** at ¶ 26; Final Outcome Letter at 22].

### c. Plaintiff fails to offer any evidence of sex-based bias during the hearing.

As explained above, controlling the hearing and limiting irrelevant or unnecessary testimony is within the discretion (and is the obligation) of the Hearing Officer under the Policy. *See* Policy §§ 3A.07, 3A.08 (requiring exclusion of irrelevant questions); Wells Decl. at ¶¶ 21-23.

### i. Plaintiff's allegations of time limitation are unsupported.

Plaintiff first contends that the Hearing Officer was biased because, at least as he characterizes it, she limited the time Plaintiff's advisor could cross-examine Jane Roe. *See* Pl.'s Br. at 15. Plaintiff does not explain that the order of witnesses for the hearing was set well in advance and was discussed with both parties both at a pre-hearing conference on November 21, 2022 and again at the beginning of the hearing. *See* Wells Decl. at ¶ 13. Plaintiff never objected to the order of witnesses before or during the hearing. Plaintiff also omits that Jane Roe was on the stand for significantly more time than any other witness, including Plaintiff himself. Jane Roe was examined for nearly three hours; approximately two hours of which was cross-examination by Plaintiff's attorney. *See* Hr'g Tr. at 223-299; Wells Decl. ¶ 15. At 9:51 p.m., more than two hours into Jane Roe's the examination, Wells told Plaintiff's advisor: "We have been going quite a while. Obviously we'll go as long as we need to, but I also will be very careful about whether questions are relevant, reliable, and relevant to my decision-making." *See* Hr'g Tr. at 288.

Twenty-five minutes later, at 10:16 p.m., Wells told Plaintiff's advisor: "I'm going to allow you to go 15 more minutes, and then I'm going to stop it. That will be two hours of cross for [Jane Roe], [Plaintiff] was crossed for an hour. And so, just know that you have 15 minutes and you can use it as you wish subject to my objections and instructions. But we'll go another 15 minutes." *See* Hr'g Tr. at 295. Plaintiff's advisor then took two short breaks, then concluded his questioning just six minutes later, saying "**I have no further questions**." *See* Hr'g Tr. at page 297 (emphasis added). Plaintiff's allegations now that his time was limited was accordingly conclusively waived in addition to being unsupported by the record.

### ii. Plaintiff's allegations of relevance determinations are unsupported.

Plaintiff's motion goes on to argue that he was prevented from asking critical questions during cross-examination of Jane Roe. *See* Pl's Br. at 15. Notably, when Doe raised this objection during the hearing, the Hearing Officer asked what specific objections he had. The only objection Plaintiff's advisor stated was "So I was not allowed to question [Jane] about her athletic conditioning, her strength. And what I was trying to get at was her ability to fight him off physically." *See* Hr'g Tr. at 298.

The Hearing Examiner responded: "I believe that she testified fully about why she did not try to push his hand away. She did not say it was a strength issue, she did not put that in question, so I don't see how that becomes relevant to any decision that I would be making." *See* Hr'g Tr. at 299. Plaintiff's advisor replied, "Very good. I am finished." *See* Hr'g Tr. at 299. The rejection of irrelevant testimony that had already been discussed is not evidence of discrimination against Plaintiff. Plaintiff's subjective disagreement with her evidentiary ruling does not make that ruling sex-discriminatory. Appeal Officer Kallem agreed and found that not allowing this line of questioning "would not be evidence of procedural irregularity but more in the nature of a

substantive disagreement. . ." *See* Appellate Decision at 7, 16; Declaration of Howard Kallem ("Kallem Decl.") attached as **Exhibit R** at ¶¶ 6-9.

### iii.   Plaintiff's allegations regarding interruptions are unsupported.

Plaintiff next argues that Hearing Officer Wells allowed Jane Roe's advisor to interrupt Plaintiff's advisor during cross-examination, although his Complaint, unlike his motion, makes clear that the single offending question from Jane Roe's advisor related to timing (ECF 1 at ¶ 229 ("Wells permitted Jane's advisor to interrupt [Plaintiff's] attorney during his cross-examination of Jane, *to inquire how much longer he would take*.")) The transcript tells the full, *de minimus* story:

> John Fitzgerald: Why would you make a joke after you had been violently raped, or I'm sorry, raped and assaulted? Why would you make a joke or sarcasm about that?
>
> Dixie Wells: Allowed.
>
> [Jane Roe]: Because as I stated, I was in a state of shock. I didn't really understand what had happened to me and I was sitting by myself unsure to make of what everything had just been. And yeah.
>
> Skye Davis: Ms. Wells, may I ask just how long we expect to continue?
>
> Dixie Wells: Mr. Fitzgerald, do you know how much longer you have?
>
> John Fitzgerald: Oh, about another hour.

*See* Hr'g Tr. at 287-88. Roe's advisor made only one other comment during the entire cross-examination, when she asked if a particular question was relevant. *See* Hr'g Tr. at 263. It seems well beyond the pale to conclude that two questions from Roe's advisor establishes bias.

### d.   Hearing Officer Wells' Final Outcome Letter was well-reasoned and supported by the evidence.

It is important to note that in addition to the advantage of being able to select highly trained, competent people, a principle goal of retaining external, third-party and independent hearing officers and appeal officers is that they are free to act independently. Neither the Hearing Officer

41154994.8

nor the Appeal Officer in this case were University employees. Both were successful, in-demand professionals for whom work for Wake Forest is a tiny proportion of their income. They are not beholden to University officials for their livelihoods in the way an internal administrator might be, and they both exercise that judgment ethically and professionally.

Against that backdrop, Plaintiff argues that the Final Outcome Letter demonstrates bias and discrimination by Hearing Officer Wells because her decision was against the weight of the evidence. *See* Pl.'s Br. at 15. First, even if Hearing Officer Wells' opinion *were* against the weight of the evidence – and it is not – there could be an infinite number of reasons why it might be. Plausibility is not the standard on Plaintiff's motion, and the bottom line is that he has failed to prove any "substantial likelihood" of a connection between the outcome and his sex.

He also fails to raise any serious question about the Hearing Officer's conduct. Plaintiff alleges that Hearing Officer Wells inappropriately relied on inconsistent statements by Jane Roe, statements suggested to Jane Roe by Investigator Telligman, and Jane Roe's refusal to allow questioning of medical personnel related to her records[3] and, therefore, the reasoning in the Final Outcome Letter was erroneous. *See* Pl.'s Br. at 15. Even were the Court to take all of these allegations as true (which is not the standard here), Plaintiff ignores the significant other evidence available in the record and relied upon by Wells, including: the testimony of six other witnesses some of who offered contemporaneous accounts, the medical records, text messages submitted by both parties, and credibility determinations of Jane Roe and Plaintiff during the hearing. Ultimately, weighing all the evidence, the Hearing Officer found, within her discretion, that it was

---

[3] Jane Roe has a right under federal law to decline to allow the University access to medical records as part of its investigation. *See* 34 C.F.R. 106.45(b)(1)(x); *see also* Policy at 2B. 05. She was also questioned extensively on this issue during the hearing. Hr'g Tr. at 37-39.

41154994.8

more likely than not that Plaintiff was responsible for two instances of sexual assault in violation of the Policy. *See* Final Outcome Letter at 22; Appellate Decision at 20.

### e. The impartiality of the outcome is bolstered by the Appellate Decision, with which Plaintiff finds no fault.

Beyond all these fundamental problems of proof, this case is also not Plaintiff's first bite at the apple – it is his third. His complaints of bias and discrimination at the hearing have *already* been examined by an independent third party on appeal and found to be without merit. [Appellate Decision ECF No. 6-9]. Plaintiff notably makes no serious allegation that the Appellate Decision is the product of bias, and yet it affirmed all of the decisions Plaintiff raises here as erroneous.

The Final Outcome Letter and Appellate Decision each read as objective, well-reasoned, and supported opinions about the evidence and the hearing. *See generally* Final Outcome Letter; Appellate Decision. The declarations by the Hearing Officer and Appellate Officer underscore those conclusions. Based on the record and the objective, well-reasoned opinions from the Hearing Officer and Appeal Officer, there is substantial evidence that Plaintiff will not succeed on the merits, which means that he cannot satisfy this essential prong of his burden.

## III. The balance of the equities tips strongly in favor of denying Plaintiff's request for preliminary injunctive relief.

Plaintiff is only entitled to a preliminary injunction if the balance of equities tilts "decidedly" in his favor. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991). Plaintiff speculates that the harm caused by his suspension and inability to graduate on time will harm him throughout his life, but the predicate for that contention – a delayed graduation – has already come to pass. Plaintiff has likewise already obtained employment once without a degree; there is no reason beyond Plaintiff's conclusory allegation to conclude Plaintiff cannot do so again, now or after attaining his degree in the future.

On the other hand, ordering a suspended student suspended back on to campus undermines the policies that govern student conduct and discipline and causes significant disruption on campus for other affected students. The construct Plaintiff proposes suggests that any student found responsible for violating University policy presumptively has the equitable upper hand and should be able to stall sanctions during the pendency of a lawsuit, but that standard is unworkable. For one thing, the University has an obligation under federal law not just to adjudicate complaints of sexual assault, but to *resolve* such complaints; institutions are not free to disregard the outcomes of Title IX adjudications merely because one student seeks civil relief, and it is not equitable to incentivize a judicial remedy for every disagreement with a disciplinary outcome.

The Court should also consider the potential harm to Jane Roe and other students. Granting injunctive relief based on a limited record and allowing Plaintiff to return to campus may put him in close proximity to Jane Roe and interfere with her rights, regardless of the no contact order in place. *Doe v. Univ. of Cincinnati*, No. 1:15-CV-600, 2015 WL 5729328, at *3 (S.D. Ohio Sept. 30, 2015) ("harm to others" prong weighed against issuance of order where reinstating plaintiff to honors program and placing plaintiff into close proximity with female student could interfere with her rights)). In light of the foregoing, Plaintiff has failed to carry his burden.

## IV. There is a strong public interest in the University being able to investigate and discipline its students for misconduct.

Granting plaintiff's extraordinary request for injunctive relief likewise undermines the University's ability to adjudicate student misconduct claims in an orderly, private, and efficient manner. The Supreme Court has recognized the need for schools to maintain order and discipline in a manner that contributes to, and does not disrupt, the educational process. *See*, *e.g.*, *Goss v. Lopez*, 419 U.S. 565, 590 (1975).

41154994.8

The University is required by law to investigate alleged sexual misconduct involving its students. *See* 20 U.S.C. §1681 *et seq.*; 34 C.F.R. Part 106 *et seq.* By placing these obligations on colleges and universities, Congress and federal agencies have clearly and on a bipartisan basis articulated a strong public interest in such processes. Although federal enforcement of Title IX obligations began in earnest under a Democratic administration, the rules currently enforced against institutions were proposed and promulgated by a Republican administration. *See e.g.* 34 C.F.R. Part 106.45 (effective Aug. 2020). With political polarization at a zenith, the issue of institutions' obligation to engage in these processes is bipartisan and unequivocally in the public interest. *Accord Tsuruta v. Augustana Univ.*, No. 15-4150, 2015 WL 5838602, *10 (D.S.D. Oct. 7 2015). Issuing injunctive relief in a case like this, particularly when the evidence does not support the injunction, "would likely interfere with [a university]'s ability to enforce its disciplinary standards." *Marshall*, 2015 WL 1179955, at *10.

Plaintiff contends that there is a strong public interest in avoiding violations of his civil rights, but as discussed above, Plaintiff has failed to establish a likelihood of success on his claims of gender discrimination and, therefore, it is unlikely he can demonstrate that his civil rights were violated. There is no public interest in reinstating a student found responsible for sexual assault prior to him demonstrating any entitlement to relief.

## CONCLUSION

For all the foregoing reasons, Plaintiff's Motion should be denied.

41154994.8

Dated: February 16, 2023

Respectfully Submitted,

*/s/Joshua W. B. Richards*
Joshua W.B. Richards (Special Appearance)
Douglas A. Sampson (Special Appearance)
SAUL EWING LLP
Centre Sq. West, 1500 Market St.
38th Floor
Philadelphia, PA 19102
215-972-7737
joshua.richards@saul.com
douglas.sampson@saul.com

and

William K. Davis (NCSB No. 01117)
Alan M. Ruley (NCSB No. 16407)
BELL, DAVID & PITT, P.A.
P.O. Box 21029
Winston-Salem, NC 27120
336-722-3700
wdavis@belldavispitt.com
aruley@belldavispitt.com

41154994.8

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | **:** | |
| JOHN DOE, | **:** | |
| | **:** | |
| Plaintiff, | **:** | Case No. 1:23-cv-00114 |
| | **:** | |
| v. | **:** | |
| | **:** | |
| WAKE FOREST UNIVERSITY, | **:** | |
| | **:** | |
| Defendant. | **:** | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | **:** | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of February, 2023, a copy of the foregoing Opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction, a proposed Order and all exhibits was served on all parties via the court's ECF system

‾‾‾‾‾‾*/s/ Douglas A. Sampson*‾‾‾‾‾‾
Douglas A. Sampson