

Doe Decl. Ex. F p. 1

ELLIS | WINTERS

Writer's E-mail Address:
dixie.wells@elliswinters.com

Writer's Direct Dial Number:
(336) 217-4197

December 20, 2022

[redacted]
Wake Forest University
c/o Aishah Casseus
Title IX Coordinator

[redacted]
Wake Forest University
c/o Aishah Casseus
Title IX Coordinator

**FINAL OUTCOME LETTER**
**Title IX Formal Complaint Submitted April 12, 2022**

The undersigned Hearing Officer issues this Final Outcome Letter pursuant to Section 3A.14 of the Wake Forest University Sex and General Discrimination and Harassment Policy and Title IX Sexual Harassment and Non-Title IX Sexual Misconduct Grievance Procedures, which was in effect at the time Claimant filed the Formal Complaint (referenced herein as the "Policy" when referring to Section 1 of the aforementioned document and as "Grievance Procedures" when referring to other sections of the aforementioned document).

1. **The Respondent**

Respondent is [redacted]

2. **Allegations Potentially Constituting Violations of Title IX**

According to the Formal Complaint[1] filed by [redacted] ("Claimant") on April 12, 2022, as supplemented in the first interview of Claimant on August 30, 2022:

> Claimant alleges that during the night of October 15, 2021, and during the early morning hours of October 16, 2021:
>
> She was incapacitated (due to alcohol) when Respondent engaged in sexual intercourse with her in her residence hall room on campus following a social event in which Respondent was Claimant's invited date. Alternatively, Claimant alleges that if she gave consent for sexual intercourse, she withdrew that consent after

[1] Capitalized terms are defined in the Policy and Grievance Procedures.

**ELLIS & WINTERS LLP**
*Mailing Address:* P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com

Richards Decl. Ex. B

> intercourse started when she stated, "this doesn't feel good," yet Respondent continued.

Separately, Claimant alleges that during the morning hours of October 16, 2021:

> She was incapacitated (due to sleep) when Respondent digitally penetrated her vagina without consent during the morning hours of October 16th when she woke up in her bed in her residence hall room. Respondent then allegedly continued to penetrate her after Claimant woke up.[2]

**3. Description of Procedural Steps**

On April 12, 2022, Claimant filed a Formal Complaint by electronic mail sent to Wake Forest's Title IX Coordinator, using the Formal Complaint Form. At the time the Formal Complaint was filed, Claimant and Respondent were each participating in Wake Forest's Education Program. Claimant and Respondent were each enrolled as a student, and each lived on the Reynolda Campus in Winston-Salem, North Carolina.

On April 13, 2022, the Title IX Coordinator provided Claimant and Respondent written notice of the Grievance Procedures and of the alleged violations, which was at least five days before any interviews were conducted. The written notice complied with the requirements of Section 2A.04 of the Grievance Procedures. Claimant and Respondent agreed to participate in Adaptive Resolution.

After Claimant and Respondent were not able to agree to a resolution through the Adaptive Resolution process, the Title IX Coordinator continued the formal resolution process. (See Hr'g Tr. Vol. 1 at 383-86.) The Title IX Coordinator promptly appointed an Investigator, Jessica Telligman, whose identity was disclosed to Claimant and Respondent on August 22, 2022. Neither Claimant nor Respondent timely raised any alleged conflicts of interest or bias. On August 25, 2022, the Investigator began the investigation. The Investigator presumed that Respondent was not responsible for the alleged conduct throughout the investigation as required under Section 2A.16 of the Grievance Procedures. (See Inv. Rpt. at 1.)

On September 1, 2022, the Title IX Coordinator provided Respondent written notice of additional allegations.

---

[2] Although not quoted verbatim from the Formal Complaint, Claimant agreed during the hearing held on November 29, 2022, that this summary accurately describes her allegations. (Hr'g Tr. Vol. 2 at 1588-90. (The system created the transcript from the hearing in three parts. When referring to that transcript, the Hearing Officer is using the convention of referencing the specific part of the transcript (or volume) and then referencing the segment number that appears before each time stamp within each part of the transcript. For example, the second volume of the transcript has 2533 different segments. Segments 1588-90 appear on page 134 of that transcript.))

ELLIS & WINTERS LLP
Mailing Address: P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com

Claimant provided the name and contact information for her advisor in writing to the Title IX Coordinator on August 26, 2022. Respondent provided the name and contact information for his advisor in writing to the Title IX Coordinator on April 20, 2022.

Between September 13, 2022 and November 4, 2022, the Investigator sent or made available to Claimant and Respondent, and to their respective advisors, an electronic copy of evidence obtained during the investigation that is directly related to the allegations raised in the Formal Complaint. Claimant and Respondent were given at least ten days from the time the evidence was provided to submit to the Investigator any written response to the evidence.

The Investigator then prepared a written Investigation Report, which was provided to Claimant, to Respondent, and to their respective advisors on November 4, 2022, which was more than ten days prior to the Hearing as required by Section 2B.03. The report stated that Wake Forest presumed that Respondent was not responsible for the alleged conduct as required under Section 2A.16 of the Grievance Procedures.

The undersigned Hearing Officer was appointed on November 1, 2022, and pursuant to Section 3A.03, Claimant and Respondent were provided the opportunity to identify in writing any alleged conflicts of interest or bias on the part of the Hearing Officer. The Title IX Coordinator provided the Hearing Officer with the Formal Complaint, the evidence directly related to the allegations, and the Investigation Report.

On November 1, 2022, Claimant and Respondent were provided with written notice setting forth the date, time, and location of the Hearing, which was more than seven days before the Hearing, as required by Section 3A.04 of the Grievance Procedures.

Pursuant to Section 3A.05, Claimant and Respondent were provided the opportunity to submit a written statement to the Hearing Officer that included any response that either wished to make to the Investigation Report. The Claimant timely submitted a Pre-Hearing Statement on November 24. The Respondent opted not to submit a Pre-Hearing Statement. The Respondent was provided with the Claimant's Pre-Hearing Statement on November 25 and timely filed a response to that statement on November 27.

The Hearing Officer reviewed all materials provided to her by the Title IX Coordinator. The Hearing was held on November 29, 2022, which was twenty-five days after the conclusion of the investigation. The Hearing took place partially remotely as permitted under Section 3A.08 of the Grievance Procedures, with the Hearing proceeding in Reynolda Hall, Room 301 and later in the Title IX Office, with the Claimant and some witnesses ([REDACTED]) appearing remotely via zoom. The Hearing Officer conducted the Hearing in accordance with the procedures set forth in Section III of the Grievance Procedures. Throughout the Hearing, the Hearing Officer presumed that Respondent was not responsible for the alleged conduct as required under Section 2A.16 of the Grievance Procedures.

Wake Forest strived to complete its investigation and resolution of the Formal Complaint within 120 days of the receipt of the Formal Complaint. This Final Outcome Letter is issuing on

ELLIS & WINTERS LLP
*Mailing Address:* P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com

Doe Decl. Ex. F p. 4

Final Outcome Letter
December 20, 2022
Page 4

December 20, 2022, which is 252 days from the filing of the Formal Complaint, and the timing of which was affected because the Claimant and Respondent agreed to engage in the Adaptive Resolution process as provided in Section 3A.01 and Section VI of the Grievance Procedures, which delayed the beginning of the investigation until the end of August.

**4. <u>Findings of Fact</u>**

Pursuant to Section 2A.17, the Hearing Officer has objectively evaluated all Relevant Evidence, including both inculpatory and exculpatory evidence, and has not made any credibility determinations based on a person's status as a Claimant, Respondent, or witness. Based on the evidence provided by Wake Forest and provided during the Hearing to review and consider, and for the reasons discussed in Section 5 herein, the Hearing Officer concludes that Wake Forest University has proven the following facts by a preponderance of the evidence:

a. Claimant and Respondent had engaged in sexual activity on at least eight occasions during the Spring of 2021 and the Fall of 2021 before October 15, 2022.

b. On each previous occasion, consent to sexual activity was inferred through a progression of kissing and caressing.

c. Claimant and Respondent had never had sexual intercourse before October 15, 2021.

d. The Claimant was intoxicated and impaired to some extent on the evening of October 15, 2021, but the Claimant was not Incapacitated as defined in the Policy on the evening of October 15, 2021, or in the early hours on October 16, 2021.

e. The Claimant and Respondent engaged in sexual intercourse during the early hours on October 16, 2021.

f. The Claimant consented to sexual intercourse initially.

g. After sexual intercourse began, the Claimant said that the sexual intercourse "doesn't feel good."

h. If the Claimant had said that the sexual intercourse "doesn't feel good," the Respondent admitted that he would have construed that statement as the Claimant withdrawing consent and would have stopped immediately.

i. By saying the sexual intercourse "doesn't feel good," the Claimant was withdrawing consent.

j. The sexual intercourse continued after the Claimant said that the sexual intercourse "doesn't feel good."

**ELLIS & WINTERS LLP**
*Mailing Address:* P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
**T** 336.217.4193 **F** 336.217.4198 **W** www.elliswinters.com

Doe Decl. Ex. F p. 5

Final Outcome Letter
December 20, 2022
Page 5

k. After the sexual intercourse, the Claimant texted [redacted] and said, "It burns."

l. The Claimant texted [redacted] on October 17, 2021, at 3:43 pm that "something really bad happened this weekend."

m. [redacted] texted the Claimant on October 17, 2021, to ask if Claimant wanted [redacted] to ship Plan B to Claimant.

n. The Claimant was seen at Wake Forest University Student Health Service on October 18, 2021.

o. The Claimant reported to the provider at Wake Forest University Student Health Service on October 18, 2021, that she had experienced vaginal pain dating since October 16, 2021.

p. Claimant was given Plan B by the provider at Wake Forest University Student Health Service on October 18, 2021; Claimant took the Plan B the same day.

q. [redacted] texted [redacted] on October 18, 2021, at 2:10 p.m. asking [redacted] not to talk about the date function with Claimant because "it wasn't a great night in all."

r. Claimant and Respondent spent the night of October 15, 2021, in Claimant's bed in Claimant's dorm room.

s. Respondent digitally penetrated Claimant on the morning of October 16, 2021.

t. Respondent digitally penetrated Claimant before Claimant awoke.

u. Claimant was Incapacitated when the digital penetration began.

**5. Statement of Rationale**

**a. Definitions**

The analysis must begin by addressing the definitions of the relevant terms as set forth in the Policy.

**(1) Sexual Assault**

The definition of Sexual Assault in Section 1.06 of the Policy is as follows:

> Sexual Assault is any sexual act directed against another person, without the consent of the person, including instances where the

ELLIS & WINTERS LLP
*Mailing Address:* P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com

> person is incapable of giving consent. Sexual Assault can occur between individuals of the same or different sexes and/or genders.

Included within Sexual Assault is "Rape", which is defined as "The carnal knowledge of a person, without the consent of the victim, including instances where the person is incapable of giving consent because . . . his/her temporary . . . mental or physical incapacity." Also included within Sexual Assault is "Sexual Assault with an Object", which is defined as

> To use an object or instrument to unlawfully penetrate, however slightly, the genital or anal opening of the body of a person, without the consent of the person, including instances where the victim is incapable of giving consent because of his/her age or because of his/her temporary or permanent mental or physical incapacity.

**(2) Consent**

The definition of Consent in Section 1.06 of the Policy is as follows:

> "Consent" means permission for something to happen or agreement to do something. For example, a person consents to sexual activity if/when they give permission for the activity to occur or agree to engage in the activity. Consent is unambiguous, informed, active (not passive), voluntary (freely given), mutually understandable words and/or actions that indicate a willingness to participate in the sexual activity.
>
> Whether someone has given consent is based on the totality of the circumstances and is determined by reference to a reasonable person in the same or similar circumstances. Once consent to a sexual act has been given, consent can be withdrawn at any time by communicating words and/or actions to the other person before or during that sexual act. Consent is automatically withdrawn if someone becomes unconscious or falls asleep during a sexual act.
>
> Consent cannot be inferred from silence, passivity, or a lack of resistance. Non-verbal communication alone may or may not be sufficient to constitute consent. Furthermore, consent cannot be inferred from a current or previous dating or sexual relationship (or the existence of such a relationship with anyone else), from someone's attire, spending money, or consent previously given. In other words, consenting to one sexual act does not imply consent to another sexual act.

ELLIS & WINTERS LLP
*Mailing Address:* P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com

> Consent cannot be coerced. Examples of coercion that prevent consent include physical force, violence, duress, intimidation, deception, or the threat, expressed or implied, of bodily injury.
>
> The use of alcohol or other drugs does not diminish one's responsibility to obtain consent before sexual activity and does not excuse conduct that violates this Policy.
>
> Consent may never be given by:
> . . . .
> 3. Persons who are Incapacitated.

**(3) <u>Incapacitated</u>**

The definition of Incapacitated in Section 1.06 of the Policy is as follows:

> "Incapacitated" means that a person does not have the capacity to consent. A person does not have the capacity to consent to a sexual act if, at the time of the act, they cannot understand the sexual nature of the proposed act, cannot understand that they have the right to refuse to participate in the act, or are otherwise unaware that the sexual activity is occurring.
>
> For example, a person is Incapacitated if, because of the effect of alcohol, narcotics, drugs, or other substances, the person cannot understand the sexual nature of the proposed act or cannot understand that they have the right to refuse to participate in the act, and the Respondent knows or should know (based on a Reasonable Person standard) that the other person does not have the capacity to consent.
>
> Other examples of persons who do not have the capacity to consent include persons who are unconscious, asleep, or physically helpless.

**b. <u>The Evidence Considered by the Hearing Officer</u>**

In reaching her decision regarding responsibility, the Hearing Officer considered the Investigation Report, the exhibits to that Investigation Report (except as noted below with respect to the Report of the Polygraph Examination), the transcripts of people interviewed by the Investigator, the Pre-Hearing Statement submitted by the Claimant and the Response to same submitted by the Respondent, and the questioning of the Claimant, Respondent, and witnesses during the Hearing.

Pursuant to Sections 2A.15 and 3A.11 of the Grievance Procedures, at all times the burden of producing evidence and of proving whether Respondent was responsible for the alleged

Case 1:23-cv-00114-KDB-SCR Document 6-7 Filed 02/07/23 Page 7 of 25

Doe Decl. Ex. F p. 8

Final Outcome Letter
December 20, 2022
Page 8

violations remained with Wake Forest University. The burden of proof is more likely than not, which is also known as the preponderance of the evidence standard.

The Respondent has been accused of Sexual Harassment by Sexual Assault (Rape) and Sexual Harassment by Sexual Assault with an Object, in violation of the Policy. Specifically, the Complainant alleges that she had sexual intercourse with Respondent without her consent due to incapacitation or, alternatively, that she consented to sexual intercourse and withdrew consent on the evening of October 15, 2022, or the early morning hours of October 16, 2021. The Complainant further alleges that Respondent digitally penetrated her without her consent due to sleep on the morning of October 16, 2022.

**(1) <u>The Polygraph Examination</u>**

Respondent provided the Investigator with a report prepared by Andrew Goldstein of a polygraph examination. The Investigator did not interview Mr. Goldstein, but Mr. Goldstein appeared by Zoom during the Hearing for questioning. The Hearing Officer has considered the report, the responses by Mr. Goldstein to questions asked during the Hearing, and how courts within North Carolina treat the results of polygraph examinations. The Hearing Officer has a number of reservations about the process and methods used by Mr. Goldstein.

Mr. Goldstein is a licensed polygraph examiner in the State of North Carolina. (Inv. Rpt. Ex. G.) During the Hearing, Mr. Goldstein discussed the importance of the control questions. (Hr'g Tr. Vol. 1 at 1184.) However, Mr. Goldstein was not able to recall any of the control questions that he asked of Respondent (<u>see</u> <u>id.</u> at 1188-89) and did not provide the control questions with the Report (<u>see generally</u> Inv. Rpt. Ex. G). Further, Mr. Goldstein said that he has provided quality control for polygraph reports in the past where people disagreed on the results. (Hr'g Tr. Vol. 1 at 1202-05.) In order to conduct the quality control, Mr. Goldstein had to have copies of the charts and the questions. (<u>Id.</u> at 1215-22.) The Hearing Officer notes two concerns here. First, Mr. Goldstein concedes that different examiners can interpret polygraph results differently, and second, Mr. Goldstein did not produce the underlying information that would be needed to conduct a quality control like the ones he has done of other exams. Because Mr. Goldstein's report does not indicate that it underwent any sort of peer review, and because Mr. Goldstein has produced a report without the underlying data that would be required for such a peer review, he offers no opportunity for any verification of the results of his report.

Further, Mr. Goldstein had the Respondent prepare the statement that Mr. Goldstein used during the examination. (<u>See</u> <u>id.</u> at 1032-44 ("Well, I listen[ed] to what he had said, and I just had him write down exactly what he told me . . . when he gave me the answer, [I]'d write it down, and then I['d] have him rewrite it.").) Yet Mr. Goldstein also explained that he was appearing by zoom at the Hearing from a sheriff's office, where he was administering polygraph examinations with questions prepared by the sheriff's office, rather than by the person taking the examination. (<u>See</u> <u>id.</u> at 1045.) In this particular matter, neither Claimant nor Wake Forest was asked to provide questions or input on the wording of the statement used by Respondent. (<u>See</u> <u>id.</u> at 1048-58.) In fact, had the results of the polygraph examination been different, Mr. Goldstein would have kept the results confidential and would not have provided those results to anyone unless Respondent

ELLIS & WINTERS LLP
*Mailing Address:* P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com

Doe Decl. Ex. F p. 9

Final Outcome Letter
December 20, 2022
Page 9

provided written consent. (See id. at 1190-98.) Had the results indicated deception, the Hearing Officer believes it unlikely the Respondent would have provided such written consent. In short, Respondent was able to control the statement used during the examination, unlike the matter on which Mr. Goldstein was working at the time he appeared at the Hearing, and had Respondent failed the examination, no one likely would have known about it.

Still further, evidence produced during the Investigation and Hearing differed in some ways from the statement Respondent provided to the polygraph examiner. Respondent says in the statement to the polygraph examiner, "We attended a party at ████ Fraternity," which he told the examiner was "truthful" and "completely honest." (See Inv. Rpt. Ex. G.) Yet, during the Hearing, he said that, while he does not deny attending the party at ████ Fraternity, he does not recall attending that party. While the Hearing Officer understands that Respondent is not denying that he attended the party at the ████ Fraternity, the Hearing Officer was concerned that Respondent would say that a statement was "truthful" and "completely honest" when he has no recollection concerning that statement. Second, Respondent says in the statement to the polygraph examiner, "I could not get an erection before I put the condom on," which he told the examiner was "truthful" and "completely honest." (Id.) Yet, during the Hearing, Respondent said that he had an erection, but that he was not able to maintain the erection while putting on the condom. (See Hr'g Tr. Vol. 2 at 1347-69 ("I couldn't maintain an erection to have sex or put on a condom even.").) Accordingly, the evidence Respondent presented at the Hearing seems inconsistent with what he said in his statement to the polygraph examiner, causing the Hearing Officer to question the credibility of the statement more generally.

Finally, although not bound during this proceeding by authority from the North Carolina courts, the Hearing Officer finds the way in which those courts have treated polygraph evidence persuasive. In 1983, the North Carolina Supreme Court held that "polygraph evidence is no longer admissible in any trial. The rule herein announced shall be effective in all trials, civil and criminal . . ." State v. Grier, 307 N.C. 628, 645, 300 S.E.2d 351, 361 (1983). Among other reasons, the court observed that "If a trial court were to adequately police the reliability of stipulated results, the time required to explore the innumerable factors which could affect the accuracy of a particular test would be incalculable." Id. at 643, 300 S.E.2d at 359. Notably, the North Carolina Supreme Court's holding applies to civil cases, where the standard of proof is the preponderance of the evidence, which is the exact same standard that applies under the Grievance Procedures. (See Grievance Procedures 4A.03(iv).) Courts have much greater resources and are able to consider expert opinions on both sides of issues before rendering opinions. Where those courts have concluded that polygraph evidence should not be admissible, the Hearing Officer finds that the results of the polygraph examination should not be considered in the instant proceeding.

Courts distinguish between the admissibility of the results of a polygraph examination and the admissibility of statements made before, during, and after a polygraph examination. See State v. Harris, 315 N.C. 556, 570, 340 S.E.2d 383, 391-92 (1986) (holding it was "not error for a trial judge to admit testimony on voir dire that defendant confessed after the polygraph operator told him he did not believe defendant was telling the truth on the test"); State v. Shepherd, 153 N.C. App. 646, 594 S.E.2d 439 (2004) (upholding admissibility of confession given in post-polygraph interview); 7 Jones on Evidence § 58:76 (collecting cases across jurisdictions to demonstrate a

ELLIS & WINTERS LLP
*Mailing Address:* P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com

Doe Decl. Ex. F p. 10

Final Outcome Letter
December 20, 2022
Page 10

"general rule . . . that although the examiner may not testify as to the results of the test nor even that the defendant took the polygraph test, the statements themselves are admissible.") Thus, the Hearing Officer will still consider the statements Respondent made to Mr. Goldstein even though she is not considering the results of the polygraph examination.

**c. Whether Respondent Violated the Policy**

The next step of the analysis involves examining the evidence collected by the Investigator and the evidence presented at the Hearing in the context of the definitions in the Policy.[3] Both Claimant and Respondent present as accomplished, earnest students who take the allegations seriously. (See generally Hr'g Tr. Vol. 1 at 153-54, 156-59, 251-59[4].)

**(1) Sexual Harassment by Sexual Assault (Rape)**

The Complainant alleges that she had sexual intercourse with Respondent without her consent due to Incapacitation or, alternatively, that she consented to sexual intercourse and withdrew Consent on the evening of October 15, 2022. (See Inv. Rpt. at 1.) The Policy defines both of those allegations as Rape. (See Policy Section 1.06 (defining Rape as "The carnal knowledge of a person, without the consent of the victim, including instances where the person is

[3] The Respondent's Advisor said at the end of the hearing that he was objecting to his questions being limited and to most of the day being spent on the Claimant's witnesses. The Hearing Officer notes that the Respondent's Advisor did not use the full time allotted to him by the Hearing Officer. The Hearing Officer further notes that Respondent's opening statement and the questioning by Respondent's Advisor consumed over 200 minutes of the hearing. In contrast, the Hearing Officer, who has the duty under the Grievance Procedures to conduct all direct examinations, consumed just over 250 minutes (which included extensive opening remarks), while the Claimant and the Claimant's Advisor consumed just over 100 minutes. The Respondent's Advisor also said that most of the day was spent on Claimant's witnesses, which was true. The questioning of Respondent's witnesses – [redacted] and [redacted] took a combined 97 minutes. The questioning of Claimant's witnesses – [redacted] (assuming that she was a witness for Claimant), [redacted], and [redacted] – took 122 minutes. Neither [redacted] nor [redacted] had any interactions on October 15-18, 2021, relating to the Claimant's allegations; in contrast, [redacted], [redacted], and [redacted] all had interactions October 15-18, 2021, relating to the Claimant's allegations. The Hearing Officer notes that the Respondent did not provide names to the Investigators of any witnesses who should be interviewed regarding the events of October 15-16, 2021. The Hearing Officer also notes that the Respondent was questioned for a total of 107 minutes, while the Claimant was questioned for a total of 147 minutes.

[4] Because the Respondent appeared in person when he presented his opening statement and his voice was recorded from the Hearing Officer's computer, the transcript indicates that [redacted] is speaking when it is clear from the context that the speaker is the Respondent. Similar issues appear in other parts of the transcript, particularly involving when the Respondent is speaking, or when [redacted] or [redacted] is speaking, given that each appeared in person before the Hearing Officer.

ELLIS & WINTERS LLP
*Mailing Address:* P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com

Doe Decl. Ex. F p. 11

Final Outcome Letter
December 20, 2022
Page 11

incapable of giving consent because . . . his/her temporary . . . mental or physical incapacity." As part of the definition of Consent, explaining that "Once consent to a sexual act has been given, consent can be withdrawn at any time by communicating words and/or actions to the other person before or during that sexual act.").)

After returning to the Claimant's room late in the evening on October 15 or early in the morning on October 16, Claimant and Respondent have similar accounts of what happened initially. Both describe consensual kissing that led to the decision to have sexual intercourse. (See Hr'g Tr. Vol. 1 at 181 (Claimant says, "We began consensually kissing . . . This interaction with ████ began consensually . . ."); Hr'g Tr. Vol. 2 at 799-815 (Respondent says, "we kind of skipped a small talk and then we would get to like, I said, for cuddling, caressing, kissing. . .").) Both describe Respondent getting a condom and beginning to put it on. (See Hr'g Tr. Vol. 2 at 1758-59 (Claimant says, "I think he put [the condom] on . . ."); Hr'g Tr. Vol. 2 at 816-18 (Respondent says, "Um, I chose Well, I thought it was appropriate, and I reached into my wallet, and I got a [condom] out, and this whole time, you know, as I got to the we got back in bed, begin to unwrap it.").)

Beginning at that point in the evening, the accounts differ completely.

Claimant says that the activity "escalated to sex". (See Hr'g Tr. Vol. 1 at 181 ("We began consensually kissing, and it escalated to sex."); Hr'g Tr. Vol. 2 at 1763-64 (When asked, "You said that he put the condom on, and he inserted his penis into [y]our vagina. Is that correct?" Complaint responded "Yes, completely."); 8/30/22 ████ Interview Tr. at 07:02 ("And once we got to my room, we began to make out and I remember at one point him pulling out a condom and after a little bit we started having sex and my head was only getting foggier.").)

Respondent says that he was not able to put the condom on successfully, because he could not maintain an erection, and denies sexual intercourse. (See Hr'g Tr. Vol. 1 at 309 ("when I attempted to put the condom on I could not get an erection."); Inv. Rpt. Ex. G (Statement ("We were going to have sex, but I could not get an erection before I put the condom on. Since I could not get erect, we did not have sex."); 9/8/22 ████ Interview Tr. at 17:18-19:03 ("I could not get hard so sex was not a possibility.").)

Both accounts cannot be true. Both Claimant and Respondent remember only portions of the evening. Claimant contends that her memory is foggy at points and missing at points because either she was past being a "normal drunk" or was otherwise impaired. (See 9/7/2022 ████ Interview Tr. at 20:13-20:38 ("I don't remember a lot of that night, and I can only imagine that type of a state being so confused . . . I was not in a normal state. Or even like a normal drunk. This was past that . . .").) Respondent contends that his memory is completely clear with respect to the portions of the evening he remembers, but that he has forgotten portions of the evening because of the insignificance of the events and because of the passage of time. (See Hr'g Tr. Vol. 1 at 345-46 ("I remember exactly what happened that night. My memory is clear, my conscience is clear."); id. at 672 ("I was having, you know some beers that night, but I was very aware and conscious, and have a clear idea of what I was doing that night."); id. at 674-75 ("I didn't remember going to ████] originally[,] it's been a while ago . . ."); id. at 697 ("I understand that I was at

ELLIS & WINTERS LLP
*Mailing Address:* P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com

Doe Decl. Ex. F p. 12

Final Outcome Letter
December 20, 2022
Page 12

█████. I just don't have a recollection of that.").) Each contends the other's admitted failure to remember portions of the events impacts her/his credibility as to the portions he/she remembers.

### 1. **Whether Claimant Was Incapacitated**

Assuming without deciding at this point whether Claimant and Respondent had sexual intercourse on the evening of October 15, 2022, Wake Forest must establish by a preponderance of the evidence that Claimant was Incapacitated when Respondent engaged in sexual intercourse with her with respect to the first alleged violation of the Policy. (See Policy Section 1.06 (defining Incapacitated); Grievance Procedures 4A.03(iv) (providing that the standard of proof is preponderance of the evidence).)

For Claimant to be Incapacitated under the Policy, Wake Forest would have to show that Claimant did

> not have the capacity to consent. A person does not have the capacity to consent to a sexual act if, at the time of the act, they cannot understand the sexual nature of the proposed act, cannot understand that they have the right to refuse to participate in the act, or are otherwise unaware that the sexual activity is occurring.

(Policy Section 1.06.)

Although the reports of the extent vary, from all accounts, Claimant was intoxicated the evening of October 15. (See Inv. Rpt. Ex. C (texts between ██████████ and ██████████ around 10:50 pm on October 15 describing Claimant as drunk and throwing up); Hr'g Tr. Vol. 2 at 97-100 (██████████ says, "She appeared very drunk and was . . . stumbling . . . [and] [h]er words were incredibly slow."); Hr'g Tr. Vol. 1 at 2186 ██████████ says, "She was pretty, she was pretty drunk"); id. at 2494 ██████████ says, "I believe that she was probably very drunk, but I don't think she was in a state of blackout.").) The Respondent describes "Claimant as 'definitely intoxicated' but he said she was energetic and coherent and described her as a "happy drunk." He said, for example, there was no sign she could not walk straight. She was not slurring her words. She was not falling asleep in the car. He said Claimant was intoxicated 'but not to the point where anything seemed off.'" (Inv. Rpt. at 10.)[5, 6]

---

[5] Respondent had a chance to review the Investigation Report and said that he was comfortable with the way the summaries were written. (Hr'g Tr. Vol. 2 at 544-49.)

[6] Respondent's description of the extent of Claimant's intoxication differs from that of ██████████ and ██████████. (See Hr'g Tr. Vol 1 at 295 ("If ███████ had told me that she felt sick, or if I'd seen her stumbling, [I] would have walked and [taken her] back to her suite and gone back to my own [dorm room]. I would never considered taking advantage of something.");_Hr'g Tr. Vol. 2 at 1475 ("However, I didn't witness any [stumbling, slurred speech, or throwing up] from █████.").)

ELLIS & WINTERS LLP
*Mailing Address:* P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com

Doe Decl. Ex. F p. 13

Final Outcome Letter
December 20, 2022
Page 13

Despite being drunk, Claimant was generally aware of her surroundings. (See Hr'g Tr. Vol. 2 at 1636-38 ("Did you feel that you were functioning normally at the pregame? Yes, absolutely. Were you aware of your surroundings? Yes, I was aware of my surroundings[.] [A]ware of what you were doing[?] Yes, I was aware of what I was doing."); id. at 1665-66 ("I do remember being on the dance [floor] a little bit. I remember, um. Earlier in the night we had actually stepped outside to just sit and chat. . . He told me that his dad was a pilot . . . I remember asking [Respondent] to bring me a cup of water, because I felt unwell."); id. at 1698-1700 ("[At ████ I remember being downstairs with [Respondent] and just chatting a dancing a little bit to the music, and then I remember like vomiting.").) Claimant was able to walk without assistance to her dorm room. (See Inv. Rpt. at 5 ("Claimant stated that she recalls having difficulty walking up the stairs in her suite in ███. She said, 'I just remember feeling just almost like a little out of breath.'"); Hr'g Tr. Vol. 1 at 179 ("I remember stumbling up to my suite with ███ following me, and by the time I made it to my room I felt out of breath, and my head was only getting foggy, and my state was only getting worse."); Inv. Rpt. at 3 (Respondent says there was no sign Claimant could not walk straight).) Claimant was also able to direct texts to the intended recipient. (See Inv. Rpt. Ex. C (texts between Claimant and ██████████ indicating that Claimant was sending texts to the desired recipient).)

This evidence, although not directly related to understanding sexual activity, supports that, even if drunk, Claimant had sufficient capacity to understand the sexual nature of a proposed act, that she had the right to refuse to participate, and that she would have been aware of ongoing sexual activity, which would mean that under the Policy, she was not Incapacitated.

Although disputed by the Respondent, Claimant also contends that while in the act of sexual intercourse, she withdrew consent when she said that this "doesn't feel good." (See Hr'g Tr. Vol. 2 at 2125 ("I withdrew my consent."); id. at 2490-91 ("I do not recall saying, Can you take your penis out of my vagina, and I do not recall explicitly, Stop, Um, I believe [] me saying this doesn't feel good is my way of saying okay, like pause. Whatever is going on like needs to stop. . .").) To withdraw consent after sexual activity has begun, one has to know that one is engaged in sexual activity and has to understand that he/she has the right to refuse to participate in the act. Further, Claimant agreed that she was saying that the Respondent's penis in her vagina hurt, thereby acknowledging the sexual nature of the ongoing act. (See Hr'g Tr. Vol. 3 at 68 ("His penis was penetrating my vagina, and as I've explained, I was not very physically into it. So it was the friction and it did not feel good.").)

Accordingly, the undersigned Hearing Officer concludes that Wake Forest has failed to meet its burden of proof to show that Claimant was Incapacitated pursuant to the Policy, assuming without deciding at this point whether Claimant and Respondent engaged in sexual intercourse.

### 2. If Sexual Intercourse Ensued, Whether Consent Was Withdrawn

The Hearing Officer must next determine if Wake Forest has met its burden of showing that Claimant withdrew consent after intercourse started when she said, "this doesn't feel good" and Respondent continued regardless. Because the Respondent denies that he and the Claimant

ELLIS & WINTERS LLP
Mailing Address: P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com

Doe Decl. Ex. F p. 14

Final Outcome Letter
December 20, 2022
Page 14

had sexual intercourse, the Hearing Officer must first determine by a preponderance of the evidence whether Claimant and Respondent engaged in sexual intercourse on the evening of October 15.

**a. <u>Whether Claimant and Respondent engaged in sexual intercourse</u>**

Except that Claimant and Respondent both say that they were (at least) on the cusp of sexual intercourse, Claimant's and Respondent's respective accounts of the evening differ significantly. Claimant says that they did engage in sexual intercourse. (<u>See</u> Hr'g Tr. Vol. 2 at 2436 ("I can [o]ne hundred percent confidently, without question, state that I remember the respondent putting his penis in me and having sex with me."); <u>id.</u> at 2442 ("the respondent[']s penis did penetrate my vagina").) In contrast, Respondent says that they did not engage in sexual intercourse. (<u>See</u> Hr'g Tr. Vol. 1 at 309 ("when I attempted to put the condom on I could not get an erection."); Inv. Rpt. Ex. G ("We were going to have sex, but I could not get an erection before I put the condom on. Since I could not get erect, we did not have sex."); 9/8/22 [REDACTED] Interview Tr. at 17:18-19:03 ("I could not get hard so sex was not a possibility.").)

The Hearing Officer thus turns to the other evidence of what happened that evening to analyze whether that evidence sheds light on which account of the evening seems more credible.

[REDACTED] testified that Claimant asked her to leave her room and told the Investigator she assumed Claimant made the request because Claimant was going to hook up. (<u>See</u> Inv. Rpt. at 16 ("[REDACTED] stated that she believes Claimant asked her to leave her room, but she said Claimant did not explain why. [REDACTED] assumed that was for the purpose of a 'hook up' but [REDACTED] also stated she was confused because there was no explanation provided."); Hr'g Tr. Vol. 1 at 1720-22 ("I do remember her communicating to me, maybe through other people, maybe through Snapchat . . . that I was supposed to leave, and the people that I had in my room were supposed to leave.").) Because both Claimant and Respondent concede being (at least) on the cusp of sexual intercourse, [REDACTED]'s report is not probative on the issue of whether sexual intercourse ensued.

Both Claimant and Respondent provided evidence regarding a condom[7] that could have been probative on this issue. However, it was not retained, and no evidence exists as to whether there was ejaculate in the condom.

---

[7] Respondent says that the condom was partially, but not fully, unrolled. (<u>See</u> Hr'g Tr. Vol. 2 at 850-851 ("No, I did not fully [u]nroll the condom because . . . there wasn't enough to roll it on."); <u>but see</u> Inv. Rpt. Ex. G, Statement for Polygraph Examination ("We were going to have sex, but I could not get an erection before I put the condom on.") <u>and</u> Inv. Rpt. at 10 ("Respondent stated that he planned to use a condom for sex and had one, but he was unable to use it because he could not get an erection.").) In contrast, Claimant says the condom was fully unrolled. (<u>See</u> Hr'g Tr. Vol. 2 at 1856 ("[The condom] was unrolled, thrown to the ground by a ripped wrapper."); <u>id.</u> at 1864-65 ("Yes, [the condom] was pretty much fully [u]nrolled.").)

ELLIS & WINTERS LLP
*Mailing Address:* P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com

Doe Decl. Ex. F p. 15

Final Outcome Letter
December 20, 2022
Page 15

Claimant produced a medical record from a visit to Wake Forest University Student Health Service on October 18, 2021, which says the provider gave Plan B to the Claimant. (See Inv. Rpt. Ex. F.) Claimant says she took the Plan B while at the clinic (see Hr'g Tr. Vol. 2 at 1921 (Question: "Did you get the Plan? B." Answer: "I did. I took it while I was there."); see Inv. Rpt. at 6 ("Claimant stated that she was provided Plan B and received a referral to the Safe Office during the [October 18, 2021] visit.").) While certainly not conclusive, being provided with Plan B and taking it is some indication that the provider opined, and the Claimant agreed, that sexual intercourse had occurred, even though in the report, the provider records that Claimant "denies sexual assault," and "does not recall consenting to or having sexual intercourse with the male." (Inv. Rpt. Ex. F.)[8]

The medical record from October 18, 2021, also notes that the Claimant reported vaginal pain. (See Inv. Rpt. Ex. F.) The Claimant said at the Hearing that the pain was the likely result of engaging in sexual intercourse when she was not sufficiently lubricated. (See Hr'g Tr. Vol. 2 at 1825-26 ("[T]he pain I felt [while] having sex with the respondent was because I was not physically as into it, and so it like I was pretty dry, and so, having his [penis] like rub against me . . . it felt like sandpaper.").)[9] Given the provider gave Plan B to the Claimant, Claimant reported pain to the provider that is described in the report, and the provider included a diagnosis of "Adult sexual abuse, confirmed, initial encounter," (see Inv. Rpt. Ex. F), the Hearing Officer finds the medical record supports that it is more likely than not that the Claimant and Respondent had sexual intercourse that evening.[10]

---

[8] Claimant explained those statements at the Hearing by saying she did not want to discuss sexual assault with a male nurse, was terrified, did not want to report it, had no plans of pursuing it, and did not want a mandatory reporter to initiate a Title IX process. (See Hr'g Tr. Vol. 2 at 1883 ("I had no intention to report and I was terrified. I was on edge of the whole time, and I'd also explained how you know the first individual asked me, and that's where I denied sexual assault, because you know, The first nurse was a male, and I felt uncomfortable."); id. at 1884-87 ("Those questions start to take away at me, and I still didn't want to get anyone in trouble, because I didn't know who mandatory reporter was . . . I was frightened by what happened to me, and I was trying to avoid saying it . . . again. I did not want to report, and I was. I was hoping they weren't taking [notes] . . .").)

[9] The medical record says that Claimant reported the pain as being "on Saturday morning." If sexual intercourse occurred, it would have been early on October 16. At the hearing, the Claimant said that she was in shock and not able to process how she felt until after the Respondent left her room the morning of Saturday, October 16. (See Hr'g Tr. Vol. 1 at 187-89 ("This traumatizing experience ended when the [Respondent] pulled his hand away and got up to use the bathroom. I sat in my room in shock of what happened. Later in the morning I went to [REDACTED] room, and when she asked me how my night was[,] I immediately broke down crying . . . It took months for me to accept that the [R]espondent raped me.").)

[10] The Investigator sought authorization from the Claimant to discuss the medical record attached as Exhibit F to the Investigation Report with Dr. Price, the Director of Student Health and the medical director of the provider involved. (Inv. Rpt. at 7.) Claimant refused to sign a release.

ELLIS & WINTERS LLP
*Mailing Address:* P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com



A text message that Claimant sent to on October 16, 2021, at 12:59 a.m. supports Claimant's account at the Hearing. (See Inv. Rpt. Ex. C, Text from Claimant to (Oct. 16, 2021).) That message says, "[i]t burns." (Id.) "It burns" would be consistent with vaginal pain resulting from engaging in sexual intercourse while not sufficiently lubricated. Claimant texted at 12:17 am to say, "I'm Coming back to " (Id.) Although not a lot of time, Claimant and Respondent could have returned to her dorm and engaged in sexual intercourse in the forty-two minutes between those two texts, especially where Respondent said because they "had already been together for a little while, so we kind of skipped a small talk, and then we would get to like, I said, for cuddling, caressing, kissing . . ." (Hr'g Tr. Vol. 2 at 799-802.)

Further, the Claimant's best friend[11], , provided evidence that the morning of October 16, 2022, Claimant reported to her that Claimant and Respondent had sex: "[F]rom what she told me it sounded like . . . they started to have sex . . . " (Hr'g Tr. Vol. 1 at 2081; see 9/6/22 Interview Tr. at 17:55, 21:09 ( describes Claimant crying on October 16, 2021, and then says, "But from what, from the way she told me she's like they started having sex.").)

Respondent says that he and Claimant did not have sex because he could not maintain an erection. He told the Hearing Officer, "I've failed to get [an erection] multiple times with other women as as well, including my girlfriend." (Hr. Tr. Vol. 2 at 872-873; see also id. at 1360.) Respondent provided no evidence to the Investigator regarding the past instances where he had not been able to provide an erection, despite the Investigator inviting him to reach out to her any time and despite the Respondent providing her with other information. (9/8/22 Tr. at 4:04; 9/26/22 Tr. at 0.02, 0.18.) Further, the Respondent produced no text messages to the Investigator from the night of October 15 or the days following.[12] Thus, the only evidence

---

(Id.) Dr. Price could have provided more information about why Claimant was assigned the specific diagnosis of "Adult sexual abuse, confirmed, initial encounter". (Hr'g Tr. Vol. 1 at 616-21.) The Hearing Officer would have liked to have been able to consider any information that Dr. Price could provide, but she did not have that opportunity.

[11] (9/6/22 Interview Tr. at 1:31 (describing Claimant as her best friend) and 8/30/22 Interview Tr. at 00:56 (including in her group of "my girl best friends, we're called 'sweeties'").)

[12] Respondent produced one string of text messages between himself and sent between April 17, 2021, and April 30, 2021. While the Hearing Officer did not find the substance of the messages probative to the issues to be decided for reasons discussed within this Final Outcome Letter, the Hearing Officer found the text string notable for three reasons. First, by providing this text string to the Investigator, Respondent demonstrated that he knew that he could provide information, including text messages, to the investigator and that he did provide such messages when he thought they would be helpful. Second, the text messages demonstrate that Respondent texted regularly with at least one friend. Third, the text messages demonstrate

before the Hearing Officer that the Respondent could not maintain an erection were the statements by the Respondent.

Although valuable evidence was not available for consideration, based on the evidence produced by Wake Forest, the Hearing Officer concludes that it is more likely than not that Claimant and Respondent engaged in sexual intercourse that evening. Further, Claimant describes the sexual intercourse as initially being consensual. (See Hr'g Tr. Vol. 2 at 2119 ("when sex had started with the [Respondent] it started off as okay, and it was something that I consented to"); Inv. Rpt. at 5 ("When we started to have sex, it started off as okay. I was basically coaching myself to do it. But I remember [the condom] coming out. I remember saying okay at first, but I wasn't doing well."); Hr'g Tr. Vol. 1 at 181 ("We began consensually kissing, and it escalated to sex. This interaction with [redacted] began consensually, but it began to [hurt] because I did not enjoy it."); Hr'g Tr. Vol. 1 at 204 (Well, I did initially consent . . .").) Accordingly, the Hearing Officer concludes that it is more likely than not that Claimant and Respondent engaged in consensual sexual intercourse in the early hours on October 16, 2021.

**b. Whether Claimant withdrew consent**

Given that the Hearing Officer has concluded that it is more likely than not that Claimant and Respondent engaged in sexual intercourse, the Hearing Officer next must determine whether Claimant withdrew consent and whether Respondent continued to engage in sexual intercourse.

Again, Claimant and Respondent diametrically diverge on their accounts. Claimant says that she withdrew consent when she said this "doesn't feel good," yet Respondent continued to engage in sexual intercourse. (See Hr'g Tr. Vol. 2 at 2125 ("I withdrew my consent."); id. at 2490-91 ("I do not recall saying, Can you take your penis out of my vagina, and I do not recall explicitly, Stop, Um, I believe [] me saying this doesn't feel good is my way of saying okay, like pause. Whatever is going on like needs to stop. . .").) Respondent says that at no time in any of their "hook ups" did Claimant ever say that anything did not feel good. (See Hr'g Tr. Vol. 2 at 583-86 (when asked whether "[redacted] ever told [him] that something did not feel good" during the "hook ups" excluding October 15, Respondent responded "No.").) Notably, Respondent said that had Claimant said that something "doesn't feel good", he would have interpreted that as withdrawing consent and would have immediately stopped the ongoing sexual activity. (See Hr'g Tr. Vol. 2 at 908-912[13].) Accordingly, both Claimant and Respondent agree that if Claimant said that the sexual

---

that Respondent maintained at least some texts from almost six months before October 16, 2021, suggesting that he would also have had text messages from around the time of October 16, 2021.

[13] The transcript says, "If someone said that to me while engaging in some sort of sexual activity to stop natively and clarify the situation, but definitely, first reaction is to stop me, the next one." In places such as this one, the transcript is unclear. The Hearing Officer bases her statement in the Final Outcome Letter on her own recollection from the Hearing, the notes she took at the hearing, and this portion of the transcript where the Respondent said his first reaction would have been to stop.

ELLIS & WINTERS LLP
*Mailing Address:* P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com

Doe Decl. Ex. F p. 18

Final Outcome Letter
December 20, 2022
Page 18

intercourse did not feel good, both would have interpreted that statement as Claimant withdrawing consent.

The question then becomes whether Claimant said that the sexual intercourse did not feel good and whether Respondent stopped. Claimant says, "I told him this doesn't feel good, and he ignored me." (Inv. Rpt. at 5.) The Hearing Officer then considers whether other evidence supports Claimant's statement.

- That the sexual intercourse was painful is consistent with the pain reported to the medical provider on October 18 (see Inv. Rpt. Ex. F) and the text Claimant sent to [redacted] on October 16 at 12:59 a.m. (see Inv. Rpt. Ex. C, Text Messages from [redacted] to [redacted] (Oct. 16, 2021, at 12:59 AM) ("It burns").)

- [redacted] provided evidence corroborating the Claimant's account. (See Hr'g Tr. Vol. 1 at 2081 ("[F]rom what she told me it sounded like . . . they started to have sex, and then she didn't want to, and . . . then she remembers him not stopping."); 9/6/22 [redacted] Interview Tr. at 17:55, 21:09 [redacted] describes Claimant crying on October 16, 2021, and then says, "But from what, from the way she told me she's like they started having sex. It hurt. And she said 'this doesn't feel good' and then does not remember anything after that, so does not remember him stopping, does not remember anything.").)

- Contemporaneous evidence from October of 2021 supports that "something bad" happened over the weekend.

  - On Sunday, October 17, 2021, the Claimant texted [redacted], a friend who was not at Wake Forest, and said, "There isn't really an easy way to word this but something really bad happened this weekend." (See Inv. Rpt. Ex. C, Text Message from [redacted] to [redacted] (Oct. 17, 2021)).) After Claimant and [redacted] talked by telephone (as indicated by the text string), [redacted] offers to ship Plan B to Claimant, again on October 17, 2021. (Id.) On October 18, 2021, [redacted] texts Claimant with links to resources at Wake Forest for support for individuals who have experienced sexual misconduct. (Id. (October 18, 2021).)

  - [redacted] texted [redacted] on October 18, 2021 to say "i don't want to tell all the boys bc I don't want them to ask questions and stuff but between me & u, please as a friend, don't talk about the dfunc with [redacted] because she's kinda nervy that she was drugged or something and it wasn't a great night in all and people keep bringing it up and i don't want it to make her anxious." (See Inv. Rpt. Ex. C, Text Message from [redacted] to [redacted] (Oct. 18, 2021).)

  - Both Claimant and Respondent agree that Claimant never contacted Respondent again after October 16, 2021. (See Inv. Rpt. at Section 7 ("Respondent stated that he never heard from Claimant again."); 8/30/22 [redacted] Interview Tr. at 15:19 ("and he and I never spoke again and in social situations, it was not friendly").) While not probative of whether sexual intercourse ensued in the early hours of

ELLIS & WINTERS LLP
*Mailing Address:* P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com

Doe Decl. Ex. F p. 19

Final Outcome Letter
December 20, 2022
Page 19

October 16, Claimant not contacting Respondent again is consistent with "something bad" happening October 16, especially where Respondent said that Claimant had previously initiated every meeting in person between the two (see Hr'g Tr. Vol. 2 at 560 ("She was usually the one trying to get together with me.")[14].)

Particularly given the divergent accounts by Claimant and Respondent as to whether sexual intercourse ensued, the Hearing Officer considered whether and how much to credit the evidence provided by Claimant's admitted "best friend," ██████████, given the Respondent's suggestion that Claimant filed her Formal Complaint as retaliation because Respondent began dating someone else when Claimant wanted to date him and as retaliation connected to ████████████. (See Hr'g Tr. Vol. 1 at 334-338)[15]; Inv. Rpt. at 11 ("Respondent described a situation involving his fraternity brother ████████████ that he stated may have been motivation for Claimant's allegations against him.").) Contemporaneous evidence from October of 2021 and discussed above supports that "something bad" happened over the weekend – evidence from well before February 2022 when the events involving ████████████ began (see Claimant's Pre-Hearing Statement at page 1; Respondent's Response to Claimant's Pre-Hearing Statement at page 1 (discussing ████)) and from before "a few weeks after" the date function on October 15 when Respondent began dating ████████████.[16, 17] Because the Hearing Officer finds ████'s interview with the Investigator and her statements at the Hearing generally consistent with these contemporaneous events and found ██████████ to be a generally credible witness at the Hearing, the Hearing Officer considered █████s statements as described above.

---

[14] In Hr'g Tr. Vol. 2 at 558 is the question, "did she initiate getting together every time." The transcript provides no answer. The Hearing Officer recalls the Respondent answering "yes" to this question.

[15] Before reading his opening statement, Respondent provided the Hearing Officer with a printed copy of that statement, which is attached to this Letter as Exhibit A. In the printed statement, Respondent says, "I had no reason to believe that 6 months later █████ would claim that I had sexually assaulted her. A few weeks after the date function on October 15, 2021, I began dating another student at Wake Forest."

[16] Respondent said that he did not begin dating ████████████ until "a couple of weeks" after the date function. (See Hr'g Tr. Vol. 2 at 634.) Considering the overlapping friend groups, the Hearing Officer assumes that Claimant would have learned that the Respondent was dating ████████████. However, the Hearing Officer focused on evidence from the time before that new relationship began.

[17] The Hearing Officer has explained why she did not find the events surrounding ████ ████████ or ████████████ relevant to what occurred on October 16, 2021. To the extent those events influenced the Claimant's decision to file a Formal Complaint with the Title IX Office (as opposed to what occurred on October 16, 2021), the Hearing Offices does not find that decision relevant to the issues to be decided by the Hearing Officer. The Hearing Officer focused on what happened on October 16 and not why Claimant ultimately decided to file a Formal Complaint almost six months after October 16.

ELLIS & WINTERS LLP
*Mailing Address:* P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com

Doe Decl. Ex. F p. 20

Final Outcome Letter
December 20, 2022
Page 20

The Hearing Officer also considered whether it is reasonable that Claimant would have remained in bed with the Respondent if sexual intercourse had ensued, she had told him that the sexual intercourse did not feel good, and he had proceeded regardless. As discussed previously, the Claimant was intoxicated that evening, although not at the point of Incapacitation under the Policy. That she may have passed out at the point where she is no longer able to recall the events of the evening seems one reasonable explanation. That she was frightened to have had someone she considered a friend proceed with sexual intercourse after she revoked consent and not known where to go – given that she was already in her own bedroom – seems another reasonable explanation. Finally, that she had not yet fully comprehended that the events of that evening translated into sexual assault seems yet another reasonable explanation. In short, on balance, the Hearing Officer did not consider Claimant remaining in bed with the Respondent probative of whether her account of the evening was credible.[18]

When considered in the context of this other evidence, some of which dates from less than seventy-two hours after the encounter, the Hearing Officer finds that Claimant's statements about the sexual intercourse, saying that it "doesn't feel good," and Respondent continuing regardless are credible and are more likely than not what happened that evening. Accordingly, the Hearing Officer concludes that it is more likely than not that Claimant revoked consent when she said the ongoing activity "doesn't feel good" and Respondent continued regardless.

**(2) Sexual Harassment by Sexual Assault with an Object**

Finally, the Hearing Officer must determine if Wake Forest has met its burden of proving that Claimant was incapacitated (due to sleep) when Respondent digitally penetrated her vagina without consent during the morning hours of October 16th.

Both Claimant and Respondent admit that Respondent digitally penetrated Claimant on the morning of October 16. (See Hr'g Tr. Vol. 1 at 323 ("I beg[a]n fingering [Claimant] as I've done [on] prior occasion[s]"); Hr'g Tr. Vol. 2 at 1792 ("And when I blinked awake he had already been inserting his fingers in me.").) Claimant says that when she woke up, Respondent was already digitally penetrating (or fingering) her. (See Hr'g Tr. Vol. 2 at 1792 ("And when I blinked awake he had already been inserting his fingers in me.").) Respondent says that Claimant was already awake when he woke up, that the two were cuddling, and that Claimant was rubbing his shoulder at the point that he began digitally penetrating her. (See Hr'g Tr. Vol. 1 at 316-23 ("[Claimant] was awake . . . She was rubbing my shoulders and reaching out toward my hair . . . I believe . . . initiating sexual contact . . . I beg[a]n fingering [Claimant] as I've done [on] prior occasion[s]"); Hr'g Tr. Vol. 2 at 927-29 ("So there was an initial sense that she's awake. Um. We're still gonna kind of cuddle, and you know, or each other's hair massage each other's shoulder or something, something along those lines.").) Neither Claimant nor Respondent provided any evidence of any words being exchanged.

---

[18] The Hearing Officer did not allow the Respondent's advisor to question the Claimant about her athletic conditioning and her strength for similar reasons. (Hr'g Tr. Vol. 3 at 397-400.)

ELLIS & WINTERS LLP
*Mailing Address:* P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com

"Sexual Assault with an Object", is defined in the Policy as "To use an object or instrument to unlawfully penetrate, however slightly, the genital or anal opening of the body of a person, without the consent of the person, including instances where the victim is incapable of giving consent because of his/her age or because of his/her temporary or permanent mental or physical incapacity." (Policy at Section 1.06.) An object is "something material that may be perceived by the senses". https://www.merriam-webster.com/dictionary/object (last visited Dec. 3, 2022). Accordingly, the definition of object includes a finger. Under the Policy, a person cannot consent if he/she is Incapacitated. (Policy at Section 1.06.) Having established that Respondent used his finger to penetrate the genital opening of Claimant, the issue is thus whether Claimant was asleep at the time he penetrated her, because pursuant to the Policy, if Claimant was asleep, then she was Incapacitated.[19] (See Policy at Section 1.06.)

Given the conflicting accounts of whether Claimant was asleep when Respondent began digitally penetrating her, the Hearing Officer examined other evidence to help her in making a determination. [redacted] told the Investigator that "Claimant said she woke up in the morning to 'him touching her or whatever he did to her,' a used condom on the floor, and her lamp turned over. [redacted] said she asked Claimant if she was 'fully asleep' and Claimant said, 'yes, I completely had not been awake and I woke up to his, to him touching me.'" (Inv. Rpt. at 13.)

Further, evidence of Claimant's condition the previous evening provides some evidence of how perceptive Respondent was regarding Claimant. Claimant and Respondent went to a pregame, followed by a date function, followed by going to a fraternity house. (See generally Inv. Rpt.) Contemporaneous text messages from the evening between [redacted] and [redacted] describe Claimant as "barely[able to] talk," "drunk," and "throwing up" that evening. (See Inv. Rpt. Ex. C.) [redacted] provided evidence that he had alerted the bar tender at the [redacted] House not to serve Claimant alcohol and told the pledges that she was under their watch (which was also confirmed by contemporaneous text). (See Hr'g Tr. Vol. 2 at 160 ("I told the bartender that she's not allowed to drink, and that she shouldn't drink, and to very much keep an eye on her."); Inv. Rpt. Ex. C.) [redacted] described a telephone call with the Claimant where Claimant could "barely talk", (see Inv. Rpt. Ex. C), and [redacted]'s text sent to [redacted] at 10:51 PM on October 15, 2021, supports that such a telephone conversation took place (see Inv. Rpt. Ex. C, Text from [redacted] to [redacted] (Oct. 15, 2021) ("i'm sorry to be a narc but she just called me and can barely talk")).

---

[19] Both Claimant and Respondent provided evidence regarding past sexual activity between them. Both acknowledged that he/she never sought express verbal consent, but instead that consent was inferred through a progression of kissing and caressing. Accordingly, based on this pattern of conduct, if Respondent's account that Claimant was stroking his hair can be credited, which would mean that she was awake before the digital penetration began, then the Hearing Officer finds that a reasonable person would find that Claimant had consented to the digital penetration. (See Hr'g Tr. Vol. 2 at 927-29 ("So there was an initial sense that she's awake. Um. We're still gonna kind of cuddle, and you know, or each other's hair massage each other's shoulder or something, something along those lines.").)

ELLIS & WINTERS LLP
*Mailing Address:* P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com

Case 1:23-cv-00114-KDB-SCR Document 6-7 Filed 02/07/23 Page 21 of 25

Contemporaneous text messages from the Claimant to ████████ contain a large number of errors that are inconsistent with other text messages produced by Claimant. (See Inv. Rpt. Ex. C (comparing texts to ████ on October 16, 2021 (including "InTAKKED ALREADY," "Z DOOMG WHAT", and "I'm Boy okay") with texts to ████ on October 17, 2021 (written in complete sentences with proper spelling and proper grammar).) While certainly not conclusive, the large number of errors tends to support that Claimant was impaired to some extent that evening (although as discussed above, the Hearing Officer has already concluded that any such impairment did not extend to being Incapacitated as defined under the Policy).

Yet Respondent, who was Claimant's date that evening and presumably was in close contact with her during at least parts of the evening, (see Inv. Rpt. Ex. C., Text from ████ to ████ (Oct. 15, 2021) ("Bro ████'s been all over ████"); Hr'g Tr. Vol. 2 at 633 (recalling taking a photo with Claimant); id. at 688 (the transcript is unclear but discusses them being on the dance floor together)), says that he did not know that Claimant had thrown up and did not understand that she was impaired (Hr'g Tr. Vol. 1 at 293-94 ("[Claimant] never mentioned that she had thrown up at any time. . . I did not think [Claimant] was extremely intoxicated by the[n]."); id. at 292 ("She was coherent and alert.").) Respondent further said that had he realized that Claimant was impaired, he would not have stayed in her room. (See Hr'g Tr. Vol 1 at 295 ("If [Claimant] had told me that she felt sick, or if I'd seen her stumbling, [I] would have walked and [taken her] back to her suite and gone back to my own [dorm room]. I would never considered taking advantage of something.").) Based on the evidence presented, Respondent should have known that Claimant was impaired in the early hours of October 16.

Respondent's assessment – describing Claimant as coherent and alert – indicates an overall lack of attention to and recognition of Claimant's condition during the evening on October 15, 2021, and in the early hours of October 16, 2021. Therefore, a fair inference is that Respondent was also unaware of Claimant's condition the next morning.

That overall lack of attention to and recognition of Claimant's condition, combined with the Hearing Officer already determining in previous instances that Claimant's account was more credible than Respondent's account, leads the Hearing Officer to conclude that Wake Forest has met its burden of proving that Respondent more likely than not digitally penetrated Claimant while she was incapacitated due to sleep and that Respondent should have known that Claimant was asleep and did not have the capacity to consent.

**(3) Summary**

In conclusion, the Hearing Officer concludes that Wake Forest has met its burden of showing by a preponderance of the evidence that Respondent engaged in Sexual Harassment by Sexual Assault (Rape) and Sexual Harassment by Sexual Assault with an Object in violation of the Policy.

**ELLIS & WINTERS LLP**
*Mailing Address:* P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com

**d. Sanctions**

As provided under the Grievance Procedures in Section 3A.12, the following section of this Final Outcome Letter was provided to the Hearing Officer by the appropriate Sanctions Officer, who in this case is Dr. Adam Goldstein, Associate Vice President and Dean of Students.

Prior to making my decision, I reviewed and considered the Draft Final Outcome Letter, Final Investigation Report, Section 3A.10 of Wake Forest University's Sexual Misconduct Policy, and the document titled "Determination Regarding Sanctions Master List of Hearings Appeals Formal Complaints Training Sessions." Items of note:

- "...it is more likely than not that Claimant revoked consent when she said the ongoing activity "doesn't feel good" and Respondent continued regardless" (Draft Final Outcome Letter, p.20).
- "...Respondent more likely than not digitally penetrated Claimant while she was incapacitated due to sleep and that Respondent should have known that Claimant was asleep and did not have the capacity to consent" (Draft Final Outcome Letter, p.22).
- "In conclusion, the Hearing Officer concludes that Wake Forest has met its burden of showing by a preponderance of the evidence that Respondent engaged in Sexual Harassment by Sexual Assault (Rape) and Sexual Harassment by Sexual Assault with an Object in violation of the Policy" (Draft Final Outcome Letter, p.22).

Additional:

- In a decision letter (date: 12/3/20), detailing outcomes from an Administrative Hearing (date: 11/23/20) about an incident (date: 10/28/20), Dr. Jim Settle, Associate Dean of Students, stated "Hearing panelists recommended any additional instances of violations of the Student Code of Conduct should result in your immediate suspension for the remainder of that semester and at least one additional semester."
- The impact of separating Mr. ████████ from their education for a period of time may result in delayed graduation, delay or loss of "a job offer in May" (████s Opening Statement, p. 1)

For the violations of Wake Forest University's Sexual Misconduct Policy, Mr. ████████ should be:

- Suspended for a period of one year (i.e., Spring/Summer 2023 and Fall 2023, with eligibility to return to Wake Forest during the Spring 2024 semester)

**6. Wake Forest's Procedures and Permissible Bases for Complainant and Respondent to Appeal**

Pursuant to the Grievance Procedures, the procedures and bases for appealing are as follows:

ELLIS & WINTERS LLP
*Mailing Address:* P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com

Doe Decl. Ex. F p. 24

Final Outcome Letter
December 20, 2022
Page 24

3A.15 Appeals

The Claimant or the Respondent may appeal the decision of the hearing officer regarding responsibility and/or the sanction(s) imposed on the Respondent.

The following are the only permissible grounds for an appeal of the hearing officer's responsibility determination: (1) procedural irregularity that affected the outcome; (2) new evidence that was not reasonably available at the time of the determination and that could affect the outcome; and (3) the Title IX Coordinator, an investigator, or the hearing or sanctions officers had a conflict of interest or bias that affected the outcome.

Sanctions may only be appealed on the ground that the severity is incommensurate to the gravity of the Sexual Harassment for which the Respondent was found responsible.

Appeals must be submitted in writing to the Title IX Coordinator within five days from the date of the final outcome letter. The Title IX Coordinator will promptly inform the other party of the filing of the appeal. The other party will have three days from such notification to submit a written response to the appeal.

3A.16 Appointment of the Appeal Officer and Challenging of the Same

Upon receipt of an appeal, the Title IX Coordinator will appoint an appeal officer.

Within two days of such appointment, the Claimant or the Respondent may identify to the Title IX Coordinator in writing alleged conflicts of interest or bias posed by assigning that appeal officer. The Title IX Coordinator will carefully consider such statements and will promptly assign a different appeal officer if the Title IX Coordinator determines that a material conflict of interest or material bias exists.

3A.17 Appellate Review

The Title IX Coordinator will share the Formal Complaint, the investigative report, the hearing recording, all statements introduced at the hearing, any other evidence considered by the hearing officer, the hearing officer's written findings, and the written appeal submissions with the appeal officer. In addition, if an appeal raises procedural issues, the Title IX Coordinator may

ELLIS & WINTERS LLP
*Mailing Address:* P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com

Doe Decl. Ex. F p. 25

Final Outcome Letter
December 20, 2022
Page 25

provide the appeal officer additional information relevant to those issues.

Within 15 days of the receipt of the appeal, the appeal officer will determine (a) that the decision of the hearing officer should stand; or (b) that the decision of the hearing officer should be overturned and will issue a written explanation of that result and the rationale behind it.

In the event that the appeal officer determines that the decision of the hearing officer should be overturned, the appeal officer will specify, after consultation with the Title IX Coordinator and other Wake Forest administrators as necessary, the appropriate steps to be taken to come to a final resolution of the Formal Complaint (which may include another hearing before the same hearing officer or a different one).

Submitted this 20th day of December, 2022.

Dixie T. Wells

Dixie T. Wells
Hearing Officer

**ELLIS & WINTERS LLP**
*Mailing Address:* P.O. Box 2752, Greensboro, NC 27402
300 North Greene Street, Suite 800, Greensboro, NC 27401
T 336.217.4193 F 336.217.4198 W www.elliswinters.com