**APPEAL BY RESPONDENT** ███████████████
**OF FINAL OUTCOME LETTER**
**Title IX Complaint Submitted April 12, 2022**

## I.   Procedural Irregularity That Adversely Affected the Outcome of the Hearing

### (A) Proceeding with Adaptive Resolution Delayed the Investigation and Adversely Affected the Outcome of the Hearing.

Section 2A.04 Notice of Allegations of Wake Forest Title IX Policy and Grievance Procedures states in part that the Respondent will be provided with:

> "written notice of these Grievance Procedures and of the allegations of conduct potentially constituting Sexual Harassment and/or SexualMis-conduct, including sufficient details known at the time…..Sufficient details include the identities of the parties involved in the incident, if known, the conduct allegedly constituting Sexual Harassment and/or Sexual Misconduct…" (emphasis added)

On April 12, 2022, *six months* after the alleged occurrence, the Claimant filed a Title IX Formal Complaint.  Her "detailed description of the incident" states:

> "The respondent attended my sorority date function as my date on October 15th. After the event in my dorm room I was unable to give consent to activity that occurred and the next morning non-consensual activity occurred."

Upon receiving notice from the Title IX office, in a letter dated April 13, 2022, the Respondent became aware that the Claimant was alleging that non-consensual activity (i.e. digital penetration) occurred on the morning of October 16, 2021.  Understanding that statement to be the Claimant's only allegation against him, the Respondent agreed to Adaptive Resolution on April 25, 2022.  If the Respondent had known that the *Title IX Director, Aishah Casseus* would supplement the allegations against him on behalf of the Claimant **four and a half months later, and a full ten and a half months after the alleged occurrence,** he would never have agreed to Adaptive Resolution.  Instead, he would have pursued his right to have an investigation commence immediately.  Certainly, if an investigation had begun in April of 2022, rather than at the end of August of 2022, the Respondent's memory, and possibly the memories of other witnesses, would have been fresher.  Furthermore, had an investigation begun immediately, the Respondent would not have been defending himself against the additional allegation of non-consensual sexual assault (i.e. rape).  Therefore, the fact that both the investigation into

1

the Claimant's complaint and the hearing were delayed due to the process of Adaptive Resolution over the summer months of 2022, adversely affected the outcome of the hearing.

**(B) Adaptive Resolution Benefited the Title IX Office and the Claimant at the Expense of the Respondent and Adversely Affected the Outcome of the Hearing.**

Respondent alleges that Adaptive Resolution was a process suggested by the Title IX office to the parties after the Title IX Office spoke with the Claimant about her claims against the Respondent. Respondent naively assumed that the Title IX Office was proceeding fairly on behalf of *both* parties. However, based on the outcome of this case, Respondent now realizes that suggesting Adaptive Resolution was a procedural irregularity because it benefited the Title IX Office and the Claimant at the expense of the Respondent. The Claimant admitted that she met with Stephanie De Angelis from the Wake Forest Safe Office once a week from October 18, 2021 through the time of the hearing on November 29, 2022. It is impossible to believe that Stephanie De Angelis never discussed the procedures involved in filing a Formal Title IX Complaint with the Claimant before April, 2022. Even assuming that such a conversation did not occur, information regarding the filing of a complaint was readily available to the Claimant on the Wake Forest website. Therefore, the Respondent contends that the Claimant, arguably upon the advise of her Safe Office advisor(s), strategically decided to file her complaint on April 12, 2022, a mere two weeks before the last day of classes in the spring semester 2022. Upon receiving the Claimant's Formal Complaint, the Title IX Office should have begun an investigation immediately. However, two issues were at play. First, realizing that the investigation could not be conducted during exams, and not wanting to deal with an investigation over the summer, the Title IX Office bought the Office and the Claimant additional time by suggesting Adaptive Resolution. Second, the Claimant admitted that she spoke with the Director of the Title IX Office, Aishah Casseus, to confirm that while participating in Adaptive Resolution she could simultaneously seek to have the Respondent punished by his fraternity.

In that regard, it is undisputed that on April 13, 2022, the day after filing her Formal Complaint with the Title IX Office, the Claimant and her friend,  contacted members of the Respondent's fraternity, including then ███ President, ███, then ███ Secretary, ███ and then ███ Judicial Chairman, ███ and demanded that the fraternity expel the Respondent because he was a "rapist". Former ███ Secretary, ███ offered testimony at the hearing to that effect on November 29, 2022. The Hearing Officer failed to attribute any significance to ███

2

███ 's testimony in her Final Outcome Letter.   In a recorded interview conducted by Assistant Title IX Director/Investigator, Telligman on October 12, 2022, the Claimant stated in response a question about the meetings she had with ███ fraternity members, ██████████ and ████████ :

> " So it wasn't a one off meeting.  It was more a process, and at this point, adaptive resolution had already started, and before reaching out in the first place to ███, *I'd gotten clearance from Aishah um in the Title IX Office* that I could go through this route because Title IX and the fraternity judiciary boards are completely separate." 17 00:02:25.290 - - 00:02:32.799

As a result of that belief, the Claimant arguably agreed to participate in the Adaptive Resolution process over the summer.  When no penalty against the Respondent was forthcoming by the time classes resumed in the fall of 2022, the Claimant made additional claims against the Respondent when she was questioned by Assistant Title IX Director/Investigator, Telligman on August 30, 2022.

In regard to the Adaptive Resolution process that was conducted through the summer months of 2022, the Respondent states that he participated in good faith at all times.  He further notes that *not once* in any of the conversations he had with the Adaptive Resolution Facilitator was the Respondent ever informed that the Claimant was alleging that he had non-consensual sexual intercourse with her.  The Respondent argues that Claimant's failure to set forth all of her allegations in the Formal Complaint filed on April 12, 2022, doomed the Adaptive Resolution process to failure.  Had the Respondent known that he might be found responsible for non-consensual sexual intercourse, as well as non-consensual sexual touching, and be suspended from the university for a year, he may have made concessions or agreed to other solutions.  Again, the irregularity of the Claimant's Formal Complaint affected the ultimate outcome of the case.

### (C) Title IX Officers Violated Title IX Policy and Grievance Procedures When They Made Credibility Determinations in Favor of Claimant.

Section 2A.15 Presumption of No Responsibility until Determination, of the Title IX Policy and Grievance Procedures states:

> "Respondents are *presumed to be not responsible* for alleged Sexual Harassment until Wake Forest makes a determination regarding responsibility pursuant to these Grievance Procedures." (Emphasis added)

3

Section 2A.16 Objective Evaluation of All Relevant Evidence; Credibility Determinations, of the Title IX Policy and Grievance Procedures states:

> "The investigators and decision-makers under these Grievance Procedures will objectively evaluate all Relevant Evidence, including both inculpatory and exculpatory evidence, and will _not make any credibility determinations based on a person's status as a Claimant, Respondent, or witness._ (Emphasis added).

On September 1, 2022, **ten and a half months after the alleged occurrence,** the Respondent received a letter from the Director of the Wake Forest Title IX Office, Aishah Casseus.  The letter states in part:

> "I am writing this letter to supplement the Notice of Allegations that I sent to you on April 13, 2022.  As you know, Claimant ███████ submitted a Title IX Formal Complaint form to the Title IX Office on April 12, 2022.  Investigator Jessica Telligman was appointed on August 22, 2022, and she has received information from the Claimant.  The Claimant advises Investigator Telligman that you allegedly engaged in sexual assault via sexual intercourse with her on October 16, 2021.  Claimant alleges that she initially consented to sexual intercourse with you in her residence hall room, but that she withdrew consent by stating "this doesn't feel good."  In summary, Claimant is alleging this instance of withdrawn consent in addition to the separate instance of alleged non-consensual digital penetration which allegedly happened a few hours later and was referenced in the original Notice of Allegations."

The Respondent submits that a review of the September 1, 2022, letter proves that the Title IX Office presumed him to be guilty at the outset of the investigation when Director Casseus and Assistant Title IX Director/Investigator, Telligman made credibility determinations in favor of the Claimant.  There can be no dispute that _neither the Claimant, nor her attorney_ decided to file a supplemental, much more serious, complaint against the Respondent.  Instead, the _Director of the Title IX Office, Aishah Casseus_ sent a letter to Respondent supplementing the allegations against him on behalf of the Claimant.  Prior to the time that the letter was sent, the supposedly impartial investigator, Assistant Title IX Director, Jessica Telligman, was tasked with investigating an allegation of non-consensual sexual touching, not an allegation of non-consensual sexual assault.

Assistant Title IX Director/Investigator, Telligman, interviewed the Claimant for the first time on Tuesday, August 30, 2022. The Respondent concedes that Director Casseus and Assistant Title IX Director/Investigator, Telligman, may not have been aware that during the Adaptive Resolution process with Facilitator, Toni McMurphy over the summer months of 2022, the Claimant **never** alleged that she had non-consensual sexual intercourse with the Respondent. Be that as it may, barely two days passed between the date of the Claimant's interview with Assistant Title IX Director/Investigator, Telligman and the date that Director, Casseus sent the letter to the Respondent on Thursday, September 1, 2022. Arguably, in that amount of time it is unlikely that a completed transcript of the Claimant's interview had been prepared. Without a completed transcript, the Respondent questions whether Director Casseus, knew that the Claimant had made inconsistent statements about the meaning of certain words that she allegedly used when she was in bed with the Respondent in the early morning hours of October 16, 2021. Whether Director Casseus knew about the inconsistent statements, or not, it is obvious that she made a credibility determination in favor of the Claimant.

In the same interview on August 30, 2022, the Claimant provided two meanings for the words "this doesn't feel good". In one instance, the Claimant allegedly uttered the words with an intent to convey to the Respondent that she was no longer interested in sexual activity with him. In another instance several pages later, the Claimant admitted that when she allegedly stated "this doesn't feel good" she was indicating that she was "very [inaudible] after throwing up three times". (Claimant's Interview 8/30/22, p. 24, 36:35).

A review of the September 1, 2022 letter proves that Title IX Director, Aishah Casseus, in consultation with, or at least at the urging of Assistant Title IX Director/ Investigator, Telligman, became the trier of fact in an 'investigation' that had only just begun and included only one interview with the Claimant. Determining the Claimant to be credible, Director Casseus concluded:

(1) that the Claimant actually used the words "this doesn't feel good" in the early morning hours of October 16, 2021;

(2) that when the Claimant said those words, she intended the Respondent to understand that she meant for him to "stop";

(3) that the Respondent actually heard the Claimant say those words to him and understood their meaning;

(4) that the Respondent ignored the Claimant and proceeded to have sexual intercourse with her without her consent.

Significantly, at this point in the investigation, neither Assistant Title IX Office Director/Investigator, Telligman nor Title IX Director, Casseus had ever laid eyes on the Respondent, much less listened to his version of what had happened on the night in question. Nevertheless, based on their bias in favor of the Claimant, the Title IX Office chose to believe the first meaning provided by the Claimant and ignore the second meaning; a meaning which did not support a claim for non-consensual sexual intercourse. Thereafter, Director, Casseus *personally* supplemented the Claimant's complaint against the Respondent.

The Respondent now realizes that it was never going to matter to Director Casseus, nor to Assistant Title IX Director/Investigator, Telligman, nor to the Hearing Officer, that he initially received notice of the supplemental, much more serious, allegation of non-consensual sexual intercourse on behalf of the Claimant *ten and a half months after the alleged occurrence*. Given that it was Director Casseus, who asserted the new, much more serious, allegation against him on the Claimant's behalf, the Claimant's credibility was ***never*** going to be questioned in this case. The Respondent contends that Director Casseus knew it; Assistant Title IX Director/Investigator, Telligman knew it; the Hearing Officer knew it; the Claimant's attorney, Skye David knew it, and the Claimant knew it. The only person who apparently did not know that the scales were tipped against him was the Respondent. Ultimately, the bias exhibited by the Title IX Office at the outset of the investigation in favor of the Claimant, adversely affected the outcome of the Hearing Officer's decision against the Respondent.

### (D) The Organization and Scheduling of the Hearing by the Title IX Office was an Irregularity that Adversely Affected the Outcome of the Hearing.

The Respondent contends that the manner in which the hearing was organized and scheduled was an irregularity that adversely affected the outcome of the case. The hearing began at 9:00 a.m. on November 29, 2022. The hearing did not conclude until 10:28 p.m. the same evening. During the course of the hearing the following individuals spoke and/or testified:

(1) Hearing Officer, Dixie Wells
(2) Assistant Director of Title IX Office/Investigator, Jessica Telligman
(3) Polygraph Examiner, Andrew Goldstein
(4) ███████████

(5)
(6)
(7)
(8) Respondent,
(9) Claimant,

The Respondent notes that in addition to "testifying" both he and the Claimant gave opening statements at the outset of the hearing.

The Respondent concedes that the organization and scheduling of witness testimony was arranged at the request and the convenience of several of the witnesses. However, other than limiting the time for the Claimant and Respondent to give their opening statements at the beginning of the hearing, the Hearing Officer did not put a time limit on the testimony of any of the witnesses, **except** when the Respondent's attorney was questioning the Claimant during the evening hours of November 29th.

The Respondent asserts that the Title IX Office has conducted numerous hearings on behalf of the university.  Based on past experience, the Title IX Office knew, or should have known, that listening to testimony from nine individuals on a case dealing with very seriousness allegations of non-consensual sexual touching as well as non-consensual sexual intercourse would take a significant amount of time.  Knowing that the outcome of the hearing could result in a potentially life changing consequences for the Respondent; specifically, being suspended from the university for a year and possibly losing the job that he had already been offered contingent upon his graduation from the university, the hearing should never have been allowed to continue into the late evening hours when all parties to the case were exhausted, hungry and no longer able to give the testimony from witnesses the attention and patience that was deserved.  It is obvious that the Title IX Office wanted to avoid bringing back the parties and their representatives for a second day of questioning.  Avoiding a second hearing day should never have been the goal, especially in light of the repercussions to the Respondent.

The Respondent also notes that during the evening hours of November 29, 2022, while his attorney was questioning the Claimant, the Claimant's attorney was allowed to interrupt the Respondent's attorney to ask how much longer he would take?  Not long afterward at 10:16 p.m., the Hearing Officer, advised the Respondent's attorney that she planned to conclude the hearing in "15 minutes".  The hearing ultimately concluded at 10:28 p.m..

7

Apparently concerned that the Respondent's attorney would raise the issue of time in an appeal on behalf to the Respondent, the Hearing Officer has gone to great lengths in her Final Outcome Letter to cite the amount of time that various witnesses were questioned during the hearing.  However, given that there were no time limits set on any witness at the outset of hearing, citing the amount of time actually spent on one or more witnesses during the hearing does not negate the unfairness of the Hearing Officer urging the Respondent's attorney to wrap things up during the late evening hours of November 29th.  Furthermore, when the Hearing Officer threatened to end the hearing in "15 minutes", she sent a clear message to the Respondent's attorney that she was no longer interested in any of the points he was trying to make and did not want to entertain any more questions from him.  Additionally, the fact that the Hearing Officer may have wanted to end the Respondent's examination of the Claimant, possibly due to her own fatigue, hunger or disinterest, certainly negatively impacted the entire point of having a hearing in the first place.

**(E) The Hearing Officer's Manner Conducting the Hearing Adversely
    Affected the Outcome of the Hearing.**

Section 3A.02 The Formal Resolution Process of the Title IX Policy and Grievance Procedures states in part:

> "[F]ollowing the investigation the appointed hearing officer will conduct a hearing in which they may question the Claimant, the Respondent, and any witnesses whose testimony the hearing officer deems relevant.  During the hearing, the hearing officer and the parties may also question the investigator(s) about the investigative report."

The Respondent contends that the point of having a hearing is to allow both parties to supplement the information obtained during the investigation.  Arguably, the goal of questioning witnesses is to flush out facts and highlight inconsistencies.  The hearing should not simply be an exercise in which witnesses are allowed to read from investigative summaries or recorded statements previously provided.

During the hearing on November 29, 2022, the Respondent's attorney questioned both Assistant Title IX Director/Investigator, Telligman and the Claimant, in addition to other witnesses.  In response to a number of questions, both of these witnesses failed to provide  answers to certain questions.  Instead, several times while being questioned, each witness felt empowered to answer the Respondent's attorney by saying, 'that information is in my report' or 'that information is in one of my recorded statements'.

8

The Hearing Officer did not advise either one of those witnesses to provide a direct answer to specific questions from the Respondent's attorney.

In addition to allowing witnesses to avoid directly answering certain questions, the Hearing Officer interrupted the Respondent's attorney numerous times when he was attempting to question the Claimant. The Hearing Officer never interrupted the Claimant's attorney when she was questioning the Respondent. Additionally, the Hearing Officer accused the Respondent's attorney of "harassing" the Claimant when he asked certain questions. She allowed the Claimant's attorney to interrupt the Respondent's attorney with an objection. She refused to allow the Respondent's attorney to ask about the Claimant's text message saying "it burns" and the possibility that the statement could just as easily have referred to the Claimant's throat after she vomited as it did to the Claimant's vaginal pain after allegedly having intercourse with the Respondent.

The Hearing Officer also refused to allow the Respondent's attorney to ask the Claimant about her physical strength and the years of physical and mental conditioning she had as a collegiate level volleyball player. Certainly, the Hearing Officer should have been interested in the fact that the Claimant had years of strength training in her arms, hands, shoulders and legs while playing volleyball. The Hearing Officer should also have been interested in hearing about the many years that the Claimant had been coached to physically and mentally outwit opponents in stressful situations. To this day, the Claimant continues to play club volleyball at Wake Forest. Additionally, in a recorded interview on August 30, 2022, the Claimant boasted that she is "extremely" healthy. "I work out like four times a week." (Claimant's 8/30/22 Interview, p. 22, 28.13 - 28.17)

Had the Hearing Officer acknowledged the physical and mental strength that the Claimant must have in body and mind, she certainly would have had an additional reason to doubt the truthfulness of the Claimant's allegations. At a minimum, the Hearing Officer should have at least questioned the Claimant's allegations that she was unable to move the Respondent's hand or leg away from her on the morning of October 16, 2021. (Claimant's Interview 8/30/22, p. 28, 41:48) The Hearing Officer also did not allow the Respondent's attorney to pose questions to the Claimant about the time when she last consumed alcohol or when she vomited or how she felt after she vomited. The Hearing Officer's refusal to allow the Respondent's attorney to ask numerous questions demonstrated that she was not impartial, she was not keeping an open mind and she did not want to hear the answers to those questions. The Hearing Officer's manner toward the Respondent's attorney demonstrated her bias in favor of the Claimant and led all parties to believe that she was doing everything in her power to protect the Claimant at the expense of an effective examination by the Respondent's attorney.

9

## II. Bias that Unfairly Affected the Outcome of the Hearing.

### (A) Hearing Examiner's Bias in Favor of Claimant Affected the Outcome of the Hearing.

The Hearing Officer's Final Outcome Letter confirmed that the Claimant and Respondent offered differing accounts of what transpired during their encounter during the early morning hours of October 16, 2021.  In order to reach her decision that the Claimant, rather than the Respondent, was telling the truth about what transpired, the hearing Officer stated that she substantially relied upon the information from the following sources:

* Claimant's 10/18/21 medical report from WF Student Health;
* Claimant's texts exchanged with her friend ██████;
* Claimant's  conversations and texts exchanged with 'best friend', ████████;
* Texts exchanged between Claimant's friends, ████████ and ████████.

The Respondent argues that despite the numerous and obvious discrepancies in the Claimant's statements, the Hearing Officer chose to believe her anyway.

### (1) Falsehoods in Claimant's 10/18/21 Medical Record.

The following statements are quoted directly from the Claimant's medical record from her visit to Student Health on October 18, 2021:

(a)  PT reports that she thinks that she might have been drugged on 10/15/21.

(b)  PT **denies** sexual assault.

(c)  *Chief Complaint:* requesting drug testing.

(d)  She went to a friend's house off-campus around 9:30pm.

(e)  (She) went to a frat party around 10:30pm.

(f)  She reports feeling intoxicated and made herself vomit some time around 11pm.

(g)  She reports "blacking out" around 12am.

10

(h)  The last thing she remembers is arriving home.

(i)  When she woke up in the morning a male was in her bed and there was a
    used condom in her trash can.

(j) She does not recall consenting to or having sexual intercourse with the male.

(k) She is not concerned with her safety at this time.

(l) On Saturday morning she noted vaginal pain that has been gradually
    improving.

(m) She is on OCP,…does not remember if she has missed any pills.

(n) Description (code): Adult sexual abuse, confirmed, initial encounter
    (T74.21XA)

(o) Patient declined to go to ER for SANE exam.

(p) Stephanie from Safe Office was consulted and _met with patient in the
    exam room._ (emphasis added).

(q) Medications: Plan B One-Step 1.5 mg Tab - by mouth once.

During the investigation that was conducted between August 30, 2022 through
November 1, 2022, the Claimant was questioned by Assistant Title IX Director/
Investigator, Telligman on August 30, 2022, September 7, 2022, October 5, 2022 and
October 12, 2022.  The Hearing Officer was provided with all transcripts of those
recorded interviews.  The Respondent points out that although the Claimant went to the
Student Health Office on Tuesday, October 18, 2021, much of the information she
provided to the staff there were outright lies which later conflicted with the information
provided by the Claimant in her recorded interviews.   The Hearing Officer obviously
anticipated that the Respondent's Appeal would raise the issue of the many glaring
discrepancies.  In footnote 8 on page 15 of  the Final Outcome Letter, the Hearing Officer
offers quotes from the Claimant's recorded statements where the Claimant explains her
reasons for not telling the truth when she went to the Student Health Office.  Among
other things, the Claimant stated that she did not want to discuss a sexual assault with a
male nurse and further stated that she was "terrified" and "frightened" by what had
allegedly happened.

The Respondent notes that by the time the Claimant went to the Student Health Office, on Tuesday, October 18, 2021 she had already spoken in person or by telephone with several of her close female friends, including ███████████████████ ██████████████████ all of whom would have provided support to the Claimant. It is true that the medical report confirms that James Perrotta, was the intake nurse when the Claimant arrived at the Student Health Office.  However, the Hearing Officer has apparently overlooked the fact that the Claimant was seen by Provider, Charley Cummings - who is female; RN Blancas - who is female; and Stephanie DeAngelis from the Safe Office - who is female.  The Respondent argues that the Claimant should have felt safe enough to tell the truth with those three women present to offer her support.

In regard to the Claimant's credibility, the Respondent notes the following information was known to the Hearing Officer *before* she reached a decision in this case:

(1) The Claimant's medical record indicates that she initially showed up at Student Health claiming that she had been *drugged*.  The Respondent contends that the Hearing Officer should have considered the possibility that the Claimant initially intended to assert that the Respondent was responsible for drugging her and thus, was responsible for her allegedly unusual level of intoxication on the night of October 15-16, 2021.

(2) After the staff at Student Health listened to the Claimant's fabricated version of events, the Claimant was diagnosed as a victim of "sexual assault" and not at all as a victim of "drugging".  Thereafter, the Claimant never again pursued any action related to an alleged "drugging".  Instead, the Claimant purposefully pursued an entirely new avenue of revenge against the Respondent, i.e., blaming him for sexually assaulting her.

(3) In response to questions from Assistant Title IX Director/Investigator Telligman, the Claimant repeatedly claimed that she threw up *three* times before returning to her suite with ████.  When the Claimant went to Student Health for drug testing a year earlier, she only mentioned that she *made herself vomit once*. (Italics added).

(4) On Sunday, October 17, 2021, Claimant exchanged text messages with her friend ████, who offered to send her a Plan B pill.  In response, the Claimant stated, " I really appreciate that too!  I think I'll be okay since *I'm on birth control*.  I think I may reach out to him to double check on that one tho".  (Italics added).

12

(5) Despite advising her friend ███ that she did not need a Plan B pill, she decided to accept a Plan B pill from Student Health.  Why? By her own admission to ███ the day before, she was already taking birth control pills.

(6) The Claimant's recorded interviews with Assistant Title IX Director/ Investigator ,Telligman and text messages exchanged with various friends, confirm that she did **not** "black out" at 12a.m. on October 16.  There was absolutely no reason for the Claimant to lie about that fact when she went to Student Health.

(6) The Claimant lied to Student Health about not giving the Respondent consent to have sexual intercourse, regardless of whether she allegedly withdrew consent later.  Instead, she led Student Health to believe that "a male" sexually assaulted her while she was passed out on her bed.

(7) The Claimant informed Student Health that she was not concerned for her safety. Nevertheless, during the investigation in the fall of 2022, the Claimant repeatedly informed Assistant Title IX Director/Investigator, Telligman that she was "triggered" every time she saw the Respondent.

(8) In regard to her claim of "vaginal pain" "gradually improving", the Claimant apparently was not asked by Charley Cummings if she had similar pain **prior** to Saturday morning; the Claimant was not actually examined to determine the basis for, nor the extent of, her "vaginal pain"; the Claimant was not prescribed any oral medications or vaginal creams to alleviate her alleged discomfort; the Claimant was not advised to follow up with a gynecologist; the Claimant never offered any evidence that she actually followed up with a gynecologist; the Claimant informed Assistant Title IX Director/Investigator, Telligman that she continued to have vaginal pain for a week and a half to two weeks after the alleged incident.  If the alleged intercourse with the Respondent was forceful enough to result in vaginal pain for up to two weeks, it is significant that the Claimant did not have any other bruises or marks on her body from the alleged assault.  It is also significant that the Claimant has never alleged that the Respondent was rough or forceful with her.

13

**(2) The Hearing Officer Did Not Draw A Negative Inference
From Claimant's Refusal to Allow Dr. Price to Testify.**

In footnote 10 on pgs. 15-16, of the Final Outcome Letter the Hearing Officer states:

> "The Investigator sought authorization from the Claimant to discuss the medical record attached as Exhibit F to the Investigation Report with Dr. Price, the Director of Student Health and the medical director of the provider involved. (Inv. Rpt. at 7.) *Claimant refused to sign a release.*(Id.) *Dr. Price could have provided more information about why Claimant was assigned the specific diagnosis of "Adult sexual abuse, confirmed, initial encounter". (Hr'g Tr. Vol. I at 616-21.) The Hearing Officer would have liked to have been able to consider any information that Dr. Price could provide, but she did not have that opportunity."* (Italics added).

Although, the Claimant's refusal to allow Dr. Price to testify at the hearing resulted in a significant gap in the Hearing Officer's full understanding of the Claimant's medical report in total, and especially, the reasons why Charley Cummings diagnosed "adult sexual abuse, confirmed..", the Hearing Officer, amazingly, did not draw any negative inferences from the Claimant's refusal. On the contrary, the Hearing Officer's response to the Claimant's affirmative refusal to allow Dr. Price to testify at the hearing and her complete failure to mention that the Claimant enforced her right to refuse access to her additional *existing* medical reports from visits to Student Health on 10/25/21, 11/12/21 and 11/22/21, was essentially non-existent.

Respondent contrasts the tepid response from the Hearing Officer to Claimant's refusal to provide existing information regarding her medical treatment and alleged physical injuries to the way in which she reacted to the Respondent's alleged failure to provide evidence in the form of text messages allegedly sent after October 16, 2021. In footnote 12 of the Final Outcome Letter, the Hearing Officer essentially accuses the Respondent of withholding evidence. The Respondent contends that he is unable to prove a negative. When he left the Claimant's room on the morning of October 16, 2021, he did not believe he had done anything different from the 8 prior occasions when he and the Claimant had spent the night together. The Claimant had not said or done anything to indicate to him otherwise before he kissed her goodbye and he left her room. Therefore, the Respondent had absolutely no reason to send a text message to anyone about the

14

Claimant personally or about what they had done together the night before.  The fact that the Hearing Officer made a point to emphasize his failure to provide text messages that do not exist, is further evidence of her bias against him.

In regard to Dr. Price, the Respondent asserts that the Claimant may not have wanted him to testify at the hearing because she was afraid that Dr. Price may have informed the Hearing Officer that Provider, Charlie Cummings' diagnosis of "adult sexual assault, confirmed" was based on the lies that she was told at the Claimant's first visit to the Student Health office.  It is undisputed that in the October 18, 2021, medical record, the Claimant advised Charley Cummings that she did not remember anything after returning to her room and that she woke up in her bed with a male beside her and a used condom in the trash can.  Those are not the facts of this case.  If allowed to testify, Dr. Price likely would have informed the Hearing Officer that Charley Cummings' diagnosis would have been very different had she been told the truth about what actually happened.  Regardless of what Dr. Price may, or may not, have said, the Hearing Officer was well aware that the version of events told by the Claimant to Charley Cummings on October 18, 2021, was not the same version that she told to Assistant Director of the Title IX Office/Investigator, Telligman a year later during the investigation of this case.  The fact that the Claimant claimed have been "frightened" or "terrified" when she went to the Student Health Office, did not negate the fact that just about every detail she provided to the medical staff that day was a lie.

Despite the numerous discrepancies between the information the Claimant provided to Student Health on October 18, 2021 and the information that she provided to Assistant Title IX Director/Investigator, Telligman a year later, the Hearing Officer relied upon information in the Claimant's medical record when she decided that the Claimant's version of events was more credible than the Respondent's.  On page 15 of the Final Outcome Letter, the Hearing Officer states:

> "Given the provider gave Plan B to the Claimant, Claimant reported pain to the provider that is described in the report, and the provider included a diagnosis of "Adult sexual abuse, confirmed, initial encounter" (see Inv. Rpt. Ex. F), the Hearing Officer finds the medical record supports that it is more likely than not that the Claimant and Respondent had sexual intercourse that evening."

The Respondent points out the numerous flaws in the Hearing Officer's decision. First, the Claimant was already taking birth control pills and did not need to take a Plan B pill.  Arguably, the Claimant accepted the pill in order to portray herself as a victim.

Second, Charley Cummings did not perform a gynecological exam to determine the actual existence of, nor the cause of, the Claimant's alleged vaginal pain. Certainly, the Hearing Officer is well aware that females on college campuses regularly experience vaginal pain that has absolutely nothing to do with having had intercourse.  Third, and particularly significant, the provider's diagnosis was based on the Claimant's **lies**!

Furthermore, if the Student Health report was to be believed and the Claimant had actually been sexually assaulted while she was blacked out on her bed, how is it possible that a physcian's assistant, two nurses, a counselor from the Safe Office, as well as the Claimant's friends, , were collectively unable to convince the Claimant to go to the hospital for a SANE exam or to the Winston-Salem police or to Wake Forest University police or to the Wake Forest Title IX Office, in the initial days, weeks *and* months following the alleged assault in order to report a sexual assault?   How is it possible that all of those individuals, while aware of the purported seriousness of the Claimant's allegations, were not troubled by the Respondent's continued presence on campus: in the Business School, in his classes, in the WF library, in the cafeteria, in the Wellbeing Center, at sporting events and and at social functions? Despite all of the questions and inconsistencies that were known to the Hearing Officer, she chose to believe the Claimant's version of events anyway.

### (3) Claimant Lied When She Approached ▮▮▮ Fraternity Brothers About Kicking Respondent Out of the Fraternity.

On October 12, 2022, Investigator Telligman interviewed the Claimant.  During that interview the following exchange took place"

"10
00:00:53.570 - - 00:01:09.119
▮▮▮ …So for starters, I reached out to the fraternity President ▮▮▮ and I went with my friend ▮▮▮ to speak with him on behalf of a *fake friend* that we made up, who wanted to report a sexual assault with their fraternity."
"21
00:03:07.710 - - 00:03:08.970
Jessica: And did you tell ▮▮▮ and or ▮▮ and or ▮▮▮ that you had evidence against ▮▮?"
"24
00:03:23.310 - - 00:03:40.580
▮▮▮: Like I said previously, with ▮▮▮ and I were

speaking on behalf of a friend.  So it was very vague and just procedural questions.  Um, more specifically with ████████ and ████████, I was referencing um the timeline that I had made, and

also information that I had shared with the Title IX Office in this investigation.  So I feel like a word like "evidence" can be used to cover that."

### (4) Assistant Title IX Director/Investigator, Telligman Suggested the Meaning of "it burns" to the Claimant.

The Hearing Officer was also biased about the Claimant's text message, "it burns", when she stated in the first paragraph on page 16 of the Final Outcome Letter that "A text message that Claimant sent to ████████ on October 16, 2021, at 12:59 a.m. supports Claimant's account at the Hearing."  In response to questions posed to her at the hearing on November 29, 2022, ████████ admitted that when she read the Claimant's text, the phrase "it burns"  did not mean anything to her and she did not understand what the words meant.   Additionally, it is extremely significant and very prejudicial to the Respondent that the person who suggested that "it burns" referred to the pain the Claimant allegedly experienced after having intercourse with the Respondent, was **not** the Claimant, but Assistant Title IX Director/Investigator, Telligman when she answered her own question posed to the Claimant.  Assistant Title IX Director/Investigator, Telligman interviewed the Claimant on September 7, 2022. During that interview, the following exchange took place:

"Jessica Telligman 22:53
Okay.  So then you say "I'm boy okay, it burns" and that's when it looks like the reference to "I'm boy okay" was your attempt to write "I'm not okay"?

████████ 23:02
Yes.  If you look on a keyboard, you know, N, O, T are right next to B,O, Y.  Um, and that's, I, I've never said the phrase "I'm boy okay" so

Jessica Telligman 23:15
***Do you think the "burns" is a reference to the intercourse?***
(emphasis added)

████████████    23:19
Most likely, I mean, I don't remember putting my hand on like a frying
pan or something.

████████████    23:23
***But I would assume so."*** (emphasis added)

The Respondent wonders why the Assistant Director of the Title IX Office, who, with six years of experience, was appointed to investigate this case, would ever choose to answer her own questions when interviewing a witness? A review of *all* of the Claimant's recorded interviews demonstrates that Assistant Title IX Director/Investigator, Telligman habitually provided the Claimant with answers to the questions that she was asking. How is that practice fair to the Respondent? After Assistant Title IX Director/Investigator, Telligman answered her own question regarding the phrase "it burns", the meaning was thereafter set in stone and attributed to the Claimant, even though it was Assistant Title IX Director/Investigator, Telligman and NOT the Claimant who originally made that assumption! Furthermore, the erroneous assumption suggested by Assistant Title IX Director/Investigator, Telligman became the basis for the Hearing Officer to determine in the Final Outcome Letter in there first paragraph on page 16 that, ""It burns" would be consistent with vaginal pain resulting from engaging in sexual intercourse while not sufficiently lubricated."  In this instance, Assistant Title IX Director/Investigator, Telligman's biased attempts to assist the Claimant to answer questions during the investigation, resulted in an erroneous finding that adversely impacted the outcome of the hearing.

### (5) Hearing Officer's Reliance Upon Claimant's Forty-Two Minute Timeline is Further Evidence of Her Bias in Favor of Claimant.

There is no dispute that the Claimant's text "it burns" was sent to ████████ at 12:59 a.m. The last text sent by the Claimant to ████████ prior to 12:59 a.m. was at 12:17 a.m. when she said, "I'm *Coming back* to ████". (emphasis added). When reviewing the two texts and the time that the Claimant sent them, the Hearing Officer determined that while there was not a lot of time between those two texts, "Claimant and Respondent could have returned to her dorm and engaged in sexual intercourse in the forty-two minutes between those two texts." (Final Outcome Letter, first paragraph, p.16) The Respondent disagrees with the Hearing Officer's assessment and argues that it is further evidence of her bias in favor of the Claimant.

18

It is obvious that when the Claimant texted ███████ at 12:17 a.m., she and the Respondent had **not** yet arrived back at ██ (the Claimant's dorm).  Therefore, the Hearing Officer must concede that they actually arrived at ██ at an unspecified, and therefore unknown amount of time **after** 12:17 a.m.  Accordingly, in a period of time that was actually **less** than forty-two minutes long, the Claimant "wearing clunky shoes" (according to her own testimony at the hearing) and the Respondent, both of whom were admittedly intoxicated, would have had to:

(1)  Pull up in a vehicle in front of ██ ;
(2)  Exit the vehicle they were traveling in;
(3)  Decide that they were headed to Claimant's suite;
(4)  Proceed from the vehicle on the street, walk across a sidewalk, climb 5 steps, walk across another short sidewalk, wait for Claimant to pull out her I.D. card to unlock the front door of the building and enter the building;
(5)  Take an elevator to the floor where Claimant's suite is located;
(6)  Walk down a hallway to the door of the Claimant's suite;
(7)  Enter the suite and climb interior stairs to the second floor of Claimant's suite; "Claimant stated that she recalls having difficulty walking up the stairs in her suite in ██.  She said, 'I just remember feeling just almost like a little out of breath.'" Final Outcome Letter p.13
(8)  Enter Claimant's individual bedroom;
(9)  Possibly take turns in the bathroom across the hall from Claimant's bedroom to relieve themselves or brush their teeth - given that the Claimant alleges that she had vomited as many as three times earlier that evening;
(10) Spend time kissing and caressing each other;
(11) Take off each other's clothes;
(12) Respondent gets up off Claimant's bed to find his pants on the floor in the dark;
(13) Respondent retrieves his wallet;
(14) Respondent takes out a condom;
(15) Respondent gets back into bed;
(16) Respondent opens the condom wrapper;
(17) Respondent unrolls the condom, puts the condom on and engages in intercourse;
(18) Claimant "blacks out", or "passes out" or "memory cuts out" ;
(19) Claimant comes to her senses;
(20) Claimant, with the Respondent in bed beside her, looks for her phone in the dark;

19

(21) Claimant finds phone;
(22) Claimant texts ████████ the message, "it burns".

The Respondent asserts that the aforementioned timeline of events, in an unknown span of time that was actually *less* than forty-two minutes long, is not only absurd, but clearly impossible under the circumstances of this case.

The Hearing Officer relied on testimony of Claimant's 'best friend' ████████ as support for the Claimant's credibility.  However, the only independent information ████████ provided was her testimony about the text messages and phone call she personally exchanged with ████████ and the Claimant.  ████████ did not see the Claimant or the Respondent, on the night of or during the early morning hours in question.  All of her testimony involved repeating what the Claimant told her after the fact.

### (6) The Hearing Officer Did Not Consider That There was More Than One Reason for the Claimant to Say  "this doesn't feel good."

The Hearing Officer, like Director Casseus and Assistant Title IX Director/ Investigator, Telligman, believed that the Claimant actually uttered the words, "this doesn't feel good" and when she did, she intended to convey to the Respondent that she was withdrawing consent to have sexual intercourse with him.  The Respondent asserted that he never heard the Claimant say those words and reiterated that, " while I was going to put the condom on, I simply could not get hard.  And therefore, there is no way I could have had sex so we did not have intercourse that night."  (Respondent's Interview 9/8/22, p.28, 02:38)   The Hearing Officer never accepted the truth of anything the Respondent ever said either in his recorded interviews or at the hearing.  Additionally, the Hearing Officer never acknowledged that the Claimant had also stated:

> "When we started to have sex, it started out as okay.  I was basically coaching myself to do it.  *But I remember it coming out*.  I remember saying okay at first, but I wasn't doing well.  *I was very [inaudible] after throwing up three times which is why I told him that this doesn't feel good*." Claimant's Recorded Statement, August 30, 2022 (p. 24.  36:35). (emphasis added).

20

The Respondent contends that this statement by the Claimant is important for five reasons.

(1) The fact that the statement exists and was ignored by Director Casseus, Assistant Title IX Director/Investigator, Telligman _and_ the Hearing Officer, demonstrates that they were all biased in favor of the Claimant.

(2) The Claimant's statement above confirms that she remembers "…*it coming out*".  (Italics added)

(3)  Assistant Title IX Director/Investigator Telligman was apparently so concerned with the obvious import of the Claimant stating that she remembered "*it coming out"* that she added footnote (3) on page 5 of the Investigation Report in an attempt to support the Claimant's alleged version of events rather than allowing the words to speak for themselves. In said footnote, Telligman claimed that she "asked Claimant to clarify this sentence, and Claimant stated that she was referring to the condom coming out of the package."  However, Assistant Title IX Director/ Investigator, Telligman failed to provide a specific cite to a specific question put by her to the Claimant to support the assertion made in footnote (3).  The Respondent concedes that it is possible that the Claimant stated that she remembered the Respondent taking a condom out of the package.  However, there is no evidence that she was ever directly asked to "clarify" what she meant when she stated "*But I remember it coming out."* (Italics added)

(4)  The Respondent contends that the statement, "*But I remember it coming out*" supports his repeated assertion that he could not maintain his erection and that he and the Claimant did not have intercourse.

(5)  Finally, in the statement above, the Claimant allegedly stated that, "this doesn't feel good " because she had vomited *"three times"* earlier in the evening and not because her vagina allegedly hurt.  (Italics added)

It is obvious that the Hearing Officer made no effort to reconcile the differing accounts given by the Claimant.  Instead, she accepted the meaning that would favor the version of events originally suggested by the Title IX Office when Director Casseus supplemented the Claimant's complaint against the Respondent, *ten and a half months*

Case 1:23-cv-01034-CCR   Document 6-8   Filed 02/02/18   Page 21 of 35

*after the alleged occurrence,* to include the more serious allegation of having non-consensual sexual intercourse with the Claimant.

### (7) Hearing Officer Failed to Consider That Claimant May Have Been Embarrassed about Vomiting the Night of the Date Function.

The Hearing Officer believed that ███████ ' text to ███████ on October 18, 2021, was her attempt to ask ███████ not to talk about the date function with Claimant because "it wasn't a great night at all" was evidence supporting Claimant's assertion that she had been sexually assaulted. The Hearing Officer never considered the possibility that the Claimant realized that she had been very drunk at the sorority date function and at the ███ fraternity party and asked her friend, ███████ to send the text because she did not want the members of ███████ ' fraternity to make fun of her.

### (8) Hearing Officer's Failure to Consider Claimant's Motivation for Filing Formal Complaint Against the Respondent is Further Evidence of Her Bias Against the Respondent.

The Hearing Officer completely discounted the possibility that the Claimant filed a Formal Complaint against the Respondent because she wanted to get back at him for choosing to date another student at Wake Forest and because her new boyfriend, ███ ███████ had been punished in February, 2022 by members of the Respondent's fraternity for unacceptable behavior toward a female student. The Hearing Officer provided the reasoning for her decision on page 19 of the Final Outcome Letter. Specifically, the Hearing Officer stated that "Contemporaneous evidence from October of 2021 and discussed above supports that "something bad" happened over the weekend".

The Respondent argues that when deciding that "something bad" had happened over the weekend, the Hearing Officer completely failed to consider the following facts:

(a) That as of October of 2021, the Claimant had been pursuing a relationship with the Respondent for over 6 months;

(b) That the Claimant had spent the night with the Respondent and had engaged in consensual sexual activity with him on at least 8 occasions prior to October 15-16, 2021;

(c) That the Respondent was never physically violent with the Claimant nor did he ever 'force' himself her on any of the 8 prior occasions;

(d) That despite the Claimant's persistence, the Respondent never expressed
    an interest in pursuing a long term relationship with the Claimant;

(e) That the Claimant was counseled by Stephanie DeAngelis from the WF
    Safe Office once a week beginning on October 18, 2021;

(f) That "something bad" happening over the weekend could have meant:

    (1) that the Claimant drank too much alcohol;
    (2) that the Claimant was embarrassed about getting drunk;
    (3) that the Claimant was embarrassed about vomiting;
    (4) that the Claimant was embarrassed about spilling a drink on herself;
    (5) that the Claimant was annoyed that the Respondent could not
        maintain an erection with her;
    (6) that the Claimant decided that Respondent's inability to maintain
        an erection with her meant that he "wasn't into her."
    (7) that the Claimant feared that she had wasted her time pursuing
        a relationship with the Respondent.

(g) That the Claimant learned that the Respondent began dating another WF
    student after the Claimant's sorority date function on October 15, 2021;

(h) That the Claimant had repeatedly claimed that she was "triggered" by the
    site of the Respondent after October 15-16, 2021;

(i) That the Claimant met boyfriend, ████████████ on February 19, 2022;

(j) That at the time Claimant met ████████████ she was aware that he was
    in the same fraternity as the Respondent;

(k) That even though the Claimant claimed to be "triggered" by the sight of the
    Respondent, she chose to date one of his fraternity brothers;

(l) That she learned that her boyfriend, ████████████ had been punished
    by his fraternity brothers as a result of his behavior toward a female
    student at a fraternity function.

(m) That the Claimant did not file a Formal Complaint against the Respondent
    for a period of six months after the alleged occurrence.

23

(n) That the Claimant's complaint was supplemented by the Director of the
Title IX Office ten and a half months after the alleged occurrence.

The Respondent contends that a Claimant's motivation for filing a complaint is always or should always be relevant, and particularly so in this case where the Claimant chose to wait six months to file her Formal Complaint with the Title IX Office and simultaneously went to the Respondent's fraternity to ask that he be punished.  In regard to the supplemental allegations raised in the September 1, 2022 letter from the Title IX Office to the Respondent, *the Hearing Officer should also have at least considered the possibility that the Claimant did not allege non-consensual sexual intercourse with the Respondent in April of 2022 because, as the Respondent has asserted, the two of them **never had intercourse**!*  Certainly, with all of the instances in which the Claimant's version of events changed with one excuse or another, the Hearing Officer owed it to the Respondent to at least pretend to consider the Claimant's motivation to punish the Respondent.

**(B) Hearing Officer's Bias Against the Respondent**

(1) On page 19 of the Final Outcome Letter, the Hearing Officer stated that "Claimant not contacting Respondent again is consistent with "something bad" happening October 16, especially where Respondent said that Claimant had previously initiated every meeting in person between the two."  Ironically, the Hearing Officer was aware of the weakness of her own analysis.  In footnote 16, also on page 19 of the Final Outcome Letter, the Hearing Officer stated, " Considering the overlapping friend groups, the Hearing Officer assumes that Claimant would have learned that the Respondent was dating ████████████".  Therefore, the Respondent submits that it is obvious that the reason the Claimant did not contact the Respondent again, was not because "something bad" had happened, but because she realized that he was interested in dating someone else.   The Respondent argues that for the Hearing Officer to decide otherwise is proof of her bias.

(2) In the fourth paragraph on page 13 of the Final Outcome Letter, the Hearing Officer concluded that Wake Forest had "failed to meet its burden of proof to show that Claimant was incapacitated pursuant to the Policy, …"   However, at the bottom of the second paragraph on page 22 of the Final Outcome Letter, the Hearing Officer declared that "[b]ased on the evidence presented, *Respondent* should have known that Claimant was impaired in the early hours of October 16.  Italics added.

24

The Hearing Officer presented her analysis on page 22 of the Final Outcome Letter as follows:

> "Yet Respondent, who was Claimant's date that evening and presumably was in close contact with her during at least parts of the evening (see Inv. Rpt. Ex. C., Text from ███████ to █████ (Oct. 15, 2021) ("Bro █████████ been all over ██████); Hog Tr. Vol. 2 at 633 (recalling taking a photo with Claimant); Id at 688 (the transcript is unclear but discusses them being on the dance floor together)), says that he did not know that Claimant had thrown up and did not understand that she was impaired (Hr'g Tr. Vol. 1 at 293-94 ("[Claimant] never mentioned that she had thrown up at any time…I did not think [Claimant]was extremely intoxicated by the[n].")); <u>id.</u> at 292 ("She was coherent and alert.").)

The Respondent argues the Hearing Officer was unquestionably biased against him for determining that he should have known that Claimant was impaired based on:

(a) A text from Claimant's friend, ████████████ <u>to</u> Claimant's 'best friend', ██████████ - describing a moment in time on the night in question that was not about intoxication but rather about Claimant's desire to engage in affectionate/sexual contact with the Respondent;

(b) The fact that the Respondent stood next to the Claimant for a photo op during the "pregame" in Claimant's suite some time between 7:30 p.m. and 9:30 p.m., before the group left for the Last Resort;

(c) The fact that the Respondent danced with the Claimant while at the Last Resort; and

(d) The fact that the Respondent was unaware that the Claimant vomited even though there is a discrepancy as to whether the Claimant made herself vomit once or whether she vomited three times. Additionally, it is at least arguable, that no girl wants her "date" to know that she vomited while out for the evening. Despite the amount of alcohol that she had consumed, the Claimant's own actions proved the manner in which she intended the evening to end. The Claimant's suite mate, ████████████, testified at the hearing that the Claimant contacted her at some point that night and asked her to be out of her room when Claimant returned from

25

the sorority date function with the Respondent, presumably because the wall between their rooms was so thin that each girl could hear what the other was doing in her room.  Obviously, the Claimant did not want ███ to hear what she planned to do when she returned to her room that night with the Respondent.

(3) In his recorded Interview on 9/8/22 at 06:30, the Respondent offered a significant reason for his failure to notice the Claimant's level of intoxication while at The Last Resort:

"So at the Last Resort, largely at sorority date functions, a lot of the time you're just going to spend talking to your own friends.  They're not necessarily always the most enjoyable time so I remember there was a certain amount of times just talking to my own friends".

There was no reason for the Hearing Officer to disbelieve the statement made by the Respondent that he was hanging out with his friends and not with the Claimant at least for some of the time while he was at the date function.  Both the Respondent and the Claimant have confirmed that they were never an official "couple".  They were not boyfriend and girlfriend.  Instead, the Respondent had simply accepted an invitation to attend the Claimant's sorority date function.  Therefore, it is illogical for the Hearing Officer to assume that the Claimant and Respondent were together every minute of the evening and that the Respondent should have been attentively watching everything the Claimant did all night.  For the Hearing Officer to decide otherwise, demonstrates her bias against the Respondent.

(4) The Respondent notes that in the Final Outcome Letter, the Hearing Officer stated:

"Respondent's assessment describing Claimant as coherent and alert indicates an overall lack of attention to and recognition of Claimant's condition during the evening on October 15, 2021, and in the early hours of October 16, 2021.  Therefore, a fair inference is that Respondent was also unaware of Claimant's condition the next morning."

In response to the Hearing Officer's analysis, the Respondent argues that even if the Hearing Officer believes that the Claimant was intoxicated at the Last Resort and possibly at ███, she was biased for failing to consider the Claimant statements about vomiting at least once and possibly, as many as three times that evening.  Vomiting could

have resulted in the Claimant sobering up.  The Claimant also described being outside for a significant amount of time that evening.  She claimed that she went outside while she at the Last Resort, while she was on the way to the party at ▮▮▮ while she was at the ▮▮▮ party, and after she left the party on a presumably, chilly, October evening.  The Hearing Officer never considered that after vomiting one or more times and being outside in the fresh air, the Claimant could have, and likely did, sober up before returning to her suite with the Respondent.

(5) The Hearing Officer also failed to recall that during the hearing on November 29, 2022, she refused to allow the Respondent's attorney to ask the Claimant questions about the timing of when she was actually drinking alcohol and when she stopped.  Other than allowing the Respondent to ask the Claimant how much she weighed; an amount which the Claimant claimed to be uncertain of, the Respondent's attorney was not allowed to ask any other questions about the Claimant's physicality.  The Hearing Officer also did not allow the Respondent's attorney to question the Claimant about what she vomited, when she vomited, how often she vomited or whether vomiting made her throat "burn".  The refusal to allow those questions precluded the Respondent from gathering evidence to prove his defense.  Said refusal ultimately demonstrated the Hearing Officer's failure to keep an open mind; her disinterest in hearing any of the facts that may have disproved the Claimant's allegations; and ultimately, her bias against the Respondent.

(6) The Respondent also asserts it is an absolutely _unfair inference_ for the Hearing Officer to decide that because the Respondent did not believe that the Claimant was impaired the night before that he must also have been "unaware of the Claimant's condition the next morning."  In fact, one statement does not even remotely begin to prove the other.  Instead, what the inference does demonstrate, is that the Hearing Officer was determined to find in favor of the Claimant.

Significantly, the Claimant admits that on the morning of October 16, 2021, she "woke up on ▮▮▮ chest." (Claimant's Interview 8/30/22, p. 3, 07:55).  Given that admission, it should have been impossible for the Hearing Officer to believe the Claimant's allegations that the Respondent had non-consensual intercourse with her the night before or that he digitally penetrated her in the morning without her consent. Recall that in the Final Outcome Letter, the Hearing Officer decided that the Claimant was more credible than the Respondent because she believed:

(a) That the Claimant could have had intercourse with the Respondent in a forty-two minute period between 12:17 a.m. and 12:59 a.m.;

27

(b) That the Claimant sent a text to her friend, ███████, after she allegedly had intercourse with the Respondent, saying "it burns";

(c) That "it burns" referred to, at the suggestion of Investigator, Telligman, the pain in the Claimant's vaginal area as a result of having had intercourse with the Respondent.

If the Hearing Officer had taken a moment to consider the Claimant's statement that she "woke up on ███ chest", in her own bed, in her own room, in a shared suite, with girls that she was at least friendly with, then it is impossible to believe that the Claimant was in pain or fearful or shocked or terrified by anything that had allegedly happened with the Respondent.  The Respondent contends that if the Claimant had even the slightest sense or inkling or memory of non-consensual sexual intercourse happening just hours before, that resulted in vaginal pain allegedly so severe that it allegedly lasted for up to two weeks afterward, then at some point before morning, even before her conscious mind was fully alert and awake, the Claimant would certainly have either gotten up out of bed or turned her back on the Respondent and/or rolled up into a protective ball and/or moved as far away from the Respondent as the bed would have allowed.  She would not have continued to sleep and later wake up on the Respondent's chest.

Furthermore, if the Hearing Officer was determined to believe that the Claimant was alert and oriented enough to send a text to her friend ███████ complaining that "it burns", soon after allegedly having non-consensual sexual intercourse with the Respondent, then the Claimant would also have been alert and oriented enough to get out of bed, particularly in light of the fact that there was no evidence that the Respondent ever restrained her in any way, as well as the fact that the Respondent fell asleep in her bed with the Claimant *on top of him*!  Alternatively, if the Claimant was consciously able to send a text saying "it burns", then she certainly could have sent a text saying, "SOS" or "send help" or "get ███ out of here".  Finally, the Claimant could have banged on the thin wall of her room or called out for help from ███████ on the other side of the wall or to one of her other suite mates across the hall.  There is no evidence that the Claimant did any of those things.

The Respondent is aware that the Claimant will likely assert that she failed to get out of bed or call for help or bang on the thin wall of her room or text an "SOS" to ███████, because she was so intoxicated that she "passed out" or "blacked out" after allegedly having non-consensual sexual intercourse with the Respondent.  While the

Respondent is aware that the Claimant informed Student Health that she "blacked out" after returning to her room that night and did not wake up until the next morning, she told a different story in her recorded interviews with Assistant Title IX Director/Investigator, Telligman.  In fact, when the Claimant was questioned during the investigation, she *never* claimed that she "passed out" that night.  Instead, the Claimant stated that her "memory cuts out" after intercourse began and she doesn't remember what happened until the next morning.  (Claimant's Interview 8/30/22, p. 24, 36:35-37:21).

In the Respondent's opinion, it is difficult to not overstate the significance of the Claimant remaining in her own bed and sleeping on the Respondent's chest until morning.  Given that her memory allegedly cut out after the Respondent allegedly began to have intercourse with her, the Claimant would not actually have known whether the Respondent had stopped or not.  Therefore, when the Claimant woke up *on the Respondent's chest,* what was she afraid of ?  Whether she was allegedly still asleep or not, the Respondent began performing an act that had given her pleasure on several occasions when they had spent the night together in the past.  There was absolutely no reason for the Claimant to be too terrified or too shocked to tell the Respondent to "stop" or "get off me" or "get out of my room".  At no time did the Claimant ever blurt out, "you are hurting me" or "stop, my vagina hurts!".  Instead, the Claimant apparently acted no differently than she had on previous occasions when she and the Respondent had been together.

Additionally, it is noteworthy that the Claimant never challenged the Respondent's assertion that he did not digitally penetrate the Claimant's vagina for his own pleasure.  In that regard the Respondent stated:

> "You know, this was something where we had a consensual relationship starting six months prior to when this happened, you know, we had previous hookups in the past, where we had spent the night, where I had fingered her because *I felt like she enjoyed it, and it was something where I wasn't getting any pleasure out of it, it was something, like fingering is an action where the girl gets the most out of it, and in the previous times I had done it, it was something that she enjoyed."* (Italics added).  (Respondent Interview 10/6/22, p. 6, 00:15)

There can be no dispute that the Claimant is gifted with personal confidence, athletic ability, a competitive nature, physical strength and years of conditioning.  Yet, surprisingly, on the morning of October 16, 2021, the Claimant never attempted to roll away from the Respondent, or push the Respondent away or indicate to him in any other

physical or vocal way that she was uncomfortable and wanted him to stop.  When the Respondent prepared to leave after spending the night with the Claimant, *she* sat up in bed and kissed him goodbye.  (Respondent Interview 9/8/22, p. 21, 29:14)  Taken as a whole, those actions, in the Respondent's opinion, cannot be attributed to a woman who was the alleged victim of non-consensual sexual activity.  The fact that the Hearing Officer decided otherwise, demonstrates her bias in favor of the Claimant at the expense of the Respondent.

(7) Further evidence of the Hearing Officer's bias against the Respondent can be found when she states:

"Respondent provided no evidence to the Investigator regarding the past instances where he had not been able to provide an erection, despite the Investigator inviting him to reach out to her any time and despite the Respondent providing her with other information."

The above statement would lead the reader to believe that after the Respondent informed the Assistant Title IX Director/Investigator, Telligman that he had been unable to maintain an erection on more than one occasion in the past, that the Assistant Director/ Investigator Telligman immediately "invited" him to provide evidence of that fact.  That is not what happened.  In truth, the "invitation" the Hearing Officer is referring to, had to do with the manner in which the Assistant Title IX Director/Investigator, Telligman habitually *ended* all of her interviews - by inviting witnesses to get in touch with her with any additional information that they wanted her to consider.  Had the Respondent been aware that the Hearing Officer required a doctor's note before she would believe his admission that he had had difficulty maintaining an erection on more than one occasion in the past - an admission that would be difficult, for most, if not all, college males to verbalize in the first place, he certainly would have done so.  Remarkably, the Hearing Officer was *convinced* of the existence of the Claimant's alleged vaginal pain, simply because the Claimant *mentioned* vaginal pain to Charley Cummings who documented the allegation in a medical report without ever actually examining the Claimant's vagina. In point of fact, the Claimant did not offer any more evidence to support her alleged physical claims - and was believed, then the Respondent did - and was not believed.

(8) Finally, the Hearing Officer demonstrated her bias toward the Respondent when at the bottom of the third paragraph on page 16, <u>and</u> in footnote (12) on page 16, she made a point of emphasizing that the "Respondent produced no text messages to the Investigator from the night of October 15 or the days following. (12)".   The Respondent

30

has previously stated that on the morning of October 16th, "I got out of bed, put my shirt back on, whatever, put my shoes back on. I said my goodbyes, gave her a kiss and then I went back to my dorm room." (Respondent's Interview 9/8/22, p.18, 23:46). The Claimant also stated that she sat up in bed as the Respondent, "thanked me for bringing him to the date function and kissed me goodbye. I panicked and thanked him for coming." (Claimant's Interview 8/30/22, p. 3, 08:26) Given that the Respondent left the Claimant's room on amicable terms and that the Claimant NEVER gave him any indication that she was upset with him for a full six months, he does not know who he should have been texting about that night or what the Hearing Officer expected him to say in such a text. The Respondent agrees that he certainly would have been using his phone to send texts after October 16, 2021. However, he does not understand why the Hearing Officer is attaching a negative inference to his failure to have texted anyone about the Claimant.

### (C) Evidence of Title IX Office's Bias Against Respondent - Retaliation

Section 1.01 of the Title IX Policy and Grievance Procedures states in part:

"Discrimination and harassment are antithetical to the values of the Wake Forest community; and are incompatible with the safe, healthy environment that the Wake Forest community expects and deserves, and will not be tolerated. Wake Forest is committed to providing programs, activities, and an education and work environment free from discrimination and harassment. Wake Forest is also committed to fostering a community that promotes prompt reporting and fair and timely resolution of those behaviors."

Section 1.02 of the Title IX Policy and Grievance Procedures states in part:

"This policy also prohibits Retaliation as defined by Title IX and in this Policy. Complaints alleging Retaliation may be filed with the Title IX Coordinator and, at the discretion of the Title IX Coordinator, may be addressed under Wake Forest's Pre-Hearing Grievance Procedures set forth below or other grievance procedures adopted by Wake Forest."

At the very beginning of the Title IX investigation into the claims made against him, the Respondent was initially interviewed by Assistant Title IX Director/Investigator, Telligman on September 8, 2022 . On that date, the Respondent advised Assistant Title IX Director/Investigator, Telligman that on at least four prior occasions he had

31

experienced episodes of retaliation by the Claimant's friends. (Respondent's Interview, p. 25, 42:26 - 43:57; p. 26, 44:38 - 45:22).  The Respondent described how on one occasion, one of the Claimant's friends elbowed him in the back.  On another occasion, one of her friends told him to "go home" when he arrived at The Last Resort with a group of his friends.  On a third occasion, a group of the Claimant's friends dumped beer on him multiple times at a fraternity party.  Finally, on a fourth occasion, Claimant's friend, ███ ████ sent texts to his fraternity brothers alleging that she and the Claimant had evidence to prove that he was a "rapist".

In addition to the prior acts of retaliation listed above, the Respondent sent an email to AssistantTitle IX Director/Investigator, Telligman on October 19, 2022, alleging additional acts of retaliation taken against him by the the Claimant's friends, ████ ████ and ████████████.  The Respondent's email stated that while on the senior fraternity/sorority trip to Las Vegas over the fall school break, October 13-16, 2022, the two women purposefully "body-checked" him on their way to the women's restroom, causing him to drop and spill a drink that he had just paid $20 to purchase after standing in line at a bar for close to 30 minutes.

In addition to the email that Respondent sent to Assistant Title IX Director/ Investigator Telligman on October 19, 2022, he met with her in person to discuss his claims against the Claimant's friends on October 21, 2022.  Thereafter, Assistant Title IX Director/Investigator Telligman informed the Respondent that Director Casseus would be handling his complaints for retaliation.  The Respondent then exchanged emails with Director Casseus on November 1, 2022, November 9, 2022, November 15, 2022 and November 18, 2022.  Before agreeing to take any action, Director Casseus required the Respondent to expressly confirm that he wished to pursue complaints for retaliation against the Claimant's friends.  Other than "talking to" the Claimant's friends, no other disciplinary action was taken by the Title IX Office.

Thereafter, Director Casseus informed the Respondent that she had transferred his complaint to the Dean of Students, Jim Settle.  The Respondent then exchanged emails with Dean Settle on December 1, 2022 and December 15, 2022.  Due to the exam schedule and the Christmas holidays, no  other action was taken.  Dean Settle informed the Respondent that he would return to his office after the break on January 3, 2022.  Of course, with the Respondent facing a possible year long suspension from the university pending the outcome of this appeal, it is unlikely that the Claimant's friends will ever be disciplined for their retaliatory actions taken against him.

Based on the Respondent's experience in this case, Wake Forest's promise to promote "*prompt reporting and the fair and timely resolution"* of harassing behaviors in Title IX cases, apparently only applies to Claimants, not Respondents.  In support of his position, the Respondent reiterates that in a recorded interview with Assistant Title IX Director/Investigator, Telligman on August 30, 2022, the Claimant alleged that the Respondent had non-consensual sexual intercourse with her after she allegedly informed him that "this doesn't feel good".  Thereafter, it took Assistant Title IX Director/ Investigator, Telligman and Director, Casseus *less than two days* to: (1) decide that "this doesn't feel good" meant "stop" *and* (2) to send a letter to the Respondent on September 1, 2022, supplementing the Claimant's complaint against him to include the much more serious allegation of non-consensual sexual intercourse.  Contrast the Title IX Office's immediate response on behalf of the *Claimant,* to it's almost complete lack of concern regarding the *Respondent's* claims of retaliation by the Claimant's friends.  Although the Respondent has repeatedly urged the Title IX Office to take action on his allegations regarding the retaliation that he endured, as of the end of December, 2022, *one hundred and fourteen days (and counting)* have passed without the Title IX Office taking any meaningful action in response to his claims.

III. **Sanctions**

The Respondent asserts that the sanction of suspending him from Wake Forest for two full semesters, prevent him from graduating with his class, and possibly losing the job that he has already been offered pending his graduation, is "*incommensurate to the gravity of the Sexual Harassment for which the Respondent was found responsible"* particularly in this case*:*

    1. That involved an on-going consensual sexual relationship between the Claimant and the Respondent;

    2. That never involved any violence nor any threats of violence by the Respondent;

    3. That was *not filed for a period of 6 months* after the alleged occurrence;

    4. That was supplemented by the Title IX Office (and not the Claimant) *ten and a half months after the alleged occurrence*;

    5. That was *not investigated for 10 and a half months after the alleged occurrence*;

33

6. That lacks any physical evidence to prove the Claimant's allegations; and

7. That involves numerous discrepancies in the Claimant's version of events.

The Respondent states that since the Claimant filed her Formal Complaint, he has suffered in ways that the Claimant has not and never will.  The Respondent has had to have ongoing discussions with his parents, particularly his mother about his sexual performance.  His parents have spent thousands of dollars on fees necessary to defend him against the Claimant's allegations.  He has been subject to retaliatory actions from the Claimant's friends; actions which neither he, nor his friends, have responded to in any way.

The Respondent further argues that suspending from Wake Forest for two full semester when he is only one semester away from graduating will likely change the entire path of his future.  The Respondent recently read the November 29, 2022 letter that President Susan Wente sent to Wake Forest parents in which she urged parents to join a Giving Society that "will empower bold initiatives to expand access, elevate the Wake Forest narrative, and extend our legacy of excellence … in an inclusive community where all Wake Foresters belong and thrive."   Said letter goes on to state:

> "Each journey is unique as each student.  And yet, those journeys are bound together by the meaning behind our motto, *Pro Humanitate*.  Our mission at Wake Forest is to inspire our students to use their education in the service of humanity.  We challenge them to appreciate their full range of lived experiences and perspectives while uniting behind a common desire to be catalysts for good in society."

The Respondent realizes that if separated from the university for any length of time, it is unlikely that he will ever again feel as if he is part of the Wake Forest community.  It is impossible to believe that after working so hard for three and a half years to: pursue a degree in Finance; be accepted into the Business school; work for two summers at internships; and accept a future, full time job offer; that the sanctions about to be imposed against him will strip away, not only all of his past efforts and memories of being a student at Wake Forest, but his pride in being a 2023 Wake Forest graduate.  In one fell swoop, the Respondent will lose his college education, his pride in Wake Forest university, as well as all of the friends and fraternity brothers who shared the Wake Forest experience with him over the past three and one half years.

The Respondent argues that in this "She said/He said" case, where there is no actual proof of the Claimant's allegations, the currently imposed sanctions are much too

severe.  Furthermore, even if the Respondent's arguments on appeal are not persuasive, he contends that there are less severe punishments available.  The Respondent states that it is possible to penalize him in such a way that he is able to attend his classes and graduate on time but not participate in campus activities.  The Respondent currently resides in a fraternity house off campus.  It is possible for this appeal to decide that for the spring 2023 semester, he can only be on the Wake Forest campus in order to attend classes but not for any other sporting or social events, other than for graduation.

Finally, the Respondent contends that if Wake Forest denies his appeal and chooses to enforce the sanctions against him, all of the people involved in this case: Director Casseus, ███████████ Assistant Director/Investigator, Telligman, ███████████, the Claimant, ███████████ and others -  will all soon forget about the Respondent and the facts of this case.  They will all carry on with their lives as if none of this had ever happened. The chosen path of their lives will not change in any way.

The Respondent however, faces a future that will be changed forever.  He will always be labeled a "rapist" without ever having the means to fully defend himself against the Claimant's allegations.  He will suffer the shame that is associated with that label and know that his claims of innocence will likely fall on deaf ears.  He will never again be able to forget the bias imposed against him by the Wake Forest Title IX Office or by the Hearing Officer, Dixie Wells.  He will suffer the embarrassment of having to explain to friends, family members, neighbors, former classmates and many others why he is suspended from the university and unable to graduate on time.  He will have to contend with the knowledge that certain people who hear the news of his suspension will choose to believe that there must have been proof that he sexually assaulted a classmate. He will likely lose the job offer that was extended to him at the end of last summer that was contingent upon his 2023 graduation from Wake Forest University.

Given all of the punishment that the future holds for the Respondent, he pleads with the officer who will decide this appeal to truly consider the facts of this case and the truthfulness of the claims alleged against him.  The Respondent believes that there has not been sufficient evidence presented against him to impose a punishment that will result in repercussions for him for the rest of his life.

Respectfully submitted,
Respondent, ███████████
January 3, 2023