# APPELLATE DECISION
## January 23, 2023

This Appellate Review of Hearing Officer Decision ("Appellate Decision") is being issued pursuant to §§ 3A.13-15 of the Wake Forest University ("WFU") Title IX & Non-Title IX Sexual Misconduct Policy & Grievance Procedures (the "Policy").[1]  The review was triggered by an Appeal of the Final Outcome Letter in this matter dated December 20, 2022, in which the Hearing Officer found that the Respondent was responsible for violating the Policy. The Respondent appealed that decision on the basis of *procedural irregularity in the hearing that affected the outcome* and *the Hearing Officer had a bias that affected the outcome.*  He also appealed the two-semester sanction as *incommensurate to the gravity of the conduct for which he was found responsible.*

## Summary of Key Procedural Steps

1.  Claimant ▆▆▆▆▆▆▆▆ filed a Formal Complaint under WFU's Policy on April 12, 2022, and supplemented it on August 30, 2022, alleging that Respondent ▆▆▆▆▆▆ violated the Policy.  Claimant alleged that:

    a.  During the night of October 15, 2021, and during the early morning hours of October 16, 2021, she was incapacitated (due to alcohol) when Respondent engaged in sexual intercourse with her in her residence hall room on campus following a social event in which the Respondent was the Claimant's invited date. Alternatively, Claimant alleges that if she gave consent for sexual intercourse, she withdrew that consent after intercourse started when she stated "this doesn't feel good," yet Respondent continued.
    b.  During the morning hours of October 16, 2021, she was incapacitated (due to sleep) when the Respondent digitally penetrated her vagina without consent when she woke up in her bed in her residence hall room. The Respondent then allegedly continued to penetrate her after she woke up.

2.  WFU's Title IX Office notified the parties in writing of the Claimant's initial allegation on April 13, 2022, and of the Claimant's subsequent allegations on September 1, 2022. The parties agreed to participate in the adaptive resolution process set out in §§ 3A.01 and VI of the Policy.

3.  When that process proved to be unsuccessful at resolving the matters, the Title IX Office began an investigation on August 30, 2022.  Between August 30, 2022, and October 12, 2022, the Title IX Office conducted 12 interviews, including four with the Claimant and four with the Respondent.  Between September 13, 2022, and November 4, 2022, the Investigator sent or made available to the Claimant and the Respondent, and to their respective advisors, an electronic copy of evidence obtained during the investigation that

---

[1] https://docs.google.com/document/d/e/2PACX-1vStSzAHju95xa5eVXcvY3g0dcCiLW_2wZEAaxSm9L3h67VEw4-tviZ2HXdmf9c4IjmBOatnrkrAkZxR/pub, last accessed January 13, 2023.

1

is directly related to the allegations raised in the Formal Complaint. The Claimant and the Respondent were given at least ten days from the time the evidence was provided to submit to the Investigator any written response to the evidence.

4. The Investigator then prepared a written Investigation Report, which was provided to the Claimant, to the Respondent, and to their respective advisors on November 4, 2022.

5. WFU appointed Dixie Wells of Ellis & Winters as the Hearing Officer and a hearing was held on November 29, 2022. The Hearing Officer issued a Final Outcome Letter on December 20, 2022.

6. The Respondent timely appealed the findings and decision contained in the Final Outcome Letter and the Claimant timely responded to the Respondent's appeal,

7. WFU appointed the undersigned as the Appeal Officer. It received no objections to the appointment.

8. WFU provided a full and complete copy of the hearing record to the Appeal Officer for review between January 6 and January 9, 2022. The record provided consisted of the following categories/groupings of documents:
   a. The Policy
   b. Notices of Allegations
   c. Interview Transcripts for the parties and four witnesses.
   d. iPhone note provided by the Claimant
   e. Investigation Report, including exhibits
   f. The Claimant's Prehearing Statement and the Respondent's Response
   g. Video Recordings and Transcripts of the hybrid in-person/Zoom Hearing
   h. Final Outcome Letter
   i. The Respondent's Appeal and the Claimant's Response

## Basis for the Respondent's Appeal and Appellate Officer's Determination and Rationale

### I. Procedural Irregularity That Affected the Outcome of the Hearing

The Appellate Officer's review of this part of the appeal is limited to whether there were any violations of the procedures set out in the Policy. The Policy is quite specific that the individual filing the appeal must show that there were procedural irregularities that affected the outcome (and, similarly, as they must do to show bias). This contrasts with other basis for appeal, new evidence not reasonably available before that *could* affect the outcome. Thus, the Respondent must do more than identify types of alleged procedural irregularities; he must identify specific instances of them and explain how those specific instances actually affected the outcome.

2

**(A) Proceeding with Adaptive Resolution Delayed the Investigation and Affected the Outcome of the Hearing.**

The alleged incidents occurred on October 15-16.  The Claimant filed her complaint se\ix months later.  The April 13, 2022, Notice of Allegation stated:

> The respondent attended my sorority date function as my date on October 15th. After the event in my dorm room I was unable to give consent to activity that occurred and the next morning non-consensual activity occurred.

In his appeal, the Respondent states that he agreed to adaptive resolution based on his understanding that the Claimant was only alleging digital penetration.  He states that, if he had known that the allegations would be changed four and a half months later and ten and a half months after the alleged occurrence, he would not have agreed to adaptive resolution and would have insisted on an investigation immediately – at which time his memory, and possibly those of the witnesses, would have been fresher.  Also, he asserts that, had the investigation begun at the time the complaint was filed, he would not have had to defend himself against the additional allegation of non-consensual sexual intercourse raised by the Claimant during her August 30, 2022, interview.

Any delay in the commencement of the investigation resulting from the adaptive resolution process was not a procedural irregularity.  The April 13, 2022, Notice of Allegation was written based on the information provided by the Claimant at the time.  The additional allegation or clarification contained in the September 1, 2022 Revised Notice of Allegation was based on information provided by the Claimant after the adaptive resolution process ended and the investigation began, specifically, in the Investigator's first interview with the Claimant on August 30, 2022.  The Policy does not have any timeframe for filing a complaint; thus, the Respondent would have been in the same position both regarding his memory and the rape allegation had the Claimant first filed her complaint in August; moreover, even if the investigation had begun in April, the Claimant might well have raised the additional allegation during it.  Moreover, his suggestion that the memories of the witnesses may have been fresher is speculative.

Thus, the Appellate Officer finds that the Respondent has not shown that proceeding with adaptive resolution was a procedural irregularity that affected the outcome of the hearing.

**(B) Adaptive Resolution Benefited the Title IX Office and the Claimant at the Expense of the Respondent and Affected the Outcome of the Hearing.**

The Respondent speculates that the Claimant was advised by the Wake Forest Safe Office to file her complaint two weeks before the last day of classes in the spring semester 2022.  He also argues that the Title IX Office suggested adaptive resolution specifically in order to buy the Office and the Claimant additional time.  He also states that the Claimant was told by the Director of the Title IX Office that she could seek to have the Respondent punished by his fraternity while the adaptive resolution process proceeded.  He argues that, when (and because) the fraternity had not penalized the Respondent over the summer, the Claimant added her allegation of nonconsensual sexual intercourse in her August 30, 2022, interview with the Investigator.  He also criticizes the adaptive

3

resolution process for not informing him of that allegation; had he known of that allegation, he might have "made concessions or agreed to other solutions."

Under § VI of the Policy, the adaptive resolution process is separate from the investigation process. The adaptive resolution process will pursue the allegation(s) contained in the notice provided by the Title IX Coordinator that also includes the requirements of the adaptive resolution process. Thus, the facilitator would not have known of the Claimant's allegation regarding sexual intercourse, as it was not specifically raised or clarified by the Claimant until her August 30, 2022, interview. There was no procedural violation in this regard, and the Respondent's assertion that, had he known of the allegation, he might have been more amenable to resolving the matter through the alternative resolution process is speculative.

Regarding the Claimant's attempt to have the fraternity punish the Respondent, the Respondent is correct in noting that any fraternity judicial process and the Title IX process are separate – indeed, the latter includes not only the adaptive resolution process as well as the investigative process itself. Thus, the Claimant would not have been precluded from pursuing redress through the fraternity even during the investigation, and it was not a procedural violation for the Title IX Coordinator to (correctly) tell the Claimant that the processes are separate. The Respondent's speculation as to any advice that may have been provided by the Safe Office is not sufficient to prove a procedural irregularity under the Policy. Indeed, given that the Policy provides no timeframe for filing a complaint, any "strategy" by the Claimant as to the timing of her complaint would not be a procedural irregularity by the Title IX Office or any others involved in the Title IX process once the complaint was filed.[2]

Thus, the Appellate Officer finds that the Respondent has not met shown that adaptive resolution benefited the Claimant and the Title IX Office and that it was a procedural irregularity that affected the outcome of the hearing.

### (C) Title IX Officers Violated Title IX Policy and Grievance Procedures When They Made Credibility Determinations in Favor of Claimant.

The Respondent correctly notes that several sections of the Policy provide that respondents are presumed to be not responsible and that credibility determinations will not be based on a person's status. He argues that, to the contrary, the September 1, 2022, Revised Notice of Allegations indicates that the Title IX Office presumed him to be responsible because it included credibility determinations in favor of the Claimant. However, a plain reading of the Revised Notice indicates that, in the Claimant's August 30, 2022, interview, the Claimant *alleged* that the Respondent engaged in sexual assault via sexual intercourse. The Revised Notice says nothing that would indicate that the Title IX Coordinator had made a credibility determination as to this allegation. Rather, once the Claimant made this allegation, the Title IX Coordinator was required to issue the Revised Notice pursuant to § 2A.04 of the Policy. While the Respondent finds it suspicious that

---

[2] The Respondent asserts that the Hearing Officer failed to attribute any significance to ▬▬▬▬ testimony; if true, this would be a substantive concern and not a procedural irregularity. Moreover, n. 17 of the Final Outcome Letter explains the Hearing Officer's view of this testimony – while the actions (or inaction) by the fraternity may have influenced the Claimant's decision as to when to file her Title IX complaint, it was not relevant to the events on October 16th.

4

the Revised Notice was issued only two days after the interview, a more reasonable explanation is that the Title IX Coordinator was taking prompt action to notify the parties of the sexual intercourse allegation.  That she may not have had a transcript of the August 30 interview at the time does not detract from the fact that the Title IX Office, through the Investigator, knew of the allegation. While the Respondent claims that, without that transcript, the Title IX Director would likely not have known of allegedly inconsistent statements by the Claimant, any such inconsistencies would have properly been the focus of the investigation.[3]  By arguing that the Title IX Coordinator should have considered them at the time she issued the Revised Notice, the Respondent appears to be arguing that she should have done precisely what he is criticizing her for – making a credibility determination (against the Claimant) without the benefit of a full investigation.  Thus, the Title IX Coordinator's issuance of the Revised Notice was not a procedural irregularity.

Thus, the Appellate Officer finds that the Respondent has not shown that the Title IX Office's handling of the Claimant's August 30th allegation was a procedural irregularity that affected the outcome of the hearing.
.

**(D) The Organization and Scheduling of the Hearing by the Title IX Office was an Irregularity that Affected the Outcome of the Hearing.**

The Respondent argues that the Hearing Officer did not put a time limit on the testimony of any of the witnesses, except when the Respondent's advisor was questioning the Claimant during the evening hours of November 29th.  He further argues that, given the seriousness of the allegations against him, the hearing should not have been allowed to continue into the late evening hours.  He seems to be suggesting that, given the seriousness of the allegations against him and the participation of nine witnesses, the hearing should have been scheduled for two days or at least stopped at some point during the first day and resumed on a second day.  He also seems to be suggesting that the Hearing Officer's decision to end the hearing when she did was influenced by the Claimant's advisor's question to the Respondent's attorney as to how much longer he would take.

There are no provisions in the Policy regarding the length of time for a hearing or requiring that it be continued the next day if it should run long.  Indeed, the Respondent acknowledges that the scheduling of the hearing was arranged at the request and convenience of several of the witnesses. Predicting the amount of time that a hearing will take can be difficult given the uncertainties as to how long each witness will testify, the amount of time that will be needed for cross-examination, etc.  Once it became apparent that the hearing was running long, rescheduling a second day might not have been readily achievable, given the number of witnesses and the schedules of the participants, including the parties, the witnesses, the advisors, and the Hearing Officer (with the advisors and the Hearing Officer presumably having commitments outside the WFU).

---

[3] The Respondent claims that the Claimant provided two meanings for the words "this doesn't feel good," one indicating that she wanted him to stop the sexual activity and another that she had vomited.  To the extent that these might be inconsistent, he does not deny that at least one of the meanings could have been a withdrawal of consent. The Title IX Coordinator's Revised Notice simply accepted this *as an allegation*, with no indication that she had made a credibility determination that it was true.

5

The Respondent correctly notes that the Hearing Officer addressed the issue of time in the Final Outcome Letter when she wrote that the Respondent's Advisor did not use the full time allotted to him.  She made this point during the hearing as well: "You have not used your entire time, so, finding it hard to believe your additional questions that you feel are critical, since you didn't use the time I gave you." (Hearing Transcript, Part 3, p. 35.)  This was in response to the statements by the Respondent's advisor on p. 35 that "'I have lots of other questions. … You're hindering me a little bit from representing my … client adequately…. Just some of the rulings on … some of my questions…" The Hearing Officer then gave the advisor the opportunity to address specific rulings; on p. 36, the only one he challenged was the Hearing Officer's decision to exclude his questions about the Claimant's athletic conditioning (discussed further in § I.E below).

Additionally, as noted by the Claimant in her response to the appeal, the Hearing Officer had determined that some of the questions had become repetitive (see, e.g., Hearing Transcript Part 3, p. 22).  Also as noted in the Claimant's response, the Hearing Officer identified at least one question by the Respondent's advisor as harassing the Claimant (Hearing Transcript Part 2, p. 213).  These, too, would be reasons under § 3A.05 of the Policy to limit the total time for the advisor's questioning of the Claimant: "The hearing officer may also exclude evidence if the hearing officer determines that the proffered evidence's probative value is outweighed by needlessly presenting cumulative evidence or that a question is posed solely to harass a witness or the other party."

Finally, at 4:43 pm, the Hearing Officer stated that she thought that the hearing was going to continue for quite some time and asked the participants if anyone had a cut-off.  It does not appear that the Respondent's advisor asked the Hearing Officer to continue the hearing on a subsequent day.  {Hearing Transcript Part 2, p. 39.)  And, later that evening, when the Claimant asked how much longer the hearing would last, the Respondent's advisor was the one who suggested "another hour."

The Respondent does not identify any questions that his advisor was precluded from asking; without that information, his claim that any limits by the Hearing Officer affected the outcome are speculative (but see § II.B.5 below).  To the extent that he is asserting that the question by the Complainant's advisor to his advisor may have influenced the Hearing Officer's determination as to when to end the hearing, that, too, is speculative.

Thus, the Appellate Officer finds that the Respondent has not shown that the organization and scheduling of the hearing was a procedural irregularity that affected the outcome of the hearing.

### (E) The Hearing Officer's Manner Conducting the Hearing Affected the Outcome of the Hearing.

The Respondent states that the Investigator and the Claimant failed to directly answer several of his advisor's questions, with the Investigator responding instead that the information requested was in the Investigative Report and the Claimant responding that the information was in one of her recorded statements.  According to the Respondent, the Hearing Officer did not instruct them to provide a direct answer.  However, there is nothing in the Policy that requires the Hearing Officer to do so; § 3A.06 only requires that the parties be given an opportunity to conduct cross-

6

examination.  Moreover, the Respondent does not identify which questions were answered indirectly and how the indirect answers affected the outcome.

The Respondent also argues that the Hearing Officer interrupted the Respondent's advisor numerous times when he was questioning the Claimant but didn't interrupt the Claimant's advisor when she was questioning the Respondent, accused the Respondent's advisor of "harassing" the Claimant, and allowed the Claimant's advisor to interrupt the Respondent's advisor with an objection.  The Respondent does not identify any specific instances in which this occurred[4] or explain how those instances affected the outcome of the hearing.

The Respondent does identify specific questions that he asserts the Hearing Officer refused to allow the Respondent's attorney to ask the Claimant, specifically, about her statement that "it burns" and about her athletic conditioning.  Section 3A.06 of the Policy requires the Hearing Officer to determine whether a question is relevant and allowed under the Policy and to explain any decision to exclude a question.  The Hearing Officer acknowledged this (see, e.g., Hearing Transcript Part 1, p. 9) and did so during the hearing as to these issues.

Contrary to the Respondent's assertion, the Hearing Officer did allow the Respondent's advisor to ask the Claimant what she thought was meant by "it burns" (Hearing Transcript Part 3, p. 2) and follow-up questions as to when she sent the text message saying this (Hearing Transcript Part 3, p. 5.).  The Hearing Officer didn't allow several  subsequent questions about the Claimant's memory because the Claimant had already testified as to them (Hearing Transcript Part 3, pp. 5-6).   Again contrary to the Respondent's assertion, the Hearing Officer also allowed the Respondent's advisor to ask the Claimant whether she could have been referring to a burning in her throat from having vomited earlier in the night.  (Hearing Transcript Part 3, p. 3.)

As to the Claimant's athleticism, the Respondent's advisor stated that he was attempting to cast doubt on Claimant's version of the alleged encounter by showing that she failed to push the Respondent's hand away during the digital penetration despite being strong enough to do so, that she had the ability to fight him off physically but was acting like she couldn't.  However, as the Hearing Officer explained during the hearing (see, e.g., Hearing Transcript Part 3, p. 36), that the Claimant "testified fully about why she did not try to push his hand away. She did not say it was a strength that she did not put that in question, so I don't see how that becomes relevant to any decision that I would be making."

While the Respondent might disagree with the Hearing Officer's determinations, that would not be evidence of procedural irregularity but more in the nature of a substantive disagreement (which is not a basis for appeal).

---

[4] Regarding the advisor harassing the Claimant, see § I.D above; the Hearing Officer seems to have objected to the way the advisor framed one of his questions: "What is…the first interview have to do with anything?"  She responded that she was "not going to allow harassing questions of the witness, and I'd like, if you would please to ask your question and not characterize it as you're asking them."  Hearing Transcript Part 2, p. 213.  In addition, the Claimant seemed to have already answered the question.

Thus, the Appellate Officer finds that the Respondent has not met shown that the Hearing Officer's manner of conducting the hearing was a procedural irregularity that affected the outcome of the hearing.

## II. Bias that Affected the Outcome of the Hearing

The Respondent argues that the Hearing Officer's decision to credit the Claimant's evidence and testimony despite its numerous inconsistencies shows that the Hearing Officer was biased.  In her response to the appeal, the Claimant asserts that the Respondent "appears to be re-litigating facts presented at the hearing" rather than providing "evidence of actual bias," and that a finding the Respondent disagrees with is not an indication of bias.  However, a pattern of findings in the Claimant's favor without apparent, evidence-based reasons and where the evidence substantially favors the Respondent can be proof of bias.  Thus, this Appellate Decision will consider each asserted instance to determine if it indicates bias that affected the outcome or, e.g., reflects a disagreement with the substance of the finding.  Moreover, as with the first basis for his appeal (procedural irregularities), the Respondent must show that any bias actually affected the outcome of the Hearing.

### A.  Hearing Examiner's Bias in Favor of Claimant Affected the Outcome of the Hearing.

1.  Falsehoods in Claimant's October 18, 2021, Medical Record

The Respondent identifies a number of instances of what he considers to be false information provided by the Claimant to the medical providers during her visit to the Student Health Office – information which later conflicted with information she provided during the investigation.  While the Respondent asserts that the Hearing Officer failed to consider these falsehoods and inconsistencies, he acknowledges that she explained in the Final Outcome Letter her reasons for accepting the Claimant's subsequent explanation during the investigation and hearing for why she (the Claimant) provided inaccurate or incomplete information to the medical providers: the nurse was a man, she was terrified, she didn't want to report the matter,[5] and she didn't know if the nurse was a mandatory reporter for Title IX purposes.[6]  This was not an instance of the Hearing Officer ignoring possible inconsistencies; rather, the Hearing Officer determined that the Claimant was able to explain them.  While the Respondent may disagree with this determination, it has a basis in evidence, is not unreasonable, and is therefore not an indication of bias.

---

[5] This point is actually contained in the medical record: "The male is a mutual friend… She states that she has no interest in reporting the assault because 'it's going to be a he said, she said, and I'm not interested in blowing up his life or mine.'"  It is not clear if the Claimant used the term "assault" or if the medical provider did.

[6] The Respondent argues that the Claimant also saw several female health providers that day, and therefore should have felt safe enough to report the alleged assault.  However, the initial information in the medical report was entered by the male nurse, indicating that the Complainant provided the information to him.  The Respondent's assertion that, shortly after allegedly experiencing a sexual assault, the Claimant should have felt safe reporting it in a medical context without acknowledging all that could entail (e.g., an intrusive medical examination, police involvement, a Title IX investigation that she wasn't ready for) is speculative.  Similarly, his assertion that the Complainant's statements about Plan B and birth control are inconsistent is also speculative, given that no method of birth control is 100% effective.  Moreover, the Hearing Officer acknowledged that the information about Plan B did not conclusively indicate that sexual intercourse had occurred, but considered it in light of the other evidence.  That the Respondent disagrees with this assessment is not an indication of bias.

8

Similarly, the Respondent claims that the Hearing Officer should have considered the possibility that the Claimant intended to blame him for drugging her and that, once she had tested negative for drugs, the Claimant blamed him for sexually assaulting her out of revenge.  However, the Claimant never stated that she thought the Respondent had drugged her and it doesn't appear that the Respondent's advisor had raised this argument during the hearing; see, e.g., Hearing Transcript Part 1, p. 73, where the Respondent's advisor stated "But there's no allegation here that ███ … drug[ged the Claimant]."  The Hearing Officer had considered – and rejected -- Respondent's theory of revenge in n. 17 of the Final Outcome Letter.  Again, while Respondent may disagree with this conclusion, it is evidence-based and sufficiently reasonable so as not to be evidence of bias.

The Respondent disputes the extent of the Claimant's alleged vaginal pain and/or when it first occurred.  The Respondent's advisor did ask questions about this during the hearing; see, e.g., his question to the Investigator (Hearing Transcript Part 1, p. 72) where he is attempting to cast doubt on the Claimant's assertion of the pain (if the pain was so great, why didn't she go to a gynecologist?).  While the Final Outcome Letter does not address why the Claimant may not have sought medical care after October 18 for the allegedly persistent vaginal pain, it does, e.g., cite the Claimant's testimony that the friction from the Respondent's penis in her vagina "did not feel good"; note that the Claimant's October 18, 2022, Student Health record, made contemporaneously with the alleged encounter, states that she reported vaginal pain; and note that the Claimant's testimony that the pain was likely the result of engaging in sexual intercourse when she was not sufficiently lubricated  The Claimant also testified during the hearing that the pain tapered off after a few days.  (Hearing Transcript Part 1, pp. 157 and 166).  Thus, again, there is sufficient evidence in the record to show that Hearing Officer's findings were not based on bias towards the Claimant.

Thus, the Appellate Officer finds that the Respondent has not shown that the Hearing Officer had a bias in favor of the Claimant that affected the outcome.

2.  The Hearing Officer Did Not Draw A Negative Inference From Claimant's Refusal to Allow Dr. Price to Testify.

The Respondent asserts that the Hearing Officer should have drawn a negative inference from the Claimant's refusal to permit the Hearing Officer to speak with Doctor Price about the diagnosis in the October 18th Student Health record.  As noted by the Claimant in her response to the appeal, the Policy provides that the University will not access medical records unless the party provides voluntary, written consent – which the Claimant declined to do.[7]  Moreover, § 3A.07 of the Policy *prohibits* the Hearing Officer from drawing a negative inference regarding responsibility based solely on a party's or witness' absence from a hearing.  Given the circumstances, the Hearing Officer did not ignore the possibility that there could be another explanation for the diagnosis, but determined that the diagnosis was *some* evidence – albeit not conclusive – that sexual intercourse had occurred.

---

[7] For this reason, it is not an indication of bias that the Hearing Officer didn't mention that the Claimant failed to give permission for disclosure of her other Student Health records.

9

The Respondent next points to n. 12 in the Final Outcome Letter, characterizing it as an accusation by the Hearing Officer against him for withholding evidence. An equally reasonable reading of the footnote is that it simply notes that the Respondent provided no contemporaneous text messages directly related to the alleged encounter.[8] It is also apparent from the Final Outcome Letter that the Hearing Officer did not make any negative inferences based on this.

The Respondent next asserts that the Hearing Officer was aware that the information provided in the October 18th Student Health record was different from what the Claimant told the Investigator.[9] Specifically, according to the appeal, the medical record indicates that the Claimant "did not remember anything after returning to her room and that she woke up in her bed with a male beside her and a used condom in the trash can." Indeed, the Final Outcome Letter doesn't specifically address the statement in the medical record about not remembering anything; however, there is evidence in the record that addresses this – during the investigation, the Claimant explained that, again, she didn't intend to reveal a sexual assault during the student health visit. The Final Outcome Letter also doesn't specifically address the discrepancy as to the location of the condom; see, e.g., n. 7, referring to the Claimant saying that the condom was thrown to the ground. However, the difference between the condom being found on the floor or in the trash can is not so significant as to indicate that the Hearing Officer's credibility determinations were biased in favor of the Claimant.

The Respondent's appeal goes on to identify numerous asserted "flaws" in the Hearing Officer's decision, some of which have already been addressed above (e.g., regarding Plan B). Notably, he bases these flaws largely on speculation (as to why the Claimant may have accepted Plan B and why the medical providers and others working with the Claimant couldn't convince her to get a SANE exam in the "days, weeks, and months following the alleged assault"[10]) and generalizations (female college students experience vaginal pain for a variety of reasons).

It remains that the findings by the Hearing Officer have some basis in evidence; thus, the Appellate Officer finds that the Respondent has not shown that the Hearing Officer had a bias in favor of the Claimant that affected the outcome.

3. Claimant Lied When she Approached ███ Fraternity Brothers About Kicking Respondent Out of the Fraternity

The Claimant addressed this in her response to the appeal. She explained during the hearing that she wanted to keep the matter private so she asked about procedures "on behalf of a friend." This comports with other evidence obtained during the investigation and the hearing about her uncertainties about moving forward and desire to keep the matter private. Thus, there was an evidence-based reason for not concluding that this undermined her credibility and the Appellate

---

[8] In his September 8, 2022, interview with the Investigator, the Respondent mentioned exchanging texts with the Claimant in the period leading up to the alleged encounter. The Respondent provided text messages with another individual from April 2021.

[9] To at least some extent, this an elaboration on the Respondent's argument in § II.A1, above.

[10] "The optimal time frame for a forensic evaluation is within 72 hours of the assault to be able to collect as much DNA evidence as possible. However, a kit can still be useful in gathering evidence after this period, up to 7 days due to advancements in DNA technology." https://www.ncbi.nlm.nih.gov/books/NBK554497/, last accessed January 9, 2023. *See also,* https://www.ojp.gov/ncjrs/virtual-library/abstracts/why-women-do-not-report-sexual-assault.

Officer finds that the Respondent has not shown that the Hearing Officer had a bias in favor of the Claimant that affected the outcome.

4. Assistant Title IX Director/Investigator Suggested the Meaning of "it burns" to the Claimant.

The Respondent argues that the Hearing Officer was biased because, despite the testimony of ███████ the witness who received this text, that she (██████) didn't understand what it meant when she received it, the Hearing Officer found that the text supported the Claimant's account.  In addition, while § II of the appeal is headed "Hearing Examiner's Bias," the Respondent in this subsection seems to be saying that the Investigator was biased in suggesting the meaning of this phrase to the Claimant.

As noted in the appeal, the Hearing Officer's statement that the phrase "would be" consistent with vaginal pain is only one piece of evidence she relied on in concluding that intercourse occurred. While perhaps it would have been better practice for the Investigator to ask the Claimant what she thought the phrase meant without reference to intercourse, the Claimant had already told the Investigator that she was so drunk that she didn't remember sending the text messages.  The Claimant testified to the meaning of the phrase during the hearing and the Respondent's advisor had an opportunity to question her about it.

The Appellate Officer finds that the way the Investigator attempted to clarify the meaning of the phrase is not enough, by itself  or together with any of the Respondent's other concerns, to show that the Investigator was biased.  The Hearing Officer finds that the weight given by the Hearing Officer to the text message had a basis in evidence and therefore did not result in an erroneous finding indicative of bias on her part.  Thus, the Appellate Officer finds that the Respondent has not shown that the Hearing Officer or the Investigator had a bias in favor of the Claimant that affected the outcome.

5. Hearing Officer's Reliance Upon Claimant's Forty-Two Minute Timeline is Further Evidence of Her Bias in Favor of Claimant.

As noted in the appeal, the Hearing Officer determined that 42 minutes could have been sufficient time for the parties to return to the Claimant's dorm and engage in sexual intercourse.  As phrased in the appeal, "[t]he Respondent disagrees with the Hearing Officer's assessment and argues that it is further evidence of bias in favor of the Claimant."  He argues that, when the Claimant sent the message "I'm coming back to ██████ at 12:17, that must have meant that she hadn't arrived yet such that the period of time was actually less than 42 minutes.  He goes on to set out the various actions that would have had to occur between their arrival at the Claimant's dorm and the alleged encounter, concluding that it was "impossible" for all these actions to happen in less than 42 minutes.  This argument would possibly have been persuasive had the Respondent, e.g., recreated and timed some of the specified actions (##1-7), further narrowing the time for what happened in the Claimant's room.  Without more, this is speculative. Moreover, it does not appear that the Respondent pursued this argument during the hearing (which would have given the Hearing Officer the opportunity to pursue it and the Claimant the opportunity to respond).

The Respondent then goes on to challenge the Hearing Officer's reliance on the testimony of ███ as ███ hadn't seen the parties at any point leading up to or during the alleged encounter: "All of her testimony involved repeating what the Claimant told her after the fact." This is true. However, while not determinative, contemporaneous accounts are appropriately considered as circumstantial evidence. The Hearing Officer explained in the Final Outcome Letter that she relied on ███' testimony because she found "███'s interview with the Investigator and her statements at the Hearing generally consistent with [the evidence of other] contemporaneous events and found … ███ to be a generally credible witness at the Hearing." This is a sufficient basis in evidence to counter Respondent's claim of bias. Thus, the Appellate Officer finds that the Respondent has not shown that the Hearing Officer had a bias in favor of the Claimant that affected the outcome.

6. The Hearing Officer Did Not Consider That There was More Than One Reason for the Claimant to Say "this doesn't feel good."

The Respondent states in his appeal that he didn't hear the Claimant say these words and that, even if she did, she couldn't have been referring to sexual intercourse because he couldn't achieve an erection. He states that the Hearing Officer "never accepted the truth of anything the Respondent ever said…." However, this is not an instance of the Hearing Officer simply ignoring the Respondent's account. The Final Outcome Letter includes a very specific explanation for why the Hearing Officer discounted the Respondent's account regarding his erection – his failure to provide available evidence to support his claimed inability to get an erection, including with his girlfriend.[11] [12]

He goes on to refer to a statement by the Claimant during her August 30, 2022, interview that he interprets as indicating that the Claimant said "this doesn't feel good," not because they were having intercourse, but because she had thrown up earlier that evening. Whether or not this is a reasonable interpretation of what the Claimant meant, the Hearing Officer's interpretation that it was evidence that sexual assault had occurred is equally reasonable. The Claimant specifically stated that "we started to have sex…[b]ut I remember it coming out"; according the Investigative Report, this was a reference to the condom. She goes on to say that, after she told the Respondent that "this doesn't feel good," he ignored her – a reasonable interpretation of this is that the Respondent continued to engage in intercourse. This reasonably supports the Hearing Officer's finding that intercourse had occurred.[13]

---

[11] There was also at least one instance in which the Claimant failed to provide possibly relevant evidence – consent for the Investigator to speak with the doctor regarding the October 18th student health record. However, in that case, there was other evidence that supported her claim. Here, as stated in the Final Outcome Letter, "the only evidence before the Hearing Officer that the Respondent could not maintain an erection were the statements by the Respondent."

[12] Moreover, in discussing the results of the polygraph exam, the Final Outcome Letter states:

Respondent says in the statement to the polygraph examiner, "I could not get an erection before I put the condom on," which he told the examiner was "truthful" and "completely honest." … Yet, during the Hearing, Respondent said that he had an erection, but that he was not able to maintain the erection while putting on the condom. … Accordingly, the evidence Respondent presented at the Hearing seems inconsistent with what he said in his statement to the polygraph examiner, causing the Hearing Officer to question the credibility of the statement more generally.

[13] Indeed, even if the Claimant said she didn't feel good because she had thrown up, her testimony that "the Respondent continued" could still be reasonably interpreted as indicating that intercourse had occurred.

12

The Respondent attempts to cast doubt on the Investigator's statement in n. 3 of the Investigative Report that the Claimant said she was referring to the condom as the "it" that came out, asserting instead that the statement supports his assertion that he could not maintain an erection.  But he doesn't dispute that he did take a condom out at some point during the alleged encounter and, indeed, concedes that the Claimant might have said this.  Rather, he seems to be attempting to cast doubt on the veracity of the Investigator.  His criticism is that the Investigator did not provide a specific cite to a specific question by the Investigator attempting to clarify what the "it" was.  However, this overlooks the manner in which the Investigator wrote the entire Investigative Report – the summaries of the interviews do not include *any* cites.  Regarding his claim that the statement supports his assertion that he could not maintain an erection, the Respondent's testimony cited in n. 7 of the Final Outcome Letter at least suggests that he never even put the condom on because he couldn't get an erection; thus, his penis couldn't have "come out" of the condom.  Finally, as indicated by the headings in his appeal, the Respondent is asserting that the Hearing Officer was biased.  Given the way the Investigative Report was written, any bias by the Investigator would not be so apparent to the Hearing Officer that the Hearing Officer's reliance on the information in n. 3 would be an indication of bias on her part.

The Respondent asserts that the Hearing Officer didn't accept the truth of anything he said.  Rather, the Hearing Officer relied on evidence in the record to conclude that the Claimant's version of the alleged encounter was more credible.  Thus, the Appellate Officer finds that the Respondent has not shown that the Hearing Officer had a bias in favor of the Claimant that affected the outcome.

7. Hearing Officer Failed to Consider That Claimant May Have Been Embarrassed about Vomiting the Night of the Date Function.

This is speculation by the Respondent and is contradicted by testimony in the record.  Thus, it is another instance in which Respondent's disagreement with the Hearing Officer's findings is not enough to demonstrate bias; moreover, it appears that the Respondent didn't raise this issue during the hearing.  Thus, the Appellate Officer finds that the Respondent has not shown that the Hearing Officer had a bias in favor of the Claimant that affected the outcome.

8. Hearing Officer's Failure to Consider Claimant's Motivation for Filing Formal Complaint Against the Respondent is Further Evidence of Her Bias Against the Respondent.

The Respondent alternately claims that the Hearing Officer "failed to consider" Claimant's motive for filing the complaint and that the Hearing Officer "completely discounted" Claimant's possible motives.  However, he acknowledges that the Hearing Officer provided reasoning for her decision in the Final Outcome Letter.  He goes on to recount several "facts" that he argues support his claim that the Claimant falsely accused him.

The Respondent is correct in that the Hearing Officer provided evidence-based reasons for her findings in support of the Claimant, including contemporaneous evidence from the time of the alleged encounter.  Thus, the Appellate Officer finds that the Respondent's asserted "facts" are not

sufficient to show that the Hearing Officer had a bias in favor of the Claimant that affected the outcome.[14]

**B. Hearing Officer's Bias Against the Respondent.**[15]

    1.   The Claimant Stopped Contacting the Respondent After the Alleged Encounter.

The Respondent continues to present information that he asserts supports his version of the alleged encounter.  Here, he argues that the reason the Claimant stopped contacting him was not because of the alleged assault, but because she learned he was dating someone else.  While he claims that this was "obvious," the Hearing Officer explained in n. 16 of the Final Outcome Letter that she based her findings on the evidence from the time before the Respondent began dating someone else.  That is a sufficiently evidence-based reason to refute Respondent's claim of bias against him.  Thus, the Appellate Officer finds that the Respondent has not shown that the Hearing Officer had a bias against him that affected the outcome.

    2.   Complainant's Claims of Incapacitation and Impairment, Respondent's Awareness Thereof, and Complainant's Plans for the Evening.[16]

The Respondent next argues that the Hearing Officer's determination that the Claimant was not incapacitated (a determination *adverse* to the Claimant) undercuts the finding that he should have known that Claimant was impaired.  However, the Hearing Officer drew a distinction between whether the Claimant was incapacitated as defined in the Policy and whether she was impaired.  In the Hearing Officer's view, the evidence regarding the Claimant's conduct showed that, "even if drunk, Claimant had sufficient capacity to understand the sexual nature of a proposed act, that she had the right to refuse to participate, and that she would have been aware of ongoing sexual activity…."  However, the Hearing Officer also determined that Claimant's observable behaviors were enough to show that she was, again, drunk to the point of being impaired, e.g., the contemporaneous text messages between ███ and ███ about the Claimant being "barely [able to] talk," "drunk," "stumbling," "her words were incredibly slow,"  and "throwing up"; ███ phone call with the Claimant in which the Claimant could "barely talk"; and the Claimant's incoherent text messages to ███

The Hearing Officer concluded that this information tended to support that the Claimant was impaired to some extent.  The Hearing Officer's analysis next turned to the interactions between the two parties – if they spent as much time together as the evidence showed, then the Respondent would have seen at least some of these behaviors.  While the Respondent provides several reasons for why he might not have (including, in his next section, his explanation that he spent some of the time at the bar apart from the Claimant while talking with his friends), this is countered by the stark difference between ███ description of the Claimant as barely able to talk and in need of monitoring as compared to the

---

[14] That some of the Respondent's facts might also be based in evidence does not change this; at most, they confirm that there were differing versions of what happened and that the Hearing Officer weighed all the information and determined which "facts" were more probative.  That Respondent might disagree with these determinations isn't enough to show bias and, indeed, isn't a permissible basis for appeal.

[15] The section of the appeal on bias in favor of the Claimant provides subheadings for each of the Respondent's arguments.  This section, on bias against the Respondent, does not; the Appeals Officer has attempted to create similar headings for clarity and ease of reading.

[16] The Appellate Officer has combined Respondent's Sections II.B.2 and .3 as they raise similar arguments.

14

Respondent's assertion that Claimant was coherent and alert. In the end, the Hearing Officer doesn't conclude that the Respondent *was* aware of Claimant's condition, but that his assessment showed a lack of attention and recognition of her condition and that he should have been aware of it during the evening of October 15 and the early hours of October 16 as well as the next morning.

The Respondent also argues that "it is at least arguable" that no girl wants her date to know that she vomited (as a possible explanation for why he didn't know that the Claimant had); however, arguments are not enough to show that an evidence-based decision was biased. He also asserts that, despite the amount of alcohol the Claimant might subsequently consume, her conversation with witness ███████ earlier in the day on October 15 showed that she intended to be intimate with the Respondent that night. The Claimant's state of mind earlier in the day would not be dispositive of her state of mind later that night, nor would it be proof of consent to the specific conduct alleged. While he asserts that the Hearing Officer's failure to agree with his arguments and assertions is evidence of bias against him, again, her findings in this regard are based in evidence. Thus, the Hearing Officer concludes that the Respondent has not shown that the Hearing Officer was biased against him.

   3.  Respondent's Awareness of Claimant's Level of Intoxication

See § II.B.2 above.

   4.  Claimant May Have Sobered Up Over the Course of the Evening

The Respondent speculates that, because the Claimant claimed to have vomited at least once and possibly three times before the alleged encounter and spent some time outside in the chilly air, the Claimant could have "sobered up." He claims that the Hearing Officer's failure to consider this indicates a bias against him. However, he offers no evidence to support this claim[17] nor does it appear that he had raised this argument during the hearing. Thus, the Appellate Officer concludes that the Respondent has not shown that the Hearing Officer was biased against him.

   5.  The Hearing Officer Refused to Allow Respondent's Advisor to Question Claimant about Her Vomiting, Physicality, and the Timing of her Alcohol Consumption

The Respondent argues that the Hearing Officer's refusal to allow these questions shows bias against him. However, as explained in § I.E above, the Respondent's advisor *was* allowed to ask the Claimant about her vomiting and whether that could have been what she was referring to when she texted "it burns." The Complainant responded (Hearing Transcript Part 3, p. 3) that she "did not feel any throat burning … after throwing up and never said that I felt a throat burning feeling from throwing up before…. So I don't think that that feeling would have started plenty of time later."

---

[17] Such evidence could possibly have included the Claimant's observable behaviors after throwing up or being outside as well as scientific or medical information on the effects of vomiting and/or cool air once an individual has alcohol in their stomach and/or in their bloodstream. *See, e.g.,* https://www.usarx.com/blog/how-to-sober-up-fast, last accessed January 11, 2023.

15

Section I.E above also sets out the reason provided by the Hearing Officer for why she didn't allow the Respondent's advisor to ask the Claimant about her physicality. The Hearing Officer explained during the hearing (see, e.g., Hearing Transcript Part 3, p. 36) that the Claimant "testified fully about why she did not try to push his hand away. She did not say it was a strength that she did not put that in question, so I don't see how that becomes relevant to any decision that I would be making."

Under the Policy, passivity doesn't indicate consent. Perhaps more importantly, during the hearing, the Claimant explained that she was in a state of shock about what was happening and frozen with fear because she just woke up and that she did try to resist by moving her legs and timidly trying to block or brush his hand. (See, e.g., Hearing Transcript Part 1, pp. 19-20.)

Contrary to the Respondent's assertion, the Hearing Officer did allow his advisor to question the Claimant about the timing of at least some of her alcohol consumption and when she stopped: "What time do you remember … consuming your last alcoholic beverage in the evening." (Hearing Transcript Part 2, p. 185.) "Do you know why you grabbed a drink when you got there?" (Hearing Transcript Part 2, p. 201.) He also asked her about her weight as part of an inquiry into the Claimant's familiarity with how alcohol is eliminated by the body over time and whether the Claimant had done any research on it. Despite questioning the validity of that inquiry, the Hearing Officer allowed the question. (Hearing Transcript Part 2, pp. 186.) However, she did not allow the advisor to ask the Claimant about the contents of the Claimant's vomit with this reason: "How would she have any knowledge of the contents of what she is throwing up?" (Hearing Transcript Part 2, p. 187.)

Thus, the Appellate Officer concludes that the Respondent has not shown that the Hearing Officer was biased against him.

6. Respondent's Awareness of Claimant's Condition

The Respondent asserts that it was unfair for the Hearing Officer to infer that, because the Respondent did not believe that the Claimant was impaired the night before, that he must also have been unaware of the Claimant's condition the next morning. However, the basis for the Hearing Officer's inference was not that the Respondent believed that the Claimant was not impaired, but that the evidence showed that the Respondent's assessment of the Claimant's condition (as coherent and alert) indicated a lack of attention to and recognition of her condition.

The Respondent then goes on to repeat some of his arguments addressed above regarding the 42 minutes and the meaning of "it burns." He speculates that, because the Claimant acknowledged that she woke up on Respondent's chest[18] in her own bed in a suite with girls with whom she was friendly, it is "impossible" to believe that Claimant was in pain or fearful. However, the Hearing Officer provided several reasons for why it was reasonable for the Claimant to stay in bed with the Respondent after he had sexually assaulted her, including the Claimant's testimony that she hadn't

---

[18] Respondent seems to be claiming that the Claimant waking up on his chest is proof that she went to sleep there. This argument ignores the possibility that the parties may have changed positions while asleep. It also ignores Claimant's testimony that she was impaired when she fell asleep; thus, she may not have been aware of her position when she fell asleep.

16

yet fully comprehended what had happened and didn't begin processing what had happened until the Respondent had left her room.[19] This testimony also counters Respondent's argument that Claimant's failure to call for help undercuts her credibility.

The Respondent doesn't help his case when he writes "Whether [the Claimant] was allegedly still asleep or not, the Respondent began performing an act that had given her pleasure on several occasions when they had spent the night together in the past." The definition of consent in the Policy is clear -- it must be active and cannot be inferred from a previous sexual relationship. It goes on to say that consent is automatically withdrawn if someone falls asleep during a sexual act. That the Claimant may have consented to an enjoyed digital penetration by the Respondent in the past, without more, is not enough to indicate consent for a subsequent act of penetration – for each instance, there must be "mutually understandable words and/or actions that indicate a willingness to participate in the sexual activity." All this makes it clear that consent cannot be given if someone is asleep when the sexual act is initiated.

The Respondent's arguments – what he characterizes in this section as his "opinion" – are not sufficient to show that the Hearing Officer's evidence-based determination was biased against him. Thus, the Appellate Officer concludes that the Respondent has not shown that the Hearing Officer was biased against him.

  7.  Respondent's Past Inability to Achieve an Erection

Respondent states that the Investigator's invitation to him to provide her with additional information noted in the Final Outcome Letter's discussion of his past inability to achieve an erection was in reference to the allegations generally and not to his particular issue. This does not affect the Hearing Officer's finding that he could have provided evidence about this issue and that, without it (as discussed above), all the Hearing Officer was left to consider was his statement about it (as well as his seemingly inconsistent statements). The Respondent comparison of his statement about his ability to achieve an erection with the Claimant's statement about having vaginal pain does not recognize that his statement was made during the course of an investigation while the Claimant's statement was made during a medical visit contemporaneously with the alleged encounter (and well before she filed her complaint). Again, the Appellate Officer concludes that these arguments are not sufficient to show that the Hearing Officer's evidence-based findings were biased against him.

  8.  Respondent Had No Text Messages Regarding the Alleged Encounter.

Respondent's arguments regarding this point are addressed in § II.A.2 above.

  C.  **Evidence of Title IX Office's Bias Against Respondent -- Retaliation**

In attempting to show that the Title IX Office was biased against him, the Respondent compares the timeliness of the Office's response to the Claimant's allegations of sexual harassment to its

---

[19] Respondent suggests that the Claimant would respond that she didn't get out of bed or call for help because she "blacked out," as indicated in the Student Health record. As explained above, the Claimant testified that she told the medical providers this because she wasn't ready to provide the details of and report being sexually assaulted.

response to his allegations of retaliation by Claimant's friends.  However, the situations are not comparable.  At least some of the acts of alleged retaliation occurred off campus and would therefore not be covered by the Sexual Harassment Procedures in the Policy, which applied to the Claimant's allegations; however, they might still be covered by the Policy's Sexual Misconduct Procedures.  The Respondent was unable to identify some of the individuals who allegedly retaliated against him, which could make it difficult to pursue a complaint against them.  Under both the Sexual Harassment Procedures and the Sexual Misconduct Procedures, the Title IX Office must take complaints of sexual harassment and sexual misconduct whereas under §§ 1.02 and 1.04, the Title IX Coordinator has the discretion to refer retaliation allegations to "other grievance procedures adopted by Wake Forest."

Moreover, the Respondent's assertion that the Title IX Office did not act on his allegations as promptly as it did for the Claimant's allegations is contradicted by his own appeal.  His appeal starts by criticizing the Title IX Office for delays in the investigation of the Claimant's complaint; the point at which it acted promptly that he uses as a comparison is its response to the allegation of sexual intercourse that the Claimant made in August.[20]   He finds it problematic that the Title IX Coordinator required him to expressly confirm that he wished to pursue retaliation complaints against Claimant's friends, but the Policy requires the signing of a formal complaint before an investigation can begin.

In order to determine how his retaliation concerns were handled and why they were not investigated by the Title IX Office, the Appeals Officer reviewed the transcript of the Respondent's September 8, 2022, interview and requested that the Title IX Office provide emails he exchanged with the Office referred to in his appeal (the ones provided by the Office are included in Exhibit 1 to this Appellate Decision) and information from the Office's Maxient case tracking system (Exhibit 2).

In his September 8th interview, the Respondent mentioned several encounters with the Claimant's friends.  He did not allege that these were retaliatory; rather, he brought them up to counter the Claimant's assertions that she hadn't told anyone about the alleged encounter and had been respectful of his space.  He did not ask the Investigator to address these alleged incidents but raised them to show that the Claimant was "definitely telling more people."  September 8, 2022, Interview Transcript, p. 25.

In an email dated October 19, 2022, the Respondent emailed the Investigator regarding an alleged off-campus incident; the Investigator forwarded that email to the Title IX Coordinator that same day.  As the Respondent acknowledges in his appeal, the Investigator met with him on October 21, 2022, to discuss his concerns and informed him that the Title IX Coordinator would address his concerns.  On November 1, 2022, the Respondent informed the Investigator that he intends to file a complaint for slander and intimidation against one of the students and that he intends to file formal complaints against two others he names (and several others that he doesn't) because their

---

[20] As explained in § I.C above, under the Policy, when the Title IX office decides to investigate allegations that were not included in the original written notice, the Office must provide notice of the additional allegations.  This is to ensure that the Respondent can provide an informed response.  Here, the investigation had already begun; the Title IX Office promptly notified the Respondent of the sexual intercourse allegation at least in part for his benefit -- so that he could address them in his interview(s).

actions may have been intended to intimidate him into not defending himself in the Title IX proceeding. The Title IX Coordinator responded later that day that the Policy doesn't prohibit slander and intimidation; as to the other named individuals, the Coordinator wrote that he should file a complaint with her in writing. The Respondent next emails the Title IX Coordinator on November 9, again stating that he "intends" to file complaints; the Title IX Coordinator responds on November 15, again telling him that he can send his complaints to her should he decide to initiate that process. It is not until later on November 15 that the Respondent emails the Title IX Coordinator to clarify that, by his messages, he *is* filing the complaints; for the first time, he also characterizes the actions of the student that he believes were slanderous as being retaliatory.

Once the Respondent confirmed that he wanted to move forward with his complaints, the Title IX Coordinator used her discretion under § 1.02 of the Policy to refer the allegations to the Dean of Students – the appeal seems to indicate that the Dean of Students had received the matter by the time the Respondent emailed him on December 1. By the Respondent's own admission, the Title IX Office followed up on his allegations by "talking to" the Claimant's friends (in late October/early November) and referring his allegations to the Dean of Students. (Also see Exhibits 1 and 2.) Thus, the Title IX Coordinator acted on his allegations promptly once she received the Respondent's written confirmation. In addition, in her response to the appeal, the Claimant states that the Title IX Office responded similarly when Claimant reported what she believed to be a threatening text message related to the Title IX Investigation.

Finally, the Respondent doesn't tie the allegedly biased response by the Title IX Office to any deficiencies in the investigation or indicate how that response influenced the external Hearing Officer. Thus, the Appellate Officer concludes that the Respondent has not shown that the Title IX Office's alleged bias affected the outcome of the hearing.

### III. Sanctions

The Respondent appeals his sanction, asserting that suspending him from WFU for two full semesters is "incommensurate to the gravity of the Sexual Harassment for which the Respondent was found responsible," per § 3A.13 of the Policy. He bases his appeal on much the same arguments discussed above as to his disagreements with the Hearing Officer's finding of responsibility. However, to support this basis for appeal, he must show, e.g., that the violations found by the Hearing Officer were not so serious as to warrant the suspension. Section 3A.10 of the Policy specifically states that the sanction for sexual assault generally will include at a minimum a period of separation from the University. In determining the sanction, the Associate Vice President and Dean of Students relied on the Hearing Officer's findings and the Respondent's previous disciplinary record; he also considered the impact of the suspension (delaying the Respondent's graduation and the delay or loss of a job offer). The Respondent has provided no information showing that a two-semester suspension is incommensurate with the findings that, as defined by the Policy, he sexually assaulted the Complainant by engaging in sexual intercourse and digital penetration without her consent. Thus, the Appellate Office concludes that the Respondent has not shown that his sanction was incommensurate with the finding of responsibility.

### Conclusion

19

The first basis for the Respondent's appeal is subsection (1) of § 3A.13, *procedural irregularity that affected the outcome*. Procedural irregularity is generally understood to mean a failure or failures to follow required procedures or a failure or failures to consider relevant evidence as required by the procedures. An example of this might be failing to allow witness testimony during a hearing, failing to conduct a hearing at all, or failing to allow one party's advisor to question a witness. It might also include WFU failing to timely submit the full record to the Hearing Officer. All of the above examples could be a failure to follow WFU's stated procedures that might also impact the outcome of the hearing.

The Respondent has not provided sufficient evidence to show that any procedural irregularities affected the outcome of the hearing.  Many of his arguments amount to disagreements with the outcome.  The Hearing Officer timely received the full record, conducted a full hearing of all desired witnesses, examined all the evidence and examined the witnesses herself.  Based on this, the Hearing Officer ultimately found that the Respondent was responsible.

The second basis for the Respondent's appeal is subsection (3) of § 3A.13, *bias in favor of the Claimant and/or against the Respondent*.  The Respondent offers no evidence of biased statements by the Hearing Officer or any others involved in the investigation and hearing.  Rather, he alleges that the Hearing Officer failed to consider "numerous and obvious discrepancies" in the evidence supporting the Claimant, failed to draw negative inference, failed to consider what he posits as alternative explanations for why the Claimant accused him of sexual assault, failed to consider what he posits as alternative interpretations of some of the evidence (without supporting evidence in many cases and without raising at least some of them during the hearing, which would have given the Hearing Officer a chance to pursue the matter and the Claimant the opportunity to respond), and what he considers to be problems with the investigation.

This is not a situation in which the Claimant's witnesses were interviewed but Respondent's weren't or where there was a failure to obtain key evidence supporting the Respondent.  The Hearing Office did not ignore possible inconsistencies in the Claimant's statements and evidence; rather, she questioned the Claimant about them and, based on the evidence as a whole, found the Claimant's explanations to be credible.  The Hearing Officer did not ignore the Respondent's evidence but found the Claimant's version to be more credible, again, based on the totality of the evidence.  Such findings are not indicative of bias as long as they are based in evidence and the evidence doesn't substantially favor the Respondent.   It is not getting into the merits of the determination to note that, here, there was substantial evidence favoring the Claimant.  Indeed, the Hearing Officer's findings were not one-sided as indicated by her finding that the Claimant was not incapacitated.

The Respondent's last basis for appeal was as to the sanction.  However, for the reasons discussed above, he did not show that the sanction was incommensurate with the finding of responsibility.

Based on a review of the record, the Appellate Officer finds no basis to overturn the Hearing Officer's determination in the Final Outcome Letter dated December 20, 2022, that Respondent was responsible for violating the Policy.

**Exhibit 1**
**Respondent's November Correspondence with Title IX Office**

From: ████████████████████████████ >
Date: Tue, Nov 15, 2022 at 8:47 PM
Subject: Re: Intimidation, Harassment and Bullying
To: Casseus, Aishah <casseua@wfu.edu>

Good Evening Ms. Casseus,

Thank you for your email dated November 15, 2022.

Please accept this email as a follow up to my email dated November 9, 2022.  I apologize for not using the correct terminology in my previous email.  Per your instructions to me in your email dated November 1, 2022, I expressly wish to initiate a formal complaint against ███████████████████████████ for the retaliatory actions each of them took against me arising out of the complaint filed against me by their friend, ████████████████.  I understand that the three of them have been advised to take no further action against me in the future.  However, I do not believe their previous discussion with Ms. Telligman excuses their past behavior toward me.

Thank you,

████████████████

Wake Forest '23 | Finance & Statistics

████████████████████████

-----------------------------------------------------------------

On Tue, Nov 15, 2022 at 11:20 AM Casseus, Aishah <casseua@wfu.edu> wrote:

Dear ██████,

I am writing in response to your November 9 email which mentions that you intend to file complaints against ████████████████████████████. As I stated in my response to your November 1 email, you may send complaints to me should you decide to initiate that process. You are also always free to contact Dean Settle directly.

As Investigator Telligman discussed in her recent meeting with you, she met with ██████ ██████████ and ██████████████ regarding the interaction in Las Vegas as she said she would. I do not expect ████████████████████ to initiate any contact with you. Should that happen please let me know.

Sincerely,

Aishah Casseus

------------------------------------------------------------------

On Wed, Nov 9, 2022 at 10:16 AM ████████████████████████████████ wrote:

Good Afternoon Ms. Casseus,

In response to your 11/1/22 email, I am confirming that I intend to file official complaints against ███████████████████████████████ and ████████other friends as soon as I am able to identify them, for bullying, harassment and intimidation related to the false allegations made against me by ███████████████.

I understand that you have said that I am not able to allege a complaint against ████████ ████████ for slander.  However, the fact that she has called me a "rapist" and a "sexual assaulter" in conversations and texts sent to ████████ prove a clear intent to harm me by intimidating ████████ and other members of my fraternity if they fail to punish and/or kick me out of the fraternity.  Even though my fraternity did not take action against me because of the pending TITLE IX case, my fraternity brothers can't help but question whether the allegations might be true.

In regard to ██████████████████████████, the two of them purposefully "bodychecked" me on a senior trip to Las Vegas in October.████████ other friends, who I am endeavoring to identify, purposefully poured beer on my back at a party in the fall.  Additionally, there have been numerous other incidents that have involved these three women, all of which I have discussed on the record with Jessica Telligman.  If you would like more details, I am happy to come in and provide additional information.  I am also able to provide the names of witnesses who were aware of the actions of these girls.  All of these episodes demonstrate an intent to intimidate, harass and bully me as a result of ████████allegations against me

I appreciate your attention to my complaint.

Thank you,

████████████████

Wake Forest '23 | Finance & Statistics
████████████████████████████████

---------------------------------------------------------------------------

From: **Casseus, Aishah** <casseua@wfu.edu>
Date: Tue, Nov 1, 2022 at 3:11 PM
Subject: Re: Formal Claim Regarding Harassment
To:████████████████████
Cc: Telligman, Jessica <telligjr@wfu.edu>, Olivia Bray <brayoy@wfu.edu>, ████████
████████████████████ <jfitznc@triad.rr.com>

Hello ████

Investigator Telligman forwarded your email to me regarding undergraduate students ████ ████████████████████████████████████████. We take retaliation very seriously in the Title IX Office and will follow our policy with regard to any alleged violations. To file a complaint with my office for retaliation, you would submit that in writing to me. You would not use the online formal complaint form. An email is fine. Pursuant to our Title IX Policy (Section 1.02), I would assign the complaint to the Dean of Students Office if it does not allege sex or gender discrimination/harassment.

With regard to ████████████, you reference slander which is not a Title IX policy violation. Slander typically references a civil court action, which is open to you and separate from the University.

You may also proceed directly to the Dean of Students if you would like to seek redress against another student for allegations which fall under the Student Code of Conduct (general harassment, bullying, harm to others, etc.). Jim Settle, Associate Dean of Students, is who you should contact if you would like to proceed with a Code of Conduct allegation. You can email him at settlej@wfu.edu.

I understand that Investigation Telligman spoke with you last week regarding ████████████ ████████████ and Investigator Telligman plans to meet with both students to ask them to avoid you going forward. I would like to hear from you before Investigator Telligman meets with them if you plan to file a complaint against those students. Please advise as soon as possible.

Sincerely,

Aishah Casseus

---

---------- Forwarded message ---------
From: ████████████████████████████████
Date: Tue, Nov 1, 2022 at 11:37 AM
Subject: Formal Claim Regarding Harassment
To: Jessica Telligman <telligjr@wfu.edu>
Cc: ████████████████████████████ John Fitzgerald <jfitznc@triad.rr.com>

Good Morning Jessica,

I am writing this email to let you know that I intend to file a formal complaint for slander and intimidation against ████████████ for calling me a 'rapist' in a text to ████ ████. Even though ████ did not have any evidence that I had done anything to ████ she purposefully slandered my good name in an attempt to get me get kicked out of my fraternity. I also believe that ████ allegation was an attempt to intimidate ████████ to convince the fraternity to kick me out. I want to know if the complaint I will be filing against ████████ is considered ancillary to the existing case or would it be considered a separate complaint entirely? Please advise me if I should use the

23

existing TITLE IX form on-line to file my complaint?  In the alternative, please let me know if someone from the TITLE IX office is in charge of filing the complaint against ██████████████ on my behalf?

I also intend to file formal complaints against ████████████████████ and ██████████ other unnamed friends for (1) pouring beer on me at an off-campus party and (2) for purposefully "bodychecking" me in Las Vegas as well as the other instances I've discussed with you. I believe that the actions of all of these WF students were done in order to intimidate and harass me.  I cannot be sure if ██████████ friends wanted to intimidate me into not defending myself against ██████ alleged claims or were the women just harassing me for their own enjoyment?  In either case, I believe the TITLE IX rules specifically protect a student in my position from intimidation and harassment from other students arising out of a complaint filed with the TITLE IX office.  That being the case, please advise me whether the complaints I intend to file against these women would be considered ancillary to the existing case or would they be considered separate complaints?  As with my complaint against ██████████ above, I need to know whether I should use the online WF complaint form to file my claims or is someone from the TITLE IX office responsible for filling the complaints on my behalf in the existing case?

Thank you,

██████

---------- Forwarded message ---------
From: Telligman, Jessica <telligjr@wfu.edu>
Date: Wed, Oct 19, 2022 at 1:19 PM
Subject: Fwd: Ongoing Intimidation from ██████████ and her friends
To: Olivia Bray <brayoy@wfu.edu>, Aishah Casseus <casseua@wfu.edu>

fyi

------------------------------------------

From: ████████████████████████████
Date: Wed, Oct 19, 2022 at 1:15 PM
Subject: Ongoing Intimidation from N. Drobnjak and her friends
To: Jessica Telligman <telligjr@wfu.edu>
Cc: John Fitzgerald <jfitznc@triad.rr.com>, ████████████████████
████████████████████████████████████████████████

Hi Jessica,

I am following up on the previous conversation that I had with you about the abuse and intimidation that I have experienced from ██████████ friends in social situations. I wanted to let you know that ██████████ friends have purposefully targeted me again.

Over the mid-semester break, members of Wake Forest fraternities and sororities went to Las Vegas on a senior trip. I attended the event with members of my fraternity. I did not see ███████ at any time over the weekend. One evening while in Las Vegas I stood in line in a crowd for a considerable length of time to purchase a beer that cost (with tip) close to $20. After standing in line to purchase the beer, I went to the men's room and came out intending to return to my group of friends. As I walked away from the restrooms, I saw ████████ friends, ████████and ██████ walking toward me. As soon as I walked on the side of the path that I was on so that the two of them could continue walking past me. Despite my attempt to avoid the two of them, ██████ - who is not a small woman - purposefully "body-checked" me so that I ended up dropping the cup of beer I was carrying. ████████ then bent down, picked up my empty cup and handed it to me. Afterward the two of them hurried away to the restrooms.

I want you to know that I have done my best to prepare for the upcoming hearing without talking about the alleged incident with any of my friends. I have not asked anyone to be mean to ████████ or to target her or her friends for what I believe are false claims against me. Given my attempts to keep to myself, I do not believe it is fair for ████████ friends to continue to harass me. This entire process has been stressful enough without having to constantly keep an eye out for ████████ and her friend group and worry about what any of them might do next to continue to make my life as miserable as possible.

I hope that you will be able to assist me in this matter.

Thank you,

████████████

**Exhibit 2**
**Maxient Case Notes**

# Re: Appeal

External

## Casseus, Aishah                                                    4:40 PM⁴

Respondent stated that last week over Fall Break the seniors went to Las Vegas; at one point on the trip ██████ ran into Respondent and knocked his beer on the floor; ██████ picked up the empty cup; Respondent ignored them but feels like they bullied him; JHT offered to speak with ████████████ and give them clear instructions not to bully him and Respondent stated that he would like to think about next steps and will get back to JHT on that ASAP.

Respondent requested JHT meet with Claimant's friends, ████████████ and ████████████████, who purposely bumped into him in Las Vegas a few weeks ago. JHT advised that she will reach out to them.

## JHT meeting with ██████████████

TIX: MEETINGS

Jessica Telligman - Thursday November 3, 2022 at 2:14pm

██████ stated that she saw ████ in Las Vegas and ████ accidentally bumped into him as she was going to the bathroom. ████████ picked the beer up. ██████ will avoid him at all costs going forward which is what she says she was already doing.

## JHT meeting with ████████████████

TIX: MEETINGS

Jessica Telligman - Thursday November 3, 2022 at 1:53pm

██████ stated that she saw ████ l and Las Vegas and accidentally bumped into him as she was rushing to the bathroom. She will avoid him at all costs going forward which is what she says she was already doing.

26