IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JOHN DOE, | |
| Plaintiff, | Case No. 1:23-cv-00114-CCE-JLW |
| v. | |
| WAKE FOREST UNIVERSITY, | |
| Defendant. | |

## DECLARATION OF DIXIE T. WELLS

I, Dixie T. Wells, hereby declare as follows:

1. I am a partner at the law firm of Ellis & Winters LLP in Greensboro, North Carolina. I have worked at Ellis & Winters LLP for the past fourteen years. I am a member of the firm's management committee. Prior to joining Ellis & Winters, I practiced law at Smith Moore LLP and before that at Smith Helms Mullis & Moore LLP in Greensboro, North Carolina.

2. I served as the hearing officer in the Title IX matter concerning John Doe that is the subject of the above-captioned lawsuit.

3. Under the Wake Forest University Sex and Gender Discrimination and Harassment Policy and Title IX Sexual Harassment and Non-Title IX Sexual Misconduct Grievance Procedures (the "Policy"), my responsibilities as the hearing officer included reviewing the Title IX Office Investigation Report ("Investigation Report") prepared by investigator Jessica Telligman [ECF No. 6-6] and all other evidence related to the allegations collected by the investigator and conducting a hearing where evidence and testimony were presented.

**Richards Decl. Ex. Q**

4. Under the Policy, after the hearing and a thorough review of all the evidence, the hearing officer determines whether the evidence establishes that it is more likely than not that the Respondent violated the Policy.

5. Prior to the hearing in this matter, I served as the hearing officer for one other sexual misconduct matter at Wake Forest. In the other matter, I found the male respondent not responsible for the allegations of sexual assault made by the female complainant. I decide each matter on its merits and not based on the sex or status of the parties.

6. The hearing in this matter was held on November 29, 2022, beginning at 9:00 a.m. on the campus of Wake Forest University. The Claimant, Jane Roe appeared virtually via Zoom. The Respondent, John Doe, appeared in person to make his opening statement and when testifying and spent the remaining parts of the hearing in a separate room where he appeared virtually via Zoom. Some witnesses appeared in person while others appeared via Zoom.

7. Before the hearing I reviewed all materials provided to me by the Wake Forest Title IX Coordinator Aishah Casseus. These included the Investigation Report, materials collected by the investigator, and the pre-hearing statement submitted by Jane Roe and the response to that pre-hearing statement submitted by John Doe.

8. Before the hearing occurred, I did not know what outcome I would reach. Even after all testimony and evidence concluded in the hearing, I was still uncertain what my final decision would be, and it was not until I re-reviewed all of the evidence and began preparing the Final Outcome Letter that I made my decision on the outcome.

9. I listened to all of the testimony at the hearing, questioned each witness including Jane Roe and John Doe, and conducted a thorough and objective review of the hearing transcript, Investigation Report, and all exhibits. I carefully evaluated and weighed the evidence before

2

reaching any conclusions. I memorialized my findings and conclusions in the Final Outcome Letter, dated December 20, 2022. Albeit redacted, a true and correct copy of the Final Outcome Letter was attached to Plaintiff's motion for a temporary restraining order and preliminary injunction. [ECF No. 6-7.]

10. I reached my conclusions based on my neutral review of the testimony, record, and exhibits before I had formed any decision about the outcome of the hearing, and not based on any particular desired outcome, on any bias for or against men or women, or any bias for or against complainants or respondents. I did not receive any pressure from Wake Forest University or any third party that impacted my findings in the Final Outcome Letter. My decision was mine alone.

11. I reviewed the Complaint [ECF No. 1] in this civil action and specifically the allegations made by Plaintiff related to alleged bias and deficient procedures at the hearing.

12. Plaintiff alleges that "John's advisor was not able to cross-examine Jane until the very end of the hearing, before Wells concluded the proceeding at 10:28 p.m." [ECF No. 1 ¶¶ 229, 327-330.]

13. The order of witnesses is determined in advance by the Wake Forest Title IX Office, with notice to the parties. The schedule is determined, in part, based on witness availability. Based on my experience, it is typical in Title IX hearings at Wake Forest to put the Respondent and the Claimant at the end of the hearing, with the Claimant testifying last. During the pre-hearing conference held on November 21, 2022, and attended by John Doe's advisor, Jane Roe's advisor, and representatives from Wake Forest's Title IX office, I provided notice of the anticipated order of witnesses. I also provided notice of the anticipated order of witnesses in my introductory remarks at the beginning of the hearing. Neither Doe nor his advisor raised any objection to me about the order of witnesses at any point before, during, or after the hearing. I was not aware that

3

Doe had any objection about the order of witnesses until I read the Complaint filed in the above-captioned action.

14. Plaintiff alleges that "despite there being no time limits imposed on the questioning of any other witnesses, Wells did limit the time for John's advisor to cross-examine Jane, because it was getting into the late evening hours and all participants were undoubtedly exhausted, hungry, and less able to focus." [ECF No. 1 ¶ 229, 328-330.] Plaintiff further alleges that at 10:16 p.m., I told John Doe's attorney he had 15 minutes to conclude his questioning. [Id.]

15. As noted in the Final Outcome Letter, Jane Doe was questioned for forty minutes longer than John Doe – Doe was questioned for a total of 107 minutes, while Roe was questioned for 147 minutes. [ECF No. 6-7 at 10 n.3.] John Doe was cross-examined by Jane Roe's advisor for exactly one hour. Jane Roe was cross-examined by John Doe's advisor for more than two hours. Excluding breaks, Jane Roe was questioned by John Doe's advisor for 96 minutes. [ECF No. 6-7 at 10 n.3.] Other than as described herein, I did not put any specific time limits on any witness. In fact, I told both parties that we would go as long as we needed to go provided the questions were relevant. See Hr.'g Tr. at 288.

16. Shortly before 10:00 p.m., the questions of John Doe's advisor were becoming repetitive and/or lacking relevance to the issues in the hearing. I cautioned Doe's advisor that a lot of questions were being repeated and asked Doe's advisor to look at his notes and determine what questions he really needed answered. About twenty minutes later, I told Doe's advisor he had 15 minutes to conclude. Doe's advisor did not elect to use all of that time; he used about 6 minutes of the remaining 15 minutes. See Hr'g Tr. Vol. 3 at 295-97. Doe's advisor concluded his examination without any further comments from me about the time remaining and said he had no further questions. Id. at 376 ("I am finished with questioning. I have no further questions.").

4

17. Despite having set a stopping time, if Doe's advisor had identified further relevant questions to me after the fifteen minutes elapsed, I would have allowed him to proceed. Doe identified no relevant questions that he wished to ask Roe that he was not granted sufficient time to ask.

18. Plaintiff alleges that I allowed witnesses, including Jane Roe and the Title IX Investigator (Jessica Telligman), to answer questions by stating that the information was found in their recorded statements or, in the case of the Investigator, in her Investigation Report. [ECF No. 1 ¶¶ 229, 336.] In the case of Jane Roe, when she was about to read part of her recorded statement, I said, "if you're just reading what's in the interview, you don't need to do that. John [Fitzgerald who was John Doe's advisor], if you have follow up questions about what's in the interview, or if you don't know the portion of the transcript she's referencing. You can certainly ask her to point you to it." See Hr'g Tr. at 259.

19. In the case of Ms. Telligman, she answered the questions that were asked. If she referred to specific portions of her report, I interpreted that as Ms. Telligman stating that nothing had changed, and she was reaffirming the information in the Investigation Report. I would not have prevented follow-up questions regarding what was contained in the Investigation Report.

20. Plaintiff's remaining allegations relate to the cross-examination of Jane Roe. He alleges that the cross-examination was interrupted by me and Jane Roe's advisor, and that I did not allow certain questions to be asked. [ECF No. 1 ¶ 229.]

21. Section 3A.08 of the Policy specifically requires that "before a party or witness answers a cross-examination question, the hearing officer will determine whether the question is Relevant and allowed under this Policy. The hearing officer will explain any decision to exclude a question." I understood this Policy to require that I determine whether a question was allowed

5

before the question was asked and to require me to exclude any questions that would not be allowed under the Policy.

22. Section 3A.07 of the Policy gives a Hearing Officer discretion in evidentiary matters: "The hearing officer may also exclude evidence if the hearing officer determines that the proffered evidence's probative value is outweighed by needlessly presenting cumulative evidence or that a question is posed solely to harass a witness or the other party." [ECF No. 6-2.]

23. I followed the Policy in making evidentiary rulings. Any decisions I made were not based on any bias or presumption of responsibility for or against any party but were related to the probative value of the questions being asked as they related to my decision-making process. As required under the Policy, if I refused to allow a question, I explained my basis for refusing to allow the question at the time the question was posed.

24. I gave John Doe's advisor wide latitude to cross-examine Jane Roe, who testified for more than two hours. [ECF No. 6-7 at 10 n.3.] To the extent specific questions were disallowed, it was because I found them to be repetitive and/or irrelevant to the issues in the case and/or otherwise not allowed under the Policy.

25. After each witness, it is my custom to ask both parties if they have any evidentiary objections or other issues that should be addressed regarding the questioning of the witness before that witness is dismissed. After John Doe's advisor finished cross-examining Jane Roe, I asked if either party had any objections. See Hr'g Tr. Vol. 3 at 297. Doe's advisor objected to my limiting his questions. Id. I asked if he would like to address specific rulings and said, "this is our opportunity to cure. You have not used your entire time, so, [I am] finding it hard to believe your additional questions that you feel are critical, since you didn't use the time I gave you." Id. The only specific objection Doe's advisor raised was that he was not allowed to ask Jane Roe about

6

her athletic conditioning and strength. Id. at 298. For the reasons set forth in the Final Outcome Letter, I did not find Jane Roe's physical strength to be relevant to my decision. [ECF No. 6-7 at 20 n.18.]

26. Based on my review of the testimony and exhibits, I determined by a preponderance of the evidence that John Doe engaged in Sexual Harassment by Sexual Assault (Rape) and Sexual Harassment by Sexual Assault with an Object in violation of the Policy. [ECF No. 6-7 at 22.] My full analysis and rationale is set forth in the Final Outcome Letter. [ECF No. 6-7.]

27. Before my review of the Complaint in this matter, I was not aware of any recent or pending investigations against Wake Forest by the Office of Civil Rights of the Department of Education, the campus climate survey completed by Wake Forest University students, or any protests or other campus pressure to reach one conclusion or the other.

28. As an external hearing officer, I exercise independent judgment in deciding these matters and am not subject to any influence in my decision-making from Wake Forest.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 16th day of February, 2023.

*Dixie T. Wells*
Dixie T. Wells