# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
# CIVIL ACTION NO. 1:23-CV-00114

| | |
|---|---|
| **JOHN DOE,**<br><br>**Plaintiff,**<br><br>v.<br><br>**WAKE FOREST UNIVERSITY,**<br><br>**Defendant.** | **MEMORANDUM OPINION** |

**THIS MATTER** is again before the Court on the Plaintiff John Doe's Motion For Temporary Restraining Order and Preliminary Injunction (the "Motion"), which the Defendant Wake Forest University ("University" or "Wake Forest") opposes. (Doc. Nos. 5, 20). On February 17, 2023, the Court entered a brief Order denying the Motion. Doc. No. 25. As forecasted in that Order, the Court now enters a Memorandum Opinion more fully explaining its denial of the Motion. No change in the Court's ruling is intended by this memorandum.

## I.  LEGAL STANDARD

Temporary Restraining Orders ("TRO") and Preliminary Injunctions are governed by Rule 65 of the Federal Rules of Civil Procedure, which provides that a TRO may be issued only if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). A Preliminary Injunction may issue only on notice to the adverse party. Fed. R. Civ. P. 65(a)(1). Here, the University has received notice, filed a written

1

response and appeared and argued at the hearing on the Motion. Thus, the Motion before the Court will be considered as a motion for a Preliminary Injunction.[1]

Very recently, the Fourth Circuit described the standard for a preliminary injunction as follows:

> We review the district court's injunction for abuse of discretion, *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013), examining all factual findings for clear error and legal conclusions de novo, *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021). Though an "extraordinary remedy," a preliminary injunction is warranted where the plaintiff has established "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008).

*Dmarcian Inc. v. Dmarcian Europe BV*, case numbers 21-1721, 21-2005 and 22-1728 (4th Cir. February 14, 2023).

Thus, while a plaintiff's entitlement to preliminary injunctive relief is a matter of discretion with the Court, *see Metro. Regul. Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 595 (4th Cir. 2013), a plaintiff seeking a temporary restraining order or a preliminary injunction must demonstrate that:

(1) he is likely to succeed on the merits,

(2) he is likely to suffer irreparable harm absent injunctive relief,

(3) the balance of the equities tips in his favor, and

(4) the injunction would be in the public interest.

---

[1] To the extent that Plaintiff's TRO motion is still before the Court, the standard for granting either a temporary restraining order or a preliminary injunction is the same. *See e.g.*, *U.S. Dep't of Lab. v. Wolf Run Mining Co.*, 452 F.3d 275, 281 n. 1 (4th Cir. 2006); *McNeill v. Bond*, No. 1:18CV786, 2022 WL 17526565, at *2 (M.D.N.C. Dec. 8, 2022), *report and recommendation adopted*, No. 1:18CV786, 2023 WL 112542 (M.D.N.C. Jan. 5, 2023).

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L.Ed.2d 249 (2008); *see Hebb v. City of Asheville, N. Carolina*, No. 1:22-CV-00222-MR-WCM, 2023 WL 1825081, at *1–2 (W.D.N.C. Feb. 8, 2023). All four requirements must be "clearly" satisfied. *Winter*, at 24, 129 S. Ct. at 376. In sum, it is an exacting test because, according to the Supreme Court, "a preliminary injunction is an extraordinary remedy never awarded as of right." *Id*.

If a Preliminary Injunction is found to be warranted, then crafting a Preliminary Injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, ––– U.S. ––––, 137 S. Ct. 2080, 2087, 198 L.Ed.2d 643 (2017) (citing *Winter*, 555 U.S. at 20, 24); *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020), *as amended* (Jan. 14, 2020). And "[i]t is well established ... that a federal district court has wide discretion to fashion appropriate injunctive relief in a particular case." *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992). Indeed, a court should "mold its decree to meet the exigencies of the particular case." *Int'l Refugee Assistance Project*, 137 S. Ct. at 2087 (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2947 (3d ed. 2013)). In doing so, a court must ensure a preliminary injunction is "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr, Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)), and be mindful that "[t]he purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Int'l Refugee Assistance Project*, 137 S. Ct. at 2087 (internal citation omitted).

## II. FACTS AND PROCEDURAL HISTORY

Plaintiff John Doe, a senior student at Wake Forest, was suspended for one year from the University on January 24, 2023, after he was found to be responsible for an alleged sexual assault on a female Wake Forest student ("Jane Roe") in October 2021. The differing versions of the history of John and Jane's dating relationship, prior sexual relations, the night and following morning of the alleged assault, Jane's medical report and other communications after the incident, etc., are described comprehensively in the parties' submissions to the Court (Doc. Nos. 6, 20, and the appointed Hearing Officer's Final Outcome Letter, Doc. No. 6-7) and will not be repeated here.

In brief summary, John and Jane were involved in a dating relationship during their Sophomore year that included numerous instances of sexual activity, although not including intercourse. The relationship continued, albeit on a more limited basis, when they returned for their Junior Fall semester. On the night in question, John accepted Jane's invitation to be her date at a sorority social event. After the party, the two returned to Jane's dorm room to spend the night (as they had done before) and engaged in sexual relations. Jane contends that she was assaulted when John engaged in intercourse either while she was incapacitated by alcohol or after she withdrew her consent to intercourse once it began. She also contends that she was assaulted the next morning when John engaged in further sexual activity while she was incapacitated due to sleep. John denies committing any assault, denies that the two engaged in intercourse and generally describes their sexual relations that night and morning as consistent with their consensual relationship that preceded that evening. He also alleges that Jane's complaint was motivated by his decision to begin dating another Wake Forest student shortly after the events in dispute.

On April 12, 2022, approximately six months after the alleged assault, Jane filed a Formal Complaint against John pursuant to the Wake Forest University Sex and Gender Discrimination

4

and Harassment Policy and Title IX Sexual Harassment and Non-Title IX Sexual Misconduct Grievance Procedures (the "Policy"). John received a written Notice of Allegations under the Policy the next day. Jane and John then agreed to participate in Adaptive Resolution, a process in which the students attempt to reach a resolution prior to a formal investigation. After Adaptive Resolution was unsuccessful, an investigation proceeded at Jane's request consistent with the Policy.[2] A "Title IX Investigator," who is a University employee, interviewed John and Jane four times each. In Jane's first interview with the investigator she alleged for the first time that the claimed assault included intercourse. Based on this information, the University's Title IX department provided John with a supplemental Notice expanding Jane's allegations before his first interview with the investigator. In addition to John and Jane, the investigator interviewed six other witnesses and collected documents and exhibits submitted by the parties.

On November 5, 2022, the Investigator issued a twenty page written report to both John and Jane. A hearing was then held on November 29, 2022, before attorney Dixie T. Wells, a partner in the Ellis & Winters, LLP law firm, who served as the appointed external "Hearing Officer." The hearing lasted over ten hours, and included in-person or Zoom testimony from John, Jane and several other witnesses. At the hearing and during the investigation, John was represented by legal counsel, who was given an opportunity to present witnesses and cross-examine Jane and the other witnesses. On December 20, 2022, Ms. Wells issued her decision in the form of a twenty-five page single spaced "Final Outcome Letter," finding that the evidence established that it was more likely than not that John Doe committed sexual misconduct in violation of University policy. Under the Policy, a University Administrator then determined the punishment for the violation, which was

---

[2] According to Plaintiff's Complaint, he was notified on August 19, 2022, that the Adaptive Resolution process had ended. (Doc. No. 1 ¶¶ 181-182) According to the Final Outcome Letter the Investigator began the investigation on August 25, 2022. (Doc. No. 6-7 at 2)

set as a one year suspension. On January 3, 2023, John filed an Appeal of the Final Outcome Letter and suspension. On January 23, 2023, Appeal Officer Howard Kallem, another external attorney, issued a detailed Appellate Decision, which affirmed the Final Outcome Letter. The University then finalized Plaintiff's suspension on January 24, 2023, and he has not attended classes since the suspension was imposed (although he was permitted to do so remotely during his appeal).

On February 7, 2023, Plaintiff filed his Complaint in this action alleging two causes of action – violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681, *et seq.*, ("Title IX") and breach of contract. The same day, Plaintiff filed the pending Motion seeking a TRO and preliminary injunction enjoining Wake Forest from further enforcing its decision to suspend him from the University for one year, including allowing him to immediately return to his classes and obtain his degree upon successful completion of his degree requirements. After the Judge initially assigned to the case recused herself, the matter was reassigned on February 14, 2023, to the undersigned Judge of the Western District of North Carolina to sit by designation in the Middle District of North Carolina. On the same day, the Court held a status conference, set an expedited briefing schedule for the University's response and scheduled a hearing on the Motion. On February 17, 2023, the Court held a hearing at which counsel for both parties presented extensive oral arguments and were given the opportunity to present witnesses (but declined to do so). As noted above, later on February 17, 2023, the Court issued an Order denying the Motion on the grounds that Plaintiff had failed to establish a likelihood of success on the merits and indicating that a more fulsome memorandum would be issued explaining the decision. *See* Doc. No. 25.

### III. DISCUSSION

The Motion before the Court arises in the context of allegations of sexual assault on a college campus, an often fraught issue which appropriately inspires passionate advocacy and

6

concern for both female student victims of sexual violence and male students who may be falsely accused of improper conduct. Even if that difficult broader topic could somehow be addressed in the context of a single specific set of "she said – he said" allegations, which it cannot, the Court's role in deciding the current Motion is much narrower. The question before the Court is simply whether Plaintiff has surmounted the high threshold for granting the "extraordinary relief" of an injunction ordering the University to displace its disciplinary process prior to a trial on Plaintiff's claims. As discussed below with respect to each of the relevant factors, the Court finds that he has not and therefore must deny the Motion.

        A.    <u>Likelihood of Success on the Merits</u>

A Plaintiff seeking a preliminary injunction "need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (internal quotation marks omitted). "While it is [the] Plaintiff['s] burden, as the movant[ ], to make a showing sufficient to justify a preliminary injunction, 'the burdens at the preliminary injunction stage track the burdens at trial.'" *Harmon v. City of Norman*, 981 F.3d 1141, 1147 (10th Cir. 2020) (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006)). "When considering a motion for preliminary injunction, a district court may assess the relative strength and persuasiveness of the evidence presented by the parties, and is not required to resolve factual disputes in favor of the non-moving party." *Queen Virgin Remy, Co. v. Thomason*, No. 1:15-cv-1638-SCJ, 2015 WL 11422300, at *2 (N.D. Ga. June 10, 2015) (citing *Imaging Bus. Machs., LLC v. BancTec, Inc.*, 459 F.3d 1186, 1192 (11th Cir. 2006)). If the evidence is contested, however, the court must "assess the facts, draw whatever reasonable inferences it might favor, and decide the likely ramifications." *Weaver v. Henderson*, 984 F.2d 11, 14 (1st Cir. 1993) (quoting *Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg.*

*Co.*, 864 F.2d 927, 933 (1st Cir. 1988)). At a preliminary injunction stage, allegations set forth in a verified complaint are treated the same as affidavits. *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 542 (7th Cir. 1998) (noting that "[v]erified complaints [are] the equivalent of affidavits"); *Synthes USA, LLC v. Davis*, No. 4:17-cv-02879-RBH, 2017 WL 5972705, at *1 n.2 (D.S.C. Dec. 1, 2017) (explaining that "a verified complaint is wholly sufficient for purposes of ruling on a preliminary injunction motion.") (citation omitted).

At the outset, it is important to understand the scope of the Court's inquiry. "[F]ederal courts are courts of limited jurisdiction and thus do not have authority to resolve a dispute unless that authority has specifically been given to them." *Peabody Holding Co., LLC v. United Mine Workers of Am., Intern. Union, Unincorporated Ass'n*, 815 F.3d 154, 159 (4th Cir. 2016) (citing *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 432 (4th Cir. 2014)); *Haynes v. S. Carolina Waste LLC*, No. 5:21-CV-1544-SAL, 2022 WL 6694904, at *4 (D.S.C. Sept. 30, 2022). As with claims of wrongful decisions in the workplace, Federal courts do not sit to finally adjudge all disputes that may arise as a result of a school's decision to discipline a student. *See DeJarnette v. Corning Inc.*, 133 F.3d 293, 298–99 (4th Cir. 1998) ("Title VII is not a vehicle for substituting the judgment of a court for that of the employer."); *Wofford v. Evans*, 390 F.3d 318, 324 (4th Cir. 2004) ("In the final analysis, the balance of rights and interests to be struck in the disciplinary process is a task best left to local school systems …."). Accordingly, this Court does not sit as a super-school disciplinary appeal board[3] in the same way that it "does not sit as a kind

---

[3] The reasons for the Federal courts' limited role in school discipline are both practical and a matter of public policy. Title IX applies to all schools at all levels that receive federal funds, including private universities such as Wake Forest. It would be impossible for Federal courts to review and consider every instance of allegedly mistaken school discipline. Further, as noted above, there is a clear public policy to entrust local school systems, colleges, and universities with the decisions on how best to discipline their students, subject to specifically applicable constitutional and statutory standards.

8

of super-personnel department weighing the prudence of employment decisions …" *DeJarnette*, 133 F.3d at 298–99. So, the Court's task here is not to decide if Wake Forest's disciplinary decision in favor of Jane rather than John was "correct," but rather much more specifically to decide if the University violated any Federal law in its discipline of the Plaintiff.

Plaintiff seeks injunctive relief based on his claim under Title IX, a federal statute within the Court's jurisdiction. *See* Doc. No. 6 at 3. Title IX states:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal Financial assistance.

20 U.S.C. § 1681(a). Title IX is enforceable through an implied private right of action. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 686, (4th Cir. 2018) ("The Supreme Court has concluded that a victim of sex discrimination is entitled to pursue a private cause of action against a federally-funded educational institution for a violation of Title IX[ ]") (citing *Cannon v. Univ. of Chi.*, 441 U.S. 677, 709 (1979)). Monetary damages are available to plaintiffs who bring lawsuits via the implied private action. *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992). The defendant in a Title IX lawsuit is the institution and not the individual alleged to have acted in violation of the statute. *See John Doe v. Virginia Polytechnic Inst. & State Univ.*, et al., No. 7:21-CV-00378, 2023 WL 2188737, at *11 (W.D. Va. Feb. 23, 2023). It is undisputed that Wake Forest receives federal funding, and that Plaintiff was "excluded from participation in [or] denied the benefits of ... [an] education program" when Wake Forest suspended him. 20 U.S.C. § 1681(a). The success of Plaintiff's claim therefore depends on whether Wake Forest discriminated against him "on the basis of sex."

The circuits are spilt as to how to determine the validity of a Title IX claim. Some circuits have adopted an "all-inclusive doctrinal" test to determine the validity of a claim. *See Yusuf v.*

*Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994) ("[p]laintiffs attacking a university disciplinary proceeding on grounds of gender bias can be expected to fall generally within two categories," erroneous outcome and selective enforcement. *Yusuf* then announced the requirements for establishing either claim); *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 73-74 (1st Cir. 2019) (holding that to succeed on a selective enforcement theory, plaintiff must show that "the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." (quoting *Yusuf*, 35 F.3d at 715)); *Klocke v. Univ. of Tex. at Arlington*, 938 F.3d 204, 210 (5th Cir. 2019) (recognizing *Yusuf*'s two-theory framework).

Other circuits, led by the Seventh Circuit, have rejected an all-inclusive doctrinal framework and articulated an approach that more closely follows the text of Title IX, asking "do the alleged facts, if true, raise a plausible inference that the university discriminated against [the student] on the basis of sex?" *See Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019) (articulating the test as "do the alleged facts, if true, raise a plausible inference that the university discriminated against John "on the basis of sex"?); *Doe v. Univ. of Sciences*, 961 F.3d 203, 209 (3d Cir. 2020) ("[T]o state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex. Although parties are free to characterize their claims however they wish, this standard hews most closely to the text of Title IX."); *Doe v. Univ. of Ark.-Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020) ("To state a claim, therefore, [plaintiff] must allege adequately that the University disciplined him on the basis of sex—that is, because he is male."); *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020) ("We adopt [the Seventh Circuit's] far simpler standard for Title IX claims. . . .").

The Fourth Circuit has generally adopted the approach set out by the Seventh Circuit, stating that while the "erroneous outcome and selective enforcement theories identified in *Yusuf*…with sufficient facts, may suffice to state a plausible claim," the student's sex must be the "but-for" causation in a Title IX claim alleging discriminatory school disciplinary proceedings. *See Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 236-7 (4th Cir. 2021) (citing 20 U.S.C. § 1681(a)). Thus, under *Sheppard*, the pleading question in Title IX cases is straightforward: Do the alleged facts, if true, raise a plausible inference that the university discriminated against the student on the basis of sex? *See Sheppard,* 993 F.3d at 236. The *Sheppard* court noted that this standard, requiring adequate pleading of but-for causation, is more consistent with the text of Title IX. *Id*. Also, by adopting a "but-for" causation requirement, the Court made clear that the Seventh Circuit's suggestion that it may be sufficient for sex to have been "a motivating factor" of the disciplinary treatment is not the governing test. *Id*. at 236 n.7; *see also Doe v. Va. Polytechnic Inst. & State Univ*., Civil Action No. 7:19-cv-00249, 2022 U.S. Dist. LEXIS 144420, at *23 (W.D. Va. Aug. 11, 2022).

Here, Plaintiff states that he is pursuing an "erroneous outcome" theory, mirroring the Second Circuit's *Yusuf* test. Doc. No. 6 at 12. However, under *Sheppard* it is not enough for the disciplinary decision to have been erroneous. Plaintiff must go further and prove that his sex was the "but-for" cause of the suspension. In an effort to meet this "but-for" burden, Plaintiff urges the Court to find (relying again on Second Circuit authority) that the Hearing Officer's decision was "so wrong" that the Court should infer that it was the result of gender bias. *See Doe v. Columbia*, 831 F.3d 46, 57 (2d Cir. 2016) ("[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side…it is plausible to

11

infer…that the evaluator has been influenced by bias.").[4] More specifically, Plaintiff contends that, among other things, the following allegations raise a plausible inference that Wake Forest discriminated against him because of his sex:

> (i) [The University] supplemented Jane's Notice of Allegations in September 2022, adding a charge of non-consensual sexual intercourse four months after the initial notice was sent to John and ten months after the encounter at issue; (ii) [The Investigator] offered to Jane suggested responses to explain away the inconsistencies between her testimony provided during the investigation and her statements made in the medical records; (iii) [The Investigator] offered to Jane proposed meanings for statements made in text messages, to strengthen Jane's claims against John; (iv) Hearing Officer Wells limited the time for John's advisor to cross-examine Jane during the hearing because it was getting late into the evening; (v) Wells permitted Jane's advisor to interrupt John's advisor during his cross-examination of Jane; (vi) Wells permitted Jane's advisor to ask every question presented to the parties and witnesses while barring John's advisor from asking critical and relevant questions; (vii) Wells issued a decision that was against the weight of the evidence; (viii) Wells disregarded the numerous inconsistencies and contradictions in Jane's statements; (ix) accepted Jane's decision not to authorize the testimony of Director of Student Health Dr. Price while drawing an adverse inference as to Doe's inability to provide relevant text messages despite his affirmation that he did not have any; (x) Wells overlooked Jane's motivations for filing the complaint against John; and (xi) entirely ignored Jane's statement that supported John's account of them having attempted to engage in intercourse but not being able to do so given he could not maintain an erection.

*See* Doc. No. 6, p. 14-15. In addition, Plaintiff argues that alleged external pressures placed upon the University to find in favor of the female complainant and against the male respondent are evidence of gender bias. *Id.* at 15-17.

---

[4] Although some "inferential" evidence may of course be considered in proof of an alleged bias, the specific rule articulated by Plaintiff does not appear to be governing law in this Circuit. Indeed, it appears to risk conflating a finding of an "erroneous" decision with the required *additional* finding that "but-for" gender bias the male student would not have been disciplined. *See Sheppard,* 993 F.3d at 236. Also, Plaintiff's argument that an inference of gender bias can be made solely from an egregiously wrong decision may prove too much. While a decision might be "so wrong" that it can be inferred that some bias or reason other than simply mistaken judgment led to the result, it does not follow that any particular form of bias – here gender bias – occurred. Rather, any number of biases (such as bias for or against the student's economic status, athletic prowess, etc.) might have led to an unsupportable decision in a specific case.

12

While the Court would have no difficulty in denying a defense motion under the significantly lower Rule 12(b)(6) standard for merely "plausibly" stating a claim under Title IX, and Plaintiff raises serious questions about the correctness of Wake Forest's disciplinary conclusion, the allegations described above fall short of clear evidence that the Plaintiff is *likely* to prove at trial that the alleged errors made by the Hearing Officer and Appeals Officer were the result of gender bias, rather than simply mistakes in either process or the final result.

Indeed, in addition to challenging Plaintiff's allegations of unfairness in the process (some of which plainly appear to be exaggerated on the Court's review of the transcript),[5] the University presented affidavits from both the Hearing and Appeals Officers (whose credibility has not been otherwise impeached) in which they directly deny any gender bias or any knowledge of the specific alleged "outside pressures" on the University to find in favor of female students in disciplinary proceedings. Also, another affidavit filed by Wake Forest notes that the University has held three trials of alleged sexual assaults since the governing Policy was implemented and that in two of the trials the Hearing Officer found in favor of the male student accused of misconduct.[6] Although, as Plaintiff's counsel noted in oral argument, additional facts may come to light in discovery that make these statistics ultimately unpersuasive, based on the record as it now stands the fact that the majority of Wake Forest's disciplinary trials have resulted in determinations that the male student

---

[5] For example, Plaintiff claims that his attorney was not permitted to fully cross-examine Jane at the hearing. However, the transcript shows that the attorney was allowed to cross-examine her for two hours (after she testified for only an hour on direct examination) and, after being told that he was being given 15 more minutes for his cross-examination, did not use all his time and concluded by telling the Hearing Officer that he had "no further questions," without any qualification.

[6] Ms. Wells served as the Hearing Officer for two of these trials so she has found once for the female student and once for the male student. At the very least, this is some evidence that counsels against the Court immediately adopting the inference that Ms. Wells' was "likely" gender biased urged by the Plaintiff.

was "not responsible" for the alleged sexual assault argues against a finding that Plaintiff is likely to succeed on his Title IX claim.

In sum, based on the current record, the Court cannot find by clear evidence that the Plaintiff will likely succeed on the merits of his Title IX claim at trial; that is, establishing that a jury will likely find that Plaintiff has proven that gender bias was a "but-for" cause of Plaintiff's suspension. In the absence of such a finding, even if the Court were to find that Plaintiff has clearly established a right to an injunction on the other factors – which it does not as discussed below – Plaintiff is not entitled to a Preliminary Injunction under the strict *Winter* test, and his Motion must be denied.

### B. Irreparable Harm

Plaintiff must also make a clear showing that future irreparable harm is likely if an injunction is not entered. *Winter*, 555 U.S. at 21-22. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id*. at 22 (internal citation omitted). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date ... weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). A plaintiff must overcome the presumption that a preliminary injunction will not issue when the harm suffered can be remedied by money damages at the time of judgment. *Id*., citing *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994).

By his Motion, Plaintiff seeks immediate injunctive relief to avoid what he contends will be unjustified "irreversible damage to Plaintiff's reputation, education, and future career" in the event that he is successful in his Title IX claim against the University. Specifically, Plaintiff argues that without immediate injunctive relief, Plaintiff – a senior student in what would be his final semester – will be unable to complete his current semester's courses, obtain his degree or begin employment for which he has already accepted a full-time offer. Further, he argues he will "forever" have a "gap" in his educational record that he will be forced to explain (to his detriment) to future employers and/or graduate schools. *See* Doc. No. 6 at 17-20. *See, e.g.*, *Doe v. Middlebury Coll.*, No. 1:15-CV-192-JGM, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2015) (Finding irreparable harm because "[w]hile Plaintiff may recover money damages to compensate for lost wages, money damages cannot compensate for the loss of his senior year in college with his class, the delay in the completion of his degree, or the opportunity to begin his career … with this particular employment."); *Ritter v. Oklahoma, No. Civ.-16-043 8-HE,* 2016 U.S. Dist. LEXIS 60193 at *8, 2016 WL 2659620 (W.D. Okla. May 6, 2016) (plaintiff seeking a TRO demonstrated that the "loss of educational and career opportunities he will encounter if he is not reinstated and allowed to graduate is not readily compensable in money damages"); *King v. DePauw University*, No. 2:14-CV-70-WTL-DKL, 2014 WL 4197507, at *13 (S.D. Ind. Aug. 22, 2014) (holding plaintiff would suffer irreparable harm if "not permitted to complete this upcoming semester" because the gap created in his record would make it "inevitable that he would be asked to explain [the] situation by future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct …").

Wake Forest responds on the issue of irreparable harm with two arguments. First, it argues, based on affidavits from two of Plaintiff's professors, that Plaintiff already has missed too many

classes, group project work and/or tests to allow him to successfully pass all the courses he needs to graduate at the end of this semester. Thus, according to the University, an injunction should not issue because the harm that Plaintiff seeks to avoid – the inability to graduate "on time" - has effectively already occurred so that any future harm he will suffer cannot be avoided by his requested injunction. Put differently, Wake Forest argues that Plaintiff's harm is already "irreparable" to the extent that preliminary relief would be ineffective and is therefore moot. *See Di Biase*, 872 F.3d at 231; *Ry. Lab. Executives Ass'n v. Chesapeake W. Ry*., 915 F.2d 116, 118 (4th Cir. 1990) (explaining when a request for injunctive relief is moot); *Winston v. Federal Bureau of Prisons*, No. 5:10-HC-2192-FL, 2011 WL 3664416, at *2 (E.D.N.C. Aug. 18, 2011) (motion seeking an injunction denied "because petitioner seeks to enjoin an act that already has occurred."). In reply, Plaintiff has filed a counter affidavit stating his belief that if he is provided reasonable accommodations toward a fair opportunity to finish his courses then he will be able to pass all of them and graduate. Doc. No. 26.

While the Court admits some skepticism that if Plaintiff had missed the same amount of coursework because of an illness or family circumstance wholly out of his control, the school might find a way to accommodate the Plaintiff so he could graduate this Spring, the limited record on which the Court must rule cannot support a finding that it is likely that Plaintiff will reasonably be able to complete and pass the necessary courses for his graduation. In the face of sworn affidavits to the contrary from University professors (who will be doing the grading), the Court cannot simply rely on Plaintiff's faith that with focused effort and (unspecified) accommodations he will be able to succeed. Simply put, it is, at best, uncertain whether Plaintiff will be able to graduate so that the Court cannot find the likelihood of "irreparable harm in the absence of preliminary relief" that is required to issue the requested injunction.

Wake Forest's second argument against a finding of irreparable harm is that the delay in the completion of Plaintiff's degree and potential loss of employment is economic harm that can be compensated by a monetary award so it is not "irreparable." *See, e.g., Madej v. Yale Univ.*, No. 3:20-CV-133 (JCH), 2020 WL 1614230, at *6 (D. Conn. Mar. 31, 2020) (delay in obtaining degree is not irreparable harm and can be compensated by monetary damages); *Doe v. George Washington Univ.*, 305 F. Supp. 3d 126, 135 (D.D.C. 2018) (delay in education due to disciplinary matter does not constitute irreparable harm); *Doe v. Vassar Coll.*, No. 19-CV-9601 (NSR), 2019 WL 6222918, at *6 (S.D.N.Y. Nov. 21, 2019) (no irreparable harm where plaintiff would lose "his ability to graduate with his class").

As evident from the numerous citations above and acknowledged by counsel at oral argument, there is substantial authority to support each side's position on whether a disruption in Plaintiff's education causing a delay in Plaintiff's graduation and the loss of his initial planned employment would cause irreparable harm. Ultimately, each case must be weighed on its own particular circumstances. Here, as Wake Forest points out, Plaintiff's allegation that he will lose his planned employment (with an unnamed future employer) rests only on his own speculation in the absence of any additional evidence.[7] Therefore, beyond the broader question of whether a loss of a student's initial employment could be compensable with money damages, the Court cannot on this record find there is a likelihood – as distinguished from a possibility – that Plaintiff will suffer irreparable harm from not starting his job as planned this summer.

---

[7] The Court understands Plaintiff's possible reluctance to involve his future employer in these proceedings; however, the lack of evidence on how a successful trial result for the Plaintiff followed by the completion of his degree would affect Plaintiff's current job offer makes a finding of a likelihood of irreparable harm on this point difficult to reach.

However, the Court shares Plaintiff's concerns about the reputational and other harm that will follow him long into the future if he has an unexplained gap in his educational record. It is doubtful that a jury could adequately compensate Plaintiff for likely future harm occasioned by a unremedied "gap" in his record, much of which (for example, job interview and other opportunities that he did not receive) would not be readily capable of being reduced to a money judgment. Still, Plaintiff's forecast of irreparable harm from a "gap" in his Wake Forest record depends on the absence of "other corrective relief" that would ameliorate any future injury. Such "other relief" may be available here. Specifically, if Plaintiff is successful at trial, then the Court can award final equitable relief that directs the University to grant him his degree (if earned in the 2024 Spring term)[8] as if it had been earned in May 2023 and prepare his transcript accordingly. Plaintiff could then move forward with a "clean" record, even if he serves the suspension. In sum, Plaintiff's official transcript thus need not "forever" show a "gap" in Plaintiff's education that creates a likelihood of irreparable harm to the Plaintiff.[9]

Accordingly, weighing all the circumstances, the Court finds that while irreparable harm to the Plaintiff is certainly possible, it cannot hold that such harm is likely. Therefore, Plaintiff has failed to carry his burden of proof as to the second element of the *Winter* test.

---

[8] As noted in its earlier Order, the Court intends to schedule this case for trial prior to the beginning of the Spring 2024 semester so Plaintiff's additional argument that the suspension may last more than one year will likely be moot (either he will win his case and the suspension will be overturned or he will lose and would not have been entitled to an injunction in any event). Further, the Court accepts the University's representation that it wants and expects Plaintiff to return to school following his suspension (and will hold the University to its promises of good faith and supportive intentions).

[9] Of course, even with the elimination of any official "gap" in his record, the Plaintiff will be left with choices as to whether and how to present what he does with his time until he returns to school. The Court finds that any potential harm with respect to that presumably short term dilemma would be too speculative on which to base a finding of a likelihood of irreparable harm.

18

C. <u>Balance of Equities</u>

The third element that Plaintiff must establish is that the balance of equities tips in his favor. There is little need to belabor this factor. As discussed above, there are real equities on both sides, the balance of which inevitably tips in favor of the party most likely to prevail on the merits. There is no question that Plaintiff's life will be substantially disrupted by the suspension, and he will lose his final semester in college as well as potentially his planned job. On the other hand, the injunction requested by Plaintiff would immediately impair Wake Forest's ability to carry out a suspension enacted after its full disciplinary process that it believes protects Jane and its broader community and ensures respect for its rules. Again, the Court cannot find based on the current record that it is likely that Plaintiff will succeed on the merits; therefore, the balance of the competing equities does not tip in his favor.

D. <u>Public Interest</u>

The final factor in the *Winter* test is consideration of the public interest. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24, quoting *Romero–Barcelo,* 456 U.S. at 312 (reversing grant of an injunction for understating the Navy's ability to conduct realistic training exercises). Here, the "public consequences" of issuing an injunction in this very personal dispute are uncertain, or, more accurately, may – like the balancing of equities – depend on one's view as to the merits. There are of course public interests both in having students of all genders treated fairly (which cuts both ways here) and allowing universities to impose discipline on their students in accordance with their policies. Further, if Plaintiff is guilty of sexual assault then there is a public interest in allowing his suspension to continue and if he is not guilty then the public interest is just the opposite. Simply put, there are no strong public interests favoring

one side or the other, without an assumption as to the merits, which again is uncertain. Therefore, the final factor of the public interest does not clearly favor entering the requested injunction.

## IV. ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

The Court's Order denying Plaintiff's Motion (Doc. Nos. 5, 25) is confirmed.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: February 27, 2023

Kenneth D. Bell
United States District Judge