1
2                    UNITED STATES DISTRICT COURT
                FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
3
     JOHN DOE,                    )
4                                 )
                   Plaintiff,     )
5                                 )
              vs.                 )
6                                 )   DOCKET NO. 1:23-cv-114
                                  )
7                                 )
     WAKE FOREST UNIVERSITY,      )
8                                 )
                   Defendant.     )
9

10      TRANSCRIPT OF MOTION FOR TEMPORARY RESTRAINING ORDER
                    AND PRELIMINARY INJUNCTION
11            BEFORE THE HONORABLE KENNETH D. BELL
                UNITED STATES DISTRICT COURT JUDGE
12                     FEBRUARY 17, 2023

13

14

15

16

17

18

19

20

21

22

23

24

25

1  APPEARANCES:

2  On Behalf of the Plaintiff:

3       Tara Jill Davis
        Nesenoff & Miltenberg, LLP
4       363 Seventh Avenue, Fifth Floor
        New York, New York  10001
5
        Robert C. Ekstrand
6       Ekstrand & Ekstrand, LLP
        110 Swift Avenue, Second Floor
7       Durham, North Carolina  27705

8  On Behalf of the Defendant:

9       Mark A. Jones
        Bell Davis & Pitt, P.A.
10      Post Office Box 21029
        Winston-Salem, North Carolina  27120-1029
11
        Joshua W. B. Richards
12      Saul Ewing LLP
        Center Square West
13      1500 Market Street, 38th Floor
        Philadelphia, Pennsylvania  19102
14
        Douglas Sampson
15      Saul Ewing LLP
        1001 Fleet Street, Ninth Floor
16      Baltimore, Maryland  21202-4359

17

18          Deborah Cohen-Rojas, R.D.R., C.R.R., F.C.R.R.
                     Official Court Reporter
19      Deborah_CohenRojas@ncwd.uscourts.gov  704.350.7497
        *Proceedings recorded by mechanical stenography, transcript*
20             *produced by computer-aided transcription.*

21

22

23

24

25

1          THE COURT:  Good morning, all.  Our next matter this
2   mornings is Middle District, Docket No. 1:23-cv-114, John Doe
3   versus Wake Forest University, on plaintiff's motion for
4   temporary restraining order.

5          Thank you all for being here.  I had a hearing scheduled
6   this morning already when this thing hit my docket.  And I'd be
7   more than happy to go to Winston-Salem any time, but I
8   appreciate you accommodating the Court on that.  And obviously,
9   there seems to be some urgency to get this done.  I have -- I'm
10  in court nearly all next week, including a trial starting on
11  Tuesday, so it was now or never, it seemed to be.

12         Let me assure you I have read everything that's been
13  filed, except for the transcript.  I've only read part of the
14  transcript, but everything else I've read.

15         Does either party intend to offer witnesses during this
16  hearing?

17         MR. RICHARDS:  Your Honor, we may, depending on the
18  course of the hearing.

19         THE COURT:  Well, let me start with the plaintiffs,
20  then.  Do you intend to offer any witnesses?

21         MS. DAVIS:  Your Honor, I have a similar response.  We
22  may, depending on the course of the hearing.  We do have a
23  declaration from the plaintiff in response to defendant's
24  filing yesterday that we'd like to present to the Court, if
25  you'll allow it.

1          THE COURT:  Yes, of course.  I know that I didn't

2  allow a reply, thinking you probably wouldn't have had time to

3  make a meaningful reply.  I wouldn't have had time to read it,

4  and I didn't want to wait until next week.

5          MS. DAVIS:  Yes, thank you.

6          MR. EKSTRAND:  May I approach, your Honor?

7          THE COURT:  Please hand it up, yes.

8          MS. DAVIS:  And, your Honor, we have provided a copy

9  to defendant's counsel, as well.

10          THE COURT:  Do you want me to read this first or do

11  you want to just talk about it?

12          MS. DAVIS:  Whatever your Honor would prefer.  It's

13  only a couple of pages, if you want to take the time.  I'll

14  also address some of what's discussed in there.

15          THE COURT:  All right.  Yeah.  Give me a minute,

16  please.

17      All right.  Thank you.

18      Well, not having a firm answer on whether we'll have any

19  witnesses, I would hear from the plaintiffs on your motion.

20  Feel free to take the time you need.  We're not under -- this

21  is the last thing we have for the day, so say what you want

22  to say.

23          MS. DAVIS:  Thank you, your Honor.

24      As you know, we're here today on plaintiff's motion for a

25  temporary restraining order and preliminary injunction.  And

1  I'd like to discuss by addressing the irreparable-harm
2  component of the analysis, and I'd also like to respond to some
3  of the arguments that were raised in defendant's brief that was
4  filed yesterday.

5      As described in the moving papers, and contrary to
6  defendant's position, the injury that plaintiff faces here if
7  the injunctive relief is not granted is far from speculative or
8  hypothetical.  There's a very concrete, imminent, and real harm
9  that will result.  And specifically, if the plaintiff is not
10 permitted to return to classes, is not permitted to complete
11 his requirements and earn his degree in May, he will lose a job
12 offer that he has previously accepted.

13     THE COURT:  My uptick from their argument is that
14 mostly any harm is economic in nature and can be remedied if
15 plaintiff wins on the merits.

16     MS. DAVIS:  So there are -- so two pieces to that.
17 One is that -- the -- I think there's two components of
18 irreparable harm.  One is the delay in education, which they're
19 saying is compensable by money damages, but there's also the
20 gap in education if he's not permitted to continue on the
21 normal track.

22     And numerous courts around the country -- and we've cited
23 to several of them in our brief -- have specifically addressed
24 that that type of harm is not compensable with monetary
25 damages.  Doe versus the University of Connecticut, the Court

 1  found plaintiff would suffer irreparable harm because it's
 2  highly likely that a suspension and sanction would forever
 3  change the trajectory of his education and career.  He would
 4  forever need to explain a gap in his resumé to potential
 5  employers or schools.

 6      Similarly, in King versus DePauw in Indiana, the Court
 7  found plaintiff would suffer irreparable harm because he would
 8  forever have either a gap or a senior-year transfer on his
 9  record.  He would undoubtedly be required to disclose the
10  finding and situation to any potential employers or graduate
11  schools to explain the gap.

12      Doe versus Texas A&M -- and I'm glad to read from all
13  these cases, but they all stand for the proposition that there
14  is irreparable harm when someone is delayed in pursuing their
15  education, especially a senior because the chances of
16  transferring are very limited at that point, and it also
17  impacts the future of the job prospects because forever they'll
18  have that gap in their education.

19      So here, I mean, there's two pieces to it.  It's, one,
20  there is a job that is contingent on him graduating.  That will
21  disappear if he's not able to continue and graduate in May.
22  The second piece is that this delay does constitute irreparable
23  harm in the future.

24      And something else I want to point out is that the
25  defendants treat this as a -- only a one-year delay.  But

1  keeping in mind what the sanction was, there's a possibility

2  that it's actually longer because part of the sanction

3  indicated that Doe will have to apply for readmission in

4  January of 2024.  So there's also no guarantee that the delay

5  is not extended beyond the one year to create a further gap in

6  the education.

7  So going back to the job-offer issue, Doe was offered a

8  position for full-time employment to begin in May of 2023, so

9  that's a real, concrete harm.  He will lose that job if he's

10  not able to continue.

11  With respect to the discussion about whether Doe can

12  return to class and actually make up the missed coursework,

13  which I know is an issue, that was pretty extensively discussed

14  in the briefing.  We've just admitted this declaration from

15  John Doe, which explains he will be able to make up that missed

16  coursework.  It's been three weeks of time that he's been out

17  of classes.

18  Defendant submitted two declarations or affidavits out of

19  the six professors for the six courses he's taking, implying

20  that, for the other four courses, that there will not be an

21  issue in him making up the missed coursework.

22  Something else I'd like to point out is that spring break

23  is coming up soon.  That's a 10-day period that would actually

24  provide a good opportunity for Doe to be able to make up any

25  coursework, and he's committed to doing so.  He's committed to

1 devoting that time and attention to making up the missed

2 coursework and ensure that he is able to pass his courses.

3     He's a senior in the business school, so this is not

4 someone who's coming in as a first-year with little knowledge

5 about the topics he's studying.  He has good knowledge and

6 understanding of the courses he's taking, and that's something

7 else that contributes to his ability and confidence that he

8 will be able to make up any coursework that he may have missed.

9     One other thing I wanted to point out.  In the two

10 declarations that were submitted by the professors, both of

11 them refer to the fact that they made special accommodations --

12 quote, unquote, "special accommodations" -- for Doe when he was

13 able to take classes remotely in January before the suspension

14 was put into full force and effect.  And that indicates that

15 the school has the ability to make accommodations to allow him

16 to return to classes and ensure that he's able to be

17 successful.

18     Along those lines, presumably, if a student had a medical

19 emergency or a family crisis that kept them out of school for a

20 few weeks, I would imagine the university would not disagree

21 that they're able to make accommodations to ensure that student

22 is back on track, and the same should be done here.  And that's

23 something that the two professors did acknowledge, that they

24 previously have made accommodations.

25     Would your Honor like to ask anything further regarding

1  the irreparable-harm case before I move into --

2         THE COURT:  No.  It would actually be easier for me to

3  keep track of things if we do sort of one factor at a time.

4      Let me hear from Mr. Sampson on the irreparable harm.

5        MR. RICHARDS:  It will be Josh Richards, your Honor.

6        THE COURT:  All right.  Thank you.

7        MR. RICHARDS:  A few things that I'd like to address.

8  The first is Miss Davis cited a string of cases around this

9  issue of irreparable harm and whether or not separation from

10  school constitutes irreparable harm.

11      I think we can -- we can all agree, and your clerks

12  will find, that you can find as many cases going one way as you

13  can the other.  This is an equitable issue for the Court to

14  find on the individual facts of the case.

15      Here, I don't think there's been a showing of imminent,

16  irreparable harm with respect to anything -- I'm sorry --

17  imminent harm with respect to anything other than losing this

18  job in particular.  And plaintiff concedes that that job in

19  particular -- the income from that job is compensable through

20  monetary damages.  And so, really, what we're talking about is

21  whether or not there's going to be some downstream effect on

22  his career that is sufficiently concrete and imminent that it

23  justifies injunctive relief.

24      I think, when the Court reads the cases that we cited in

25  our brief and the two dozen other cases that are published on

1  this -- those cases I find to be more persuasive, but

2  ultimately this is an equitable issue.  And so I think, you

3  know, relying on other cases, you know, only takes you so far.

4      I think the facts of this case are that Mr. Doe is

5  obviously a bright young man.  He's obviously a compelling

6  young man.  He was able to secure a job in time for graduation.

7  And next year, when he -- when his graduation is imminent, it

8  is speculative to suggest that he won't be able to obtain

9  another job.  And so really, here, the harm that's imminent is

10  economic in nature, not irreparable.

11      THE COURT:  What about the argument that he will

12  forever have to explain whether it's late graduation or a gap

13  in his resumé, however described?

14      MR. RICHARDS:  Well, your Honor, students graduate

15  late from institutions all the time.  They take on extra

16  coursework, they take medical leaves.  I think the idea that,

17  again, some future employer is going to look at Doe's resumé in

18  particular and say, knowing full well that there may have been

19  a death in his family, that he may have had a disease, that any

20  number of things could have caused a five-year undergraduate

21  career, and that he is then going to be grilled and lose jobs

22  over that, is sort of the height of speculation.

23      And we don't deny the fact that this will delay his

24  graduation for a year, but the harm there is in lost salary for

25  a year, and that's something that we can remedy.

1          THE COURT:  Well, with respect to the sanction that he
2  has, I guess, the right to reapply, but no guarantee of
3  readmission, how does that affect the harm analysis?
4          MR. RICHARDS:  Again, I would say, your Honor, that's
5  highly speculative.  To be honest, it's not something that I
6  have --
7          THE COURT:  Why was it done that way?  I mean, if the
8  idea was to sanction him for a year, what -- why is it a
9  readmit/reapply scenario --
10          MR. RICHARDS:  My understanding --
11          THE COURT:  -- instead of coming back in January?
12          MR. RICHARDS:  I apologize, your Honor.
13          THE COURT:  No, that's all right.
14          MR. RICHARDS:  My understanding is that it's done that
15  way in part because, if additional disciplinary issues arise
16  over the course of that year, then there may be some question.
17  But again, my understanding -- and I can get a declaration on
18  this if it would help the Court -- is that it's largely
19  perfunctory.  And then, assuming there's no issue between the
20  time of his suspension and the time of reapplication, that, you
21  know, the student is readmitted.
22      And I think this is actually a good -- a good point in the
23  discussion for me to raise something that, you know, I had
24  intended to raise at the beginning of my remarks, anyway.
25      I don't know how meaningful this is to the Court, but this

1  is a situation that the university really does not like to be
2  in.  We view Mr. Doe as our student.  We view it as our
3  obligation for him to be successful in life.  We don't like,
4  you know, adjudicating these things in this way.  We wish we
5  didn't have to do these sorts of adjudications.  We wish sexual
6  assault wasn't ever reported on our campus.

7      And so our goal here is not to punish, per se.  Our goal
8  here is educational, rehabilitative.  We want him to come back.
9  We want him to graduate.  We want him to succeed.  And so, you
10 know, everything that we're doing here is framed through that
11 lens.  So the idea that we would then say you have to apply for
12 readmission, but we're going to pull the rug out from under you
13 there, you know, that's just not consistent with the way the
14 university approaches these cases.

15     I want to address a couple of things that I think are
16 really the predicate here in terms of the redress-ability
17 issue.

18     We have a real asymmetry in evidence on this issue.  On
19 the one hand, we have experts in their academic fields, who all
20 they do is teach this material to hundreds, thousands, of
21 students over years, and who have made academic judgments that,
22 in light of the way that their particular courses work,
23 plaintiff cannot drop in now and pass.

24     We didn't just say, oh, he has no shot, it's too late in
25 the semester.  We went to these professors, and we had

individual discussions with them. We asked them what it was about their classes that would make it difficult for him to succeed.

And we didn't put six affidavits in the record. We put two in. And that was intentional because we talked to the other four, and they said to us we think it would be really, really hard for him to succeed in this class, but we're not going to say it would be impossible.

And so, if it were just those four professors, we wouldn't be having this conversation. But we talked to two of his professors and to one of the deans, and what they told us was, because of the nature of our classes and where we are in this semester, he's not going to be able to pass our classes. And the one that I want you to focus on in particular is the Anderson affidavit.

Mr. Doe is in a business course of study. A critical portion of the curriculum for that course of study is learning how to work in dynamic groups. The class that Mr. Anderson teaches works through three group settings, two initial, skills-build settings and one capstone, final setting.

Mr. Anderson talks -- or Dr. Anderson -- Professor Anderson talked in his affidavit about how the skills that are developed in those first two group projects are essential to succeed in the final project. It's not a question of time. It's a question of a time machine.

1    The only way that Doe can be successful in rejoining his

2 group is if he can build the skills that involved working with

3 those two groups, which he can't do because that part of the

4 semester has already passed.  These are academic judgments,

5 made by professors who -- this is all they do.

6    We're not trying to be difficult about this.  What we're

7 suggesting here is that we want him to be successful, but he

8 cannot be successful in these classes.

9        THE COURT:  Well, what about the concept of letting

10 him try?  If he fails, he fails.

11        MR. RICHARDS:  Well, there's two problems with that.

12 The first problem is that, specifically with respect to the

13 group class, it's not fair to the rest of the group.  They're

14 going to be spending their time reteaching him the skills that

15 they have already learned, instead of working on the skills

16 that they're intending to be building.

17    The second problem is -- and this goes, again, sort of

18 maybe more to the merits -- the university has an interest in

19 the outcome of its process, and him returning to campus will

20 have an impact.

21    This isn't something that nobody's going to hear about.

22 The impact is going to be -- because, by the way, he's John Doe

23 in this lawsuit, but he's not John Doe on campus, right?  His

24 friends know about this, the complainant's friends know about

25 this.  And so, all of a sudden, the message to the community is

1  going to be, if you go through the process and you're found

2  responsible and you run to court and you get a TRO, you can

3  actually come back.

4      And that's not a productive message to be sending to the

5  community.  It undermines the university's ability to enforce

6  its codes of conduct, and it undermines students' faith in the

7  way that the institution operates.  And so to say, well, we'll

8  just let him back for this period of time because it would help

9  him doesn't address all of the problems that it would create.

10      It also -- I mean, I suppose this is on him, too, but, you

11  know, it's not good for anybody if he ends up with Fs in these

12  classes.  And the university doesn't want that, either.  And he

13  may say, well, that's my risk to bear, but that reflects on the

14  university, too.  The professors have to give Fs in their

15  classes.  The university has to note that students in this

16  major are getting Fs.

17      I just -- you know, I think there are a lot of reasons why

18  this is just not a good fit.

19          THE COURT:  All right.  Is that all you wanted to say

20  with respect to --

21          MR. RICHARDS:  I would touch briefly on the

22  medical-accommodations point because I think it's sort of

23  off-topic here.

24      If a student has a medical issue and they miss a couple of

25  weeks of class, then what we do is we say to the professor, can

the student succeed in the class notwithstanding missing this time?  And if the student can succeed, then we support them and let them back and accommodate them, exactly as Miss Davis suggested.

But if we go to a professor, and we say, you know, this student has been out five weeks, six weeks, and ask, are they going to be successful in your class, and the professor says, no, they really aren't, there's no magic wand where we sort of say, okay, you can come back, and we'll give you accommodations.  That isn't how accommodations work. Accommodations create a situation for the student to be able to succeed on equal footing to a student similarly situated, but doesn't have that medical issue, doesn't have that missed time.

So in a situation like this, with Mr. Anderson's class, a more likely outcome would be we would allow the student to withdraw from the class, notwithstanding the fact that it was past the deadline, not making them take an incomplete or an F, and allowing him to take retake the class on a fresh slate. That's what we would be suggesting that we're doing here.  It's exactly the same way we would handle it.

THE COURT:  Does the plaintiff need every course in which he's enrolled to graduate?

MR. RICHARDS:  Yes.  Yes, he does.

THE COURT:  All right.  Miss Davis, would you like to respond to any of that?

1          MR. RICHARDS:  Maybe just one additional point --

2          THE COURT:  I'm sorry.  Yes.  I thought you were

3    finished.

4          MR. RICHARDS:  Well, I did -- I apologize.  I

5    apologize.

6       With all respect to the plaintiff's desire to be heard

7    today on all of the issues, I would suggest to the Court that

8    one potential way to resolve the hearing today is on this

9    issue, which would obviate the need for a lot of additional

10   witness testimony, a lot of additional argument.

11      We believe that this issue is dispositive.  We believe the

12   other issues are more hotly contested, and certainly we can

13   argue all the rest of them.  But, if the Court feels it can

14   decide the case on this particular issue, we would ask that the

15   Court consider doing that.

16         THE COURT:  Well, if, sitting here right now, my mind

17   was firm, I would do exactly that --

18         MR. RICHARDS:  Thank you, your Honor.

19         THE COURT:  -- but it's not.

20      Miss Davis --

21         MS. DAVIS:  Thank you, your Honor.  I do have --

22         THE COURT:  -- what do you say about these two

23   professors, in particular, that -- according to their

24   affidavits, that the question was put to them in a blind

25   manner?  They have no idea whether John Doe is on medical

1  leave, family emergency, or this situation.  And they're

2  rendering their professional judgments that he cannot complete

3  and be successful in those courses.

4       MS. DAVIS:  Uh-huh.  Well, a couple of things, and

5  some of this is addressed in Doe's declaration, but it -- the

6  two professors -- and this goes to the issue of accommodations,

7  as well.

8       He missed three weeks of classes, so we're not talking

9  about five, six, or seven weeks.  And keeping in mind that he

10 did do some work towards the beginning of the semester -- so

11 it's not as if he's starting, you know, eight weeks behind.  He

12 did do work in the beginning of the semester.  I think some of

13 what the professors indicated was not entirely accurate with

14 respect to the work that Doe did do.

15      But with respect to accommodations, if there's any way for

16 Doe to be reintegrated into the class, whether it's by, you

17 know, participating in group projects or, you know, submitting

18 any additional assignments, I mean, he's willing to do whatever

19 work it takes to get caught up.

20      And to say that it would impact other students in the

21 class because he's coming into a group project late -- I think,

22 to the contrary, having an additional person participating in a

23 group project and taking a share of the work -- I don't see how

24 that would negatively impact the group or why other members of

25 the group would be responsible for getting him caught up to

1 speed.  I don't think that's a fair assessment.

2      Mr. Richards said repeatedly about the university wants

3 him to be successful.  They want the plaintiff to be

4 successful.  He will become a graduate of the school at some

5 point.  And to that extent, if that's the case, then they

6 should be willing to do what it takes to ensure that their

7 student is successful.  And if these two classes are the

8 primary issue, I think that there's a way that the professors

9 could work with him to ensure that he is able to get up to

10 speed in a way that doesn't impact other students in the class.

11            THE COURT:  All right.

12            MR. RICHARDS:  Your Honor --

13            THE COURT:  Yes, sir.

14            MR. RICHARDS:  -- I just want to -- he's missed six

15 weeks of class, not three.  Just -- Miss Davis just said he's

16 only missed three weeks, but it's been six.  It's been since

17 January 5th.  Particularly --

18            THE COURT:  January 25th.

19            MS. DAVIS:  January 25th.

20            MR. RICHARDS:  Oh, excuse me.  The Palak affidavit

21 says he didn't attend or access any course materials for six

22 weeks for that class.

23            THE COURT:  Well, I was going to ask about that.

24            MR. RICHARDS:  Yeah.  He's missed six weeks for that

25 class.

1          THE COURT:  I was going to ask about that because the
2   affidavit does say that he did not access the online materials.
3   Apparently, he wasn't allowed to be in class, but he was not --
4   he did not access the online materials available during those
5   first, I guess, couple weeks or so.

6          MS. DAVIS:  So he did -- as I indicated in Doe's
7   declaration, he did access some of the materials.

8          And, I mean, something else I wanted to point out is,
9   keeping in mind that he was doing all this remotely while
10  submitting an appeal on the Title IX case and awaiting a
11  decision, with all of that weighing on him and not knowing if
12  he was permitted to go back to school, if he was not permitted
13  to go back, he -- you know, his family paid tuition in the
14  event that he was able to go back, which the school gladly
15  accepted.  So that was all weighing on him at the time that he
16  was also trying to keep up with these courses.

17         So it's not that he did not participate in anything.  He
18  did, frankly, the best that he could with everything that was
19  happening, unsure of whether the suspension was going to be
20  upheld or not.

21         THE COURT:  Well, I can understand why he might not
22  have accessed certain materials.  I'm just wondering if there's
23  dispute that, with respect to that course, that he did not
24  access the online materials during those two weeks.

25         MS. DAVIS:  I don't believe it's accurate he did not

access any materials.  It's accurate he did not access all of them, yes.

        THE COURT:  In that particular course?

        MS. DAVIS:  Correct.

        THE COURT:  All right.  Let me hear from you on the likelihood of success on the merits.

        MS. DAVIS:  So with respect to Doe's Title IX claim -- and I appreciate that your Honor had the chance to review everything, given the -- our expedited time frame.  This is discussed in some detail in the complaint at paragraphs 324 to 384, but I do want to highlight a couple of particularly compelling instances of the facts that do demonstrate there was a gender bias here.

     The first one is that Doe was deprived of his right to a fair hearing.  The defendant's brief makes a lot of mention about the time that was spent on each witness and how much time was spent on cross-examination and the fact that the hearing went for 13 hours, but all those facts don't establish that the hearing was fair and impartial.  And to the contrary, when one looks at what actually occurred during the hearing, it's clear that the parties, Doe and Roe, were not treated equitably.

     The first point I'd like to note is that the hearing officer prevented Doe's advisor from asking a total of 30 questions of the complainant and the other witnesses throughout the entire hearing.  In contrast, she did not

prevent the question -- one single question from Roe's advisor.

The questions that Doe's advisor was prohibited from asking were all related to relevant topics. These included Roe's athletic fitness and strength with respect to why she wasn't able to push Doe off of her, how she felt when she found out that Doe was dating someone else, certain text messages that she sent that night, the meaning of those text messages, what her condition was with respect to an intoxication level at the time she returned to the room, and such other relevant topics, 30 questions in total that Doe's advisor was not allowed to ask in comparison to none by Roe's advisor.

Additionally, the hearing officer limited Doe's advisor's ability to cross-examine the complainant. And if we look at the order of witnesses in the hearing, the complainant was the last one to go at the end of the evening.

I know there's a discussion in defendant's brief about the -- an agreement about the order of witnesses, but keeping in mind that this was a Title IX hearing with at least eight witnesses, it's unusual -- or it seems unusual, at least in my view and based on experience, that they wouldn't consider pushing the hearing to a second day, if needed, to ensure that everyone was fully able to have the opportunity to cross-examine parties and witnesses.

THE COURT: But Mr. Doe's advocate didn't even use all the time allowed him, correct?

1        MS. DAVIS:  So at the end of the hearing, the hearing

2 officer, Miss Wells, stated that he had 15 minutes remaining.

3 And at that point -- and this is an issue that certainly, if

4 there's an evidentiary hearing, we would plan to have Doe's

5 advisor testify on this.  But at that point, it had already

6 felt rushed along, and he knew that he wasn't going to be able

7 to complete all of his questions in 15 minutes.  So he finished

8 the line of questioning that he was asking and then had to stop

9 at that point.

10        THE COURT:  Well, you -- you have to show more than an

11 erroneous decision or a failed process to succeed, correct?

12        MS. DAVIS:  Yes.

13        THE COURT:  All right.  So what's the evidence

14 that the but/for cause of this entire thing was bias based on

15 his sex --

16        MS. DAVIS:  So the majority of the evidence --

17        THE COURT:  -- because it sounds like, just reading

18 it -- and you can -- you can challenge this characterization --

19        MS. DAVIS:  Sure.

20        THE COURT:  -- that the decision was so wrong it had

21 to be because of bias.  Am I oversimplifying that?

22        MS. DAVIS:  No.  I think that's fair to say.  And that

23 goes into the written hearing decision, so I'll move forward

24 from the actual hearing itself to the hearing decision because

25 that's where the majority of the bias evidence appears.  And

1  that's because you can -- one can establish bias when the

2  outcome goes against the great weight of the evidence, which is

3  what happened here.

4      One of the main issues that comes up is Jane Doe's medical

5  records -- or Jane Roe, rather, her medical records.  She

6  sought -- she went to student health a couple days after the

7  alleged incident.  The report that she gave to student health

8  on October of 2021 vastly differed from the reports that she

9  gave to the investigator a year later.

10      And some of these inconsistencies, I'd be glad to go

11  through them, but they include, for instance, Jane denied a

12  sexual assault occurred in the medical records.  She stated

13  that she did not recall consenting to or having sexual

14  intercourse with a male, which she later told Investigator

15  Telligman a year later that she did initially consent, but then

16  withdrew consent.  She told the student health that she was not

17  concerned for her safety.  A year later, she told Investigator

18  Telligman she was triggered every time she saw Doe.  She

19  reported to student health that she made herself vomit once.

20  She then told Telligman she vomited three times.

21      So these are just some of the instances that show the

22  complete disparity between her report to student health and her

23  report to the investigator.  Nevertheless, Hearing Officer

24  Wells relies heavily on the medical records still, despite

25  those inconsistencies, to find Jane Roe more credible than Doe

1  and to find that a sexual assault had occurred.

2     A couple of other points that appear in the written

3  decision which indicate bias, there was a -- there was an

4  adverse inference that was drawn against Doe for not submitting

5  text messages.

6     So Wells indicated that the investigator had requested any

7  relevant text messages from Doe.  He explained that he did not

8  have any because, in his view, nothing unusual happened, and

9  there would be no reason for him to send any text messages to

10  anyone about what had occurred.  Yet an adverse inference was

11  drawn against him for allegedly failing to produce this

12  evidence, which did not even exist.

13     In comparison, no adverse inference was drawn by the

14  hearing officer in making her decision with respect to -- with

15  respect to Roe not authorizing the investigator to speak with

16  the director of student health.

17     In the investigation report, the investigator did

18  highlight that she would have preferred if that authorization

19  was provided because it would help to provide clarity about

20  what Jane Roe had stated and what the findings or

21  determinations made were in the medical reports, but no adverse

22  inference -- no adverse inference was drawn, which, again,

23  demonstrates a disparity on how the parties were treated.  And

24  that appears in the hearing decision, as well.

25     One other thing I wanted to point out with respect to the

1  decision.  Jane Roe made a statement during the investigation
2  interviews.  When describing that the sexual encounter had
3  occurred, she stated, "When we started to have sex, it started
4  off as okay, but I remember it coming out."

5      And this statement ended up becoming quite important
6  because her statement during that interview actually supports
7  Doe's account, which is that they began to have intercourse, he
8  was -- or they attempted to, but he was not able to maintain an
9  erection, so it stopped.

10      However, in the investigation report, Telligman, the
11  investigator, included a footnote stating that she asked Jane
12  Roe to clarify what was meant by that, what was meant
13  specifically by "I remember it coming out."  And Jane Roe
14  replied allegedly that this referred to the condom coming out
15  of its wrapper.

16      Interestingly, if you look at the four investigation and
17  interview transcripts, that exchange never takes place.
18  Telligman never asked her that question, never asked her to
19  clarify what that statement meant, and Roe never responded to
20  it.  Yet somehow it ends up in the hearing decision of evidence
21  supportive of Jane Roe's account and complete disregard of the
22  fact that it actually supported Doe's account of what happened.

23      Something else that appears in the hearing decision, I
24  think, is worth noting.  The hearing officer concluded that
25  John Doe was not particularly attentive to Jane Roe's level of

1  intoxication on the evening of October 15th, and, because of

2  that, it somehow translated into a conclusion that he,

3  therefore, also was not particularly aware of her condition on

4  the morning of October 16th and, therefore, did not realize

5  that she was asleep when he digitally penetrated her.

6       One of the things to note about the hearing decision,

7  Wells never considered Roe's motivation for filing the

8  complaint.  She disregarded it as not relevant, and that

9  appeared in the hearing transcript, as well, when it is

10  relevant to consider why she filed because Roe -- shortly after

11  the encounter that's at issue here in October 2021, Doe began

12  dating a different student at Wake Forest.

13      The testimony from Jane Roe's witnesses reflected that she

14  had been interested in a relationship with Doe and was

15  disappointed that it did not get to that level.  So it's --

16  it's worth considering the motivation for her filing the

17  complaint when she was interested in a relationship, he began

18  dating someone else, and she was upset by that fact.

19      I'm just seeing if there's any other points I -- in

20  particular I wanted to point out to your Honor.

21      One other thing the hearing officer noted, also, was that

22  it -- Doe and Roe were not in contact after the evening of

23  October 2021, and she considered that evidence that an assault

24  had occurred, when, in fact, again, because Doe had begun

25  dating another student, that was the reason that they did not

1 have any further contact.  Roe was aware of that.  They had

2 overlapping friend groups, so she certainly was aware that he

3 had begun dating someone else, and it would make sense that she

4 would refrain from contacting him going forward.

5     In addition to these specific instances -- and again,

6 they're laid out in more detail in the complaint.  I just

7 wanted to highlight a couple for you that I thought were worth

8 highlighting at this point.

9     There was also some activism and activity going on

10 on-campus that coincided with the allegations made against Doe.

11 And the case law demonstrates, as well, that external pressure

12 on the university to find in favor of a female complainant and

13 against a male respondent is also part of the greater

14 consideration.

15     So while, on its own, the fact that there were protests on

16 campus and a petition to the administration about their

17 handling of sexual assault -- while that, on its own, may not

18 be sufficient to show bias, when that's combined and considered

19 in the greater context of the timeline of events and the fact

20 that all that activism directly preceded and overlapped with

21 what was happening with Doe's case, that also comes into play

22 in demonstrating that there was a gender bias that impacted the

23 outcome here.

24       THE COURT:  Is it required that you prove both the

25 hearing officer and the appeal officer had bias?

1          MS. DAVIS:  The ultimate decision-maker -- so it's at
2     any level.  It could be -- I mean, here we allege that it -- it
3     was all related.  I mean, you have an investigator that
4     produces a report that's then, essentially, accepted as fact by
5     the hearing officer, which is then adopted by the appeals
6     officer.  So all the points I just raised were accepted by all
7     three of those individuals, which all led to the ultimate
8     outcome.

9          THE COURT:  But what I'm asking for is with respect to
10    the appeal officer.  Is there any requirement that the appeal
11    officer be motivated by bias based on sex?

12         MS. DAVIS:  That the appeal officer specifically,
13    separate from the hearing -- I don't know that that's required
14    because it -- he was adopting the -- I mean, in our view, it's
15    basically a rubber stamp.  And I know he produced a detailed
16    response, but, when you get to the appeal level, you're not
17    challenging the underlying facts of what was determined.  It's
18    based on procedural errors, so bias or the severity of the
19    sanction.

20        So at that point, the factual determination that was
21    reached isn't permitted to be determined under the policies.
22    It's a matter of those three grounds.  Was there procedural
23    errors?  Was there bias?  Was there a disproportionate
24    sanction?  And those are the grounds that Doe did appeal on,
25    but, because of that, it -- I think you have to distinguish

1 because he wasn't the decision-maker on the facts.  He was

2 determining whether any of those three grounds for appeal were

3 satisfied.

4          THE COURT:  But your argument is that the hearing

5 officer -- and the investigator, of course, but the hearing

6 officer making certain findings and considering and not

7 considering certain things was biased.

8          MS. DAVIS:  Uh-huh.

9          THE COURT:  But the appeal officer is supposed to look

10 for bias.  So if the -- if he did his job -- and I think it was

11 a male.  Correct me if I'm wrong.

12          MS. DAVIS:  Correct.

13          THE COURT:  If he did his job, he implicitly, if not

14 explicitly, found that there was no bias by the hearing

15 officer, correct?

16          MS. DAVIS:  If that was one of the grounds raised,

17 yes, but they were several grounds for appeal raised.

18          THE COURT:  So I'm wondering, is it -- and I don't

19 know the answer to this.  Is isn't a trick question because I

20 don't know the answer.

21          MS. DAVIS:  I'm trying --

22          THE COURT:  I'm asking whether the -- if the appeals

23 officer is supposed to judge, among other things, whether there

24 was bias below and, by upholding the hearing officer,

25 necessarily found that there was no bias, does the -- does the

1  appeal officer have to be found to have had bias in making that
2  decision?

3          MS. DAVIS:  That is a good question.  I'm trying to
4  recall a case where that was specifically discussed.  And off
5  the top of my head, I cannot, but I'd glad to look into it and
6  submit a supplemental briefing if I can find information on
7  that.

8          THE COURT:  Am I cutting you off or --

9          MS. DAVIS:  No.  I believe I raised all the points I
10 did want to raise on the gender-bias piece.

11         THE COURT:  Well, let me ask you one question before I
12 let you sit down.  The university submitted an affidavit, I
13 guess it was, but information that, at least in some period of
14 time, there have been three such allegations brought and
15 adjudicated through the process against men, and two of the
16 three were found not responsible.

17    How does that affect your argument that there is -- that
18 the university has bias against males in these kind of cases?

19         MS. DAVIS:  So I did note that, as well.  And in
20 reviewing that, I was thinking that we need more information on
21 that, and that's one of the questions I would like to explore
22 through testimony because I think it depends on the timing of
23 when those matters occurred.

24    They make the point that there were three cases since
25 August 2020.  If those other two cases occurred immediately

1 after August 2020, for instance, I don't think that's

2 necessarily indicative of anything because, if we look at what

3 happened on campus with respect to the protests and petitions

4 and a new sexual-assault task force and all that, that began in

5 the spring of 2021. So I think that likely changed the

6 climate, as well. And because Doe's case happened after that,

7 it wouldn't be surprising that there may have been a different

8 motivation coming into his case.

9     So without having more specifics about the timing and the

10 allegations and were there cross-complaints, it's hard to say.

11 I understand that they're provided that information because

12 statistics is one way of showing a pattern. But without seeing

13 more information about those cases, it's hard to say that it's

14 indicative of anything at this point.

15         THE COURT: Would it make a difference to what extent

16 there's overlap among the investigators and hearing officers?

17         MS. DAVIS: It could be, but, again, without knowing

18 the circumstances of the case, it's hard to speak to that. I

19 believe Miss Wells said she had heard one. I don't know who

20 else was involved, though, on the others.

21         THE COURT: All right. Mr. Richards, let me ask you a

22 couple questions on some of the -- I guess I'll call them

23 anomalies or strange things that happened during the hearing

24 and maybe the investigation, as well.

25     But the hearing officer's reliance on the medical records

1  that the claimant or complainant -- whichever is the right

2  word -- wanted the hearing officer to rely on, and then

3  allowing the claimant to withhold other medical -- I know the

4  court -- the rules of court don't apply in these hearings, but

5  that just seems fundamentally wrong.  Hearing officer, rely on

6  these parts of the record I want you to rely on, and let me

7  continue to protect others that might hurt my case.

8  MR. RICHARDS:  Well, certainly, your Honor -- and we

9  can hear from the hearing officer.  She's here today, and I

10  will put her on the stand if it will be helpful for the Court

11  at some point.

12  But I think there's a few pieces to consider there.  The

13  first is the constraint of the 2020 regulations.  What the

14  Department of Education, the regulations promulgated by Betsy

15  DeVos's Department of Ed in 2020, say is that institutions are

16  required to consider all relevant evidence.

17  So the absence of additional, relevant evidence does not

18  permit the hearing officer to disregard relevant evidence.

19  Now, it certainly doesn't affect the ability to give weight to

20  some evidence and particularly to say this evidence may be less

21  reliable in light of these circumstances.  And I think, when

22  we hear from Miss Wells, we may hear that that's exactly what

23  she did.

24  But you have to remember that these are extraordinarily

25  difficult cases.  They come in, and a complainant makes an

1 allegation that is often something that really only two people
2 have percipient knowledge of.  And the standard of review is a
3 preponderance of evidence, so you're in a situation where two
4 people tell very different stories, and the hearing officer is
5 required to decide and, whether the evidence is 75 percent in
6 favor or 50.1 percent in favor, make a decision as which side's
7 story is more plausible.  And that's a very difficult job.

8 And so when the hearing officer looks at the information
9 that comes in, they have to -- in all cases, not just in this
10 one, they have to look at an imperfect record.  There's always
11 inconsistent records.  There's always inconsistent evidence, I
12 should say.  Right?  And there's no -- never a perfect case,
13 where all the evidence lines up and points to the perfect
14 conclusion.  There's always going to be inconsistent evidence,
15 and that makes that hard -- that job very difficult.

16 And so what I think the hearing officer did in this
17 particular case is to say there are two potential narratives
18 here, and I have some evidence that supports one, and there's
19 evidence that undermines that evidence, and I have some
20 evidence that supports another, and there's evidence that's
21 contrary, there, too.  And what I have to do is decide whether
22 there's 50.1 in one direction or the other.

23 And here, whether I would have done the same thing as the
24 hearing officer, whether the Court would have done the same
25 thing as the hearing officer, that's not really what's before

the Court.  What's before the Court is, did the hearing officer
resolve these things in a manner that reflected either overt
bias or in a way that was so, so wrong that the only
explanation could be nefarious?  And we know that it's not the
latter because the hearing officer writes a very detailed
description of what her thought process was.

Now, again, we may have resolved those things differently.
I think any time I write something and somebody comes in and
they fly-speck it, they're going to find things they disagree
with, and they're going to say, you know, you screwed this part
up.  It doesn't mean that I screwed it up on purpose or that I
screwed it up with an ill motive.

Now, here, the hearing officer said I am considering these
records, for these purposes, and for these reasons.  And
they're not perfect, but they're contemporaneous, for instance.
I have one version of the respondent's story, and it's
unsupported by any contemporaneous text messages, records.
That's not necessarily the respondent's fault.  He's not
getting an adverse inference because of that, but the hearing
officer can only decide based on the evidence that she has.

So she looks at all the evidence that she has.  And she
has text messages demonstrating that, for instance, the
complainant was extremely inebriated.  And on the other hand,
she has the respondent saying that she wasn't.  So she has
multiple witnesses, lots of text messages, that say somebody's

1 very inebriated, and she has one party saying, no, that's not

2 the case at all.  That's a credibility problem.

3      Again, she has a trip to the doctor, where the complainant

4 says that she has vaginal pain, but she also denies sexual

5 assault.  So the hearing officer has to look at that and say,

6 well, okay, the vaginal pain is consistent with intercourse,

7 and the respondent says there was no intercourse.  So that's a

8 bit of a problem.

9           THE COURT:  Well, I'm just curious as to what the rest

10 of the medical records might have --

11           MR. RICHARDS:  Well, we don't know.  We don't know

12 and --

13           THE COURT:  Right.  And I know folks stay on this one

14 thing because that's just sort of like, how is that fair?

15 But -- so not to cut you off, but obviously the plaintiff has

16 made lots of allegations about deficiencies in the

17 investigation, the hearing itself, and the hearing decision.

18      And without accepting any of that, without agreeing with

19 those representations and characterizations, if true, would

20 that be sufficient to get to a jury?  Let's ask that question

21 first because I think the theory, as I said before, was the

22 decision was so wrong, the investigation was so poorly

23 conducted, that a reasonable jury could conclude that the

24 but/for reason was bias based on sex.

25           MR. RICHARDS:  So let's --

1          THE COURT:  As a matter of law, would you agree that

2 that -- that that can -- such evidence can get to a jury?

3          MR. RICHARDS:  I would say, in a hypothetical case,

4 that evidence could get to a jury.  I don't think in this case

5 it could.  I think --

6          THE COURT:  Yeah.  We'll find that out.

7          MR. RICHARDS:  Well, sure, but, you know, the nice

8 thing about this, your Honor, is it's not a Rule 12 argument,

9 right?  So I don't have to accept all their allegations as

10 true, and neither do you.  We can look at them.

11          THE COURT:  Well, I was trying to stair-step this, and

12 I'll get the same discussion with Miss Davis.

13    All right.  So if such evidence, if proven and believed by

14 a jury, is sufficient to get to a jury, we still have to decide

15 whether it is so strong that, by clear and convincing evidence,

16 the Court is persuaded that the plaintiff is likely to succeed.

17          MR. RICHARDS:  And we certainly make a big deal of

18 that in our brief, your Honor.  We really don't think -- and

19 not -- it's not just -- I mean, if we walk through -- and this

20 is the problem, is that, in a complaint -- you know, you read

21 the complaint, and it's as important what's not there as what's

22 there, right?

23    So in the complaint we say, oh, limited the time, right?

24 But when we actually look at the record, what we see is that

25 the respondent's counsel rests.  And we see, you know,

 1  overruled questions 30 times.  When you actually look at the
 2  transcript, you find out that, you know, a solid 20 of those
 3  times, the question was just rephrased and then asked.
 4       And, you know, we look at whether or not any question that
 5  they wanted to ask wasn't able to be asked, and there's --
 6  actually there's an exchange in the hearing transcript where
 7  the hearing officer says, "Are there any questions that you
 8  want to ask?"  And there's none.  And so these are all sort of
 9  phantom issues.
10       And sure, you know, any time you fly-speck 12 hours,
11  you're going to find a couple of things you don't like.  I'm
12  not saying it was a perfect hearing, but that's not even close
13  to what the standard is here.  And it seems to be the standard
14  that -- that John Doe wants to hold us to, that it's a perfect
15  hearing or it was sex-biased.  That's not reasonable.
16       What he needs to show is that not only were there so many
17  errors, but those errors also are indicative of sex bias, not
18  bias because he didn't like the color -- she didn't like the
19  color of his shoes, not biased because, you know, she was
20  cranky that day, you know, because of his sex.
21       Now, what about this record points to sex?  Nothing.
22           THE COURT:  Well, I think their argument is -- and I
23  can be correct that I said this before -- and they recite what
24  they allege is just a whole host of unexplainable errors, that
25  the -- a conclusion, if not the conclusion, is that the only

1 reasonable explanation for that many errors, it must have been
2 bias.

3       MR. RICHARDS:  And I think the problem that they have
4 with that is, number one, I don't think it's plausible, and I
5 certainly don't think it's been proven by clear and convincing
6 evidence, but they're also not operating in a vacuum.

7       Think about the way this system is set up in the first
8 place.  The university -- it is in the university's great
9 interest to get these right.  There's no interest in getting
10 these wrong and ending up in court because guess what?
11 Somebody threatens to sue the university in almost every single
12 one of these cases.  The complainant is unhappy, the respondent
13 is unhappy.

14      Our interest is in getting it right.  So how do we do
15 that?  Well, the first thing we do is we design a system that
16 has an enormous amount of process with a ton of internal
17 opportunity for error correction because, by the time we get to
18 the end of the case, we want it to be bulletproof.  We want it
19 to be right.  If there was a problem, we want to send it back
20 down and fix it because we don't want to be in here.

21      Now, what Miss Davis said about the investigation being
22 accepted as fact is completely belied by the record.  The
23 investigation -- the purpose is to elicit a whole bunch of
24 facts to allow the hearing officer to know what's material.
25 Nothing is taken as given at the hearing.  It is a fresh bite

1 at the apple.

2      There was extensive cross-examination at the hearing as to

3 a number of issues that were raised by the investigator.  Then

4 you have the hearing.  And at the hearing, there are multiple

5 opportunities to weigh in with places where you think there was

6 error.

7      They barely objected at the hearing, your Honor.  I mean,

8 there are a small handful of things that they said weren't

9 right, the most prominent of which was whether or not evidence

10 should be allowed of whether or not the 120-pound claimant was

11 strong enough to physically fight off the respondent when there

12 was never even a suggestion that there was a physical struggle.

13 So that's the extent of the objections at the hearing.

14      Then you get to the hearing report, you get a reasoned

15 outcome, and you get the chance to appeal it.  Oh, I'm sorry.

16 I missed an important part.

17      The hearing officer isn't a university employee.  The

18 hearing officer is an independent person they bring in from the

19 outside who has no skin in this game, other than their ethical

20 duty to get to the right outcome.  So the hearing officer

21 decides.

22      Then it goes up to a third person, who's also external --

23 in this case, someone who had, I don't know, 20 years of

24 experience in government agencies working in civil rights, no

25 connection to the parties, looks at it, and is required to say,

okay, I'm going to take an objective look at this. Are the errors in this to me indicative of bias? I'm looking at this as somebody with no skin in the game here, and I don't see it.

I see errors. In fact, the hearing -- the appeal officer identified a couple of things that he didn't like about the hearing, but none of them met the standard, which was bias that affected the outcome or procedural error that affected the outcome.

So, I mean, can you imagine the amount of process that goes into this? I mean, this is an allegation that happens between two students. And you have, I don't know, a dozen people, a dozen professionals involved in this process from start to finish. You have a 13-hour hearing. You have a 25-page appeal written by a professional with, you know, 20 years of government experience.

There's no room for an inference of bias in a process that's set up like that because you have to allege that every single person throughout it was involved in a conspiracy, instead of concluding -- and, again, we're not under Rule 12. But is it plausible that all of those people were in on the fix here? I mean, it certainly isn't proved by clear and convincing evidence. I mean, that's the problem.

There are cases out there, your Honor. There are cases out there where plaintiffs allege that gendered emails between hearing officer and appeal officer were sent, that there were

1  jokes that were made, that there are -- you know, that there
2  are chats talking about how this respondent is, you know, so
3  guilty.  That's not this case.  There's none of that in this
4  case.  And Miss Davis's firm is very experienced in this area.
5  They bring cases that are like that.  This isn't a case that's
6  like that.

7      There's just no nexus at all between the facts of what
8  happened and gender.  And if you look at the hearing officer's
9  affidavit, if you look at the appeal officer's affidavit, they
10 will all tell you exactly that.

11          THE COURT:  Miss Davis, I mean, let me ask you the
12 ultimate question.

13          MS. DAVIS:  Yes.

14          THE COURT:  Even if the Court accepts everything
15 that's alleged in the complaint as true, with the many alleged
16 errors, the Court -- to grant your motion, the Court would have
17 to find, by clear and convincing evidence, that the plaintiff
18 will likely succeed on the claim, which includes the but/for
19 sex requirement.

20          MS. DAVIS:  Yes, that's correct.

21          THE COURT:  Yeah.  And the Court's having a little
22 trouble getting there.  I'll be honest with you.  It's the
23 standard -- if we were 12 -- 12(b), you know, we wouldn't be
24 having a hearing.  I'm sure you'll file your motion, that's
25 what lawyers do, but it will be denied.  So --

 1          MR. RICHARDS:  Thank you, your Honor.

 2          MS. DAVIS:  Yes.

 3          THE COURT:  So the question is, to try to get the

 4  Court to believe by clear -- I'm going to say it -- clear and

 5  convincing evidence of a likelihood to succeed, including on

 6  the this wouldn't have happened, but for discrimination and

 7  bias based on sex.

 8          MS. DAVIS:  And I think that's addressed by the

 9  number -- the sheer number of procedural irregularities and the

10  fact that the hearing officer decision was just not supported

11  by the evidence.  This is not a situation of one or two issues,

12  where there was maybe a small inconsistency, but, given the

13  full scope or universe of the facts, that was minor.

14      As I articulated earlier -- and those were not even all of

15  the issues with the decision that went against the weight of

16  the evidence.  There were text messages that were misconstrued

17  and misrepresented between claimant and -- or Jane Roe and her

18  friends.  There were other adverse inferences drawn.

19      So when you look at all of that, there is case law stating

20  that, when the evidence favors one party's version, but the

21  evaluator reaches the opposite conclusion, that is indicative

22  of gender bias.  So we feel that --

23          THE COURT:  It can be.

24          MS. DAVIS:  Yes.

25          THE COURT:  No doubt.

1          MS. DAVIS:  Yes.

2          THE COURT:  But clear and convincing, the likelihood

3 of success.

4          MS. DAVIS:  And looking at -- the fact that every --

5 every inference that was drawn went against Doe, the accused.

6  So, again, this wasn't a situation where there were

7 20 inconsistencies, and the hearing resolved some in favor of

8 each party and then made a credibility assessment.  Every

9 inference that was drawn went against him, even those where the

10 evidence favored his side of the events.

11     And keep in mind that the university bears the burden of

12 proof here.  It's not on Doe.  And they failed to do that.

13 They failed to do that when they reached a decision that was

14 not supported by the evidence and drew every inference against

15 him.  The only logical explanation for that is there was a

16 gender bias that motivated that finding.

17          THE COURT:  All right.  If anybody else wants to say

18 anything, that's fine.  If anybody wants to create a record,

19 that's fine, too, but --

20          MR. RICHARDS:  No.  I think we're satisfied, your

21 Honor.

22          MS. DAVIS:  I was just going to address the balance of

23 the hardships issue, but I think we've addressed most of that

24 in terms of --

25          THE COURT:  I saw Mr. Whelan about this yesterday.

1   And it's awfully hard to imagine the case where you can find

2   likely success on the merits, irreparable harm, but the balance

3   is tipped the other way.

4           MS. DAVIS:  This is true, yes.

5           THE COURT:  I guess it's all well and good to have

6   those other two elements in there, but it's hard to imagine.

7   If you win on the first two, you're going to lose on the

8   other two.

9           MS. DAVIS:  Understood.  Thank you.

10          THE COURT:  All right.  Well, the Court will get an

11  order out today just with its ruling.  Obviously, we'll have a

12  more fulsome written order in support or a written memo in

13  support of that order because I know the parties need an answer

14  today, and you'll get one, and a more fulsome memo explaining

15  that order will follow if I can get myself out of court and get

16  to work on it.

17      Now, as I said, I am wholly content -- this is a Middle

18  District case, and I am wholly content to hold any future

19  hearings as necessary in Winston-Salem.  I'm also wholly

20  content to sit right here if -- because I know a lot of you

21  travel, and this may be a more convenient place to fly into

22  than somewhere else.  I don't want my fellows in the Middle

23  District to think I'm dissing them in any way by not showing

24  up.  Mr. Jones knows I love going to Winston-Salem.

25      So not to commit anybody here, but do you have some

1  thoughts on where you would like to conduct these hearings as

2  necessary?

3        MS. DAVIS:  I mean, for me, personally, I flew in from

4  Boston, and there are probably more flights to Charlotte

5  available if that's -- but I'm glad to go anywhere that the

6  Court would --

7        MR. RICHARDS:  Yeah.  At the risk of incurring my

8  client's ire -- it's a longer trip for them -- it's certainly

9  easier for me to get here.

10        THE COURT:  Well, we'll just try to be accommodating

11  about that because I do want to be accommodating.  And it's not

12  about me.  I'm happy to go anywhere.  I hold court in

13  Statesville all the time, including next week, and it's only

14  35 more minutes to get to Winston, so it's not a problem

15  for me.

16        MR. RICHARDS:  Your Honor, may I just be heard on one

17  logistical question?  In all the hubbub around this, I've lost

18  track around when and whether service was made, et cetera.

19    Can we agree to hold a response to the complaint in

20  abeyance pending the opinion on the TRO so that we can address

21  the issues that are raised in the Court's ruling?  The Court

22  may make findings of law that we may need to incorporate.  I'd

23  hate to sort of duplicate efforts there.

24        THE COURT:  We can hold that in abeyance because it

25  isn't going to take long.

1          MR. RICHARDS:  Thank you, your Honor.

2          THE COURT:  It won't take long, so we can hold it in

3 abeyance.

4     All right.  Anything you want to discuss or that we could

5 briefly discuss?  I know that only took an hour, but I really

6 do feel like I benefit from the back-and-forth and being able

7 to talk to the attorneys.  I particularly hate telephone

8 conferences because you don't know whose's talking and, if you

9 do, they're talking over each other, and it doesn't really

10 allow for much give-and-take.  So I really appreciate everyone

11 making the effort to get here, even though it only took an

12 hour.  It's obviously an important question.  There was urgency

13 to it.  And as I said before, this would be an easy call if we

14 were at a 12(b)(6) hearing, but not so easy in this context.

15     All right.  We'll be in recess till Tuesday morning.

16          (End of proceedings.)

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4

 5           I, DEBORAH COHEN-ROJAS, Federal Official Court

 6   Reporter for the United States District Court for the Western

 7   District of North Carolina, a Registered Diplomate Reporter,

 8   Certified Realtime Reporter, and Federal Certified Realtime

 9   Reporter, do hereby certify that I reported by machine

10   shorthand the foregoing proceedings contained herein on the

11   aforementioned subject on the date herein set forth, and that

12   the foregoing pages constitute a full, true and correct

13   transcript.

14

15           Dated this 28th day of February, 2023.

16

17

18

19

20   _____

21                    DEBORAH COHEN-ROJAS
                       RDR, CRR, FCRR
22                    Federal Official Court Reporter

23

24

25
```