**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**CIVIL ACTION NO. 1:23-CV-00114**

| | |
|---|---|
| **JOHN DOE,** | |
| **Plaintiff,** | |
| **v.** | **ORDER** |
| **WAKE FOREST UNIVERSITY,** | |
| **Defendant.** | |

**THIS MATTER** is before the Court on Defendant's Motion to Dismiss for Failure to State a Claim (Doc. No. 31). For the reasons discussed below, which reflect the more lenient standard of review of a plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6), the Court will deny the motion. Defendant's motion to dismiss the Title IX claim will be denied for the reasons previously stated in Doc. Nos. 25, 27, 33 and the February 17, 2023, hearing. The Court will also allow Plaintiff's breach of contract claim to proceed. Plaintiff has alleged that Wake Forest violated "identifiable" and "specific" contractual terms of the parties' relationship related to the process by which students could be suspended from the University. Therefore, even though it is a close question as to whether Plaintiff has alleged an objective material breach of that process rather than unavailable subjective claims that the process could have been implemented more fairly or the school simply reached the wrong result, the Court will wait until summary judgment to reach a final decision on whether Plaintiff's breach of contract claim can proceed to trial.

## I.    LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted" tests whether the complaint is legally and factually

sufficient. See Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012). A complaint must only contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* In evaluating whether a claim is sufficiently stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, ... bare assertions devoid of further factual enhancement[,] ... unwarranted inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). Further, a court is not bound to "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002); *see also Miller v. Pacific Shore Funding*, 224 F.Supp.2d 977, 984 n.1 (D. Md. 2002) ("When the bare allegations of the complaint conflict with any exhibits or documents, whether attached or adopted by reference, the exhibits or documents prevail") (citing *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)); *Sec'y of State for Defense v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Thus, a motion to dismiss under Rule 12(b)(6) determines only whether a claim is stated; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

## II.    FACTS AND PROCEDURAL HISTORY

Plaintiff John Doe, a senior student at Wake Forest, was suspended for one year from the University on January 24, 2023, after he was found to be responsible for an alleged sexual assault on a female Wake Forest student ("Jane Roe") in October 2021. In brief summary, John and Jane were involved in a dating relationship during their Sophomore year that included numerous

instances of sexual activity, although not including intercourse. The relationship continued, albeit on a more limited basis, when they returned for their Junior Fall semester. On the night in question, John accepted Jane's invitation to be her date at a sorority social event. After the party, the two returned to Jane's dorm room to spend the night (as they had done before) and engaged in sexual relations. Jane contends that she was assaulted when John engaged in intercourse either while she was incapacitated by alcohol or after she withdrew her consent to intercourse once it began. She also contends that she was assaulted the next morning when John engaged in further sexual activity while she was incapacitated due to sleep. John denies committing any assault, denies that the two engaged in intercourse and generally describes their sexual relations that night and morning as consistent with their consensual relationship that preceded that evening. He also alleges that Jane's complaint was motivated by his decision to begin dating another Wake Forest student shortly after the events in dispute.

On April 12, 2022, approximately six months after the alleged assault, Jane filed a Formal Complaint against John pursuant to the Wake Forest University Sex and Gender Discrimination and Harassment Policy and Title IX Sexual Harassment and Non-Title IX Sexual Misconduct Grievance Procedures (the "Policy"). John received a written Notice of Allegations under the Policy the next day. Jane and John then agreed to participate in Adaptive Resolution, a process in which the students attempt to reach a resolution prior to a formal investigation. After Adaptive Resolution was unsuccessful, an investigation proceeded at Jane's request consistent with the Policy.

A "Title IX Investigator," who is a University employee, interviewed John and Jane four times each. In Jane's first interview with the investigator she alleged for the first time that the claimed assault included intercourse. Based on this information, the University's Title IX

3

department provided John with a supplemental Notice expanding Jane's allegations before his first interview with the investigator. In addition to John and Jane, the investigator interviewed six other witnesses and collected documents and exhibits submitted by the parties. On November 5, 2022, the Investigator issued a twenty page written report to both John and Jane.

A hearing was then held on November 29, 2022, before attorney Dixie T. Wells, a partner in the Ellis & Winters, LLP law firm, who served as the appointed external "Hearing Officer." The hearing lasted over ten hours and included in-person or Zoom testimony from John, Jane and several other witnesses. At the hearing and during the investigation, John was represented by legal counsel, who was given an opportunity to present witnesses and cross-examine Jane and the other witnesses. On December 20, 2022, Ms. Wells issued her decision in the form of a twenty-five page single spaced "Final Outcome Letter," finding that the evidence established that it was more likely than not that John Doe committed sexual misconduct in violation of University policy. Under the Policy, a University Administrator then determined the punishment for the violation, which was set as a one year suspension. On January 3, 2023, John filed an Appeal of the Final Outcome Letter and suspension. On January 23, 2023, Appeal Officer Howard Kallem, another external attorney, issued a detailed Appellate Decision, which affirmed the Final Outcome Letter.

The University then finalized Plaintiff's suspension on January 24, 2023, and he has not attended classes since the suspension was imposed (although he was permitted to do so remotely during his appeal). On February 7, 2023, Plaintiff filed his Complaint in this action alleging two causes of action – violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681, et seq., ("Title IX") and breach of contract. The same day, Plaintiff filed a motion seeking a TRO and preliminary injunction enjoining Wake Forest from further enforcing its decision to suspend him from the University for one year, thereby allowing him to immediately return to his classes

4

and obtain his degree upon successful completion of his degree requirements. After a hearing on the Motion on February 17, 2023, the Court denied the motion in two subsequent orders holding that Plaintiff had failed to establish a likelihood of success on the merits based on the limited record before the Court. *See* Doc. Nos. 25, 27.

Notwithstanding the Court's suggestion that a motion to dismiss not be filed (in particular with respect to Plaintiff's Title IX claim), Defendant filed its motion to dismiss both of Plaintiff's claims on March 16, 2023. Doc. No. 31. Noting again that it intended to allow Plaintiff's Title IX claim to proceed, the Court permitted the parties to fully brief Defendant's motion to dismiss Plaintiff's breach of contract claim. Doc. No. 33. That briefing has now concluded and the full motion is ripe for the Court's decision.

## III. DISCUSSION

### A. Title IX

For the reasons discussed in the Court's earlier orders, Defendant's motion to dismiss Plaintiff's Title IX claim will be denied. *See* Doc. Nos. 25, 27, 33. In brief summary, the Court has held that while Plaintiff's allegations fall short of clear evidence that the Plaintiff is likely to succeed on the merits of his Title IX claim at trial; that is, establishing that a jury will likely find that Plaintiff has proven that gender bias was a "but-for" cause of Plaintiff's suspension, "the Court [has] no difficulty in denying a defense motion under the significantly lower Rule 12(b)(6) standard for merely 'plausibly' stating a claim under Title IX…" *See Doe v. Wake Forest Univ.*, No. 1:23-CV-00114, 2023 WL 2239475, at *7 (M.D.N.C. Feb. 27, 2023).

Further, in its motion Defendant emphasizes its argument that Plaintiff cannot succeed in proving "but...for" causation based, in part, on the purported absence of discrimination in the limited "appellate" review of the hearing officer's decision. The Court notes that, contrary to

5

Defendant's suggestion, this argument was indeed previously made to the Court in connection with the consideration of Plaintiff's motions for injunctive relief. *See, e.g.*, Doc. No. 20 at 23 ("Plaintiff notably makes no serious allegation that the Appellate Decision is the product of bias…"). Moreover, Defendant's primary reliance on *Neal v. E. Carolina Univ.*, 53 F.4th 130 (4th Cir. 2022) is unpersuasive at this stage of the case. *Neal* reflects the Court of Appeals' review of a motion for Summary Judgment not a motion to dismiss. *See Neal*, 53 F.4th at 150 ("We've considered … the record evidence … and conclude that the district court did not err in holding that the undisputed record would preclude a jury from finding in favor of Neal on the issue of causation."). Therefore, Defendant's motion to dismiss Plaintiff's Title IX claim will be denied.

### B.     Breach of Contract

Plaintiff's second claim alleges that Defendant breached a contract with Plaintiff by violating the University's Sex and Gender Discrimination and Harassment policy and procedures. Under governing North Carolina law, the elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract. *Montessori Children's House of Durham v. Blizzard*, 781 S.E.2d 511, 514 (N.C. Ct. App. 2016); *Herrera v. Charlotte Sch. of L., LLC*, No. 17 CVS 1965, 2018 WL 1902556, at *9 (N.C. Super. Apr. 20, 2018). Thus, the issues presented by this motion are whether 1) a valid contract existed between Plaintiff and Defendant which included the terms of the Policy and 2) Plaintiff has sufficiently alleged a breach of that putative contract. The Court finds that Plaintiff's contractual relationship with Defendant included at least some of the terms of the Policy and that the Complaint, applying the generous standard of review at this early stage of the action, states a plausible claim for breach of that contract.

6

"It is held generally in the United States that the basic legal relation between a student and a private university or college is contractual in nature." *Ryan v. Univ. of N.C. Hosps.,* 128 N.C.App. 300, 301 (1998) (quoting *Ross v. Creighton Univ., 957* F.2d 410, 416 (7th Cir.1992)). However, a valid contract is formed only if there is mutual intent to contract and an agreement on sufficiently definite terms to be enforceable. *See Parker v. Glosson,* 182 N.C.App. 229, 232 (2007) ("No contract is formed without an agreement to which at least two parties manifest an intent to be bound"); *Elliott v. Duke Univ., Inc.,* 66 N.C.App. 590, 595 (1984) (noting that a contract does not exist if "one party simply believes that a contract exists, but there is no meeting of the minds."). Thus, in North Carolina, a student may bring a breach of contract action related to an "educational contract" when the student is able to point to an identifiable contractual promise that the university failed to honor. *Williams v. Livingstone Coll., Inc.*, 239 N.C. App. 468 (2015), citing *Ryan,* 128 N.C.App. 300, 301–03.

In *Ross,* on which the North Carolina Court of Appeals[1] specifically relied in *Ryan* and *Williams*, the court recognized that in the college setting "a formal university-student contract is rarely employed" and, consequently, "the general nature and terms of the agreement are usually implied, with specific terms to be found in the university bulletin and other publications; custom

---

[1] In ruling on matters of North Carolina law, this Court must predict how the Supreme Court of North Carolina would rule; however, that court has not directly addressed these issues. Accordingly, this Court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." *See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C.*, 433 F.3d 365, 369 (4th Cir. 2005). Further, this Court must "follow the decision of an intermediate state appellate court unless there [are] persuasive data that the highest court would decide differently." *See Town of Nags Head v. Toloczko*, 728 F.3d 391, 398 (4th Cir. 2013); *Hicks v. Feiock*, 485 U.S. 624, 630 & n.3 (1988). Moreover, in predicting how the highest court of a state would address an issue, this Court "should not create or expand a [s]tate's public policy." *Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp.*, 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); *Hampton v. KPM LLC*, 423 F. Supp. 3d 172, 176–77 (E.D.N.C. 2019).

7

and usages can also become specific terms by implication." *Ross*, 957 F.2d at 417; *Williams*, 239 N.C. App. 468 (quoting *Ross* in holding that, "[t]he catalogs, bulletins, circulars, and regulations of the institution made available to the matriculant become a part of the contract").[2]

However, general policies, alone, are not sufficient to establish an implied contract. *See, e.g.*, *Herrera*, 2018 WL 1902556, at *10; *McFadyen v. Duke Univ.*, 786 F.Supp.2d 887, 983 (M.D.N.C. Mar. 31, 2011) (concluding that the university's "general policy against harassment [did] not provide any indication of any mutual agreement between Duke and the students," but that the Code of Conduct's specific provisions "outlining certain procedures to be followed before a student would be suspended" were sufficient to establish a contract term); *Doe v. Lees-McRae Coll.*, No. 1:20 CV 105 MR WCM, 2021 WL 1096285, at *10 (W.D.N.C. Feb. 4, 2021) (general assurance of a "safe, supportive, accommodating campus environment" does not suggest an obligation to be bound to any specific or identifiable course of conduct and thus is not an "identifiable contractual promise," as required by North Carolina law); *Shaw v. Elon Univ.*, 400 F. Supp. 3d 360, 368 (M.D.N.C. 2019) ("The language Elon employs in its Student Handbook [such as violations should be handled "expeditiously and thoroughly"] is aspirational and cannot reasonably be interpreted as a guarantee.").

In sum, to assert a legally enforceable contract against a university, "the student 'must point to an identifiable contractual promise that the University failed to honor'" that can be judged

---

[2] Only student / school contractual relationships are at issue in this matter. Colleges have separate and distinct relationships with their employees, which are governed by other well-established principles, including different rules concerning how and when employment handbooks become part of an employee's contract. *See Black v. W. Carolina Univ.*, 109 N.C. App. 209, 213, 426 S.E.2d 733, 736 (1993) ("[T]he law of North Carolina is clear that unilaterally promulgated employment manuals or policies do not become part of the employment contract unless expressly included in it."(citation omitted)). Indeed, rather than employees, students are "customers" who purchase a college's educational and social experience as described further below.

8

objectively. *Supplee v. Miller–Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 219, 768 S.E.2d 582, 592 (2015) (quoting *Ryan*, 128 N.C. App. at 302, 494 S.E.2d at 791); *Herrera*, 2018 WL 1902556, at *9. If a student's claim includes such "identifiable contractual promises," the court can make "an objective assessment of whether the institution made a good faith effort to perform on its promise," without inquiring into the nuances of educational processes, thus permitting a breach of contract claim to survive. *Id.*; *see Ryan*, 128 N.C. App. at 302, 494 S.E.2d at 791 (finding that the student's allegation that a university breached its contract by failing to provide a one-month rotation in gynecology was sufficient to support his breach of contract claim); *Williams,* 239 N.C. App. at 468 (college catalog held to be part of the contract between the college and the student but denying breach of contract claim because course syllabus included notice of required exam); *Supplee*, 239 N.C. App. at 220 (affirming verdict in favor of student on breach of contract claim where the college failed to perform a background check which was noted as required for program admission in the student catalog); *McFadyen*, 786 F.Supp.2d at 983 (allowing plaintiff's breach-of-contract claim to proceed as to plaintiff's allegation that "Duke failed to follow promised procedures for imposing discipline (particularly suspension) under the Code of Conduct").

Purporting to apply these principles here, Defendant argues that Plaintiff's breach of contract claim fails "because … student handbooks and other published policies and procedures do not constitute legally binding contracts … unless expressed into a standalone written contract," and "North Carolina courts have consistently rejected the existence of a contractual relationship because such handbooks are unilateral in nature and subject to change without notice by the university." Doc. No. 32 at 1-2. In response, Plaintiff argues that its allegations, including that "a contractual relationship existed between Wake Forest and Plaintiff by virtue of Plaintiff's enrollment at Wake Forest and as defined by and through Wake Forest's policies and procedures

governing the student disciplinary system, including [the Policy]," Doc. No. 1 at ¶¶ 403-409, sufficiently allege a valid contract. The Court agrees with Plaintiff, at least to the extent necessary to permit his breach of contract claim to proceed.

As discussed above, Defendant's asserted limitations on how and when an enforceable contract between a student and a college is created misstates North Carolina law. Specifically, the cited North Carolina Court of Appeals cases do not require a "standalone written contract." On the contrary, *Ryan*, *Williams*, etc. consistently quote *Ross'* declaration that "a formal university-student contract is rarely employed and, consequently, "the general nature and terms of the agreement are usually implied." *See Williams*, 239 N.C. App. 468. Moreover, the governing cases hold that these "implied" agreements are to be fleshed out "with specific terms to be found in the university bulletin and other publications." *Id*., quoting *Ross*, 957 F.2d at 417. Thus, to the extent that *Shaw* or any other federal district court cases cited by Defendants hold otherwise (which the Court need not decide) the Court respectfully declines to follow them as inconsistent with the North Carolina authorities.

Also, unlike the unilateral and one-sided contract urged by Defendant, the true nature of the contractual relationship between a university and its students reflects mutual and reciprocal obligations. In the bargain between school and student, the student promises to pay tuition and other fees in return for the right to pursue an academic degree and otherwise participate in the school's educational and social experience.[3] However, either expressly or impliedly, the student's

---

[3] The bounds of enforceable reciprocal obligations related to participation in the school "experience" are, however, narrow and focused on those policies which may impair a student's fundamental right to attend or obtain an education. *See Ross*, 957 F.2d at 417 (noting a potential claim if, for example, "the defendant took tuition money and then provided no education, or alternately, promised a set number of hours of instruction and then failed to deliver"). Thus, a university's contractual commitments do not include all aspects of college life that might be

10

purchased right of attendance is conditional. That is, both sides mutually agree that a student can remain a student only so long as he or she meets the financial, academic and behavior requirements set by the school. Yet, the flexibility granted to the school by the student to enact, modify and enforce the rules and polices on which being an enrolled student depends does not mean that the school is free to simply ignore them. Rather, the student's payment of tuition and fees creates a *reciprocal* obligation on the parties to follow those rules and policies on which continued attendance is conditioned. In other words, a school cannot assert control over the behavior of students (and the related right to expel those who don't abide by the rules) without the reciprocal obligation to follow its own rules for exerting that control.

If, as in effect argued by Defendant, a school could summarily and arbitrarily dismiss students without any regard for its established and published procedures then the conditional right to attend the school would be "illusory" and the contractual agreement (including the obligation to pay tuition) unenforceable. *See Bowman v. Hill*, 45 N.C. App. 116, 117-118, 262 S.E.2d 376, 377 (1979) ("An apparent promise which, according to its terms, makes performance optional with the promisor no matter what may happen, or no matter what course of conduct in other respects he may pursue, is in fact no promise. Such an expression is often called an illusory promise." (internal citations omitted)). Thus, while individuals are free to enter into contracts that confer "on one party a discretionary power affecting the rights of the other," *Mezzanotte v. Freeland*, 20 N.C. App. 11, 17, 200 S.E.2d 410, 414 (1973), in such contracts, the "discretion must be exercised in a reasonable

---

referenced in advertisements, websites, student handbooks or other sources of information about the school. For example, representations as to dining room food, recreational and club opportunities, dormitory amenities, etc. are unlikely to be considered contractual promises (outside of a separate dining or dormitory contract), even though the availability of midnight pizza or a rock-climbing wall might have been a significant factor in a particular student's decision to matriculate.

manner based upon good faith and fair play." *Id.* Here, such good faith properly translates into at least a plausible claim that the school is obligated to materially follow its policy and procedures related to student sexual misconduct, including the possible dismissal or suspension of students accused of violations. Therefore, the Court concludes that Plaintiff has carried its limited Rule 12(b)(6) burden to allege the existence of a valid contract that includes the material objective protections of the Policy.

The second element of Plaintiff's breach of contract claim – whether he has sufficiently alleged a breach of the contract the Court has found above – is a closer question. As in *McFadyen* and *Neal*, the Court must distinguish between allegations related to a subjective assessment of how Defendant's sexual misconduct policies and procedures operated in Plaintiff's case and violations of fundamental procedural protections in the Policy. *See McFadyen*, 786 F.Supp.2d at 983; *Neal*, 2018 WL 2027730, at *7 (allowing plaintiff's breach of contract claim to go forward on a limited basis with regard only to the alleged failure to follow the promised procedures in the appeal process). Specifically, subjective or "aspirational" claims related to the overall "fairness" of the process[4] and whether the hearing officer or others made "mistakes" of judgment in handling the claims against the Plaintiff, including the ultimate correctness of the decision to find Plaintiff "responsible" for misconduct and suspend him, are not enforceable identifiable objective contractual promises. In other words, Plaintiff is entitled to insist that Wake Forest materially comply with its process for adjudicating claims of sexual misconduct, but not entitled to have the Court or a jury review the outcome of the process as a breach of contract. *See Doe v. Wake Forest*, 2023 WL 2239475, at *4 ("Federal courts do not sit to finally adjudge all disputes that may arise

---

[4] The Court refers here to allegations beyond Plaintiff's claims that Defendant was biased in violation of Title IX, which are subject to the separate statutory analysis discussed above.

as a result of a school's decision to discipline a student" … "[T]his Court does not sit as a super-school disciplinary appeal board.).

Plaintiff alleges that Wake Forest breached the Policy in several ways.   Plaintiff contends that Wake Forest: 1) failed to provide Plaintiff with proper notice of the allegations against him, Doc. No. 1 at ¶ 305; 2)  violated Section 2A.15 of its Procedures which mandates that students be presumed not responsible for alleged sexual harassment until a determination regarding responsibility is made by allowing Jane Roe to supplement her allegations to include an additional charge of non-consensual sexual intercourse, *Id*. at ¶¶ 420-422; 3) failed to conduct a fair hearing thereby violating the "assurance" that those involved in the investigation process will be trained to "not rely on sex or gender stereotypes" and to "promote impartial investigations and adjudications," as well as Section 3A.02 of the Procedures which addresses the right of both parties to question the other party and any witnesses during the hearing, *Id*. at ¶¶ 426-427 and 4) violated its obligation to address instances of retaliation, as required by Sections 1.01 and 1.02 of the Procedures, *Id*. at ¶¶ 452-453.

Plaintiff's first and second allegations are based on the university's decision to permit Plaintiff's accuser to supplement her charges, without any specific allegation that the Policy prohibits such amendments. As to "notice," the Complaint reveals that Plaintiff in fact received prompt notice of both the original and amended charges. *Id*. at ¶¶ 414, 425. And, the second allegation appears to directly challenge whether or not the school's investigator "believed" Plaintiff's accuser in allowing her to add to her complaint. Thus, the Court questions if these allegations fall within the bounds of the permitted "procedural" claims of breach of contract. Similarly, Plaintiff's third allegation that the hearing was "unfair" asserts claims based on general "aspirational" promises of "impartial" investigations. So, except for his additional allegations that

13

the hearing officer conducted the hearing without permitting Plaintiff to effectively cross examine witnesses, Plaintiff's allegations that he did not receive a "fair hearing" seem to go to the substance rather than the process of the hearing (and, as to the allegations that the hearing officer was biased are subsumed in Plaintiff's Title IX claim). Finally, Plaintiff's allegations concerning Defendant's failure to pursue a putative "retaliation" claim against Jane Roe and her friends, which he does not explain as directly impacting the process that led to his suspension, again appears to relate primarily to Defendant's exercise of discretion in handling various allegations rather than a fundamental procedural error.

Despite these potential shortcomings, the Court has determined that it will allow Plaintiff's claim of breach of contract to proceed under the applicable generous standard of review. However, the Court's ruling comes with the caveat that, as stated in *McFadyen*, the Court "will look closely at summary judgment to determine if Plaintiffs have presented evidence of a breach of a specifically enforceable, procedural promise." In the absence of such a showing, Plaintiff's claim of breach of contract will not be permitted to proceed.

## IV.    ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Defendant's Motion to Dismiss (Doc. No. 31) is **DENIED**; and

2. This case shall proceed towards a determination of the merits of Plaintiff's claims in the absence of a voluntary resolution of the dispute among the parties.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: May 1, 2023

Kenneth D. Bell
United States District Judge

14