

# *CONFIDENTIAL*

# Transcript of John Doe

**Date:** May 23, 2023
**Case:** Doe -v- Wake Forest University

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

EXHIBIT C

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

---

**Page 9**

Q  Did you request and obtain emails from any third parties related to this case -- I should say -- strike that.
     Did you request emails and other documents related to this case from any third parties?
A  Are you saying did we request documents from the defendant -- the defendant?
Q  For instance, did you request emails from your friends or your parents, communications, that sort of thing?
A  No, I didn't request it.
Q  Did your parents provide you with communications that they had to provide to your attorneys?
A  Yes.
Q  What sort of documents did your parents provide to you?
A  My parents had provided -- for instance, my dad, I know, tallied up receipts and documentation, say, for instance, regarding the polygraph; instances where he may have paid for legal counsel and documents on his end.
     And as for my mom, as of today, I don't have a full recollection of what she's provided, but she's been involved in helping the process.

---

**Page 10**

Q  What sort of things was she involved in in helping the process?
A  She served as -- I guess while she was not my adviser in the Title IX hearing, she was a close person for emotional support. She appeared in the -- she attended the hearing, so she has notes related to the case. Other than that, I can't be sure, as of today, what she has or what she already has provided.
Q  How did you communicate with your mother about the case?
A  It would be in the form of texts, phone calls, and then there would be emails as well.
Q  And did you provide all of your texts and emails between you and your mother to your counsel for production in this case?
A  To the best of my recollection, I provided all texts necessary to the case to my attorneys.
Q  And just to be clear that we're talking in the same vein here, you provided all of the texts and emails that were related to this case to your attorneys?
A  Yes.
Q  You also said that your mother prepared notes related to this case. Did you provide those notes to your attorneys?

---

**Page 11**

A  No.
Q  Did your mother draft any of your emails, statements, or other communications that you then provided to Wake Forest as part of the process?
A  Yes.
Q  Did you provide drafts of those ghostwritten statements to your attorneys as part of the discovery process?
     MS. DAVIS:  Objection.
     MR. RICHARDS:  Basis?
     MS. DAVIS:  To the form.  He didn't describe it as -- what was it? -- ghostwritten documents.  I don't know that that's an accurate characterization.
     I would also note that we didn't agree to stips at the beginning, but are we reserving objections as to -- except as to form?
     MR. RICHARDS:  Yes.
     MS. DAVIS:  Okay.
BY MR. RICHARDS:
Q  You said a moment ago that your mother drafted emails on your behalf.  Correct?
A  I believe the question you asked included other documentation besides emails.  But yes, she has -- I recall there being a time where she did

---

**Page 12**

draft an email.
Q  Was it one email or more than one?
A  I don't -- I can't recollect as of today.
Q  Did you provide -- well, strike that.
     When somebody drafts a document on behalf of someone else, do you understand that to be the definition of ghostwriting something?
A  Yes.
Q  And did you provide, as part of the discovery process, drafts of the documents that your mother ghost-wrote for you?
A  I don't remember as of today.
Q  After today's deposition, would you please go back and search for documents that your mother drafted at your behalf and provide those to your counsel?
A  Yes, sir, I would be happy to.
(This page contains requested information.)
Q  Did you obtain documents from your father related to this case?
A  I don't remember.
Q  Did you ask your father to provide documents related to this case to you?
A  To me directly, I don't remember.  He may have directly communicated with my attorneys.

---

**Page 21**

1 to receive any new emails. I don't think that was
2 ever a possibility. I think I was wrong in that
3 regard.
4     And then I don't think I was able to get a
5 full download of all of my emails from the Wake one
6 to the first name, last name, 2. I just can't
7 recollect as of today. But for -- generally, I don't
8 think it downloaded all of the emails from the old
9 one.
10 Q  And did you search the first name, last name,
11 1, at Gmail account for emails that would have been
12 responsive to discovery requests in this case?
13 A  Yes.
14 Q  And did you search the first name, last name,
15 2 email address as well?
16 A  No.
17 Q  Why didn't you search that email address?
18 A  I realized that on my MacBook, at least, I --
19 the Wake Forest email address is still like a part of
20 my, like, Apple MacBook mail app. So it still
21 appears there. You know, it tells me it's offline,
22 not receiving any new emails, but -- and I didn't
23 realize this at the time when I created the first
24 name, last name, 2 email address, that all the old
25 emails are just still sitting in there, so I'm able

**Page 22**

1 to search them.
2     And I have searched those -- searched the
3 Wake Forest email. So I didn't need to -- in the
4 end, I didn't need to use the first name, last name,
5 2.
6 Q  And what efforts did you undertake to make
7 sure that none of the Wake Forest emails were lost
8 following your intention to commence this lawsuit?
9 A  I'm sorry. Could you repeat the first part of
10 the question?
11 Q  After you decided to file this lawsuit, what
12 did you do to make sure that all of your emails were
13 preserved and not inadvertently deleted?
14 A  I don't think I did anything specific. I did
15 buy more iCloud storage on my phone, but I don't
16 know -- I don't think that has any effect on it. So
17 I don't know if I did anything specific to preserving
18 emails.
19 Q  What is your Instagram handle?
20 A  [John Doe] 1.
21 Q  And did you search your Instagram for any
22 posts or communications that may have been relevant
23 to this case?
24 A  No.
25 Q  What's your TikTok?

**Page 23**

1 A  I actually don't know off the top of my head.
2 Q  Did you search your TikTok account to see
3 whether there were any posts or messages that would
4 have been responsive to discovery requests in this
5 case?
6 A  I haven't posted a TikTok, and I don't think
7 I've direct-messaged anyone on the app.
8 Q  What is your Twitter handle?
9 A  I believe it's possibly [John], underscore,
10 [Doe], or [Doe], underscore, [John], a
11 combination -- or you know, one of those two, as I
12 recall. I don't remember it fully off the top of my
13 head.
14 Q  Did you search your Twitter account for posts
15 or messages that would have been responsive to
16 discovery requests in this case?
17 A  No. I haven't tweeted on that account or
18 retweeted recently, as I recall. And as for direct
19 messages, the last time I checked was this semester,
20 and I didn't have any -- or this past spring. I
21 didn't have any direct messages related to it.
22 Q  Did you ever post anything on Twitter related
23 to this case?
24 A  No, sir.
25 Q  Is that your only -- are the handles or user

**Page 24**

1 names that you've given me for Instagram, TikTok, and
2 Twitter, are those the only handles that you have for
3 those or do you have additional handles as well?
4 A  I have an additional Twitter handle.
5 Q  What's the additional Twitter handle?
6 A  Same goes for that one: I can't remember the
7 full name off the top of my head right now.
8 Q  Have you ever tweeted under that handle
9 anything related to this case?
10 A  No.
11 Q  Have you ever sent any direct messages on that
12 handle regarding this case?
13 A  No.
14 Q  And did you ever use Snapchat to talk about
15 anything related to this case?
16 A  Yes.
17 Q  And did you search your Snapchat for documents
18 responsive to discovery requests in this case?
19 A  I provided -- I know I provided my -- I
20 collected my Snapchat data. However, I don't recall
21 if I did a search through specific content --
22 specific contacts, messages. In general, messages or
23 pictures are deleted right away or, you know, just
24 don't appear. There's a time limit for them.
25     So no, I do not recall doing any additional

25

search through specific messages. I only recall providing Snapchat data.

Q And to whom did you provide Snapchat data?

A My attorneys.

Q And what was the date that you provided that data, approximately? Was it before the lawsuit was filed or after the lawsuit was filed?

A After the lawsuit was filed.

Q Did you ever try to contact Snapchat to ascertain whether or not the data that had been removed from the app was available?

A No.

Q Did you engage in communications on Snapchat that were related to the underlying allegations or investigation by Wake Forest?

A I'm sorry. Could you repeat that? Are you -- could you clarify? Did you mean throughout the investigation last fall or are you saying more recently?

Q Both.

A Okay. And I'm sorry. Could you repeat the question one more time?

Q Sure. Did you use Snapchat to talk about this case with anybody else?

A I remember I reached out to [Student] at one

26

point last fall, but I can't remember the exact contents of the conversation.

Q Did you ever talk with anybody on Snapchat, since this case has been filed, about the case?

MS. DAVIS: Objection.

Q You can answer.

A To the best of my recollection today, no. I wouldn't have used Snapchat.

Q What about prior to the lawsuit being filed and during the investigation? Did you communicate with anybody in that time period about the investigation or the allegations against you via Snapchat?

A Yes.

Q Who would you have communicated them with? I'm sorry.

A Again, I remember speaking with [Student] over Snapchat, but other than [Student], I don't -- I don't recall any specific people or conversations I had over Snapchat regarding the case.

Q Who is [Student]?

A [Student] was -- it was a -- was a member of the fraternity I was once in at the time of the investigation, and he played a role in our fraternity's judicial board. In that role, he

27

unfortunately dealt with Jane Roe's allegation in a certain capacity.

So as it got closer to my hearing, I believe I reached out to him around then, but again, I can't recall specifically what the details of the conversation were.

Q And when, approximately, would that have been? Close to the hearing date?

A Yes, sir, if I recall.

Q Can you recall having conversations with anyone on Snapchat after the hearing but before you filed the lawsuit?

MS. DAVIS: Objection.

A So prior to filing, you said?

Q After the hearing but before you filed the lawsuit.

MS. DAVIS: Are you asking generally or about some specific topic?

MR. RICHARDS: Fair enough.

Q Communications with people on Snapchat about the underlying allegations, the adjudication, or this lawsuit, in the time period between the hearing and when you filed the lawsuit.

A As of today, I don't recollect having any conversations over Snapchat.

28

Q I think you mentioned a moment ago that prior to today's deposition, you reviewed a copy of the complaint in this matter with your counsel. Is that right?

A Yes.

Q Would it be fair then, during the course of the deposition, for me to assume that you're generally familiar with the allegations in the complaint?

A Yes, that would be fair.

Q And did you review that complaint prior to it being filed?

A Yes.

Q Do you recall signing that complaint?

A No. I don't remember the specific day or time or context of when I signed.

Q Do you remember that you did sign the complaint?

A Yes.

MR. RICHARDS: I'll ask the court reporter to mark the complaint in this case as Exhibit 1.

(Exhibit 1 was marked for identification.)

Q If you would, Mr. Doe, if you'd just flip to the last page of Exhibit 1.

A Right here, the last page?

33

1 Q Who drafted that prehearing statement?
2 A It would have -- I would have likely received
3 help from my mother as well as my adviser.
4 Q When you say "help," what do you mean by that?
5 A Again, I can't remember the specifics of what
6 that document was, since I haven't reviewed it, but
7 my mother would -- she might have written a good
8 portion of it, sent it to me to make changes, sent it
9 to my adviser to make changes.
10    But my mother was helpful in that regard,
11 often putting together a base level of response that
12 either myself or my adviser would be able to make
13 changes to.
14 Q When you say "a base level response," do you
15 mean a first draft?
16 A Yeah.
17 Q Prior to today's deposition, did you review
18 the hearing transcripts?
19 A No. I did not review the transcript of the
20 hearing.
21 Q Do you recall giving an opening statement at
22 the hearing?
23 A Yes.
24 Q Who wrote that opening statement?
25 A I don't recall, but again, my mother likely

34

1 helped with first draft.
2 Q Understanding that you did not review the
3 hearing transcripts immediately before today's
4 deposition, is there anything that you can recall
5 from your testimony at the hearing that you now
6 believe is untrue?
7 A No. I don't believe I said anything untrue in
8 my hearing.
9 Q So it would be fair for me then, in today's
10 deposition, to rely on the truth of everything that
11 you said in the hearing transcript?
12 A Yes.
13 Q And do you recall submitting a declaration in
14 support of the temporary restraining order that you
15 filed in this case?
16 A That sounds familiar. However, at this point
17 in time, I don't have an exact recollection.
18    MR. RICHARDS: Let's mark John Doe's
19 declaration as Exhibit 2, please.
20 (Exhibit 2 was marked for identification.)
21    THE WITNESS: Thank you.
22    THE COURT REPORTER: Thank you.
23 Q Mr. Doe, do you want to just take a moment and
24 review Exhibit 2?
25    I'm going to ask you in a moment whether or

35

1 not there's any statement in that document that you
2 have concerns about the truth of today, but I'd like
3 you to take a look at it first.
4 A Okay. I've had the chance to look through it.
5 Q Having now reviewed it, is there any statement
6 in that declaration that you have concerns about the
7 truth of?
8 A No, sir.
9 Q Prior to this -- prior to the complaint that
10 Jane Roe filed against you, were you aware that
11 Wake Forest had a Title IX policy called "The Sex and
12 Gender Discrimination and Harassment Policy and
13 Title IV Sexual Harassment and Non-Title IX Sexual
14 Misconduct Grievance Procedures"?
15 A While I wasn't aware of the full title, I was
16 aware of the Title IX Office and their duty to uphold
17 that.
18 Q So you were aware that the institution had a
19 policy?
20 A Yes.
21 Q What's the purpose of the policy, as you
22 understand it?
23 A To protect all students from discrimination,
24 and that can come in different forms, as in sexual
25 harassment. But in general, I guess I'm not too

36

1 familiar with the full scope of Title IX, but I
2 know -- as you've described, I was aware of the
3 policies regarding sexual assault, sexual harassment,
4 and things in those regards.
5 Q Could we agree: One of the purposes of the
6 policies is to set out the ways that the University
7 will respond to reports of sexual harassment or the
8 like?
9 A Yes.
10 Q When was the first time that you actually
11 reviewed the University's Title IX policy?
12 A I can't recall the first time I read it.
13 Q Was it before or after you received the notice
14 in this case?
15 A After I received the notice last April.
16 Q Do you have an understanding as to whether or
17 not if Wake Forest receives a formal complaint under
18 the policy that alleges conduct that would violate
19 the policy, whether Wake Forest has discretion to not
20 investigate that complaint?
21 A I'm sorry. Could you repeat that, sir?
22 Q If Wake Forest receives a complaint under the
23 policy, do you understand Wake Forest to be able to
24 decide not to investigate that complaint?
25 A No. I don't -- I don't -- I'm a bit confused

---

69

A   It could have been either my Wake Forest account or my personal first name, last name, 1, @gmail.com.

Q   Did your mother also participate in your preparation session for today's deposition?

A   No.

Q   Did you have an understanding as to whether or not Mr. Fitzgerald had a specialty in Title IX matters?

A   No. I was not aware of him having experience in Title IX matters.

Q   Did he make representations to you one way or the other about his experience in these kind of cases?

MS. DAVIS: Objection. Don't answer. It's privileged.

MR. RICHARDS: So your position about his lawyer's qualifications -- your position is that his lawyer's representations with respect to his own qualifications is a privileged communication?

MS. DAVIS: You asked him if John made any representations to [John]. That would be a communication between them.

MR. RICHARDS: Right, but it's not legal advice.

---

70

MS. DAVIS: It could be legal advice. We don't know what the scope of the representation is. I'm not going to allow him to talk about his communications with his counsel.

MR. RICHARDS: I think there's a serious question as to whether or not there is a privilege there. He's just testified that a non-represented party was present for a number of conversations.

MS. DAVIS: Not the conversation you just asked about.

MR. RICHARDS: I don't think there's a privilege at all if he's engaging in conversations with a third party present for substantial [inaudible] --

MS. DAVIS: I disagree with respect to whether she was also a party, but regardless, the waiver would only apply to communications that a third party was involved in. And we haven't established whether she was present for any conversation, whether it was a discussion about John's qualifications.

BY MR. RICHARDS:

Q   Was your mother present during any conversations that you had about John's qualifications?

---

71

A   I remember the first time I met with him, it was alone.

Q   What did you talk about in the first conversation that you had with John where your mother was present?

A   I don't recall the first meeting where she was present specifically.

Q   Did you ever discuss Mr. Fitzgerald's views of the strengths or weaknesses of your case in a conversation where your mother was present?

MS. DAVIS: Objection.

Q   You can answer.

A   Again, I can't recall specific conversations where a certain topic was discussed and if my mother was involved. I can only recall if there were certain conversations that my mom was present for. But just based off my recollection today, I don't know the specific topics, timing, and people present at certain calls.

Q   I don't believe that your counsel has produced in this litigation emails between you, Mr. Fitzgerald, and your mother of the kind that you described a moment ago.

Did you provide those emails to your counsel?

A   Yes. I believe I provided emails where my

---

72

mother was attached to the email chain to my counsel.

MR. RICHARDS: Can we go off the record?

THE VIDEOGRAPHER: Stand by. We are going off the record. The time is 11:50.

(Off-the-record discussion.)

THE VIDEOGRAPHER: We are back on the record. The time is 11:52.

MR. RICHARDS: Counsel had a conversation off the record in which they agreed that counsel for the plaintiff will conduct a search of [John's] emails for -- strike that -- conduct a search of Mr. Doe's emails for emails involving himself, any third party, including his mother, and Mr. Fitzgerald; will provide those documents to Defense counsel; and upon review, Defense counsel will alert Plaintiff's counsel whether a reopening of the deposition via Zoom would be appropriate under the circumstances.

MS. DAVIS: For that limited purpose.

MR. RICHARDS: For that limited purpose.

MS. DAVIS: Yes.

BY MR. RICHARDS:

Q   Mr. Doe, when did you first engage Tara Davis and her firm?

A   I didn't engage them myself.

73

1  Q  Who engaged them?
2  A  My parents.
3  Q  And did they send you an engagement letter?
4  A  I don't recall at this time.
5  Q  And what was the date of your first meeting
6  with them, whether by phone, in person, via Zoom,
7  anything?
8  A  I don't recall a specific date, but it likely
9  would have been January or February. But I can't
10 remember the specific date I first talked with
11 anyone.
12 Q  And when you met with counsel for the first
13 time, was it via phone or text or Zoom?
14 A  It would have been via phone or Zoom likely.
15 I don't recall having any text messages. At this
16 time, to the best of my recollection, I would -- I
17 think it was either Zoom or by phone.
18 Q  And you said it would have been January or
19 February. Do you recall whether it was before or
20 after you filed your appeal in the case -- I'm sorry;
21 "the case" is ambiguous -- before you filed your
22 appeal in the Wake Forest process?
23 A  I can't -- again, I can't recall the specific
24 date, but it would have likely been right around the
25 same time we were either getting ready to file the

74

1  appeal or right after we filed the appeal. I can't
2  remember.
3      It was in close proximity to the time of the
4  appeal, which I believe was January 3rd, but I
5  can't remember if it was before or right after.
6  Q  And do you recall who was on the Zoom or phone
7  call when you first spoke with counsel?
8  A  No.
9  Q  Do you recall whether there was anyone besides
10 you and representatives of Ms. Davis's firm?
11 A  No. I don't recall.
12 Q  What about subsequent calls or Zooms with
13 Ms. Davis's firm? Do you recall whether there was
14 anybody besides you on those?
15 A  Yes.
16 Q  And who else was on those calls?
17 A  My parents.
18 Q  Both your mother and your father?
19 A  Yes, at times.
20 Q  And when you corresponded with Ms. Davis's
21 firm, who was on the emails?
22 A  It would depend on the context of the email.
23 For example, if it was like a general update on the
24 case, that may have been sent out to me myself --
25 or -- and my parents. So in those cases, I may have

75

1  replied-all, just to say like "I received the
2  update." That's an example. I'm not recalling a
3  specific conversation.
4      But there were some like that where my parents
5  were involved in the email chain, and then there was
6  other information where it was only between me and
7  Tara.
8  Q  And what about in-person meetings? Have you
9  had any in-person meetings with Ms. Davis's firm
10 apart from prior to today's deposition?
11 A  I had the chance to meet with counsel when we
12 were in Charlotte for the TRO earlier this year, but
13 in-person meetings, no, I don't recall any other --
14 other meetings besides when we were all in town for
15 the TRO.
16 Q  And was anybody else present besides you and
17 your counsel for that meeting?
18 A  Yes.
19 Q  Who?
20 A  My mother.
21 Q  And what did you talk about at that meeting
22 with your mother and counsel?
23 A  I don't recall specifics. It was at the time
24 of us filing the TRO, so likely issues surrounding
25 the TRO, but I can't recall specifics.

76

1  Q  You can't recall any specifics of that
2  conversation you had about the TRO?
3  A  No.
4  Q  What about since that meeting? Have you had
5  any other in-person meetings involving your mother
6  and counsel?
7  A  Yeah. Yes.
8  Q  And when have those meetings taken place?
9  A  We met up for coffee this morning before the
10 deposition.
11 Q  Apart from this morning.
12 A  Yesterday afternoon. I'd like to make clear
13 that when my mother was present, it was general
14 hellos. And specific to the conversation yesterday,
15 my mother was not present when I spoke about actual
16 issues with my counsel.
17 Q  And what about at prior meetings? Was your
18 mother present when you had discussions regarding
19 case strategy?
20 A  For this case?
21 Q  For this case.
22 A  And you're referring to in-person meetings
23 specifically?
24 Q  In person or on the phone or on Zoom.
25     MS. DAVIS: Just note my objection to the

**Page 77**

1  whole line of questioning so I don't have to keep
2  saying it. Thank you.
3    A  Again, so similar to -- I would say it was --
4  again, the same thing goes as it did with my adviser,
5  Mr. Fitzgerald: There were times where my parents
6  were on the call. However, I don't remember the
7  exact conversation or specific contents of the
8  meeting. I don't remember the times, like, my
9  parents were on the call, what that conversation was;
10 when they weren't on the call, what that conversation
11 was.
12       However, I believe when my counsel, Ms. Davis,
13 reached out to me and my family, it would have been
14 only for general updates, as I assume my counsel
15 would not have wanted to inform my parents of
16 anything my counsel knew they shouldn't. But I can't
17 remember anything specific.
18   Q  Did you ever have a conversation with your
19 mother and John Fitzgerald in which he expressed a
20 view of the strength of your case?
21   A  Yes.
22   Q  And what did he say about the strength of your
23 case?
24   A  I don't remember the specifics.
25   Q  What generally did he say?

**Page 78**

1    A  I don't recall as of today. I -- all I
2  remember is there being conversations that were
3  relating to the strength of my case where my mom
4  would have been involved. But aside from that
5  general description, I don't remember what, you know,
6  he said while my mom was there, when she wasn't
7  there.
8       Obviously, as my adviser, there are many times
9  where we discussed strengths and weaknesses of my
10 case.
11   Q  But your testimony today is that you don't
12 remember the substance of any of those conversations;
13 is that correct?
14   A  I don't remember the substance specific to
15 when my mom was there.
16   Q  What about the substance just generally?
17   A  Yes. I'm aware of his opinions regarding my
18 case.
19   Q  And what were his opinions regarding your
20 case?
21       MS. DAVIS: Objection.
22   Q  You can answer.
23   A  That it should have gone in my favor.
24   Q  And why was that?
25   A  Because of the facts relating to the incident

**Page 79**

1  itself. And other than the facts of the case itself,
2  I can't -- I don't want to put words in his mouth in
3  his regard for his opinion on the fairness of the
4  process, so I can't speak to that.
5       MR. RICHARDS: Go off the record.
6       THE VIDEOGRAPHER: Standby. We are going off
7    the record. The time is 12:04.
8  (A recess transpired.)
9       THE VIDEOGRAPHER: We are back on the record.
10   The time is 1:04 p.m.
11 BY MR. RICHARDS:
12   Q  Mr. Doe, I'd like to turn now to the
13 underlying events that caused the complaint to be
14 filed against you at Wake Forest.
15       Could you walk me through, in your own words,
16 what happened on the nights of October 15th
17 through 16th, please.
18   A  Yes. The night started off with a pregame to
19 her sorority date function in Polo Residence Hall.
20 We pregamed there for a period of time, and then we
21 rode in vans provided by her sorority to the bar
22 called Last Resort, in which the date function was
23 taking place.
24       We then went to AEPi fraternity following Last
25 Resort. And I'd like to clarify again that there was

**Page 80**

1  the issue of me not originally recalling going to
2  AEPi, so I'd just like to make that clear.
3       But then following AEPi, we returned to her
4  dorm in Polo Residence Hall. We began to kiss. We
5  were cuddling with each other, touching each other,
6  and then we were going to have sexual intercourse.
7  However, I could not maintain an erection, so that
8  never happened.
9       Once I could not maintain an erection and we
10 did not have intercourse, we went to sleep in bed
11 with each other.
12       When we awoke in the morning, myself and
13 Jane Roe included -- we were awake. We then again
14 began to engage in cuddling and kissing. And then I
15 digitally penetrated Jane Roe for a very brief period
16 of time for her enjoyment. And following that, we
17 cuddled some more, and I left her dorm room, said
18 some type of goodbye, kissed her goodbye, and then
19 that -- that ends the two nights -- or two days in
20 question.
21   Q  Do you have a recollection now, as you sit
22 here today, of going to AEPi?
23       MR. RICHARDS: And for the court reporter,
24 that's A, lowercase E, capital P, lowercase I -- or
25 is it capital E?