**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

|  |  |  |
|---|---|---|
| JOHN DOE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Case No. 1:23-cv-114 |
| | : | |
| WAKE FOREST UNIVERSITY, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## MEMORANDUM OF LAW IN SUPPORT OF WAKE FOREST UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT

Wake Forest University (the "University") submits the following memorandum of law in support of its Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.

## INTRODUCTION

Discovery in this matter has revealed no direct or circumstantial evidence of gender discrimination. Plaintiff has adduced no statement by any decision-maker related to his gender, no pattern of adverse decisions against male respondents, and no material deviations by the University from its written procedures. Underscoring these points, since August 2020, the University has held five separate Title IX hearings against male respondents accused of sexual assault by female complainants. Plaintiff is the *only* respondent to be found responsible.

There is no question that Jane Roe's allegations against John Doe presented a difficult case. The only witnesses with direct knowledge of what happened were the parties themselves. Once Jane Roe submitted a formal complaint, the University was legally required to make a determination about whose version of events was supported by a preponderance of the evidence. There were no smoking guns and no unambiguous evidence pointing one way or the other, so the

outcome had to be based on the plausibility and credibility of each party's narrative. The hearing officer found John Doe less credible than Jane Roe, grounded largely in the ways the parties' respective testimony was consistent with or at odds with other reliable evidence.

For example, Doe testified at the hearing that Jane Roe was not that intoxicated – that she was "happy drunk" – despite contemporaneous evidence that she was highly intoxicated, including text messages among third parties exchanged long before Doe and Roe returned to Roe's room. That testimony by Doe about Roe's state – ultimately not relevant to the facts supporting the finding, but important to whether he was telling the truth about that night generally – placed Doe's credibility in doubt, as the hearing officer testified at her deposition. Prior to the hearing, in interviews with the investigator and a polygraph examiner, Doe maintained that intercourse never occurred, because he could not *get* an erection, while at the hearing he changed his story and testified that he did get an erection but could not *maintain* it before putting on a condom. Under either conflicting account, his denial that intercourse occurred was directly contradicted by contemporaneous evidence that intercourse did occur, including Jane Roe seeking medical attention and Plan B, all months before she ever contacted the Title IX office or filed a complaint. Jane Roe's testimony contained inconsistencies too, as the hearing officer explained, but ultimately the hearing officer found Roe's explanation of those inconsistencies more plausible than Doe's.

There are other good reasons this Court should not believe Doe either. For example, Doe alleged in his appeal that the investigator and hearing officer were biased because, among other things, they did not gather medical records related to his history of erectile dysfunction. In so doing, he directly implied to the appeal officer that such records existed, but then admitted in this litigation that he has never sought treatment for erectile dysfunction and that no such records exist. Arguments like these, as with the many other exaggerations in Doe's verified complaint discussed

41858837.10

below, are causes for significant concern about the merit of Doe's claims. Ultimately, the standard in this case is not what Doe or the Court would have decided as the hearing officer. Instead, the question is whether but for being a male, Doe would have been found not responsible. No reasonable jury could find that is the case, and the facts adduced by Doe do not approach the high bar the Fourth Circuit has set to show "particularized facts" of gender discrimination. Instead, the facts demonstrate that the hearing officer's credibility determinations and findings were supported by the evidence and she conducted the hearing consistent with University policy a fact confirmed by an independent, outside appellate review, which is itself separately fatal to Doe's claims. The appellate review found no evidence of gender bias motivating the hearing officer's findings.

Finally, Doe has adduced no facts that demonstrate that the University departed from its written procedures in any material way, so he cannot demonstrate the breach of any enforceable contract, if in fact the University's policies constitute enforceable contracts, which North Carolina law says they do not. For all the foregoing reasons and those that follow, the University is entitled to summary judgment on all claims.

## STATEMENT OF UNDISPUTED FACTS

On December 20, 2023, Plaintiff was suspended for one year after he was found responsible for sexually assaulting Jane Roe. *See* **Exhibit 1**. Doe appealed, and an independent appeal officer affirmed the outcome after finding no bias or procedural deficiencies. *See* **Exhibits 2** and **3**. Discovery in this matter has unearthed no direct or circumstantial evidence of discrimination by the University. Doe has adduced no gender-based statement by any University decision-maker and no pattern of anti-male decision-making. To the contrary, Doe is the first male found responsible by Hearing Officer Dixie Wells as part of a Wake Forest process, *see* **Exhibit 4**. ("Wells Dep.") at 33:5-9, and of the five cases heard under the University's current policy since

2020, Doe is the only one of the five male respondents found responsible. *See* **Exhibit 5**. All five cases, including Doe's, were investigated by Jessica Telligman.

The University is required to investigate and respond to complaints of sexual harassment involving University students or employees. *See* 34 C.F.R. Part 106 *et seq*. In response to its obligations, the University implemented its Sex and Gender Discrimination and Harassment Policy and Title IX Sexual Harassment and Non-Title IX Sexual Misconduct Grievance Procedures (the "Policy"), attached as **Exhibit 6**. Under the Policy, after a formal complaint is filed, the University sends a notice containing known allegations to both parties. *Id.* at § 2A.04. The complaint can follow a formal resolution process, with an investigation, hearing, and appeal, or an "Adaptive Resolution" process, whereby a facilitator attempts to resolve the matter by agreement. *Id.* at § 3A.01. If Adaptive Resolution is attempted but fails, the complaint reverts to the formal process. *Id*. In a formal process, an investigator meets with parties and witnesses to gather facts. *Id.* at § 2B.02. Following the investigation, the investigator creates a report summarizing the gathered evidence. *Id.* at § 2B.03. A draft report is provided to the parties for their feedback, then revised by the investigator as appropriate, before being finalized and provided to a hearing officer. *Id.* The investigator does not make any findings or credibility determinations. *Id.* at § 2A.17.

At the hearing, the hearing officer may question, and each party's advisor may cross-examine, all parties and witnesses by asking only relevant questions. *Id.* § 3A.08. The hearing officer may exclude evidence if its probative value is outweighed by its cumulativeness or harassing nature. *Id*. at 3A.07. Following the hearing, the hearing officer drafts a final outcome letter containing factual findings, outcome determinations with respect to any the alleged violations, and rationales. *Id.* at §§ 3A.11, 3A.14. A different University administrator is responsible for imposing an appropriate sanction where a Policy violation is found. *Id.* at § 3A.12.

4

Both parties have the right to appeal the outcome on the basis of: (1) a procedural irregularity that affected the outcome; (2) new evidence that was not reasonably available at the time of the determination and could affect the outcome; and (3) the Title IX Coordinator, an investigator, or the hearing or sanctions officers had a conflict of interest or bias that affected the outcome. *Id.* at § 3A.15. The appeal is heard by an appeal officer who has not participated in any earlier stage of the process. *Id.* at § 3A.17. The outcome of the appeal is final. *Id.*

John Doe matriculated to the University in the Fall of 2019. Compl. ¶ 19. Prior to receiving the Notice of Allegations against him on April 13, 2022, Doe had not read the University's Title IX Policy. *See* **Exhibit 7** ("Doe Dep.") at 36:10-15; **Exhibit 32** ("Doe's Admissions") at No. 16. Doe does not have a signed copy of any contract between himself and the University in his possession. *See* Doe Dep. at 151:17-152:4. Doe and Jane Roe were involved in a casual relationship that included several instances of sexual activity, although not sexual intercourse, between spring 2021 and October 15, 2022. *Id.* at 133:22-134:14.

On October 15, 2021, Doe and Roe went to a bar for a sorority social event, where they both consumed alcohol. *Id.* at 79:15-80:20. Contemporaneous text messages exchanged between Doe's fraternity brother and Roe's friend described Roe as very drunk and throwing up. *See* **Exhibit 8**. After stopping at a fraternity house, Doe and Roe returned to Roe's dorm room and spent the night. *See* Doe Dep. at 139:21-24. Roe later alleged that Doe had intercourse with her while she was incapacitated orafter she withdrew her consent and that Doe digitally penetrated her the next morning while she was still asleep. *See* **Exhibits 9** and **10**. Doe denied the allegations.

On April 12, 2022, Jane Roe submitted a Title IX Formal Complaint alleging:

The respondent attended my sorority date function as my date on October 15th. After the event in my dorm room I was unable to give consent to activity that occurred due to incapacitation and the next morning non-consensual digital penetration occurred.

41858837.10

*See* **Exhibit 11**. University Title IX Coordinator Aishah Casseus and investigator Jessica Telligman understood the formal complaint to allege a single incident of sexual assault against Doe. *See* **Exhibit 12** ("Telligman Dep.") at 56:10-24, 58:5-23; **Exhibit 13** ("Casseus Dep.") at 53:20-54:5. On April 13, 2022, Casseus sent a Notice of Allegations, *see* Ex. 9, to Doe stating:

> In the Formal Complaint, [Jane Roe] alleges that you engaged in sexual harassment (as defined by the Policy) by sexual assault on October 16, 2021, in Polo Residence Hall including, but not limited to, as follows: *The respondent attended my sorority date function as my date on October 15th. After the event in my dorm room I was unable to give consent to activity that occurred due to incapacitation and the next morning non-consensual digital penetration occurred.*"

Shortly thereafter, both parties consented to adaptive resolution. *See* Ex. 6 at § 3A.01. The adaptive resolution process was replete with delays, including but not limited to: Doe's inability to meet during business hours, Doe's advisor being unwilling to meet after business hours, and Jane Roe taking the LSAT exams. *See* **Exhibit 14**, ("Fitzgerald Dep.") at 49:18-50:17; **Exhibit 15**, ("C.B. Dep.") at 65:3-23; **Exhibit 16**. Eventually, Doe came up with five separate concessions and/or restrictions that he intended to propose to reach a resolution. *See* **Exhibit 17**. However, Doe's mother, a former attorney who was acting as his support person in this matter, felt she was an experienced negotiator and, upon her advice, John Doe only offered two of the five concessions. *See* **Exhibit 18**. Doe's advisor disagreed with the strategy and felt Doe should "concede everything at this point." *See* Fitzgerald Dep. at 57:22-58:22. Roe rejected the offer, and shortly thereafter, on Adaptive Resolution was terminated, triggering a formal investigation. *See* **Exhibit 19**.

Jessica Telligman was assigned as investigator. She interviewed Roe for the first time on August 30, 2022, during which Roe explained that she was alleging two separate instances of sexual assault. *See* Ex. 10. That same day, Telligman sent Roe a letter that stated, in relevant part: "we intend to update the Notice of Allegations to state that you are alleging two different instances

41858837.10

of sexual assault: (1) sexual assault following withdrawn consent; and (2) sexual assault due to non-consensual digital penetration." *See* **Exhibit 20**. On September 1, 2022, Casseus sent John Doe an Updated Notice of Allegations, which stated, in relevant part:

> The Claimant advises Investigator Telligman that you allegedly engaged in sexual assault via sexual intercourse with her on October 16, 2021. Claimant alleges that she initially consented to sexual intercourse with you in her residence hall room, but that she withdrew consent by stating 'this doesn't feel good.' In summary, Claimant is alleging this instance of withdrawn consent in addition to the separate instance of alleged non-consensual digital penetration which allegedly happened a few hours later and was referenced in the original Notice of Allegations.

*See* Ex. 10. No one at the University was aware that Roe was alleging two violations of the Policy until August 30, 2022. *See* **Exhibit 21** ("Telligman Decl.") at ¶ 20; Casseus Dep. At 58:9-59:8.

Telligman went on to interview Doe and Roe four times each as new issues arose. *See* **Exhibit 22** at 17-18. Telligman also interviewed six other witnesses and collected documents and exhibits submitted by the parties and other witnesses. *Id*. Both Doe and Roe were informed that they had the right to provide the names of any witnesses they felt had relevant information, and the right to provide any evidence they believed was relevant. *See* Telligman Dep. at 19:23-20:6, 132:3-6; Doe Dep. at 44:1-16; **Exhibit 34** at 2-3 (requesting all relevant evidence immediately). However, the University had no ability to compel any individual to provide evidence or a statement. *See* Telligman Dep. at 17:19-19:1; Doe Dep. at 109:11-19; Fitzgerald Dep. at 63:18-64:3; Doe's Admission No. 24. Doe was aware that he was not required to provide any evidence at all, and his support person and attorney both acknowledged that if Doe had evidence that tended to show that he was responsible for a Policy violation, he was not required to, and likely would not have, provided that evidence to the University. *See* C.B. Dep. at 73:6-24 Fitzgerald Dep. at 63:18-64:9; 66:24-67:6

Jane Roe provided the investigator with medical records related to a visit she made to Student Health Services on October 18, 2021. *See* **Exhibit 23** ("Medical Record"). Consistent with

41858837.10

her rights under federal law, *see* 34 C.F.R. 106.45(b)(1)(x), and the Policy, Roe declined to provide additional treatment records. *See* Ex. 6, Policy at § 3A.07; Telligman Dep. at 78:23-79:6. The Medical Record reflects that when asked whether she was a sexual assault victim, Roe said she was not. Based on a description of what treatment she was seeking, she was nevertheless diagnosed by Student Health as a sexual assault victim, tested for STDs, and prescribed Plan B. *Id*. Telligman extensively questioned Roe on the differences between her version of events and the information in the Medical Record. *See* Ex. 22 at 7; **Exhibit 24** at 3-5.

Plaintiff has alleged that Telligman was biased because she "repeatedly offered Jane [Roe] suggested responses to her investigatory questions." Compl. at ¶ 310. Plaintiff provides two examples of alleged bias: (1) a clarification as to why Roe went to Student Health and (2) Telligman suggested that "it burns" in a text message from Roe suggested non-consensual sexual intercourse occurred. (*Id*. at ¶ 311-12). Telligman explained that her responsibility as an investigator was to "ask clarifying questions to create a record that is thorough, accurate and complete." *See* Ex. 21 Telligman Decl. at ¶ 35. Because students can be difficult witnesses, Telligman "occasionally ask[s] leading questions of witnesses to help ensure a clear record and redirect witnesses to specific information I am asking about."[1] *Id*..

On November 4, 2022, Telligman issued her final report ("Investigation Report"), which was "based upon a presumption that [Jane Roe] made the Formal Complaint in good faith, as well as a presumption [John Doe] is not responsible for the alleged violations unless and until a determination regarding responsibility is made by the Hearing Officer after the conclusion of the

---

[1] Telligman's reasons for this practice are uncontradicted because Plaintiff did not ask Telligman about them during her deposition. Telligman used the same technique in eliciting Doe's testimony. *See e.g.* **Exhibit 35** at 8 ("Your felt like you were in control?"), 12 ("I'm assuming that's not because you were too impaired to remember. It's because of passage of time?").

41858837.10

hearing." *See* Ex. 22 at 1; Ex. 6 at §2A.16. The Investigation Report summarized the evidence Telligman gathered. *See generally* Ex. 22. It did not make any findings of fact or credibility or opine on whether Doe was responsible for a Policy violation. Telligman did not have any discussions with the hearing officer prior to the hearing. *See* Wells Dep. at 64:15-65:7.

On November 1, 2022, Casseus appointed Wells as hearing officer. *See* **Exhibit 25**. Wells has been a practicing attorney since 1999 and specializes in commercial litigation with a portion of her work devoted to higher education matters. *See* Wells Dep. at 8:23-24, 10:5-17. Wells has been retained previously as a potential hearing officer for the University, but has only served as a hearing officer for two matters at the University: one in 2021 and the hearing in this case. *Id*. at 31:19-32:18. In 2021, Wells found the male respondent not responsible. *Id.* at 33: 5-8; Ex. 5 at 4.

The November 29, 2022 hearing in this case began at 9:05 a.m. and concluded at 10:28 p.m. *See* **Exhibit 26** at 6:3-4; 492:17-18. Wells asked Doe if he had any objections to any portion of the investigation process, including the witnesses interviewed, evidence gathered, and Investigation Report. **Doe stated that he had no objections**. *Id.* at 295:15-297:3. The witness order was determined in advance and discussed with Doe's and Roe's advisors at a pre-hearing conference a week earlier. *See* Wells Dep. at 63:7-19, 70:12-22; Fitzgerald Dep. at 102:7-19. Wells reiterated the witness order at the beginning of the hearing, stating Roe would be the last witness. There were no objections. *See* Ex. 26 at 18:4-20:1. The hearing was conducted that way to afford Doe the *maximum* amount of notice and process, meaning that prior to cross examining Roe, Doe would know what *every* other witness had been asked and testified about. This would enable him to cross-examine Roe about every topic that arose. *See* Wells Dep. at 71:15-72:12.

Contrary to Doe's allegations in Paragraphs 229 and 340 of the Complaint, Roe's advisor did not raise multiple objections at the hearing and, in fact, did not even say the word "objection."

41858837.10

*See generally* Ex. 26. At one point, John Fitzgerald, Doe's advisor, asked Roe: "Do you think some people find it pleasurable to be awakened by sensual touch or even by a sex act? Have you ever heard of that?" After Fitzgerald concluded his question, Jane Roe's advisor asked, "Is this relevant?" *Id.* at 433:11-15. Wells agreed that the question wasn't relevant because whether Roe found it pleasurable was not relevant to whether she was *asleep* when the penetration occurred, which would be a Policy violation regardless of whether Roe found it enjoyable. *Id*; Ex. 6 at § 1.06 (defining "Incapacitated"). Fitzgerald moved to his next question without objection. *See* Ex. 26 at 433:11-434:1. During a natural break between answer and question, Jane Roe's advisor asked how much longer Fitzgerald intended to question the witness. *Id.* at 473:4-14. Wells asked Fitzgerald how much longer, and he said "about another hour." *Id.* This was after Roe's cross examination had been underway for one hour, 23 minutes.[2]

As required by § 3A.08 of the Policy, Wells permitted only relevant questions. Wells disallowed certain questions as confusing or misstating testimony, but allowed Fitzgerald to re-frame the question. *See e.g.* Ex. 26 at 434:11-22, 438:22-439:13, 453:19-454:8; Wells Dep. at 105:9-22. In other instances, Wells did not permit questions that asked witnesses to merely repeat at the hearing what they had told the investigator in the interview transcripts. *See e.g.* Ex. 26 at 448:9-449:18. After nearly two hours of cross-examination of Roe, Wells told Fitzgerald "I'm going to allow you to go 15 more minutes and then I'm going to stop it." *Id.* at 486:9-16. Approximately six minutes later, Fitzgerald stated that he had "no further questions." *Id*. at 489:1-2. Wells then gave the parties an opportunity to raise evidentiary issues. Fitzgerald objected that he had "lots of other questions" when he was told he had 15 minutes to conclude. *Id*. at 489:21-

---

[2] The hearing transcript does not include time codes. The University reviewed video recordings of the hearing to determine, which can be provided to Court upon request.

41858837.10

25.  Wells responded that it was hard to believe that Fitzgerald had more questions when he did not use the full time she permitted him. *Id*. at 490:8-12. Fitzgerald raised just one issue – a question about Roe's strength – and Wells responded that the issue was not relevant because Roe "testified fully about why she did not try to push his hand away. She did not say it was a strength issue." *Id*. at 491:14-17. Fitzgerald responded he was finished and did not raise any other objections. *Id*. at 491:20-21. In her deposition, Wells testified that "[i]f [Fitzgerald] had provided other topics that he had . . . not been able to go into, and I had deemed those relevant, I would have allowed him to continue." *See* Wells Dep. at 104:22-105:3.

On December 20, 2022, Wells issued the Final Outcome Letter, finding that the evidence established that it was more likely than not that Doe violated the Policy. *See* Ex. 1 at 22. Wells found that the facts demonstrated, by a preponderance of the evidence, that Doe and Roe engaged in sexual intercourse and that Roe withdrew consent during intercourse. *Id*. at 4. Wells further found that the facts established that Doe digitally penetrated Roe while she was incapacitated before she awoke on October 16, 2021. *Id*. at 5. Wells considered the inconsistencies between the stories of Roe and Doe, as well as the inconsistencies in their respective memories and testimony. *Id*. at 9, 11, 22; Wells Dep. at 109:13-111:9 (explaining concerns with Doe's credibility). Ultimately, Wells determined that the weight of the evidence made it more likely than not that Doe committed two violations of the Policy. *See* Ex. At 22; Wells Dep. at 175:6-10.

Wells had no bias against Plaintiff and allowed the facts to dictate the outcome. *See* Ex. 2 at 9-10, 17-19. Wells explained in her deposition that when the hearing concluded, she did not know whether she would find Plaintiff responsible or not, and it was not until she was drafting the Final Outcome Letter and reviewing all of the facts together that she determined the outcome. *See* Wells Dep. at 60:6-16.  Plaintiff alleges that external pressures such as a student protest related to

41858837.10

a separate Sexual assault allegation, a campus climate survey, and other discrete incidents influenced the outcome, *see* Compl. at ¶¶ 385-401, but Wells was not aware of any of the alleged external pressures. *See* **Exhibit 27** ("Wells Decl.") at ¶ 27; Wells Dep. at 195:25-196:4.

A draft of The Final Outcome Letter was sent to Dean of Students Dr. Adam Goldstein. Following the Policy, Dr. Goldstein reviewed the nature and severity of the conduct, whether the sanction would remedy the sexual harassment, the impact of separating Doe from the University, and Doe's prior disciplinary record. *See* **Exhibit 28**, ("Goldstein Dep.") at 50:19-52:22 Ex. 6, Policy at § 3A.12. The Policy states that the appropriate sanction for sexual assault "generally will include at a minimum a period of separation from Wake Forest." *See* Ex. 6 at § 3A.12. Dr. Goldstein suspended Doe for two semesters (one for each violation of the Policy). *See* Goldstein Dep. at 13:22-24; 64:20-65:22. Doe appealed, alleging procedural irregularities that affected the outcome, bias, and that the sanction was disproportionate. *See* **Exhibit 29.**

Appeal Officer Howard Kallem, an experienced Title IX practitioner, was not a University employee and had never previously worked for the University. *See* **Exhibit 30**, ("Kallem Dep.") at 16:6-8. Like Wells, Kallem was not aware of the alleged external pressures. *See* **Exhibit 34** ("Kallem Decl.") at ¶ 11. Kallem explained he was a "neutral and independent reviewer." *See* Kallem Dep. at 32:23-33:12. On January 23, 2023, Kallem issued his Appellate Decision, *see* Ex. 2**,** which affirmed the Final Outcome Letter, including the sanction. Kallem determined that Doe had failed to demonstrate procedural irregularities and found no bias on the part of Hearing Officer Wells, in addition to concluding that the findings by Wells had a basis in the evidence. *Id*. at 10. Kallem further found that John Doe "has not shown that the Title IX Office's alleged bias affected the outcome of the hearing." *Id*. Kallem found that there was "no evidence of biased statements by the Hearing Officer or any others involved in the investigation and hearing." *Id*. Kallem's

41858837.10

determination was the final word on Plaintiff's Title IX matter, and Plaintiff makes no allegations about Kallem, his process, or his determination. *See generally* Compl.

There is no evidence in the record of direct conduct or statements by Jessica Telligman, Aishah Casseus, Dixie Wells, Howard Kallem, or Andrew Goldstein evincing bias against Plaintiff on the basis of his gender, or in favor of Jane Roe based on her gender. *See* Doe's Admissions Nos. 2-11, 14-15; Doe Dep. at 104:4-22, 144:24-145:8; C.B. Dep. at 25:3-26:4; Fitzgerald Dep at 41:24-44:6. Despite Plaintiff's allegation that the University "has engaged in a pattern of unfair investigations and adjudications" involving male students, *see* Compl. ¶ 398, the evidence directly contradicts this allegation. The University has received twelve formal complaints and has held five hearings against male respondents in Title IX cases since August 2020. *See* Ex. 5. Doe is the only male student to be found responsible. *Id*.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *U.S. v. 8.929 Acres of Land in Arlington Cnty., Virginia*, 36 F.4th 240, 252 (4th Cir. 2022). A factual dispute is considered genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). Instead, the nonmoving party must establish that a material fact is genuinely disputed by citing to particular parts of the record and cannot rely only on conclusions, speculation, or "a mere scintilla" of evidence. *8.929 Acres*, 36 F.4th at 252.

## ARGUMENT

**I.     The University is entitled to judgment on Plaintiff's Title IX claim because he has failed to adduce any facts from which a reasonable jury could conclude Doe's status**

41858837.10

**as a male was the but-for cause of the University's decision.**

Discrimination based on sex under Title IX can be proven by direct or circumstantial evidence. *U.S. Postal Serv. Bd. Of Governors v. Aikens*, 460 U.S. 711, 714 n.3 (1983), but Plaintiff has not adduced any direct evidence of discrimination – no University official involved in the investigation, hearing, sanction, or appeal is alleged to have made any gender-discriminatory remarks; there are no provisions in the Policy that put any party at a disadvantage based on gender; and there are no gender stereotypes in the Investigation Report. *See* Exs. 6 & 22; Doe Dep. at 104:4-22; C.B. Dep. at 25:3-26:4. To survive summary judgment, a plaintiff asserting a Title IX claim challenging a university disciplinary proceeding on grounds of sex discrimination must show "but-for" causation, that is, a direct causal link between the student's sex and the outcome. *Sheppard v. Visitors of Virginia State Univ.*, 993 F.3d 230, 236 (4th Cir. 2021) (holding that pleading a Title IX discrimination claim on the basis of sex requires "but-for" causation); *Kashdan v. George Mason Univ.*, 70 F.4th 694, 701 (4th Cir. 2023) (same). As the Fourth Circuit recently held, that means a plaintiff must show "[a] causal link between the student's sex and the university's challenged disciplinary proceeding." *Id.*

**A.  Plaintiff has failed to make out the elements of an erroneous outcome claim.**

To support a claim of discrimination based on an erroneous outcome claim, Plaintiff must show: (1) the student was subjected to "a procedurally flawed or otherwise flawed proceeding"; (2) which "led to an adverse and erroneous outcome"; and (3) involved "particular circumstances" that suggest "gender bias was a motivating factor behind the erroneous finding." *Kashdan*, 70 F.4th at 701 (citing *Doe v. Loh*, 767 Fed. App. 489, 491 (4th Cir. 2019)). If Plaintiff fails to prove any prong, his Title IX claim fails. *Id.*; *Sheppard*, 993 F.3d at 236. Following discovery, Plaintiff has mustered no evidence of either a flawed process or of gender bias as a motivating factor.

As an initial matter, the record is completely devoid of the "particular circumstances"

14

41858837.10

related to *gender bias* required by *Loh, Kashdan*, and *Sheppard*. The best Doe musters in this case is the speculation that because (he contends) the University reached the wrong outcome, it must have been based on sex.  In addition to being logically unsound – even *if* the University reached the wrong outcome as a result of *some* bias, the alternatives to gender bias are literally infinite – that sort of inference is not sufficient.  *See Kashdan*, 70 F.4th at 701.

Courts in the Fourth Circuit have routinely rejected gender bias claims based solely on disagreement with the outcome of a hearing absent specific facts supporting actual bias. *Haley v. Virginia Com. Univ.*, 948 F. Supp. 573, 578 (E.D. Va. 1996) (granting judgment to university because a plaintiff must be able to establish causation, "a mere iota of evidence, followed by conclusory allegations of discriminatory intent, will not suffice."); *Doe v. Coastal Carolina Univ.*, 522 F. Supp. 3d 173, 181 (D.S.C. 2021) (holding that allegations that university had a victim-centered approach and that complainants and respondents did not receive similar support from university was not evidence of gender bias); *Doe v. Maryland*, No. CV ELH-20-1227, 2021 WL 1174707, at *28 (D. Md. Mar. 29, 2021) (plaintiff cannot establish erroneous outcome discrimination by alleging that outcome can *only* be explained by bias absent any specific facts of actual or implied gender bias. (emphasis added)); *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 733 (E.D. Va. 2015) (conclusory statements that bias occurred without specific evidence is insufficient to sustain a discrimination claim.).

Moreover, the undisputed evidence demonstrates that through twelve Title IX formal complaints and five investigations under the Policy for claims by female students against male students (all of which were investigated by Telligman), Doe is the *only* male respondent to be found responsible of a Policy violation. *See* Ex. 5.  He is the only male respondent to be found responsible by Wells. *Id.*; Wells Dep. at 33:5-9.  Plaintiff has failed to meet his burden to identify

*any* "particular circumstances" connecting his gender to the outcome.

Plaintiff has not shown a procedurally-flawed proceeding either. Doe alleges that the University provided a "vague notice" of allegations and permitted new claims against him after Adaptive Resolution. *See* Compl ¶¶ 305, 309. It is undisputed Telligman and Casseus were not aware that Roe was alleging two separate violations of the Policy until Telligman's initial interview with Roe on August 30, 2022. *See* Telligman Decl. at ¶ 20; Casseus Dep. at 58:9-59:8. Pursuant to Policy § 2A.04, Casseus promptly notified Doe of the additional allegations more than five days before his first interview with Telligman. *Accord* Ex. 6 at § 2A.04.

Plaintiff further alleges that Telligman suggested answers to Jane Roe. *Id*. at ¶¶ 310-14. Telligman provided her interview transcripts to the parties well in advance of the hearing. Plaintiff stated that he reviewed the transcripts and had no objection to their contents or the transcription by Telligman. *See* Ex. 26 at 295:15-297:3. It wasn't until Plaintiff was found responsible that he complained that Telligman had "suggested" answers to Roe. Even had Plaintiff not waived that argument by remaining silent about it at the hearing, Wells made clear that the "suggested answers" were not dispositive to her ultimate outcome. *See* Wells Dep. at 174:15-175:6.

Plaintiff further argues: (1) his advisor was not able to cross-examine Roe until the very end of the hearing; (2) Wells permitted Roe's advisor to interrupt Doe's advisor during his cross-examination of Jane with objections and to inquire how much longer he would take; (3) Wells prevented Doe's advisor from asking certain questions as not relevant; (4) Wells permitted Roe and Telligman to respond to questions by referencing back to other reports or transcripts; and (5) Wells limited the time for questioning Roe. *See* Compl. at ¶ 229.

As an initial matter, the Court should rule that Plaintiff waived each of these arguments to the extent not raised when given an opportunity at the hearing. The University puts careful thought

41858837.10

into preserving multiple opportunities for process and cure at the hearing to fix potential errors in real time rather than litigation. *See e.g.* Ex. 26 at 14:20-15:10, 490:6-19. For Plaintiff to be silent at the hearing but now claim foul presents precisely the type of perverse incentives that the University's process-laden decision-making and the Title IX regulations seek to avoid. The order of witnesses was determined well in advance of the hearing, and Plaintiff and his advisor did not object to the order during the pre-hearing conference more than a week before the hearing or during the hearing itself when Wells discussed the witness order. Roe's advisor only interjected once in two hours, asking if it was relevant whether Roe found it arousing to be awoken to digital penetration (though this question directly contradicted Doe's position that Roe was awake at the time). *See* Ex. 26 at 433:11-15. Wells correctly agreed that it was not relevant, because the Policy's definition of incapacitation did not discriminate as to whether conduct was arousing, but whether a person was unable to consent at the time sexual activity occurred. *See* Ex. 6 at § 1.06.

While Wells disallowed some questions, she generally allowed Fitzgerald to rephrase those questions. *See e.g.* Ex. 26 at 418:6-15, 480:15-481:11. Following cross-examination, Wells asked Fitzgerald what questions he wanted to ask but was not allowed to. *See e.g. Id.* at 490:6-19. The only question Fitzgerald complained he was not able to ask pertained to Roe's physical conditioning, and when Wells gave him fifteen minutes to wrap up, he used only six of those minutes. *Id.* Further, the Policy gave Wells discretion to exclude questions based on relevancy or other factors. *See* Ex. 6 at § 3A.08. Wells' determinations as to whether questions were relevant, helpful to her analysis, and not duplicative were consistent with the Policy.

Ultimately, no one will ever know what happened in that room except Doe and Roe. In such a word-against-word situation, the hearing officer's primary role is to make credibility determinations and decide which story is supported by the weight of the evidence. *See* Wells Dep.

at 109:15-111:4, 174:21-175:16. Ultimately, Wells determined that Roe was more credible, not because she was female and the respondent was male, but because that is what the evidence established. By way of example, the following weighed into Wells' credibility determination: (1) despite Doe's instance that Roe was not highly intoxicated but was "happy drunk," contemporaneous text messages (and direct testimony from witnesses) established that Roe was highly intoxicated (Ex. 1 at 12); (2) Doe's statement in his polygraph examination that he couldn't get an erection before he put the condom on was directly contradicted by his hearing testimony that he had an erection but couldn't maintain it to put the condom on (Ex. 1 at 9); (3) Doe claimed in his opening statement: "I remember exactly what happened that night. My memory is clear. . ." (Ex. 26 at 41:19-20), yet couldn't remember going to a fraternity party before Roe's dorm room (Ex. 1 at 9); and (4) Doe provided no contemporaneous evidence to support his story that intercourse did not occur, while there was significant evidence that it did occur (Jane sought medical treatment, the provider believed it was sexual assault, she was prescribed Plan B, she sought testing for STDs, and she contemporaneously texted her friend that "something bad happened last night.") (Ex. 1 at 18-19). That Wells considered the evidence and listened to the testimony and made credibility determinations based on that is not evidence of gender bias, it is evidence that she did her job. That Plaintiff disagrees with those determinations does not establish any inference of gender-based bias.

Incredibly, Plaintiff argued in his appeal that *Doe's* medical records related to his history of erectile dysfunction were not collected, but Roe's were, exhibited bias. *See* Ex. 29 at 30; Compl. ¶¶ 383-84. This argument of course suggests medical records for Doe's erectile dysfunction exist. They do not. *See* Doe's Admission No. 1. Although of course not considered by Wells in her outcome, Plaintiff's implication to the appeal officer that such records exist is deeply concerning,

Case 1:23-cv-00114-KDB-SCR   Document 64   Filed 07/24/23   Page 18 of 26

and of a kind with the credibility determinations Wells made about Doe's truthfulness generally.

In sum, Doe has adduced no evidence of bias or discrimination that affected the outcome, which was upheld by the independent appeal officer as supported by the weight of the evidence, and no meaningful evidence of a flawed proceeding. Mere disagreement with the outcome is insufficient to sustain a Title IX claim. *Brzonkala v. Virginia Polytechnic Inst. & State Univ.*, 132 F.3d 949, 962 (4th Cir. 1997) (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)); *Carolina*, 359 F. Supp. 3d at 375. Judgment should be entered in the University's favor.

### B. Plaintiff has failed to make out the elements of a selective enforcement claim.

To survive summary judgment on a selective enforcement claim, a plaintiff must show that regardless of his guilt or innocence, his gender was a but-for cause of the severity of the sanctions or of the decision to initiate the challenged disciplinary proceeding in the first place. *Sheppard*, 993 F.3d at 235 n.6, 236–237. A plaintiff can do this by showing that a similarly situated person of the opposite sex was treated more favorably. *Id.* (a claim based on selective enforcement requires that "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender."). However, it is not a Court's responsibility to review every proceeding as a "super-school disciplinary board." *See* ECF No. 27 at 8-9 (citing *DeJarnette v. Corning Inc.*, 133 F.3d 293, 298–99 (4th Cir. 1998)).

Plaintiff has adduced no evidence that a woman accused of the same misconduct was treated more favorably. Rather, the history of Title IX investigations and hearings at the University demonstrates no bias against male respondents. Since the Department of Education updated the Title IX regulations in May 2020 and the University revised its Policy in August 2020, the University has had five Title IX complaints go to a hearing and decision. *See* Ex. 5. All five matters had female complaints and male respondents. *Id.* Out of the five hearings, Plaintiff was the *only* male respondent found responsible for violations of the Policy. *Id.* In fact, Wells served as hearing

41858837.10

officer for a hearing held in June 2021, in which a female complainant accused a male respondent of sexual assault. *Id*. Wells found that male respondent not responsible. *Id*.; Wells Dep. at 33:5-9. The sanction issued by Dr. Goldstein was consistent with the criteria in the Policy, which recommends suspension for sexual assault. *See* Goldstein Dep. at 50:19-52:22; Ex. 6 at § 3A.12. Plaintiff has provided no evidence of selective enforcement sufficient to sustain a Title IX claim.

### C. Plaintiff has failed to show that external pressures affected the outcome.

The Complaint alleges that external pressures forced the University "to Aggressively Respond to Allegations of Sexual Harassment." *See* Compl. at p. 67. Plaintiff alleges these pressures included: (1) an April 26, 2021 OCR investigation against Wake Forest regarding a sexual harassment complaint at the medical school (Compl. ¶ 386); (2) an August 28, 2021 protest by University students re: the return of a student to campus after serving suspension for a sexual assault (Compl. ¶ 387); (3) the October 2021 creation of the University's "Sexual Assault Prevention Support and Accountability Committee" (Compl. ¶ 388); (4) a change.org petition (Compl. ¶ 389); and (5) a campus climate survey conducted by the University (Compl. ¶ 394).

Ultimately, these external pressures are immaterial. The Fourth Circuit recently held that "while pressure from the Department of Education or the general campus climate is relevant, it does not suffice by itself to plausibly allege sex discrimination in a particular instance." *Kashdan*, 70 F.4th at 701 (citing *Doe v. Univ. of Sciences*, 961 F.3d 203, 210 (3d Cir. 2020); *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019); *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018)). In *Kashdan*, the Plaintiff failed to connect the alleged external pressures to his adverse outcome "in a way that creates a reasonable inference that anti-male bias motivated" the university. *Id*.; *see also Doe v. The Citadel,* No. 22-1843, 2023 WL 3944370, at *4 (4th Cir. June 12, 2023) (rejecting argument agency enforcement could establish general bias by the University without specifically linking it to the alleged discrimination against Doe). There is no evidence that anyone involved in

Doe's Title IX investigation, hearing, or appeal altered their methodology or process based on any of the external pressures alleged by Plaintiff. In fact, it is unrefuted that neither the hearing officer or appeal officer was aware of the OCR investigation, campus climate survey, change.org petition, creation of the Sexual Assault Prevention Support and Accountability Committee, or the student protest on campus prior to rendering their respective opinions. *See* Wells Decl. at ¶ 27; Wells Dep. at 195:25-196:4; Kallem Aff. ¶ 11. Moreover, in the nine months following the August 2021 protest alleged by Plaintiff, the University held three Title IX hearings. *See* Ex. 5. All three involved a female complaint alleging sexual assault against a male respondent. *Id*. All three were investigated by Jessica Telligman. *Id*. All three male respondents were found not responsible for violations of the University's Policy. *Id*. There is no pattern of bias by the University against male respondents, and zero reasonable inference that the protest affected any hearing outcomes, including Doe's. Absent such a connection, the external pressures cannot support a reasonable inference of bias by the University against Plaintiff. *Kashdan*, 70 F.4th at 701.

### D. Plaintiff's Title IX claim fails for lack of causation because there is no allegation of bias by the Appeal Officer.

Failure to show that unlawful bias also affected an independent review of a disciplinary decision is fatal to the causation element of a civil rights claim. *See Neal v. E. Carolina Univ.*, 53 F.4th 130 (4th Cir. 2022). In other words, if there is no evidence sufficient to show discrimination on the basis of sex at every level of the disciplinary process, there is no causal link necessary to prevail on a Title IX discrimination claim. *Id*. (holding discrimination claim causal link was broken because an independent panel reviewed and upheld her dismissal); *Oleyar v. Cnty. of Durham*, 336 F. Supp. 2d 512, 518 (M.D.N.C. 2004) (claim failed because independent, third-party review "further attenuated" any potential discrimination claim); *Rowe v. N. Carolina Agr. & Tech. State Univ.*, 630 F. Supp. 2d 601, 611 (M.D.N.C. 2009) (no discrimination where university's stated

reason to deny a professor tenure was confirmed by an independent review as unbiased).

In *Neal*, the plaintiff brought a claim against East Carolina University alleging disability discrimination related to her dismissal from a program. *Id*. at 134. Affirming the entry of summary judgment, the Fourth Circuit explained the causal link between alleged discrimination and adverse action was broken because an independent panel reviewed and upheld the action. *Id*. at 152. Because an outside, independent review agreed with the University's disciplinary action, the plaintiff could not establish causation. *Id*. *Neal* is controlling here. It is undisputed that Plaintiff appealed the hearing officer's decision, and it is likewise undisputed that the external, independent appeal officer denied the appeal, specifically finding that Doe "has not shown that the Hearing Officer had a bias in favor of the Claimant that affected the outcome" and had "not demonstrated bias in favor of the Claimant and/or against [Doe]. . ." *See* Ex. 2 at 9, 20.

Kallem was an experienced independent reviewer, brought in from outside the University to review the hearing officer's decision. *See* Kallem Dep. at 79:2-20. Plaintiff does not allege that Kallem had any bias or discriminatory intent against him and, in fact, has never interacted with Kallem. *See* Doe Dep. at 144:24-145:8. Nor does Plaintiff complain about any specific issue with the Appellate Decision itself. *Id*. Such an allegation cannot sustain a Title IX claim. *Brzonkala*, 132 F.3d at 962; *Doe v. Maryland*, 2021 WL 1174707, at *28. Indeed, the very purpose of having an outside independent reviewer review disciplinary decisions is to root out, and self-correct, potential problems or bias to avoid suits like this one. In sum, Plaintiff's failure to allege bias by the appeal officer breaks the causal link. Without causation, Plaintiff cannot show discrimination and the University is entitled to judgment on Plaintiff's Title IX claim.

**II.    The University is entitled to judgment on Plaintiff's breach of contract claim because he has not identified a breach of any a specifically enforceable procedural promise or the existence of an enforceable agreement.**

Under North Carolina law, the elements of a claim for breach of contract are (1) existence

22

of a valid contract and (2) breach of the terms of that contract. *Montessori Children's House of Durham v. Blizzard*, 244 N.C.App. 633, 636 (2016). Plaintiff has shown neither.

### A. Plaintiff has failed to show that the University breached a specific promise.

Assuming for the sake of argument that an enforceable contract between Doe and the University exists, Plaintiff "'must point to an identifiable contractual promise that the University failed to honor' that can be judged objectively." *See* ECF No. 43 at 9-10 (quoting *Supplee v. Miller–Motte Bus. Coll., Inc.,* 239 N.C. App. 208, 219 (2015) (internal quotations omitted)); *see also* ECF No. 43 at 14 (mandating that at summary judgment Doe present "evidence of a breach of a specifically enforceable, procedural promise."). Plaintiff argues that Wake Forest breached the Policy because it: (1) failed to provide Plaintiff with proper notice of the allegations against him (Compl. ¶ 305); (2) violated Section 2A.16 of its Procedures which mandates that students be presumed not responsible for alleged sexual harassment until a determination regarding responsibility is made by allowing Jane Roe to supplement her allegations to include an additional charge of non-consensual sexual intercourse (*Id.* at ¶¶ 420-422); (3) failed to conduct a fair hearing thereby violating Policy § 2A.14's "assurance" that staff will be trained to "not rely on sex or gender stereotypes" and to "promote impartial investigations and adjudications," as well as Policy § 3A.02 which addresses the right of both parties to question the other party and any witnesses during the hearing (*Id.* at ¶¶ 426-427); and (4) violated its obligation to address instances of retaliation, as required by Policy §§ 1.01 and 1.02 (*Id.* at ¶¶ 452-453).

As discussed above, the University provided timely notice to Doe of the allegations against him. There is no evidence that the University had knowledge of Roe's "additional" allegation prior to Roe's initial interview on August 30, 2022, and there is no testimony in the record that anyone at the University presumed the allegation to be true. *See* Doe's Admissions Nos. 2-11, 14-15. The third "breach" alleged by Plaintiff – the University's alleged reliance on sex stereotypes – is of a

type broadly held to not constitute an enforceable promise. *See* ECF No. 43 at 8 (citing *Doe v. Lees-McRae Coll.*, No. 1:20 CV 105 MR WCM, 2021 WL 1096285, at *10 (W.D.N.C. Feb. 4, 2021); *Shaw v. Elon Univ.*, 400 F. Supp. 3d 360, 368 (M.D.N.C. 2019)). Even so, the hearing transcript establishes that Plaintiff's advisor was allowed wide latitude to cross-examine Roe for more than two hours and only objected to not being allowed to ask a question regarding Roe's physical strength. Finally, there is no evidence that the University violated its Policy in responding to allegations of retaliation against Doe. As Kallem found, the University promptly responded to Doe's complaint when he made it clear he wished to file a formal complaint. *See* Kallem Dep. at 92:2-93:3. Plaintiff himself admits that he elected to not pursue his own complaint(s) for retaliation. *See* Doe Dep. at 150:6-151:16; Doe's Admissions Nos. 27-30; **Exhibit 33**. Plaintiff has not provided evidence of a breach of a specifically enforceable, procedural promise by the University so his breach of contract claim cannot survive as a matter of law.

### B. The University's Policy is not a contract.

"A valid contract is formed only if there is mutual intent to contract and an agreement on sufficiently definite terms to be enforceable." *See* ECF No. 43 at 7; *Elliott v. Duke Univ., Inc.*, 66 N.C.App. 590, 595 (1984) (noting that a contract does not exist if "one party simply believes that a contract exists, but there is no meeting of the minds."). Courts applying North Carolina state law have squarely held that student handbooks and other student policies are not enforceable contracts unless their terms are expressly incorporated into a written contract between the parties. *Shaw*, 400 F. Supp. 3d at 365 ("terms found in [student policies] must be explicitly included in or incorporated into a valid and enforceable contract for those terms themselves to become enforceable obligations."); *Chandler v. Forsyth Tech. Cmty. Coll.*, 294 F. Supp. 3d 445, 458-59 (M.D.N.C.), *aff'd*, 739 F. App'x 203 (4th Cir. 2018) (absent an allegation of an enforceable contract explicitly incorporating policies or procedures from a college handbook, a student cannot

41858837.10

premise a breach of contract claim on those policies and procedures); *see also Black v. W. Carolina Univ.*, 109 N.C. App. 209, 213 (1993) (University procedures could not form basis of contract claim unless expressly incorporated into a contract).

In *McClean v. Duke University*, a student alleged that after she was raped and sexually assaulted by another student, the university failed to protect her from subsequent harassment and retaliation as allegedly promised in its policies. 376 F. Supp. 3d 585, 595-96 (M.D.N.C. 2019). This Court unambiguously held that "[u]nilateral manuals and policy handbooks produced by an employer or university are not independent contracts and do not become a part of any contract unless expressly included." *Id*. at 606. This conclusion is underscored by the University's handbooks explicit terms, which grant the University the right to unilaterally modify the handbooks at any time.[3]

Here, Plaintiff did not sign any document or contract that incorporated the Policy into a written contract between himself and the University. *See* Doe Dep at 152:5-7. Doe has never signed a copy of the University's Title IX Policy and, prior to receiving the Notice of Allegations against on April 13, 2022, he had not read the Policy. *Id.* at 36:10-12. Absent evidence of a mutual intent to be bound by sufficiently definite terms, which does not exist in this factual record, no fact finder could reasonably find that the Policy constitutes a contract between the University and Plaintiff.

## CONCLUSION

For all the foregoing reasons, the University's Motion should be granted, and judgment should be entered in favor of the University on both claims alleged by Plaintiff.

---

[3] *See* Wake Forest University, *Undergraduate Student Handbook*, updated Feb. 27, 2023, *available at* https://studentconduct.wfu.edu/undergraduate-student-handbook/.

41858837.10

Dated: July 24, 2023

Respectfully Submitted,

*/s/ Joshua W.B. Richards*

Joshua W.B. Richards (Special Appearance)
Douglas A. Sampson (Special Appearance)
SAUL EWING LLP
Centre Sq. West, 1500 Market St.
38th Floor
Philadelphia, PA 19102
215-972-7737
joshua.richards@saul.com
douglas.sampson@saul.com

and

William K. Davis (NCSB No. 01117)
Alan M. Ruley (NCSB No. 16407)
Mark A. Jones (NCSB No. 36215)
BELL, DAVIS & PITT, P.A.
P.O. Box 21029
Winston-Salem, NC 27120
336-722-3700
wdavis@belldavispitt.com
aruley@belldavispitt.com
mjones@belldavispitt.com

*Counsel for Defendant Wake Forest University*

41858837.10