**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| **JOHN DOE,** | |
| *Plaintiff*, | |
| | |
| **v.** | **Civ. No. 1:23-cv-00114** |
| | |
| **WAKE FOREST UNIVERSITY,** | |
| *Defendant*. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT WAKE FOREST UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff John Doe ("Plaintiff" or "Doe") submits this Memorandum of Law in opposition to Defendant Wake Forest University's ("Defendant" or "Wake Forest" or the "University") Motion for Summary Judgment. For the reasons described below, the motion should be denied.

**STATEMENT OF FACTS**

Plaintiff matriculated at Wake Forest University in the fall of 2019, with an anticipated graduation date in May of 2023. Verified Complaint, ECF No. 1 ("Compl.") ¶ 19. During the spring of 2021, Doe met Jane Roe ("Roe") through a mutual friend. Compl. ¶ 123. Doe and Roe engaged in sexual activity on approximately six to eight occasions that semester. *Id*. ¶ 125. On or about October 7 or 8 of 2021, Roe invited Doe to attend a sorority date function, and Doe agreed. *Id*. ¶¶ 134-135. On October 15, 2021, Doe attended a pregame in Roe's residence hall, followed by the event. *Id*. ¶¶ 136, 139; Ex. 1 ("Doe Dep.") at 79:18-19; 79:20-23. After a few hours, Doe and Roe left the bar and went to a fraternity house, followed by their return to Roe's residence hall. Compl. ¶¶ 144-145. Once in Roe's room, they began to kiss, cuddle, and touch one another. Compl. ¶ 148; Doe Dep. 80:3-6. Both parties expressed their agreement to engage in sexual intercourse; however, because Doe was unable to maintain an erection, intercourse never occurred.

1

Compl. ¶¶ 150-154; Doe Dep. 80:7-8. The following morning, once Doe and Roe had awoken, they began to cuddle, and Roe rubbed Doe's shoulders and ran her hands through his hair, which indicated the initiation of sexual contact. Compl. ¶ 160. In response, Doe digitally penetrated Roe, an act they had engaged in before. Compl. ¶ 161; Doe Dep. 80:12-16. Doe left Roe's room, parting in the same manner as they had on prior occasions. Compl. ¶¶ 162-163; Doe Dep. 80:16-20.

On April 1, 2022, a Safe Office advocate requested a meeting with Title IX Director Aishah Casseus ("Casseus") and Roe. Ex. 2 at 2. On April 12, 2022, Roe submitted a formal complaint against Doe. Ex. 3. On April 13, 2022, Casseus sent Doe a Notice of Allegations (the "Notice") indicating that Roe was alleging that Doe engaged in sexual harassment by sexual assault on October 16, 2021 in Roe's residence hall, in violation of the University's Policy. ECF No. 66-9. On April 14, 2022, Casseus advised Doe that Roe was interested in pursuing an adaptive resolution. Compl. ¶ 173. After several meetings and email communications from May through August of 2022, Roe declined to accept Doe's proposed terms for resolution[1] and withdrew from the adaptive resolution process. Compl. ¶ 180. On August 19, 2022, Casseus notified Doe that the formal resolution process would resume. ECF No. 66-19. Assistant Director of Title IX Jessica Telligman ("Telligman") was appointed to serve as investigator. Compl. ¶ 182. Telligman interviewed Roe on August 30, 2022. ECF No. 66-22 at 17. During this interview, Roe alleged for the first time that she initially consented to intercourse with Doe on October 15, 2021 but subsequently withdrew her consent by stating "this doesn't feel good." ECF No. 66-10; Ex. 15 ("Telligman Dep.") at 58:13-60:10. Based on this information, Telligman notified Casseus that she would need to prepare

---

[1] Though not particularly probative, Wake Forest misrepresents the witness testimony, stating that Doe initially came up with five concessions that he intended to propose in an effort to reach a resolution, which he later reduced to two concessions on the advice of his mother who, as a former attorney, "felt she was an experienced negotiator." ECF No. 64 at 6. However, this testimony regarding Doe's mother's beliefs about her negotiation skills was offered by Doe's former counsel, thus constituting hearsay. Ex. 4 ("Fitzgerald Dep.") at 57:13-58:4.

an updated Notice of Allegations. Telligman Dep. 62:8-63:23. On September 1, 2022, Casseus provided Doe with an Updated Notice of Allegations, indicating that Roe now also alleged that Doe engaged in non-consensual sexual intercourse on October 15, 2021. ECF No. 66-10.

Telligman interviewed Roe again on September 7, October 5, and October 12, 2022. ECF No. 66-22 at 18-19. Roe concurred that she and Doe had engaged in consensual kissing and fondling and spent the night together on several occasions in the spring of 2021 and once or twice in the fall of 2021 but did not have sexual intercourse. ECF No. 66-22 at 4. Roe also confirmed that she and Doe had not previously discussed consent for any of their sexual interactions, but instead both used "physical responses" to indicate consent. ECF No. 66-22 at 4. Roe produced medical records from a visit to Wake Forest's Student Health Services on October 18, 2021, initially in a format that included a redaction of her statement indicating she denied sexual assault (Ex. 5; ECF No. 66-22 at 20; Ex. 6 ("Casseus Dep.") at 74:11-75:1) and refused to produce medical records from later visits dated October 25, November 12, and November 22, 2021 despite claiming that such visits were related to the alleged assault. ECF No. 66-22 at 8. When Telligman inquired whether Roe would sign a release authorizing her to speak with the Director of Student Health Dr. Price, Roe declined. ECF No. 66-22 at 8. As part of the investigation, Roe provided text messages exchanged with I.L. on October 15-16, 2021. ECF No. 66-22 at 37-41. I.L. was not with Roe at any time during the evening or early morning of October 15-16, 2021. Ex. 7 ("Wells Dep.") at 142:2-12. Roe also provided text messages exchanged with a non-Wake Forest student, M.D., on October 17-18, 2021. ECF No. 66-22 at 43-45. Oddly, Telligman never requested an investigation interview with M.D. Telligman Dep. 122:14-124:17.

Doe appeared for investigation interviews with Telligman on September 8, September 15, September 26, and October 6, 2022. ECF No. 66-22 at 19. During his interviews, Doe provided

truthful information concerning the relevant events. Doe Dep. 44:17-20. Doe submitted the limited evidence he had, which included text messages between him and the friend who initially connected Doe and Roe, and the polygraph report indicating Doe's account of October 15-16, 2021 was truthful. ECF No. 66-22 at 20-21; Ex. 14. Because the majority of his and Roe's communications were on Snapchat, an application that causes messages to be deleted once viewed by the recipient, just as Roe was unable to provide communications between them, Doe was likewise unable to do so. ECF No. 66-22 at 19-21; Doe Dep. 152:8-11. In a blatant misconstrual of the record, Wake Forest claims that if Doe had evidence tending to show he was responsible for a violation, he likely would not have provided that evidence to the University. ECF No. 64 at 7. This statement is wrong on two fronts. First, Doe did not have any evidence tending to show he was responsible, as he affirmatively denied the accusations. Second, he never stated, nor did his mother or advisor testify, that in the event he did have such inculpatory information, he would not have provided it. Ex. 8 ("C.B. Dep.") at 73:19-24. The testimony cited does not support this baseless claim.

On November 4, 2022, Telligman issued the Final Investigation Report. ECF No. 66-22. The University appointed attorney Dixie Wells ("Wells") to serve as the hearing officer. Wells had served as a hearing officer in one other Title IX matter at Wake Forest[2] and had previously represented Wake Forest in a legal capacity, in approximately seven to eight "discrete engagements" which have included matters arising from employment, Title IX/student conduct and Covid, dating back to 2007 or 2008. Wells Dep. 26:7-29:6.

Doe appeared for the hearing in person on November 29, 2022 while Roe and the witnesses appeared remotely. Compl. ¶ 228. The hearing commenced around 9:00 a.m. and continued until

---

[2] While Wake Forest makes much of the fact that Doe was the first male student that Wells found responsible through Wake Forest's disciplinary process, she has only served as hearing officer for one other matter at the University, bringing her track record in finding males responsible to 50%. Wells Dep. 33:5-9.

4

10:28 p.m. ECF No. 66-26; ECF No. 66-29 at 7. At the start of Doe's cross-examination, Wells asked whether he had any concerns regarding the way in which the summaries of his own interviews were written, to which he responded that he did not. ECF No. 66- 26 at 295:15-297:3. Contrary to Defendant's claim, Doe did not state that he had no objections to the witnesses interviewed, evidence gathered, or investigation report. *Id*. During the hearing, Wells deprived Doe's advisor of an opportunity to properly defend Doe. Fitzgerald Dep. 29:20-30:6.

Wake Forest's portrayal of the concluding remarks made by Doe's advisor at the hearing does not paint the full picture. What is not perceptible within the confines of the transcript is that Wells and Doe's advisor were quite irritated with one another by the time the hearing neared its conclusion. Fitzgerald Dep. 85:18-20. By this point, it was apparent to Doe's advisor that the hearing was far from fair, as he was not allowed to adequately defend Doe. Fitzgerald Dep. 85:21-23. Thus, when asked by Wells whether he had any further questions, Doe's advisor indicated that he did not, in an effort to avoid jeopardizing the outcome for his client and with the intention of addressing these arguments further if there were an appeal. Fitzgerald Dep. 85:8-86:21.

On December 20, 2022, Wells issued the hearing outcome letter. ECF No. 66-1. Wells concluded that Wake Forest met its burden by demonstrating that Doe engaged in Sexual Harassment by Sexual Assault (Rape) and Sexual Harassment by Sexual Assault with an Object. ECF No. 66-1 at 23.[3] Wells relied upon Roe's medical records from October 18, 2021 (despite Roe's failure to produce records from any follow up visits), text messages exchanged between Roe and I.L. (who was not present for any of the relevant events) on October 15-16, 2021, text messages between Roe and M.D. (who was not present for any of the relevant events, was not a Wake Forest student, and was never interviewed by Telligman), testimony from both Roe and Doe that neither

---

[3] Because Wells found Roe not to have been incapacitated, Roe's alternative theory of non-consensual sexual intercourse due to incapacitation was not substantiated. ECF No. 66-1 at 14.

one contacted the other after October 16, 2021 (despite Roe's knowledge that Doe began dating another student shortly thereafter), Doe's failure to produce (non-existent) medical records demonstrating he had previously experienced issues with erectile dysfunction, Doe's failure to provide (non-existent) text messages concerning his interactions with Roe, and statements Doe made to the polygraph examiner during his voluntary polygraph exam (while refusing to consider the results of the exam itself). *See generally* ECF No. 66-1.

Demonstrating her clear predisposition against Doe, in a draft version of the hearing outcome letter, Wells wrote as follows in her analysis of the Sexual Harassment by Sexual Assault (Rape) claim: "[t]he Hearing Officer noted Respondent's overall attitude toward that evening. He told the investigator that he panicked when he received the Snapchat from Claimant inviting him to the date function on October 15…He described himself as "neutral" about going to the date function…he then volunteered multiple times during the hearing that he, like other men who are invited to such parties, do not enjoy them…Given that Respondent admittedly did not want to be at the function or with Claimant, it ***is not difficult to see how he might have considered himself entitled to sex in return.***" Ex. 9 at 18. That this section of the outcome letter was eliminated before the final version was issued to Doe is immaterial. Wells wrote this section while preparing the outcome letter and considered including it in the final version of the outcome letter. Wells Dep. 132:12-24. This far-reaching conclusion about Doe's purported belief that he was "entitled to sex" was wholly unsupported by the record; Doe never stated such a thing in his interviews or the hearing. Wells Dep. 133:8-135:7. This statement, and the thought process behind it, reveals Wells' biased presumption about male behavior, and her inherent predisposition against Doe, the male.

Wells' findings were sent to an appointed sanctions officer, Dr. Adam Goldstein ("Goldstein"), who recommended a sanction of a two-semester suspension, with eligibility to

6

return in Spring 2024. ECF No. 66-1 at 24; Ex. 19; Ex. 20. In reaching this decision, Goldstein reviewed the outcome letter and the investigative report but did not review the hearing transcripts. Ex. 10 ("Goldstein Dep.") at 57:12-19. Doe's case was the first one in which Goldstein was solely responsible for deciding upon a sanction in a Title IX case. Goldstein Dep. 13:18-21. The recommended sanction was incorporated into the outcome letter. Goldstein Dep. 68:17-69:1.

Doe submitted his appeal of the hearing outcome on January 3, 2023. ECF No. 66-29. Wake Forest retained Howard Kallem ("Kallem") to serve as the appeals officer. Ex. 11. Kallem understood that his role was not to make any determination as to whether the hearing officer's findings were correct, but instead to determine whether the findings had some basis in evidence. Ex. 12 ("Kallem Dep.") at 35:23-36:11. In rejecting Doe's claim that Wells was biased, Kallem cited to the fact that Wells found Roe was not incapacitated on the night in question. ECF No. 66-2 at 21. Kallem reasoned that had Wells been biased against Doe, she would have found against him on all three theories of responsibility. Kallem Dep. 52:12-53:25. However, by the Policy's definition, this is an impossibility. Wells could not have found both that (i) Roe was incapacitated at the time of the alleged intercourse, and (ii) that Roe was capable of consenting and then withdrawing consent, given one who is incapacitated is unable to consent. Kallem Dep. 54:25-55:15; ECF No. 66-6 at 15. On January 23, 2023, Kallem denied Doe's appeal. ECF No. 66-2.

## STANDARD OF REVIEW

Under Rule 56(c), summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A fact is material "if proof of its existence or non-existence would affect disposition of the case under applicable law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct.

7

2505, 91 L.Ed.2d 202 (1986). Further, "an issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. When determining whether a genuine issue of material fact has been raised, the court must construe all reasonable inferences and ambiguities against the movant and in favor of the nonmoving party." *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (internal citations omitted).

<u>**ARGUMENT**</u>

**I.  Doe's Title IX claim should be permitted to proceed as the record raises genuine issues of fact, such that a reasonable jury could conclude gender bias was a but-for cause of the erroneous outcome.**

**A. Plaintiff has established the elements for an erroneous outcome claim.[4]**

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). To prove liability under an erroneous outcome theory, a plaintiff must show: "(1) particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding"; and (2) "a causal connection between the flawed outcome and gender bias." *Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d Cir. 1994). Articulable doubt on the accuracy of a disciplinary outcome can be established in a number of ways including by pointing to procedural flaws in the investigatory and adjudicative processes; noting inconsistencies or errors in the adjudicator's findings; or challenging the overall sufficiency and reliability of the evidence. *See Yusuf,* 35 F.3d at 715. As set forth below, there are genuine disputes of material fact relating to the accuracy of the investigation outcome against Plaintiff, and the impact of gender bias on the proceedings.

---

[4] Plaintiff does not address Wake Forest's argument concerning Title IX Selective Enforcement, as he did not plead this theory in his complaint.

8

Plaintiff does not rely upon mere speculation as to the University's motivations for reaching an erroneous finding, nor does his gender bias claim arise purely out of a disagreement with the outcome. Instead, he presents specific instances of procedural error, unfounded credibility determinations, disparate treatment as between the male respondent and female complainant, and a decision that goes against the weight of the evidence, all of which occurred against the backdrop of substantial pressure on Wake Forest to demonstrate that it was responsive to sexual misconduct complaints. Thus, a reasonable jury could conclude "there is no lack of a particularized allegation relating to a causal connection between the flawed outcome and gender bias." *Doe v. Washington & Lee Univ.,* No. 6:19-CV-00023, 2021 WL 1520001, at *14–15 (W.D. Va. Apr. 17, 2021).

### i. Procedural errors/disparate treatment all favoring the female complainant and disfavoring the male respondent.

As many courts have acknowledged, procedural irregularities, when combined with other allegations such as federal pressure to aggressively pursue sexual misconduct claims, are sufficient to support a Title IX claim. *See, e.g.*, *Doe v. Oberlin Coll.*, 963 F.3d 580, 586–88 (6th Cir. 2020) ("[Plaintiff had] amply stated a claim for sex discrimination" where there were "clear procedural irregularities," "the Department of Education's Office of Civil Rights was engaged in a systemic investigation of the College's policies," and the "facts of the case cast . . . doubt on the accuracy of the disciplinary proceeding's outcome."); *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018); *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573 (E.D. Va. 2018); *Doe v. Univ. of Denver*, 1 F.4th 822, 832-34 (10th Cir. 2021) (substantial procedural irregularities plus minimal additional indicia of gender bias sufficient to overcome summary judgment motion). Doe presents sufficient evidence of procedural error and disparate treatment as between him and Roe to raise a question of fact regarding whether gender bias impacted the outcome in his case.

Case 1:23-cv-00114-KDB-SCR   Document 69   Filed 08/17/23   Page 9 of 28

The investigation and adjudication of the allegations against Doe involved procedural errors at every phase of the proceedings. Telligman described that her job as investigator was to "gather the information and the evidence presented." Telligman Dep. 16:22-17:3. This description was emblematic of her failure to thoroughly "investigate" the case, as she accepted whatever information the witnesses chose to provide and did not proactively seek additional relevant information. For instance, she failed to request any relevant communications exchanged between Roe and witness I.L., whom Roe described as her best friend, in the months following the alleged assault, accepting that a mere four text messages represented the full universe of communications between Roe and her best friend concerning the encounter with Doe. Telligman Dep. 24:13-24; 128:5-18; 130:22-133:18. She also failed to interview Roe's friend M.D., despite her recognition that Roe texted M.D. about what happened between her and Doe in the days after, and that such information could have been helpful. Telligman Dep. 122:14-124:17. Telligman justified her decision not to interview M.D., stating she did not deem such testimony to be relevant "because it didn't go to whether the claimant was actually sexually assaulted." Telligman Dep. 124:18-21. Of course, the same could be said for the testimony of witnesses I.L. and P.K., whom Telligman did decide to speak with, and whose testimony Wells ultimate relied upon when finding Roe more credible than Doe. ECF No. 66-1 at 13, 17, 19, 20, 22, 23.

Telligman also assisted Roe in altering her testimony in a manner that would help substantiate her claims. This included requesting clarification from Roe on the meaning of the following statement: "When we started to have sex, it started off as okay. I was basically coaching myself to do it. *But I remember it coming out*." The plain language makes clear that Roe was referring to Doe's penis coming out, a fact that would have supported his testimony that he was not able to maintain an erection. However, for reasons unknown, Telligman followed up with Roe

10

regarding this particular statement two months later, to confirm what she meant by it, leading to a reference in the report that what Roe was referring to was the condom coming out of the package. ECF No. 66-22 at 6; Telligman Dep. 87:4-91:9; Ex. 13 at 24; Ex. 16. Similarly, Telligman offered Roe a suggested explanation for a text message in which she wrote "it burns." ECF No. 66-22 at 5-6. Roe initially stated that she was not sure what she meant by this message (which a reasonable person would certainly understand to refer to her throat burning after vomiting), yet subsequently adopted Telligman's suggestion that the text instead referred to pain from intercourse. *Id.;* Ex. 13 at 84. Further, Telligman never requested Roe's authorization to speak with the P.A. who was present for Roe's examination. Telligman Dep. 119:2-120:18. While proactively assisting Roe to strengthen her claims, Telligman made no effort to seek out potentially exculpatory information and in fact, did not even view her role as requiring her to do so. Telligman Dep. 95:5-97:7.

The procedural errors and disparate treatment of Doe as the male accused continued through the hearing process when Wells deprived Doe's advisor of an opportunity to properly defend Doe. Fitzgerald Dep. 29:20-30:6. Among other things, Wells prohibited Doe's advisor from questioning Roe about her motivations for filing the complaint (Fitzgerald Dep. 29:24-30:13; ECF No. 66-26 at 160:11-24), Wells accused Doe's advisor of asking Roe harassing questions despite all such questions being relevant to the allegations (Fitzgerald Dep. 30:14-30:18; ECF No. 66-26 at 450:21-451:19; 483:9-16), Wells placed an arbitrary time limit on Doe's advisor's cross-examination of Roe while no such time limit was placed on the examination of any other witness (Fitzgerald Dep. 31:19-24; ECF No. 66-26 at 486:9-16) [5], Wells prohibited Doe's advisor from

---

[5] Wake Forest points to the fact that Doe's advisor did not make any objections during the hearing, to refute Doe's claims regarding the fairness of the process, however this is disputed by the hearing transcript. ECF No. 66-26 at 489:3-490:5. Moreover, given the Policy does not allow for objections during the hearing, the failure to raise any specific objections cannot possibly be deemed a waiver of any such arguments. ECF No. 66-6.

11

asking relevant questions, such as those related to her physical strength and Roe's medical records (ECF No. 66-26 at 478:6-15, 491:3-13; Fitzgerald Dep. 84:22-85:7), and Wells permitted Roe's advisor to ask every question posed, while barring Doe's advisor from asking questions that Wells unfairly deemed irrelevant. *See generally* ECF No. 66-26; Compl. ¶ 229.

### ii. Wells made unfounded credibility determinations and unsupported conclusions regarding responsibility.

Further evidence of gender bias was revealed through the Hearing Officer's findings that Roe was more credible than Doe, despite the overwhelming evidence tending to refute her claims. Wells' conclusion in her draft outcome letter that it was "not difficult to see how [Doe] might have considered himself entitled to sex in return," despite the absence of any evidence establishing this finding, demonstrates Wells' mindset as she evaluated the evidence and reached her conclusions. Ex. 9 at 18. Further, Wells determined that Roe was not incapacitated per the Policy's definition, noting that she was "generally aware of her surroundings"; "was able to walk without assistance"; "was able to direct texts to the intended recipient;" "had sufficient capacity to understand the sexual nature of a proposed act, that she had the right to refuse to participate, and that she would have been aware of ongoing sexual activity." ECF No. 66-1 at 14. Yet rather than afford Doe the benefit of doubt and recognize that he may have observed these same indicators concerning Roe's level of capacity, Wells concluded that Doe's lack of observation of Roe's condition on October 15 somehow supported a "fair inference" that he likewise failed to observe that she was asleep the following morning when he initiated sexual activity.[6] ECF No. 66-1 at 14, 23.

The evidence Wells relied upon in reaching her conclusions was also problematic, and led to findings that went against the weight of the evidence. First, the meaning of the "it burns" text

---

[6] When questioned about how she made this leap, Wells referred to Doe's character, noting "[s]ome people are very empathetic towards others... Some people are less so." Wells Dep. 147:10-20. This presumption about Doe's character had no basis in fact.

message Roe sent to I.L. at 12:59 a.m. on October 16 was disputed. Wells construed this message as being consistent with a report of vaginal pain, however Roe did not recall sending this text and initially stated she was unsure what she meant by it, witness I.L. stated she did not know what was meant by this text, and a reasonable interpretation would be that the message referred to a sore throat after having vomited. ECF No. 66-1 at 17; ECF No. 66-22 at 5-6; ECF No. 66-26 at 199:10-21; 455:17-23. Further, both the medical records and Roe's testimony at the hearing confirmed that the vaginal pain did not begin until the following morning, after Doe left her room. ECF No. 66-23; ECF No. 66-26 at 391:20-392:3. As such, Wells' interpretation of this text, as corroborative of Roe's report that intercourse took place, was erroneous.

Second, Wells considered Roe's report of vaginal pain as further evidence that sexual intercourse took place. ECF No. 66-1 at 16. The reliance on this supposed evidence was improper as Roe failed to disclose the medical records that purportedly addressed this concern. ECF No. 66-22 at 8. Roe testified that she discussed the vaginal pain during a visit to Student Health on October 25, 2021, did not receive any prescription for the pain, and could not recall what she was told about the pain at the appointment. ECF No. 66-26 at 401:16-402:11; Wells Dep. 161:19-162:20. While Wells did not accept Doe's testimony that he had previously experienced erectile dysfunction, due to a lack of corroborating evidence, she did accept Roe's claims of vaginal pain due to intercourse, without any further corroborating evidence (beyond Roe's own subjective history report).

Third, Wells relied upon what she considered "contemporaneous evidence" to give further credence to Roe's allegations: (i) the fact that Roe did not contact Doe after October 16, 2021, despite noting Roe may have refrained from contacting him because Doe began dating another student at Wake Forest shortly thereafter (ECF No. 66-1 at 19-20); (ii) the text message Roe sent to M.D. on October 17, 2021, stating "something really bad happened this weekend." ECF No. 66-

13

1 at 19. As Telligman never interviewed M.D., she did not appear for the hearing, and Roe did not provide any additional messages exchanged with M.D., it was inappropriate to afford this statement, which could have held countless meanings, any weight; and (iii) a text message from I.L. to P.K. stating that Roe was nervous she had been drugged that weekend. ECF No. 66-1 at 19. While each of the foregoing were neutral at best (which, under the preponderance of the evidence standard would require a decision in Doe's favor), Wells construed this evidence in Roe's favor.

Wells further evidenced disparate treatment, and a bias against Doe, when she drew numerous adverse inferences against Doe while failing to make corresponding inferences against Roe. Wells viewed Doe's inability to provide medical record evidence confirming his history of erectile dysfunction as a knock against his credibility, when no such adverse conclusion was drawn in response to Roe's failure to authorize Telligman to speak with Dr. Price or her failure to disclose the medical records from her follow up visits to Student Health. ECF No. 66-1 at 16, 17. While acknowledging that the records Roe refused to provide could include relevant information, Wells declined to draw an adverse inference against Roe and determined that concerns about Doe's credibility still outweighed "the concerns about some missing medical records." Wells Dep. 158:11-159:23. Instead, the cherry-picked records that Roe did produce were relied upon heavily by Wells in reaching her findings. ECF No. 66-1 at 16. Incredibly, in furtherance of its suggestion that the Court should not believe Doe's account of the relevant events, Wake Forest entirely misconstrues the argument raised by Doe in his appeal concerning the issue of evidence related to his erectile dysfunction. ECF No. 64 at 2. Contrary to Wake Forest's characterization, Doe did not allege in his appeal that there was evidence of bias because the Investigator failed to gather medical records related to his history of erectile dysfunction, nor did he ever suggest that such records

14

existed. ECF No. 66-29. Instead, Doe argued that Telligman and Wells penalized him for not producing records, even though no such records existed. *See* ECF No. 66-29 at 31.

Wells similarly drew an adverse inference against Doe because he was not able to provide any relevant text messages from the evening of October 15 or the days following. ECF No. 66-1 at 17. While alleging that she merely noted this as relevant to the fact that Doe did not have corroborating evidence, the language of the hearing outcome letter suggests Wells did draw an adverse conclusion on this basis. Wells Dep. 175:17-177:11; ECF No. 66-1 at 17, fn. 12. In contrast, Wells viewed the limited text message evidence provided by Roe to be probative and did not question whether Roe had provided the totality of relevant messages. ECF No. 66-1 at 19.

Additionally, Wells went to considerable lengths to explain why she would not consider the results of the polygraph examination that Doe voluntarily submitted to, because she viewed the examination as a "win-win for [Doe];" meaning, if he passed the test, he could use it and if he failed, no one would have to know about the results. ECF No. 66-1 at 9-11; Wells Dep. 81:14-82:16.[7] Putting aside the inaptness of this reasoning, given Doe did pass the polygraph examination, Wells could have decided to omit the report from her consideration entirely. Yet, she chose to ignore the results of the examination while still relying upon statements Doe made during the polygraph examination process, to find (minor) inconsistencies in his account and support her predetermined conclusion that he was not credible. ECF No. 66-1 at 10-11.

Ultimately, Wells found Doe to be less credible than Roe, despite both parties presenting with inconsistencies in their accounts and notwithstanding that the inconsistencies in Doe's account were considerably less material to the overall narrative than Roe's. Specifically, Wells viewed Doe's lack of recall regarding their stop at a fraternity house before returning to Roe's

---

[7] Doe inquired whether Roe would take a polygraph, with an examiner of her choosing, and offered to pay for the exam. Roe declined. Ex. 22; Casseus Dep. 66:12-68:5.

15

dorm as a notable discrepancy in his account, in disregard of his testimony clarifying that his memory on that point was not clear because of the frequency with which he went to such fraternity. ECF No. 66-26 at 307:21-308:1. Similarly, Wells took great issue with the semantics of Doe's testimony, when he stated to the polygraph examiner that he could not *get* an erection, while testifying at the hearing that he could not *maintain* an erection. Wells Dep. 109:15-25; Ex. 14. Regardless of the terminology, either one definitively establishes that intercourse did not take place. Wells Dep. 111:22-112:15. In contrast to these minor, and insignificant discrepancies, the contradictions that appeared in Roe's accounts were numerous and material. *See* Compl. ¶ 209; ECF No. 66-29 at 11-12. Yet, Wells inexplicably found each of Roe's contradictions to have plausible explanations. Wells Dep. 111:10-16.

### iii. External pressure on Wake Forest to aggressively respond to sexual misconduct complaints further supports Doe's gender bias claim.

In discrimination cases, courts have found that external pressure can "provide[ ] a backdrop that, ***when combined with*** other circumstantial evidence of bias in [a plaintiff's] specific proceeding, gives rise to a plausible claim." *See, e.g., Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018). *See, e.g., Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019) ("It is precisely because procedural irregularity alone already suggests bias that even minimal evidence of sex-based pressure on the university is sufficient to establish bias on account of sex."); *Doe v. Oberlin Coll.*, 963 F.3d 580, 586–88 (6th Cir. 2020) ("[Plaintiff had] amply stated a claim for sex discrimination" where there were "clear procedural irregularities," "the Department of Education's Office of Civil Rights was engaged in a systemic investigation of the College's policies," and the "facts of the case cast ... doubt on the accuracy of the disciplinary proceeding's outcome."); *Doe v. Univ. of Arkansas*, 974 F.3d 858, 865 (8th Cir. 2020) (concluding a "dubious [disciplinary] decision ... taken against the backdrop of substantial pressure on the University to demonstrate that it was

responsive to female complainants" supports "an inference that a university is biased based on sex."). *Doe v. Univ. of Denver*, 1 F.4th 822, 831 (10th Cir. 2021).

Here, the factual record demonstrates a connection "to [Plaintiff's] case in a way that creates a reasonable inference that anti-male bias motivated [the University's] finding…" *Kashdan v. George Mason Univ.,* 70 F.4th 694, 701 (4th Cir. 2023). The Title IX director, investigator, and sanctioning officer were all aware of, and involved in the response to, campus protests concerning the University's handling of sexual misconduct. Telligman described the campus unrest that arose in the fall of 2021 in response to a male student returning to campus following a suspension after being found responsible in a Title IX case. Students responded by protesting and walking through campus with signs expressing their frustration with what they believed to be an insufficiently severe sanction. Telligman Dep. 26:1-29; Goldstein Dep. 28:17-29:3, 29:4-12; 42:6-10. Wake Forest's Title IX office was aware of this dissent, which caused Casseus to feel "a level of discomfort about the protest," and the office engaged in conversations concerning the student activism. Telligman Dep. 29:5-13; Casseus Dep. 12:7-22; 24:9-18.

In response, the Wake Forest student newspaper covered these events (Telligman Dep. 30:16-23) and University leadership created the Sexual Assault Prevention Support and Accountability ("SAPSA") task force. Telligman Dep. 30:24-31:16; Casseus Dep. 14:12-17. One of the charges directed to SAPSA, a group that both Casseus and Telligman were a part of, was to develop a response to the student unrest. Telligman Dep. 32:1-33:7; 37:13-16; Casseus Dep. 14:12-15:13. As part of its response, SAPSA held listening sessions on campus following the protest, (Telligman Dep. 35:25-15), conducted outreach to student organizations (Casseus Dep. 21:8-23), issued a sexual misconduct climate survey to seek information from students who had experienced sexual misconduct or been perpetrators of sexual misconduct to better understand the current

17

climate on campus, the data for which was gathered between March and April of 2022 (Telligman Dep. 39:11-41:5; Casseus Dep. 16:12-17:24; Ex. 18), and issued a training conducted by the Office of Wellbeing concerning bystander intervention. Telligman Dep. 41:6-20. SAPSA continued on for approximately one to two years, directly overlapping with the Doe/Roe case. Telligman Dep. 42:25-43:3. Additionally, because there was a lot of conversation on campus stemming from the protest, several professors reached out to Casseus directly to ask if she could speak with their classes about Title IX, which she did. Casseus Dep. 26:7-19.

The timeline of these actions coincided directly with the Doe/Roe case. While Wake Forest attempts to establish through a self-serving affidavit that Wells had no knowledge of the campus protest, this contention is dubious given Roe referenced the protest during the hearing, in response to a question posed by Wells. ECF No. 66-26 at 408:17-409:9. Based on the context of Roe's response, Wells made an assumption about the protest Roe alluded to. Wells Dep. 194:25-196:4. Thus, the only person involved in Doe's case who was potentially unaware of the protest and the responsive action that followed was Kallem. However, for the reasons discussed *infra* at I(C), Wake Forest's retention of an external appellate officer does not defeat Doe's gender bias claim.

Further, the statistical information provided by Wake Forest concerning prior disciplinary matters is not dispositive in Doe's case, nor is this information as cut and dry on the issue of gender bias as Defendant makes it out to be. Importantly, since August of 2020, *all* of the cases brought by male complainants have been dismissed and/or have not proceeded to a Title IX hearing. ECF No. 66-5. When combined with the manner in which Wake Forest handled Doe's complaint for retaliation (discussed *infra* at II(B)), a jury could conclude that Wake Forest's actions have discouraged male students from pursuing Title IX claims, supporting Doe's gender bias claim. Accordingly, when the foregoing events are considered in the aggregate, along with the procedural

18

errors and questionable decision making described above, a question of fact arises as to whether the outcome in Doe's case was biased based on sex.

### B. To Establish His Title IX Claim, Plaintiff is Not Required to Show that Gender Was the Only Motivating Factor/But-For Causation.

Wake Forest takes the position that the "but for" standard articulated in *Sheppard v. Visitors of Virginia State Univ.,* (993 F.3d 230 (4th Cir. 2021)) requires that Plaintiff establish his sex was the *only* reason for the erroneous outcome. However, such a sweeping standard is not supported by the relevant case law. The Supreme Court in *Bostock v. Clayton Cnty., Georgia* (207 L. Ed. 2d 218, 140 S. Ct. 1731, 1739–40 (2020)) recently provided clarity on the standard:

> That form of causation is established whenever a particular outcome would not have happened "but for" the purported cause. In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause. . . When it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision. So long as the plaintiff 's sex *was one but-for cause* of that decision, that is enough to trigger the law. . . No doubt, Congress could have taken a more parsimonious approach. As it has in other statutes, it could have added "solely" to indicate that actions taken "because of " the confluence of multiple factors do not violate the law. Or it could have written "primarily because of " to indicate that the prohibited factor had to be the main cause of the defendant's challenged employment decision. But none of this is the law we have. *If anything, Congress has moved in the opposite direction, supplementing Title VII in 1991 to allow a plaintiff to prevail merely by showing that a protected trait like sex was a "motivating factor" in a defendant's challenged employment practice.* Under this more forgiving standard, liability can sometimes follow even if sex *wasn't* a but-for cause of the employer's challenged decision.

(internal citations and quotations omitted). Citing *Sheppard* (993 F.3d at 236-23), the Fourth Circuit in *Kashdan* confirmed that the improper motivating factor—here, gender bias— "must be a but-for cause of the erroneous outcome in the challenged disciplinary proceeding", not the *sole* cause. *Kashdan v. George Mason Univ.*, 70 F.4th 694, 701 (4th Cir. 2023). *See also Tennessee v. United States Dep't of Agric.,* No. 3:22-CV-257, 2023 WL 3048342, at *18 (E.D. Tenn. Mar. 29, 2023) (citing to various circuits in holding "Title IX prohibits all discrimination where sex is a

19

but-for cause, even if there is another motivating factor.") Ultimately, whether gender-based discrimination was a but-for cause of the adverse action here is a question for the jury.

### C. Retention of an External Appeals Officer Does Not Inevitably Sever the Causal Link Between Gender Bias and the Outcome.

Wake Forest argues that a failure to show discrimination at every level of the university disciplinary process breaks the causal link required to establish a Title IX gender bias claim. Citing *Neal v. E. Carolina Univ.* (53 F.4th 130, 150 (4th Cir. 2022)), Defendant argues that because an externally retained appeal officer concluded Plaintiff did not establish that the hearing officer had a bias in favor of Roe, Plaintiff cannot establish the requisite causation. *Id.* However, the court's decision in *Neal* is not as concrete on the issue of causation as Defendant makes it out to be. *Neal* involved a school's determination of the plaintiff's qualification for its programs, in the context of an ADA discrimination claim. *Id.* Further, *Neal* is factually distinguishable as the independent panel employed a decision-making process that was substantially more comprehensive than the review undertaken by Kallem. *Id.* In *Neal,* the review panel consisted of two faculty members and one graduate student rather than a single decision-maker, met six times over a two-month period to interview the plaintiff and the graduate program's faculty members, and reviewed the plaintiff's entire record, as well as additional documentary evidence submitted by the plaintiff which had not been previously disclosed. *Id.* Additionally, the Dean of Graduate Studies adopted the recommendations before upholding the dismissal decision. *Id.*

Similarly, in *Oleyar v. Cnty. of Durham,* (336 F. Supp. 2d 512, 518 (M.D.N.C. 2004)), the plaintiff was afforded a full appeal hearing that included the appeals officer receiving testimony from the plaintiff and several witnesses and allowed the plaintiff to question the witnesses. *Id.* The processes in *Neal* and *Oleyar* were remarkably more robust than the appeals process provided here. Kallem's role was essentially to serve as a rubber stamp. He never spoke with Doe or Roe, the

20

witnesses, or the hearing officer, and he did not conduct any independent investigation. Kallem Dep. 24:11-14; 44:11-19. Instead, Kallem understood his role was limited to determining whether there was any basis raised in the appeal to warrant overturning the final outcome. Kallem Dep. 35:4-13. Accordingly, because Kallem did not conduct a meaningfully independent review, the causal link between the bias against Doe and the ultimate outcome is not broken.

Moreover, Defendant makes much of the assertion that because Kallem found no bias on the part of the Hearing Officer, Doe cannot now establish gender bias was the "but for" cause of the erroneous outcome. However, in doing so, Defendant misrepresents the findings made by Kallem. Specifically, the Kallem did not conclude that there *was* "no evidence of biased statements by the Hearing Officer or any others involved in the investigation and hearing." The appellate decision instead found "[t]he Respondent offers no evidence of biased statements by the Hearing Officer or any others involved in the investigation and hearing." ECF No. 66-2 at 21. It is not unusual that a respondent to a university disciplinary proceeding, without the benefit of discovery, would not be privy to information that may reveal potential biases on the part of the university administrators. As such, it cannot be the case that the availability of an appeal process, or the fact that such process resulted in affirmation of the decision, precludes any potential gender bias claim.

## II. Plaintiff should be permitted to proceed on his breach of contract claim; a valid and enforceable contract exists, and Wake Forest violated its disciplinary procedures.

Wake Forest ignores this Court's holding in its previous decision denying the University's motion to dismiss, when inaccurately declaring that the University's Policy is not an enforceable contract. In North Carolina, "the elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Montessori Children's House of Durham v. Blizzard*, 244 N.C.App. 633, 781 S.E.2d 511, 514 (2016); *Herrera v. Charlotte Sch. of L., LLC*, No. 17 CVS 1965, 2018 WL 1902556, at *9 (N.C. Super. Apr. 20, 2018). This Court

21

previously held that "to assert a legally enforceable contract against a university, the student must point to an identifiable contractual promise that the University failed to honor that can be judged objectively…If a student's claim includes such identifiable contractual promises, the court can make an objective assessment of whether the institution made a good faith effort to perform on its promise, without inquiring into the nuances of educational processes, thus permitting a breach of contract claim to survive." *Doe v. Wake Forest Univ.,* No. 1:23-CV-00114, 2023 WL 3242687, at *3 (M.D.N.C. May 1, 2023) (internal citations omitted); ECF No. 43.

**A. Plaintiff has identified an enforceable contract.**

Plaintiff has identified a valid and enforceable contract, thus satisfying the first element of this claim. Wake Forest's Title IX Sexual Harassment and Non-Title IX Sexual Misconduct Grievance Procedures applies to allegations of sexual harassment in the University's Education Program or Activity and allegations of sexual misconduct. ECF No. 66-6 at 21. The Procedures describe the steps that must be followed by the University when the University learns of allegations of sexual misconduct, from the time a complaint is received, through the investigation process, the hearing process, and a potential appeal, as well as factors to be considered in a sanctioning decision. ECF No. 66-6 at 21-38. The Policy thus constituted a contract between Plaintiff and the University, with the provisions of the Policy forming the specific terms of the contract. *See Doe v. Wake Forest Univ.,* No. 1:23-CV-00114, 2023 WL 3242687, at *5 (M.D.N.C. May 1, 2023).

In its moving brief, Defendant once again takes the position that student handbooks and policies are not enforceable contracts unless their terms are expressly incorporated into a written contract between the parties. This argument ignores this Court's previous decision (ECF No. 43) and misconstrues the well settled law in North Carolina which confirms that a "standalone written contract" is not required to create an enforceable agreement between a university and student. *Doe*

22

*v. Wake Forest Univ.*, No. 1:23-CV-00114, 2023 WL 3242687, at *5 (M.D.N.C. May 1, 2023).[8]

A student may bring a breach of contract action against a university "when the student is able to point to an identifiable contractual promise that the university failed to honor." *Williams v. Livingstone College, Inc.*, 239 N.C. App. 468, 770 S.E.2d 389 (2015); *see McFadyen v. Duke University*, 786 F. Supp. 2d 887, 981 (M.D.N.C. 2011), *aff'd in part, rev'd in part, dismissed in part sub nom., Evans v. Chalmers*, 703 F. 3d 636 (4th Cir. 2012) (permitting breach of contract action to proceed on limited inquiry of whether Duke failed to follow promised procedures for imposing discipline (particularly suspension) under the Code of Conduct);[9] *Neal v. Univ. of N. Carolina*, 2018 WL 2027730, at *7 (E.D.N.C. May 1, 2018).[10]

**B. Plaintiff has raised questions of fact as to whether Wake Forest violated the Policy.**

In addition to establishing the existence of a valid and enforceable contract, Plaintiff also presents evidence that Wake Forest breached specific provisions of this Policy when carrying out its disciplinary proceedings against Doe. First, Wake Forest violated Section 2A.17 of the Policy which provides that "[t]he investigators and decision-makers under these Grievance Procedures will objectively evaluate all Relevant Evidence, including both inculpatory and exculpatory evidence, and will not make any credibility determinations based on a person's status as a

---

[8] Even if the law required Plaintiff to sign a document incorporating the Policy into a written contract to be enforceable, which it does not, Wake Forest misstates Plaintiff's testimony on this point. He testified that he did sign "some sort of honor code or some type of general policy [his] first semester freshman year." Doe Dep. 151:17-24.

[9] Wake Forest conspicuously avoids addressing *McFadyen v. Duke University* (786 F. Supp. 2d 887, 981 (M.D.N.C. 2011), *aff'd in part, rev'd in part, dismissed in part sub nom., Evans v. Chalmers*, 703 F. 3d 636 (4th Cir. 2012)), in its brief, which remains good law on this issue.

[10] Defendant's reliance on *McClean v. Duke University*, (376 F. Supp. 3d 585, (M.D.N.C. 2019)) is misplaced. There, the court declined to recognize a breach of contract claim where the plaintiff failed to identify the source of the contractual promises allegedly breached and failed to point to any specific promise Duke allegedly contracted to provide. In contrast, Plaintiff here has identified the particular source of Wake Forest's promises, as well as the precise provisions breached.

Claimant, Respondent, or witness." Compl. ¶ 421; ECF No. 66-6 at 28. As discussed at I(A)(i) *supra*, Telligman failed to objectively evaluate the relevant evidence, including potentially exculpatory evidence which was all but ignored. Telligman did not speak with witness M.D. whom Roe had exchanged text messages with in the days following the relevant encounter (Telligman Dep. 122:14-124:17), failed to seek authorization to speak with P.A. Cummings who was present for Roe's medical examination (Telligman Dep. 119:2-120:18), failed to request all relevant messages exchanged between Roe and her best friend I.L. concerning the interaction with Doe (Telligman Dep. 24:13-24), and did not include as part of the Final Investigation Report a copy of the medical records initially submitted by Roe in which she had blacked out the portion of the record where she denied a sexual assault. Ex. 5; ECF No. 66-22; Casseus Dep. 74:11-75:1. Such evidence was exculpatory by its very nature, yet in failing to make it a part of the investigation record, Wake Forest concealed the redacted medical record from Doe and did not disclose it to Hearing Officer Wells. *See generally,* ECF No. 66-22. Equally concerning was Telligman's lack of knowledge concerning what would constitute exculpatory evidence. Telligman Dep. 95:5-97:7. Given her lack of knowledge as to what type of evidence may be considered exculpatory, it follows that she could not possibly have adhered to the Policy's mandate that she objectively evaluate such evidence. ECF No. 66-6 at 28. Wells likewise violated Section 2A.17, when she failed to objectively evaluate all relevant evidence, as described in detail at I(A)(ii) *supra*.

Additionally, the University failed to conduct a fair hearing, in contrast to the Policy's assurance that those involved in the process will be trained to "promote impartial investigations and adjudications," as well as Section 3A.02 of the Policy which addresses the right of both parties to question the other party and witnesses during the hearing. Compl. ¶¶ 426-427; ECF No.66-6 at

24

27, 32. As detailed above at I(A)(i) *supra*, Wells violated these contractual provisions through the manner in which she conducted the hearing.

Finally, Wake Forest violated its obligation to address instances of retaliation, as required by Sections 1.01 and 1.02 of the Policy. Compl. ¶¶ 452-453; ECF No.66-6 at 9-10. During the investigation of Roe's complaint, Doe notified Wake Forest on several occasions that he had experienced retaliation by Roe and her friends. He first advised Telligman of the details of these interactions on September 8, 2022, and followed up this report by emails to Telligman and Casseus. Ex. 17; Ex. 21; Doe Dep. 147:15-24. Despite the Title IX Office having the authority to investigate retaliation claims under Title IX, the retaliation arose from Doe's status as a respondent in a Title IX case, and notwithstanding that the Title IX office was already familiar with the facts of the underlying case as well as the involved parties, Casseus oddly delegated the handling of Doe's complaint to the Dean of Students office, thus delaying the resolution. Casseus Dep. 106:5-107:13. Though Doe exchanged emails with Telligman, Casseus, and Dean of Students Jim Settle about his concerns throughout November and December of 2022, the University did not take appropriate steps to timely investigate his retaliation complaint. By the time Dean Settle offered to meet with Doe about his complaint in January of 2023, he had already been sanctioned to a suspension for one year. Doe Dep. 147:19-150:14.

Based on the foregoing, a reasonable fact finder could find that the Policy created a binding contract between Wake Forest and Doe, and that Wake Forest violated the terms of the contract, thus warranting denial of Wake Forest's motion.

## **CONCLUSION**

For all the reasons set forth herein, Defendant Wake Forest University's motion for summary judgment should be denied in its entirety.

DATED: August 17, 2023

Respectfully submitted,

**NESENOFF & MILTENBERG, LLP**
***Attorneys for Plaintiff John Doe***

By: _/s/ Andrew Miltenberg_
Andrew T. Miltenberg, Esq. (Special Appearance)
Stuart Bernstein, Esq. (Special Appearance)
Tara J. Davis, Esq. (Special Appearance)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
tdavis@nmllplaw.com

-and-

**EKSTRAND AND EKSTRAND, LLP**
By: /s/_ Robert Ekstrand_
Robert C. Ekstrand, Esq.
110 Swift Avenue, 2nd Floor
Durham, North Carolina 27705
(919) 416-4590
rce@ninthstreetlaw.com
Bar No. 26673

26

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

JOHN DOE,
                    *Plaintiff*,

            v.                                          Civ. No. 1:23-cv-00114

WAKE FOREST UNIVERSITY,
                    *Defendant*.

## CERTIFICATE OF COMPLIANCE WITH L.R. 7.3(d)

The undersigned counsel hereby certifies, pursuant to Local Rule 7.3(d), that Plaintiff's

Opposition to Defendant Wake Forest University's Motion for Summary Judgment complies with

the Court's Pretrial Order and Case Management Plan, as it does not exceed twenty-five (25) pages

–inclusive of caption but excluding signatures and certificates—and the memorandum is double

spaced, using the "double spaced" setting in Microsoft Word and all text, including footnotes, is

in 12-point font. *See* ECF No. 35 at ¶ II.E.

                                                */s/ Tara J. Davis*
                                                Tara J. Davis, Esq.
                                                Special Appearance

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

**JOHN DOE,**
                *Plaintiff,*

      **v.**                                          **Civ. No. 1:23-cv-00114**

**WAKE FOREST UNIVERSITY,**
                *Defendant.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of August, 2023, I filed the foregoing Plaintiff's Memorandum of Law in Opposition to Wake Forest University's Motion for Summary Judgment using the Clerk's CM/ECF system, which will provide notice to all counsel of record. The accompanying exhibits are being filed under seal, and counsel will provide copies to the Court and parties electronically.

*/s/ Tara J. Davis*
Tara J. Davis, Esq.
Special Appearance

28