## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## CIVIL ACTION NO. 1:23-CV-00114

| | |
|---|---|
| **JOHN DOE,** | |
| **Plaintiff,** | |
| **v.** | **ORDER** |
| **WAKE FOREST UNIVERSITY,** | |
| **Defendant.** | |

      **THIS MATTER** is before the Court on Defendant's Motion for Summary Judgment (Doc. No. 63). In one sense, this is a close and difficult case. Allegations of sexual assault on college campuses are fraught with potential injustice for both female student victims of sexual violence and male students who may be falsely accused of improper conduct. Here, on an alcohol sodden night in October 2021, John Doe attended a sorority event at Wake Forest University as Jane Roe's invited date. After the party, they spent the night together in her dorm bed as they had done several times before. What happened then is known only to Doe and Roe (and perhaps not even to the two of them because of their mutual inebriation). Six months later, Roe filed a complaint against Doe for sexual assault which led to a disciplinary hearing in which Doe was found responsible and suspended for one year from the University. Did Doe sexually assault Roe? The available evidence does not lead to a clear answer and were the Court tasked with deciding that question in the first instance – which crucially it is not – it might well have reached a different judgment.

      However, as to the legal claims before the Court, the proper result is much clearer. After a full opportunity for discovery in pursuit of his Title IX and breach of contract claims, Plaintiff has failed to offer evidence from which a jury could reasonably find that gender discrimination was a

1

"but-for" cause of his suspension or that the University breached an enforceable objective procedural promise with respect to its disciplinary process. In other words, although the wisdom of Wake Forest's decision to suspend Doe may be in doubt, the lack of evidence in support of his legal claims is not. Therefore, after carefully considering this motion, the parties' briefs and exhibits, and oral argument on the motion from the parties' counsel on August 31, 2023, summary judgment will be granted to Wake Forest on Plaintiff's claims.

## I.      LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *United States v. 8.929 Acres of Land in Arlington Cnty., Virginia*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Modern Mosaic, LTD v. Turner Construction Co., et al.*, 946 F.3d 201, 206 (4th Cir. 2019).  A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *8.929 Acres of Land,* 36 F.4th at 252. "A fact is material if it might affect the outcome of the suit under the governing law."  *Id.* (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (when the nonmoving party "has failed to make a sufficient showing on an essential element of [his] claim with respect to which [he] has the burden of proof," summary judgment is warranted); *United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 178 (4th Cir. 2022).  If the movant satisfies his initial burden to demonstrate "an absence of evidence

to support the nonmoving party's case," the burden shifts to the nonmovant to "present specific facts showing that there is a genuine issue for trial." *8.929 Acres of Land,* 36 F.4th at 252 (quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015)). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). Rather, the nonmoving party must establish that a material fact is genuinely disputed by, *inter alia*, "citing to particular parts of the materials of record" and cannot rely only on "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." Fed. R. Civ. P. 56(c)(1)(A); *8.929 Acres of Land,* 36 F.4th at 252 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)).

Still, summary judgment is not intended to be a substitute for a trial of the facts. *Anderson*, 477 U.S. at 249. In determining if summary judgment is appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (internal quotation marks omitted) (quoting *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017)). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)).

In the end, the relevant inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## II.    FACTS AND PROCEDURAL HISTORY

Plaintiff John Doe, a senior student at Wake Forest, was suspended for one year from the University on January 24, 2023, after he was found to be responsible for an alleged sexual assault on a female Wake Forest student ("Jane Roe") in October 2021. *See* Doc. No. 66-1. The disputed factual circumstances of the night in question, the details of the lengthy hearing held to determine Doe's responsibility and other relevant facts are extensively described in the parties' respective briefs. *See* Doc. Nos. 64 (pp. 3-13), 69 (pp. 1-7) and 71. The Court will only summarize that background here, deferring to its legal analysis a more thorough discussion of the specific facts and hearing testimony most relevant to the Court's ruling.

John and Jane were involved in a dating relationship during their Sophomore year that included numerous instances of sexual activity, although not including intercourse. *See* Doc. No. 66-7 (Doe Deposition) at 36:10-15; 133:22-134:14. The relationship continued, albeit on a more limited basis, when they returned for their Junior Fall semester. On the night in question, John accepted Jane's invitation to be her date at a sorority social event. After the party, the two returned to Jane's dorm room to spend the night (as they had done before) and engaged in sexual relations. Jane contends that she was assaulted when John engaged in intercourse either while she was incapacitated by alcohol or after she withdrew her consent to intercourse once it began. She also contends that she was assaulted the next morning when John engaged in further sexual activity while she was incapacitated due to sleep. John denies committing any assault, denies that the two engaged in intercourse and generally describes their sexual relations that night and morning as consistent with their consensual relationship that preceded that evening. He also alleges that Jane's complaint was motivated by his decision to begin dating another Wake Forest student shortly after the events in dispute.

4

On April 12, 2022, approximately six months after the alleged assault, Jane filed a Formal Complaint against John pursuant to the Wake Forest University Sex and Gender Discrimination and Harassment Policy and Title IX Sexual Harassment and Non-Title IX Sexual Misconduct Grievance Procedures (the "Policy"). *See* Doc. No. 66-6. Under 34 C.F.R. Part 106 et seq., the University is required to investigate and respond to complaints of sexual harassment involving University students or employees. John received a written Notice of Allegations under the Policy the day after Roe's complaint. *See* Doc. No. 66-9. Jane and John then agreed to participate in Adaptive Resolution, a process in which the students attempt to reach a resolution prior to a formal investigation. After Adaptive Resolution was unsuccessful, an investigation proceeded at Jane's request consistent with the Policy.

The University's Assistant Director of Title IX Jessica Telligman was appointed to serve as the "Investigator" of the complaint and interviewed John and Jane four times each. In Jane's first interview with the investigator she alleged for the first time that the claimed assault included intercourse. Based on this information, the University's Title IX department provided John with a supplemental Notice expanding Jane's allegations before his first interview with the investigator. *See* Doc. No. 66-10. In addition to John and Jane, Ms. Telligman interviewed numerous other witnesses and collected documents and exhibits submitted by the parties. On November 5, 2022, the Investigator issued a twenty page written report to both John and Jane, which they had an opportunity to comment on as well as suggest additional investigation and provide further evidence. *See* Doc. No. 66-22. The report did not make any findings of fact or credibility or opine on whether Doe was responsible for a Policy violation. Also, Ms. Telligman did not have any discussions with the Hearing Officer prior to the hearing. *See* Doc. No. 70-4 (Wells Deposition) at 64:15-65:7.

A hearing was then held on November 29, 2022, before attorney Dixie T. Wells, a partner in the Ellis & Winters, LLP law firm, who served as the appointed external "Hearing Officer." Ms. Wells had served as a hearing officer in one other Title IX matter at Wake Forest (a 2021 hearing after which she found that the male student accused of sexual assault was not responsible) and had previously represented Wake Forest in a legal capacity in approximately seven to eight engagements related to employment, Title IX/student conduct and Covid issues, dating back to 2007 or 2008. Doc. No. 70-4 at 26:7-29:6; 31:19-32:18; 33: 5-8; Doc. No. 66-5 at 4. The hearing began at 9:05 a.m. and concluded at 10:28 p.m., *see* Doc. No. 66-26 at 6:3-4; 492:17-18, and included in-person testimony from Doe and testimony over Zoom from Roe and the other witnesses. During the hearing, Ms. Wells asked Doe if he had any objections to any portion of the investigation process, including the witnesses interviewed, evidence gathered, and Investigation Report. Doe stated that he had no objections. *Id.* at 295:15-297:3. At the hearing and during the investigation, Doe was represented by legal counsel, who was given an opportunity to present witnesses and cross-examine Roe and the other witnesses. Roe's cross-examination lasted approximately two hours.

On December 20, 2022, Ms. Wells issued her decision in the form of a twenty-five page single spaced "Final Outcome Letter," finding that the evidence established that it was more likely than not that Doe committed sexual misconduct in violation of University policy. *See* Doc. No. 66-1. As required by the Policy, a University administrator, here Dean of Students Dr. Adam Goldstein, determined the punishment for the violation, which was set as a one year suspension. *See* Doc. No. 66-28 (Goldstein Deposition) at 50:19-52:22; Doc. No. 66-6 at § 3A.12. Doe's case was the first one in which Goldstein was solely responsible for deciding upon a sanction in a Title IX case. *See* Doc. No. 66-28 at 13:18-21.

6

On January 3, 2023, Doe filed an Appeal of the Final Outcome Letter, alleging procedural irregularities that affected the outcome, bias, and that the sanction was disproportionate. *See* Doc. No. 66-29. Howard Kallem, an experienced Title IX attorney who was not a University employee and had never previously worked for the University was appointed to hear Doe's Appeal. On January 23, 2023, he issued a detailed Appellate Decision, which affirmed the Final Outcome Letter. *See* Doc. No. 66-2; Doc. No. 66-30 (Kallem Deposition) at 16:6-8. While not expressing his own opinion as to Doe's responsibility, Mr. Kallem determined in the Appellate Decision that the findings by Ms. Wells had a sufficient basis in the evidence. He also found that Doe had failed to demonstrate procedural irregularities or improper bias, concluding that there was "no evidence of biased statements by the Hearing Officer or any others involved in the investigation and hearing." Doc. No. 66-2 at 10.

This process – from complaint to investigation to hearing, decision and appeal – is typical of Wake Forest's handling of other Title IX complaints, although the result here is not. Since August 2020, the University has received twelve complaints and held five separate Title IX hearings against male respondents accused of sexual assault by female complainants. All five complaints that resulted in a hearing were investigated by Ms. Telligman. Plaintiff is the only male respondent to be found responsible. *See* Doc. No. 66-5.

The University finalized Plaintiff's suspension on January 24, 2023, and he has not attended classes since the suspension was imposed. On February 7, 2023, Plaintiff filed his Complaint in this Court alleging two causes of action – violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681, et seq., ("Title IX") and breach of contract under North Carolina law. Subsequently, the Court denied Plaintiff's motion seeking a TRO and preliminary injunction enjoining Wake Forest from further enforcing his suspension as well as Defendant's

motion to dismiss. *See* Doc. Nos. 25, 27 and 43. After the completion of discovery and an unsuccessful mediation, Defendant filed its Motion for Summary Judgment. *See* Doc. No. 63. The motion has been fully briefed and a hearing on the motion was held on August 31, 2023. It is now ripe for the Court's ruling.

## III. DISCUSSION

### A. Plaintiff's Title IX Claim

At the outset, it is important to understand the narrow scope of the Court's inquiry. "[F]ederal courts are courts of limited jurisdiction and thus do not have authority to resolve a dispute unless that authority has specifically been given to them." *Peabody Holding Co., LLC v. United Mine Workers of Am., Intern. Union, Unincorporated Ass'n*, 815 F.3d 154, 159 (4th Cir. 2016). As with claims of wrongful decisions in the workplace, Federal courts do not sit to ultimately adjudge all disputes that may arise as a result of a school's decision to discipline a student. *See DeJarnette v. Corning Inc*., 133 F.3d 293, 298–99 (4th Cir. 1998) ("Title VII is not a vehicle for substituting the judgment of a court for that of the employer."); *Wofford v. Evans*, 390 F.3d 318, 324 (4th Cir. 2004) ("In the final analysis, the balance of rights and interests to be struck in the disciplinary process is a task best left to local school systems …."). Accordingly, this Court does not sit as a super-school discipline appeal board[1] in the same way that it "does not sit as a kind of super-personnel department weighing the prudence of employment decisions …" *DeJarnette*, 133 F.3d at 298–99. So, the issue before the Court is not whether Wake Forest's

---

[1] Federal courts have a limited role in school discipline for both practical and policy reasons. Title IX applies to all schools at all levels that receive federal funds, including private universities such as Wake Forest. It would be impossible for Federal courts to review every instance of allegedly mistaken school discipline. Also, there is a clear public policy to entrust local school systems, colleges, and universities with the decisions on how best to discipline their students, while still being subject to established constitutional and statutory standards.

Case 1:23-cv-00114-KDB-SCR   Document 72   Filed 09/06/23   Page 8 of 22

decision to discipline Doe was "correct," but, rather, if in doing so the University violated any Federal or state law.

Plaintiff's first claim is under Title IX, a federal statute within the Court's jurisdiction. Title IX states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal Financial assistance." 20 U.S.C. § 1681(a). The law is enforceable through an implied private right of action and the defendant in a Title IX lawsuit is the institution and not the individual alleged to have acted in violation of the statute. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 686, (4th Cir. 2018) ("The Supreme Court has concluded that a victim of sex discrimination is entitled to pursue a private cause of action against a federally-funded educational institution for a violation of Title IX[ ]"); *John Doe v. Virginia Polytechnic Inst. & State Univ*., et al., No. 7:21-CV-00378, 2023 WL 2188737, at *11 (W.D. Va. Feb. 23, 2023). It is undisputed that Wake Forest receives federal funding, and that Plaintiff was "excluded from participation in [or] denied the benefits of ... [an] education program" when Wake Forest suspended him. *See* 20 U.S.C. § 1681(a). The success of Plaintiff's claim therefore depends on whether Wake Forest discriminated against him "on the basis of sex."

In *Sheppard v. Visitors of Va. State Univ*., 993 F.3d 230, 236-7 (4th Cir. 2021), the Fourth Circuit explained the governing test for gender discrimination in this context: to succeed on a Title IX claim based on an allegation of discriminatory school disciplinary proceedings, the student's sex must be a "but-for" cause of the discipline.[2] In other words, a Plaintiff must prove that but-for

---

[2] Plaintiff complains that the University seeks to require him to prove more than gender bias was a but-for cause of his suspension; specifically, that such bias was "the *only* reason for the erroneous outcome." *See* Doc. No. 69 at 19 (emphasis in original). First, Defendant disclaims that argument. Further, the Court agrees that whether or not other reasons (be they but-for causes or otherwise)

9

sex bias the challenged discipline would not have been imposed. *See Kashdan v. George Mason Univ.*, 70 F.4th 694, 701 (4th Cir. 2023) (plaintiff must show "[a] causal link between the student's sex and the university's challenged disciplinary proceeding"). The *Sheppard* court noted that this standard, requiring adequate pleading of but-for causation, is more consistent with the text of Title IX, which prohibits discrimination by federally supported educational institutions "on the basis of sex." *Id.* at 236.[3] (citing with approval, *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019) (articulating the test as "do the alleged facts, if true, raise a plausible inference that the university discriminated against John "on the basis of sex"?); *Doe v. Univ. of Sciences*, 961 F.3d 203, 209 (3d Cir. 2020) ("[T]o state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex. Although parties are free to characterize their claims however they wish, this standard hews most closely to the text of Title IX."); *Doe v. Univ. of Ark.-Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020) ("To state a claim, therefore, [plaintiff] must allege adequately that the University disciplined him on the basis of sex—that is, because he is male."); *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020) ("We adopt [the Seventh Circuit's] far simpler standard for Title IX claims. . . .")). In summary, it is not enough to prove that the disciplinary decision was erroneous. Plaintiff must go further and prove that his sex was the 'but-for' cause of his suspension.

---

motivated the disciplinary decision is not part of the causation test. Doe must prove that gender bias was a but-for cause of his suspension, no more but no less.

[3] Indeed, in specifically adopting a but-for causation requirement, the *Sheppard* court made clear that the suggestion in other circuits that it may be sufficient for sex to have been only "a motivating factor" of the disciplinary treatment is not the correct test to the extent it requires less than but-for causation. *Id.* at 236 n.7; *see also Doe v. Va. Polytechnic Inst. & State Univ.*, 2022 U.S. Dist. LEXIS 144420, at *23.

10

Plaintiff argues that he has established his Title IX claim under the so-called "erroneous outcome" theory, which is an acceptable way to plead a Title IX claim. *See Sheppard*, 993 at 235 n.6, 236. To prevail, Plaintiff must prove that "(1) [he] was subjected to 'a procedurally flawed or otherwise flawed proceeding'; (2) which 'led to an adverse and erroneous outcome'; and (3) involved 'particular circumstances' that suggest 'gender bias was a motivating factor behind the erroneous finding.'" *Doe v. Loh*, 767 Fed. App. 489, 491 (4th Cir. 2019) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). Critically, the improper motivating factor must still be a but-for cause of the erroneous disciplinary outcome. *See Sheppard*, 993 F.3d at 236–237; *Kashdan*, 70 F.4th at 701. And, a plaintiff must prove all three elements. *Id*.

Assuming that Doe has shown a triable factual dispute as to the second element (that there was an erroneous decision), the question becomes whether a reasonable jury could find in his favor on both the "flawed proceeding" and "gender bias causation" prongs. The Court finds that Plaintiff's evidence falls short on each element.

### 1. "A Procedurally Flawed or Otherwise Flawed Proceeding."

With respect to a procedurally or otherwise flawed proceeding, Doe argues that both the investigation and hearing were flawed. As to the investigation, Plaintiff contends that Ms. Telligman did not thoroughly investigate the case, did not ask for additional text messages from Roe's friend I.L., did not interview Roe's friend M.D., did not pursue Roe's medical records and an interview with a medical provider, and "altered" Roe's answers. *See* Doc. No. 69 at 10-11.

Section 2B.02 of the Policy requires an investigator to: (1) interview the Claimant, Respondent, and witnesses; (2) summarize such interviews in writing; (3) collect and review relevant documents; and (4) collect and review relevant evidence. The Investigator then prepares a written report to summarize the evidence, and makes the evidence available to all parties. *See*

11

Doc. No. 66-6. There is no dispute that Ms. Telligman did all of these things. Further, under the Policy, after an investigation report is drafted and sent to the parties, they have ten days to provide a written response or raise any issues or additional evidence they believe should be considered.

Despite knowing the facts underlying Ms. Telligman's alleged failures, there is no evidence in the record that Doe objected, asked for further investigation, or earlier raised the points concerning the investigation that he now complains about. Instead, when Ms. Wells asked Plaintiff at the hearing, "Do you have any concerns regarding the way in which your formal complaint or the way in which [Roe's] formal complaint has been investigated?" Plaintiff answered "No." Doc. No. 66-26 at 295:15-19. Further, Ms. Wells asked each attorney if they had any objections at the conclusion of each witness and made it clear she wanted any objections or issues raised during the hearing. Plaintiff's attorney consistently said he had no objections. *See* Doc. No. 66-26 at 14-15, 92, 137, 166, 254, 288, 367. Having failed to timely raise these complaints[4] either to the Investigator or the Hearing Officer, when the University may have been able to expand the investigation/evidence (taking into account its inability to compel witness testimony or the production of documents, including, but not limited to Roe's medical records), Plaintiff's efforts to do so here ring hollow. Moreover, Plaintiff has failed to present evidence that the flaws he complains about affected the outcome of his case (or, more directly, had anything to do with Doe's gender). Therefore, Doe's allegations concerning Defendant's investigation are insufficient to show a flawed process.

---

[4] Plaintiff argues that "the Policy does not allow for objections during the hearing." Doc. No. 69 at 11, n. 5. However, this argument is misleading. While it is true that attorney "advisors" are not permitted to object to other advisors' questions during the hearing, that does not absolve Doe from the consequences of his or his attorney's responses to Wells' direct questions about whether there were any defects in the process or testimony that could be corrected before the outcome was determined.

12

Plaintiff also argues that the hearing was procedurally flawed, but the record shows otherwise. While it is very rare (and perhaps impossible) that a presiding official or judge can conduct a "perfect" hearing or trial, it is clear that Ms. Wells did not "deprive Doe's [attorney] of an opportunity to properly defend Doe." *See* Doc. No. 69 at 11. First, Plaintiff asserts that Ms. Wells "prohibited Doe's [attorney] from questioning Roe about her motivations for filing the complaint." *Id*. Yet, in the cited portion of the hearing transcript, Ms. Wells actually *allowed* the question asked. Then, she told Doe's attorney that she'll "allow some" (more) questioning, while suggesting that Doe's attorney should focus on what happened and that Roe's motivation "for when she's filing [the complaint]" is not relevant "in and of itself."[5] Thus, Doe's attorney could have, but chose not to, pursue further questions related to this topic. *See* Doc. No. 66-26 at 160-61.

Similarly, regarding Ms. Wells allegedly limiting "harassing" questions, the cited portions of the transcript show that in one instance she allowed the substance of Doe's attorney's question (while noting that the form of the question was "a little harassing") and in the other that she disallowed a question as harassing but allowed Doe's attorney to rephrase the question, which he did. *See id*. at 450-51, 483. Ms. Well's rulings on the relevance of other questions were also well within her discretion as the Hearing Officer. *See id*. at 478, 491 (finding that questions about Roe's strength were not relevant because Roe did not contend that she was not strong enough to stop Doe – rather, she offered other reasons for not trying to move his hand away from her).

---

[5] Ms. Wells also specifically told Doe's attorney that he could pursue questions suggesting that Roe was not telling the truth. "If you're -- if you're trying to say she made it up, that's different, but the motivation for when she's filing it, I don't think the motivation is relevant in and of itself." Doc. No. 66-26 at 160.

Finally, Ms. Wells did not unfairly limit Doe's attorney's time to cross-examine Roe. Late in the evening of the hearing, after Doe's attorney had cross-examined Roe for almost two hours, Ms. Wells told him that she would "allow [him] to go 15 more minutes and then I'm going to stop it," specifically noting that "[Doe] was crossed for an hour." *Id*. at 486. Doe's attorney then asked six more minutes of questions and requested and was allowed "a final moment" to review his notes. When the hearing reconvened, he announced "I am finished with questioning. I have no further questions." *Id*. at 488-89. Therefore, Doe's attorney had a fair opportunity to cross-examine Roe and didn't even use all the time he was allotted.[6,7] Indeed, in her deposition, Wells testified that "[i]f [Doe's attorney] had provided other topics that he had . . . not been able to go into, and I had deemed those relevant, I would have allowed him to continue." *See* Doc. No. 66-4 at 104-05.

Accordingly, a reasonable jury could not find that Plaintiff "was subjected to 'a procedurally flawed or otherwise flawed proceeding.'"

### 2.    "Particular Circumstances that Suggest Gender Bias"

In addition to proving a flawed proceeding, Plaintiff must show "particular circumstances" that suggest gender bias was a "but-for" motivation for his suspension. Again, Plaintiff's evidence falls short. First, Doe contends that evidence of "gender bias" was "revealed through the Hearing

---

[6] Later, before the hearing concluded, Doe's attorney objected to the fact that Ms. Wells "limited my questions," but did not describe the questions or the areas of questioning that he wanted to pursue. In response, Ms. Wells asked him if he would "like to address specific rulings," noting "this is our opportunity to cure" and "you [have] not used your entire time." Doc. No. 66-26 at 489-90. After conferring with Doe, Doe's attorney raised only the issue of Roe's strength, which Ms. Wells said would not be relevant to her decision as discussed above. Then, Doe's attorney concluded, "Very good. I am finished." *Id*. at 490-91.

[7] Doe's attorney sought to justify his lack of additional questions at his deposition, testifying that he refrained from asking more questions in an effort to avoid jeopardizing the outcome for his client because he felt that Ms. Wells was irritated with him. In other words, Doe asks the Court to ignore his attorney's plain statement that he was finished asking questions (after an opportunity to consult his notes and his client) based on his later claimed unstated feelings and strategic intentions. The Court declines that invitation.

14

Officer's findings that Roe was more credible than Doe." However, other than recording his disagreement with how the Hearing Officer weighed the evidence, Plaintiff has not explained how the decision itself is (or could be) evidence of gender bias. Credibility determinations made by a factfinder cannot, without more, establish bias or discrimination. *N.L.R.B. v. Honaker Mills, Div. of Top Form Mills, Inc.*, 789 F.2d 262, 266 (4th Cir. 1986) (holding credibility determinations made while listening to the evidence cannot sustain a claim for bias; there must be a showing of something from outside the case that affected the factfinder's impartiality); *Nickelson v. Astrue*, No. 1:07CV00783, 2009 WL 2243626, at *5 (M.D.N.C. July 27, 2009) ("Rulings alone, however, are almost never sufficient evidence of bias."). Simply put, the Hearing Officer's job was to make factual and credibility findings and doing that job, even incorrectly (which is a separate and different element of Doe's claim), is not evidence of gender bias. Indeed, an erroneous ruling could be the result of any number of reasons, from pure errors of judgment to biases unrelated to gender. Therefore, Ms. Wells' findings and conclusions in her decision are insufficient evidence of gender bias.

Beyond Ms. Wells' actual decision, Doe grasps for support in a sentence she wrote in a *draft* of her decision. In the draft, Wells wrote, "[g]iven that Respondent admittedly did not want to be at the function or with the Claimant, it is not difficult to see how he might have considered himself entitled to sex in return. (THINK HARD ABOUT THIS)." Doc. No. 70-9 at 19 (capitalized emphasis in original). Even accepting that this sentence could be evidence of gender bias against men generally (rather than a conclusion about Doe based on the evidence in this case as this appears to be), its inclusion in only a draft decision is not probative. This is especially true when Ms. Wells explained in her deposition that:

> And so what I was -- what I was thinking about in my own writing process was whether that was his way of saying that he had gone to this date function and

> therefore was entitled to sex. And, you know, ultimately, I took that out because I felt that that was too far a leap and not fair to him based on what I had heard from the evidence.

Doc. No. 70-7 at p. 134. Removal of a potential draft finding from the final decision because the Hearing Officer felt it was unsupported by the evidence is a thought process that is the opposite of a ruling based on unlawful bias. In sum, this argument rivals for weakness the argument that Doe's attorney didn't ask questions or object at the hearing because he thought Ms. Wells was irritated with him. The Court cannot credit questions that weren't asked and draft findings that were never made (and taken out because Ms. Wells concluded upon further reflection that they weren't supported by the record). Rather, Plaintiff must provide actual evidence that suggests gender bias, which this is not.

In addition to the lack of particular circumstances in this case suggesting gender bias, the broader picture also cannot support such a finding. If past is prologue, Ms. Wells' and the University's history of handling sexual assault accusations by females against males doesn't suggest a gender bias against men. As noted above, Ms. Wells has handled two sexual assault hearings at Wake Forest, once finding in favor of the male and once finding against him. Overall, Doe is the only male student to be found responsible for sexual assault among twelve different complaints by female students (with five of those complaints going to trial). *See* Doc. No. 66-5. If they suggest anything, these historical statistics favor men overwhelmingly.[8] *See Doe v. Rollins*

_____

[8] Doe suggests that the fact that all (four) cases brought by males against females since 2020 have been dismissed or not proceeded to a hearing (including one that was withdrawn, one that was settled and another that is still pending) supports an overall finding of gender bias (i.e., the University supposedly discourages male students from pursuing Title IX claims). Such a conclusion, unsupported by any specific evidence, would amount to nothing more than speculation. Indeed, taken together with the track record of female complaints against males, a more obvious takeaway might be that it is unlikely that anyone accused of sexual misconduct at Wake Forest – male or female – will be found responsible.

*Coll.*, No. 21-11081, 2023 WL 5199469 (11th Cir. Aug. 14, 2023) (finding that 7 out of 12 males being found responsible was not evidence of anti-male bias).

In the same vein, Doe's attempt to prove gender bias based on alleged "external pressures" on the University (purportedly related to student protests over unaddressed sexual assaults) is not supported by the record. First, such external pressure must be specifically linked to the alleged discrimination in this case. *See Doe v. The Citadel*, No. 22-1843, 2023 WL 3944370, at *4 (4th Cir. June 12, 2023) (citing *Sheppard*, 993 F.3d at 236). However, here both the Hearing Officer and Appeals Officer testified that they had no knowledge of the protests prior to their decisions.[9] Moreover, there were two other Title IX cases being processed and decided in the same time frame as Doe's. Each had the same Investigator and Title IX coordinator as in Doe's case, both of whom were actually aware of the protests. In those two cases the male respondent was found not responsible. *See* Doc. No. 66-5. Thus, closer in time to the protests, the University (twice) did not favor the male respondent despite the protests. So, again, the facts are at odds with Doe's contentions.

In summary, the Court cannot conclude that there is evidence from which a jury could find that Plaintiff has satisfied his burden to prove his Title IX claim. He has shown neither a flawed process nor evidence that suggests gender discrimination was a but-for cause of his suspension. Therefore, Defendant is entitled to summary judgment on Plaintiff's Title IX claim.

---

[9] Doe suggests, based on one sentence in Roe's testimony in which she referred generally to student protests (which were held because "people were not taken seriously and they were not believed"), that Ms. Wells was aware of the protests. Again, this is burdening the record with more "inferences" than it can bear. Ms. Wells testified that she didn't remember the testimony, but after having her memory refreshed by reading the transcript, she said she "did not know of any protests on campus" but "from the context" of Roe's statement would have made an assumption. Further, she testified that she neither followed up with Roe or with Wake Forest because she believed any protests had no relevance to her task. *See* Doc. No. 70-7 at 195-96.

### B. Plaintiff's Breach of Contract Claim

Plaintiff's second claim alleges that Defendant breached a contract with Plaintiff by violating the University's Disciplinary Policy. Under governing North Carolina law, the elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract. *Montessori Children's House of Durham v. Blizzard*, 781 S.E.2d 511, 514 (N.C. Ct. App. 2016); *Herrera v. Charlotte Sch. of L., LLC*, No. 17 CVS 1965, 2018 WL 1902556, at *9 (N.C. Super. Apr. 20, 2018). The Court has previously discussed at length the nature of contract claims between universities and their students, *see* Doc. No. 43. at 6-14, which it will not fully repeat here.

In summary, a student may bring a breach of contract action related to an "educational contract" when the student is able to point to an identifiable contractual promise that the university failed to honor that can be judged objectively. *Williams v. Livingstone Coll., Inc.*, 239 N.C. App. 468 (2015) (citing *Ryan v. Univ. of N.C. Hosps.*, 128 N.C.App. 300, 301 (1998)); *Supplee v. Miller–Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 219, 768 S.E.2d 582, 592 (2015); *Herrera*, 2018 WL 1902556, at **9-10. However, in a college setting "a formal university-student contract is rarely employed" and, consequently, "the general nature and terms of the agreement are usually implied, with specific terms to be found in the university bulletin and other publications; custom and usages can also become specific terms by implication." *Ross v. Creighton Univ.*, 957 F.2d 410, 417 (7th Cir.1992); *Williams*, 239 N.C. App. at 468 (quoting *Ross* in holding that, "[t]he catalogs, bulletins, circulars, and regulations of the institution made available to the matriculant become a part of the contract").

Still, not all university policies are sufficiently objective to support a student's contractual claims. Subjective or "aspirational" policy provisions related to the overall "fairness" of a

18

disciplinary process[10] or, more specifically, whether the hearing officer "accurately" adjudicated claims are not enforceable identifiable objective contractual promises. In other words, Plaintiff is entitled to insist that Wake Forest materially comply with its *process* for adjudicating claims of sexual misconduct, but is not entitled to have the Court or a jury review the *outcome* of the process as a breach of contract. *See McFadyen v. Duke Univ.*, 786 F.Supp.2d 887, 983 (M.D.N.C. Mar. 31, 2011) (concluding that the university's "general policy against harassment [did] not provide any indication of any mutual agreement between Duke and the students," but that the Code of Conduct's specific provisions "outlining certain procedures to be followed before a student would be suspended" were sufficient to establish a contract term); *Doe v. Lees-McRae Coll.*, No. 1:20 CV 105 MR WCM, 2021 WL 1096285, at *10 (W.D.N.C. Feb. 4, 2021) (general assurance of a "safe, supportive, accommodating campus environment" does not suggest an obligation to be bound to any specific or identifiable course of conduct and thus is not an "identifiable contractual promise," as required by North Carolina law); *Shaw v. Elon Univ.*, 400 F. Supp. 3d 360, 368 (M.D.N.C. 2019) ("The language Elon employs in its Student Handbook [such as violations should be handled "expeditiously and thoroughly"] is aspirational and cannot reasonably be interpreted as a guarantee."). Therefore, as stated in *McFadyen*, the Court must "look closely at summary judgment to determine if [Doe] has presented evidence from which a jury could find a breach of a specifically enforceable, objective procedural promise." In the absence of such a showing, Plaintiff's claim of breach of contract cannot proceed.

The Court finds that the Policy as to its process could be determined by a jury to be a contract between Doe and Wake Forest under North Carolina law. At issue then is whether there

_____

[10] The Court refers here to allegations beyond Plaintiff's claims that Defendant was biased in violation of Title IX, which are subject to the separate analysis discussed above.

is sufficient evidence of breach. Plaintiff contends that the University breached three sections of the Policy: Sections 2A.17, 3A.02 and 1.01 / 1.02. Section 2A.17 provides: "The Investigators and decision-makers under these Grievance Procedures will objectively evaluate all Relevant Evidence, including both inculpatory and exculpatory evidence, and will not make any credibility determinations based on a person's status as a Claimant, Respondent, or witness." *See* Doc. No. 66-6. Doe contends that the University breached this section because of Ms. Telligman's alleged investigative failures and Ms. Wells' allegedly erroneous evaluation of the evidence.

With respect to the "objective[] evaluat[ion] [of] all Relevant Evidence," Section 2A.17 is a subjective or aspirational provision related to the fairness of the process. The investigator and hearing officer's determinations of what constitutes relevant evidence and certainly their evaluation of that evidence is subjective. Credibility determinations are likewise not objective procedural protections that can form the basis of a breach of contract claim. *See Supplee*, 239 N.C. App. at 219; *McFadyen*, 786 F.Supp.2d at 983. And, there is no contention that Ms. Wells did not evaluate all the evidence; rather, Doe's charge is that she didn't reach the correct conclusion in her evaluation. Finally, although the failure to act "objectively" might engender a claim of breach with appropriate supporting evidence, as discussed at length above Doe has failed to present sufficient evidence to maintain his claim that he was discriminated against. Therefore, Doe's evidence is insufficient to prove an actionable breach of Section 2A.17.

Similarly, Section 3A.02 requires a hearing offer to "conduct a hearing in which they may question the Claimant, the Respondent, and any witness whose testimony the hearing officer deems relevant. During the hearing, the hearing officer and the parties may also question the investigator(s) about the investigative report." Doc. No. 66-6. Plaintiff alleges that Wells violated

20

this provision "through the manner in which she conducted the hearing."[11] Doc. No. 69 at 24-25. However, as noted above, it is undisputed that the procedure followed in the hearing was consistent with the Policy. Ms. Wells: (1) questioned Jane Roe; (2) questioned John Doe; (3) questioned six other witnesses whose testimony she deemed relevant; and (4) Wells and the attorney advisors questioned the investigator about her investigative report. Also, Doe's attorney was given the opportunity to cross examine the witnesses. Therefore, Doe has failed to present evidence of a procedural breach of Section 3A.02. To be sure, Doe disagrees with the result of the hearing as reflected in Ms. Wells' decision, but, again, that discretionary judgment cannot be the grounds for his breach of contract claim.

Finally, Plaintiff alleges that the University breached Sections 1.01 and 1.02 by failing to address Doe's claims of retaliation. Section 1.01 states, "[d]iscrimination and harassment are antithetical to the values and standards of the Wake Forest community; … Wake Forest is also committed to fostering a community that promotes prompt reporting and fair and timely resolution of those behaviors." Section 1.02 provides that, "[t]his Policy also prohibits Retaliation, as defined by Title IX and in this Policy. Complaints alleging Retaliation may be filed with the Title IX Coordinator and, at the discretion of the Title IX Coordinator, may be addressed under Wake Forest's Pre-Hearing and Hearing Grievance Procedures set forth below or other grievance procedures adopted by Wake Forest." Section 1.02 does not provide any specified time frame in

---

[11] Plaintiff also contends that the Policy states that "those involved in the process will be trained to 'promote impartial investigations and adjudications.'" Doc. No. 69 at 24. In Section 2A.14, the Policy actually states that "[m]aterials used to train Title IX Coordinators, investigators, decision-makers, sanctions officers, appellate officers, and adaptive resolution facilitators will not rely on sex or gender stereotypes and will promote impartial investigations and adjudications …" As to "promoting" impartial processes and decisions, this provision in the Policy is clearly aspirational and not capable of "objective" assessment. In any event, Doe has not presented any evidence that any materials used to train Ms. Telligman or Ms. Wells violated the Policy.

which a retaliation complaint must be addressed and gives the Title IX Coordinator discretion in how to pursue such a claim.

Plaintiff's allegation that the means and timing of the University's response to his claims of retaliation was untimely and unnecessarily "delayed" does not rise to the level of a fundamental procedural error that might violate the Policy. Instead, it relates to Defendant's exercise of its discretion to handle such complaints, which the Policy plainly gives to the Title IX coordinator. Moreover, the facts conspire against Doe. The University administrator responding to Plaintiff's retaliation complaint emailed Plaintiff (before the Final Decision was released) to set up a time to meet to discuss Plaintiff's retaliation allegations, *see* Doc. No. 66-33, and Plaintiff conceded that after December 15, 2022, he didn't further pursue that claim. *See* Doc. Nos. 66-7 at 150:6-151:16; 66-32. Therefore, the University is entitled to summary judgment as to the claimed breach of Sections 1.01 and 1.02, as it is with the other claimed breaches of the Policy.

## IV.   ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Defendant's Motion for Summary Judgment (Doc. No. 63) is **GRANTED**; and

2. The Clerk is directed to close this matter in accordance with this Order.

**SO ORDERED ADJUDGED AND DECREED**.

Signed:   September   6,

Kenneth D. Bell
United States District Judge

22